# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ANGELICA S., *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | No. 1:25-cv-01405 |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................4

I.  ORR's Statutory Mandate and Regulations .........................................................4

II.  Sponsor Application Process...............................................................................6

    A. Family Reunification Application .......................................................................6

    B. Changes to Sponsor Application Proof of Identity Requirements....................7

    C. New Sponsor Proof of Income Requirements ...................................................9

    D. Proposed Revisions to Family Reunification Application................................10

    E. Expanded Collection of Biometric Data on Sponsors ....................................11

III.  Information Sharing with DHS .........................................................................12

    A. Prior Information Sharing with DHS................................................................12

    B. Restrictions on Using ORR Data for Immigration Enforcement .....................13

ARGUMENT ......................................................................................................................14

I.  Plaintiffs are Likely to Succeed on the Merits ..................................................15

    A. The Interim Final Rule is Unlawful and Must be Set Aside...........................15

    B. ORR's New Sponsor Documentation Requirements Are Unlawful.............27

II.  Plaintiffs are Suffering Irreparable Injury ......................................................40

III.  Balance of Harm and Public Interest Favor Plaintiffs....................................42

IV.  Relief Requested ..............................................................................................43

CONCLUSION ...................................................................................................................45

# TABLE OF AUTHORITIES

## Cases

\* *Am. Fed. of Govt. Emps., AFL-CIO v. Block*, 655 F.2d 1153 (D.C. Cir. 1981) ...................16, 21

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017)................................20

\* *Arkema, Inc. v. EPA*, 618 F.3d 1 (D.C. Cir. 2010) ................................................................38, 39

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610 (2020) ...................................................23

*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284 (D.C. Cir. 2023).................................38

\* *Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................................28

*Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103 (1948)........................................28

*Consumer Energy Council of Am. v. Fed. Energy Reg. Comm'n*, 673 F.2d 425 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983)....................................................................................................20

*Damus v. Nielsen*, 313 F.Supp.3d 317 (D.D.C. 2018) .....................................................................15

*Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356 (D.C. Cir. 1999) ..............................14

*De Niz Robles v. Lynch*, 803 F.3d 1165 (10th Cir. 2015)................................................................38

\* *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020)..........................................20, 23, 27, 33, 36

*Drs. for Am. v. Off. of Pers. Mgmt.*, No. CV 25-322, 2025 WL 452707 (D.D.C. Feb. 11, 2025)..................................................................................................................................37

\* *FCC. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)......................................27, 33, 34, 36

*Fla. Inst. of Tech. v. FCC*, 952 F.2d 549 (D.C. Cir. 1992).............................................................28

*Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020).....................................................................14

*INS v. St. Cyr*, 533 U.S. 289 (2001)...........................................................................................38, 39

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250 (D.C. Cir. 2005)....................................................................................................................15

\* *J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559 (E.D. Va. 2018) ...........................................24, 26, 28, 31

*Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491 (D.D.C. 2018) ...................................................................................................42

Judgment, *Lucas R. v. Becerra,* No. 18-5741 (C.D. Cal. Sept. 16, 2024), ECF No. 449 .............32

\* *Kirwa v. U.S. Dep't of Defense*, 285 F. Supp. 3d 257 (D.D.C. 2018) ...................................38, 39

\* *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601 (S.D.N.Y. 2018) ................................................24, 28, 31, 36

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) ......................................................................38

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ..................................................42

\* *Lucas R. v. Becerra*, No. 18-5741, 2022 WL 2177454 (C.D. Cal. Mar. 11, 2022).........32, 36, 42

*Lucas R. v. Becerra*, No. 18-5741, 2022 WL 3908829 (C.D. Cal. Aug. 30, 2022) ......................32

*M.G.U. v. Nielsen*, 325 F. Supp. 3d 111 (D.D.C. 2018)..................................................................43

\* *Mack Trucks, Inc. v. EPA*, 682 F.3d 87 (D.C. Cir. 2012) ......................................................16, 18

*Martin v. Hadix*, 527 U.S. 343 (1999) ..........................................................................................38

*Milliken v. Bradley*, 418 U.S. 717 (1974)......................................................................................44

*Moore v. City of E. Cleveland*, 431 U.S. 494 (1977)................................................................35, 43

\* *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................................................................................................................................passim

*Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014).................................................28

*Nat'l Parks Conservation Ass'n v. Salazar*, 660 F. Supp. 2d 3 (D.D.C. 2009) ...........................20

*Nat'l Treasury Emps. Union v. Cornelius*, 617 F. Supp. 365 (D.D.C. 1985) ...............................20

*Nken v. Holder*, 556 U.S. 418 (2009) ...........................................................................................42

*Ohio v. E.P.A.*, 603 U.S. 279 (2024) .............................................................................................22

*Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62 (1970) ...................................................................................................................................28

*Public Utilities Comm'n of State of Cal. v. FERC*, 988 F.2d 154 (D.C. Cir. 1993)......................44

*Purdue Univ. v. Scalia*, No. CV 20-3006 (EGS), 2020 WL 7340156 (D.D.C. Dec. 14, 2020)....................................................................................................................................16

*Ramirez v. ICE*, 471 F. Supp. 3d 88 (D.D.C. 2020) ........................................................................31

\* *Saco River Cellular, Inc. v. FCC*, 133 F.3d 25 (D.C. Cir. 1998) ...............................................37

*Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017) ........................................................42

\* *Saravia v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) ....................................................................31

*Sierra Club v. EPA*, 955 F.3d 56 (D.C. Cir. 2020) ........................................................................28

*Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702 (D.C. Cir. 2014) ........................................16, 21

*Stanley v. Illinois*, 405 U.S. 645 (1972) ........................................................................................43

*Treasure State Resource Industry Ass'n v. EPA*, 805 F.3d 300 (D.C. Cir. 2015) ..........................39

*Tri-Cnty. Tel. Ass'n, Inc. v. FCC*, 999 F.3d 714 (D.C. Cir. 2021) .................................................16

*Troxel v. Granville,* 530 U.S. 57 (2000) ........................................................................................43

\* *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ...........................................28

*United States v. Nixon*, 418 U.S. 683 (1974) .................................................................................28

*Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749 (D.C. Cir. 2001) ...............................17, 18

*Vitarelli v. Seaton*, 359 U.S. 535 (1959) .......................................................................................28

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994) ........................................................................42

*Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356 (D.C. Cir. 1979) ............................28

\* *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...........................................................14

\* *World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61 (D.D.C. 2000) ........................19

**Statutes**

44 U.S.C. § 3502 ...........................................................................................................................37

44 U.S.C. § 3507 ....................................................................................................................11, 36

5 U.S.C. § 553 ..........................................................................................................15, 16, 20, 21

5 U.S.C. § 704 ...............................................................................................................................27

5 U.S.C. § 705 ...............................................................................................................................14

5 U.S.C. § 706 ........................................................................................22, 31, 33

5 U.S.C. §§ 702 ..................................................................................................27

6 U.S.C. §§ 279 ...............................................................................................1, 4

8 U.S.C. § 1232 ..........................................................................................passim

8 U.S.C. § 1373 ............................................................................................18, 22

Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317 (2019) ..................13

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L.  No. 119-4, 139 Stat. 9 (2025) ..................................................................................................13

### Rules

Unaccompanied Children Foundational Rule, 89 Fed. Reg. 34384 (Apr. 30, 2024) ............passim

Unaccompanied Program Foundational Rule, 88 Fed. Reg. 68908 (Oct. 4, 2023)......................23

Unaccompanied Program Foundational Rule; Update to Accord with Statutory Requirements, 90 Fed. Reg. 13554 (Mar. 25, 2025) .........................................................2

### Regulations

45 C.F.R § 410.1205 ...................................................................................5, 31, 32, 33

45 C.F.R. § 410.1205(b) ......................................................................................44

45 C.F.R. § 1202 ..........................................................................................31, 35

45 C.F.R. § 410.1201 .................................................................................5, 18, 28, 31

5 C.F.R. § 1320.6 ...............................................................................................37

### Other Authorities

Cal. Dep't of Motor Vehicles, *ID Cards*, https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/identification-id-cards/ (last visited May 8, 2025) ....................................30

Comments, Unaccompanied Children Program Foundational Rule, https://perma.cc/DL56-J2TT ..............................................................................17

Dep't of Health & Hum. Servs., Office of the Inspector Gen., Report No. OEI-09-18-00431, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* (Sept. 2019) .......................................................12

Dep't of Just., Attorney General's Manual on the Administrative Procedure Act (1947) .............17

H.R. Rep., No. 116-450 (2021) ........................................................................................13

N.Y. Dep't of Motor Vehicles, *Driver Licenses and the Green Light Law*,
    https://dmv.ny.gov/driver-license/driver-licenses-and-the-green-light-law (last visited
    May 8, 2025) ..............................................................................................................30

Office of Legal Counsel, *Relationship Between Illegal Immigration Reform and
    Immigrant Responsibility Act of 1996 and Statutory Requirement for Confidentiality of
    Census Information*, 1999 WL 34995963 (O.L.C. May 18, 1999) ...........................................19

Office of Refugee Resettlement, Field Guidance #26 ("FG-26"): Fingerprint Background
    Checks and Acceptable Supporting Documentation for a Family Reunification
    Application (Feb. 14, 2025), https://perma.cc/3R26-GK9Y ........................................................11

Office of Refugee Resettlement, Field Guidance #27 ("FG-27"): DNA Testing Expansion
    (Mar. 14, 2025), https://perma.cc/67MF-ELB8..........................................................................11

Office of Refugee Resettlement, Unaccompanied Alien Children Bureau Policy Guide
    ("Policy Guide") § 2.2.1, https://perma.cc/TZ83-H2PC ..............................................6, 7, 9, 30

Proposed Information Collection Activity: Unaccompanied Alien Children Sponsor
    Application Packet (OMB # 0970-0278), 90 Fed. Reg. 17438 (Apr. 25, 2025) .......................10

Testimony of Jonathan Hayes before the Subcomm. on Lab., Health & Hum. Services,
    Educ., & Related Agencies, U.S. House Comm. on Appropriations (Sept. 18, 2019),
    https://www.c-span.org/video/?464368-1/administration-officials-testify-migrant-
    children-mental-health..............................................................................................................12

Tex. Dep't of Pub. Safety, *How to Apply for a Texas Identification Card*,
    https://www.dps.texas.gov/section/driver-license/how-apply-texas-identification-card
    (last visited May 8, 2025)..........................................................................................................29

U.S. Citizenship & Immigr. Servs., *Temporary I-551 Stamps and MRIVs*,
    https://perma.cc/HBL5-CUYT .....................................................................................................7

UC Program Foundational Rule Update on Info Sharing, https://perma.cc/HB8B-CDZ8 ..........17

William Kandel, Cong. Rsch. Serv., R43599 *Unaccompanied Alien Children: An
    Overview* (updated Sept. 2024) ..................................................................................................5

## INTRODUCTION

Unaccompanied children fleeing violence and persecution arrive at our borders hoping to grow up safely in the United States with family. These children are held in the custody of the Office of Refugee Resettlement ("ORR") within the Department of Health and Human Services ("HHS") while they await release to a sponsor who is willing and able to care for them while they undergo immigration proceedings. Plaintiff children are suffering unnecessarily prolonged—and possibly permanent—separation from their parents or other family members because of new ORR policies promulgated in violation of the Administrative Procedure Act.

Until recently, ORR's policies and regulations prioritized releasing children without unnecessary delay to their parents, legal guardians, or other close relatives, regardless of their potential sponsor's immigration status. ORR also assured sponsors—through explicit language on its application forms and in its policies and regulations—that the extensive personal information they and their household members provide to ORR would be used only to determine their ability to care for the child, not for immigration enforcement purposes. These policies reflect a well-established consensus that it is in children's best interests to grow up with family rather than confined in an institution. They also reflect Congress's deliberate choice to transfer the care of unaccompanied children out of an immigration enforcement agency—the former Immigration and Naturalization Service ("INS")—and to a non-enforcement agency like ORR with a mandate to make decisions in children's best interests. 6 U.S.C. §§ 279(a), (b)(1)(B); 8 U.S.C. § 1232(c)(2)(A).

In early March 2025, ORR abruptly informed sponsors that it would refuse to accept most of the proof of identification documents listed on its sponsor application form. Contrary to

its own regulations prohibiting sponsor denials based solely on immigration status, ORR instead demanded proof of work authorization or other forms of identification such as State-issued driver's licenses that are not generally available to sponsors without stable lawful immigration status. ORR applied this new policy to all sponsors regardless of their relationship to the child, including those who had already completed their sponsorship applications and undergone fingerprint-based background checks.

Children looking forward to imminent reunification with their family were devastated to learn that their release processes had been upended overnight. This included many children expecting release to their parents, such as 14-year-old Eduardo M. and his 7-year-old brother, 15-year-old Liam W., and 17-year old Xavier L. and his 13-year-old sister. It also included children whose applications were complete but were just pending medical clearance from ORR, such as 17-year-old Angelica S. and her newborn daughter, and Eduardo M. and his brother. Instead of benefiting from her sister's support in caring for her baby, Angelica S. learned that her sister had been abruptly disqualified and she and her baby no longer had any release options.

On March 25, 2025, ORR formalized its change in policy and promulgated an Interim Final Rule ("IFR") rescinding prior regulatory prohibitions on (1) disqualifying sponsors based solely on immigration status, (2) collecting sponsor immigration status information for enforcement purposes, and (3) sharing sponsor immigration status information with enforcement agencies. *See* Unaccompanied Program Foundational Rule; Update to Accord with Statutory Requirements, 90 Fed. Reg. 13554 (Mar. 25, 2025) (to be codified at 45 C.F.R. pt. 410). Despite representing a significant change in policy with far-reaching consequences for unaccompanied children, ORR made the IFR effective immediately without first considering notice and

comment. ORR's justification focused only on a purported statutory conflict related to information sharing and offered no reasoned justification for permitting sponsorship denials based on immigration status or collecting sponsor information for enforcement purposes.

In April 2025, ORR created further obstacles for children seeking release to sponsors without certain immigration status by implementing a new requirement that all sponsors provide specific types of documentation to show proof of income. Sponsors without work authorization are not lawfully permitted to work in the U.S. and requiring evidence of U.S. income while refusing to accept other proof of financial stability—such as bank statements—unlawfully excludes sponsors based on immigration status.

ORR's IFR and concurrent policy changes are procedurally defective, arbitrary and capricious, and contrary to law, in violation of the Administrative Procedure Act. Plaintiffs are likely to succeed on multiple independent grounds. ORR's unlawful policies are inflicting irreparable harm on Plaintiffs and numerous other children by prolonging their time in detention, separating them from their parents and other loving family members, causing extreme stress and uncertainty, and leaving many children with no release options at all. Each day children remain unnecessarily separated from their families, the greater the irreparable harm becomes. The public interest favors family integrity and the well-being of children.

Plaintiffs thus seek a preliminary injunction on behalf of Plaintiffs and a putative class of all unaccompanied children who are or will be in the custody of HHS and who (a) have or had a potential sponsor who has been identified; and (b) have not been released to a sponsor in whole or in part because they are missing documents newly required on or after March 7, 2025 ("Proposed Class"). Plaintiffs filed a motion for class certification on May 9, 2025. *See* ECF 9.

Plaintiffs request that the Court provisionally certify the Proposed Class and preliminarily enjoin Defendants from enforcing their harmful policies during the pendency of this litigation.

## BACKGROUND

### I.    ORR's Statutory Mandate and Regulations

In the Homeland Security Act ("HSA") of 2002, Congress entrusted ORR with the placement, care, custody, and release of unaccompanied children who arrive in the United States without a parent or legal guardian and without lawful immigration status. 6 U.S.C. § 279; 8 U.S.C. § 1232. Although unaccompanied children were previously held in INS custody, Congress intentionally chose to transfer responsibility for these vulnerable children out of the immigration enforcement system to ORR. The Trafficking Victims Protection Reauthorization Act ("TVPRA") of 2008 reinforced the separation between the immigration enforcement system and ORR's child welfare mandate, requiring any federal agency with custody of an unaccompanied child to transfer the child to HHS within 72 hours and mandating that ORR promptly place unaccompanied children "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. §§ 1232(b)(3), (c)(2)(A). The TVPRA contemplates that children will usually be placed with "a suitable family member" and provides for ORR to conduct suitability assessments of potential sponsors focused on the safety and well-being of the child. 8 U.S.C. §§ 1232(c)(2)(A), (c)(3).

In April 2024, ORR promulgated its Foundational Rule, a set of regulations aimed at implementing its statutory mandate and codifying its policies related to the custody and release of unaccompanied children. Unaccompanied Children Foundational Rule, 89 Fed. Reg. 34384, 34385 (Apr. 30, 2024) (the "Foundational Rule"). The Preamble to the Foundational Rule

repeatedly emphasizes ORR's role as a child welfare agency rather than an immigration enforcement agency. *See id.* at 34399, 34442-43, 34452, 34568. The Foundational Rule requires ORR to "release a child from its custody without unnecessary delay," with preference to a parent, legal guardian, or adult relative. 45 C.F.R. § 410.1201. Recognizing children's strong interest in prompt release, the regulations further require ORR to "adjudicate the completed sponsor application of a parent or legal guardian" or other close relative within 10 or 14 days, depending on the closeness of the relationship, absent an unexpected delay. 45 C.F.R § 410.1205(b).

Consistent with ORR's role as a child welfare rather than an immigration enforcement agency, the Foundational Rule further provided that:

> ORR shall not disqualify potential sponsors based solely on their immigration status and shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement related purposes. ORR shall not share any immigration status information relating to potential sponsors with any law enforcement or immigration enforcement related entity at any time.

45 C.F.R. § 410.1201(b). Plaintiffs will refer to the three parts of § 410.1201(b) as the Disqualification, Information Collection, and Information Sharing provisions, respectively. These provisions are significant because most potential sponsors lack lawful immigration status and discriminating based on immigration status would thus prevent ORR from releasing children to their close relatives. *See* Ex. 2, Declaration of Mari Dorn-Lopez ¶ 8, May 4, 2025 ("Dorn-Lopez Decl."); Ex. 3, Declaration of Jenifer Smyers ¶ 7, May 6, 2025 ("Smyers Decl."). In 2018, for example, ICE data indicated that approximately 80 percent of sponsors or household members lacked lawful immigration status. *See* William Kandel, Cong. Rsch. Serv., R 43599 *Unaccompanied Alien Children: An Overview* 24 (updated Sept. 2024).

On March 25, 2025, ORR issued an Interim Final Rule rescinding 45 C.F.R.

§ 410.1201(b), effective immediately. 90 Fed. Reg. 13554. The sole justification for this IFR was

a purported conflict between the Information Sharing provision and 8 U.S.C. § 1373, an

immigration statute regarding communication between the INS and other government entities.

*Id.* Aside from a conclusory assertion that the Disqualification and Information Collection

provisions are inextricably linked with the Information Sharing provision, the IFR included no

justification for changing ORR's policies related to disqualifying sponsors based on immigration

status or collecting sponsor information for enforcement purposes. Nor did it address the likely

impacts on unaccompanied children, the reliance interests of those who already provided

personal information to ORR, or the conflict with ORR's statutory mission.

## II.    Sponsor Application Process

### A. Family Reunification Application

When a child enters ORR custody, ORR interviews the child and close family members

to identify potential sponsors. *See* Office of Refugee Resettlement, Unaccompanied Alien

Children Bureau Policy Guide ("Policy Guide") § 2.2.1, https://perma.cc/TZ83-H2PC (as of May

9, 2025). ORR then sends the child's potential sponsor a Family Reunification Packet ("FRP")

with an application form. *Id.* § 2.2.3.

The Family Reunification Application ("FRA") currently in use by ORR and approved by

the Office of Management and Budget ("OMB") requires proof of identity from sponsors and

any household members in the "Supporting Documents" section. *See* Ex. 1-A, Family

Reunification Application at 8, Declaration of Diane de Gramont, May 9, 2025 ("de Gramont

Decl."). The list of acceptable forms of government-issued identification includes forms of

identification issued by foreign governments and permits the sponsor or adult household member to establish their identity through a foreign passport or two or more documents such as a birth certificate, foreign national identification card, or similar documentation. *Id.* The application asks sponsors how they will financially support the child but does not require specific supporting documentation. *Id.* at 6, 8-10.

### B.  Changes to Sponsor Application Proof of Identity Requirements

Although ORR has not updated its application form, on March 7, 2025, ORR unilaterally and without any warning to sponsors or children amended its Policy Guide § 2.2.4 to include a new, more restrictive list of acceptable forms of identification for sponsors, adult household members, and alternative adult caregivers.[1] *See* de Gramont Decl. Ex. 1-F (Policy Guide § 2.2.4 as amended on March 7, 2025); *see also id.* Ex. 1-E (prior version of the Policy Guide). The new list eliminates all forms of identification issued by foreign governments, except for Canadian driver's licenses and foreign passports accompanied by proof of lawful U.S. immigration status such as "an endorsement to work" or an I-551 indicating permanent residence. *See* Policy Guide § 2.2.4; *see also* U.S. Citizenship & Immigr. Servs., *Temporary I-551 Stamps and MRIVs*, https://perma.cc/HBL5-CUYT. While the FRA explicitly permits the use of expired documents to establish proof of identification, revised Policy Guide § 2.2.4 forbids them.

ORR applied this new policy to all pending sponsorship applications, including to completed applications ready for approval. *See* Declaration of Deisy S. ¶ 22, ECF 9-12 ("Deisy S. Decl."); Declaration of Rosa M. ¶¶ 4-5, ECF 9-13 ("Rosa M. Decl."); Ex. 5, Declaration of

---

[1] ORR requires each sponsor application to include a sponsor care plan identifying an alternative adult caregiver who could care for the child if the sponsor becomes unavailable. *See* Policy Guide §§ 2.6; 2.7.6; Smyers Decl. ¶ 8.

J.E.D.M. ¶ 6, April 16, 2025 ("J.E.D.M. Decl."); Declaration of Sofia W. ¶¶ 6-7, ECF 9-14

("Sofia W. Decl."); Declaration of Ximena L. ¶¶ 6-8, ECF 9-15 ("Ximena L. Decl."). Parents and

other sponsors who had already provided a copy of their foreign passport as permitted by the

FRA but lacked accompanying immigration documentation (not required by the FRA) were told

that their foreign passports were now insufficient under the new policy. Rosa M. Decl. ¶¶ 3, 5;

Sofia W. Decl. ¶¶ 4, 7; Ximena L. Decl. ¶ 6; Deisy S. Decl. ¶¶ 11, 22.

 The new policy permits exceptions only in the case of a parent or legal guardian sponsor,

and even then, only if "supported by clear justification" and approved by ORR Headquarters "on

a case-by-case basis." Policy Guide § 2.2.4. To the extent such an exception is possible, it

appears available only to the parent themselves. *Id.* Any adult household members living with

the parent or backup caregiver would still have to provide qualifying identification. *Id.*

 Rosa M., for example, was told she could not even be considered for an exception until

after she completed DNA testing and identified a backup caregiver with the approved form of

identification. Rosa M. Decl. ¶¶ 4-7. Liam W.'s release to his mother has not been able to move

forward because the adults living in his mother's home lack qualifying identification. Declaration

of Liam W. ¶ 7, ECF 9-9 ("Liam W. Decl."); Sofia W. Decl. ¶ 7. Sofia was advised that if she

wanted to sponsor Liam she would have to move out of the home she shares with her adult

children and nephew, or ask them to leave the home. Sofia W. Decl. ¶ 7. There is no timeline or

decision criteria for ORR's approval of exception requests. Despite doing everything she could to

sponsor her sons, Rosa M.'s exception request has been pending ORR approval since April 28,

2025, with no response and no way to comfort her young sons. Rosa M. Decl. ¶¶ 9-11.

Angelica S. has been in custody since November 2024. Declaration of Angelica S. ¶ 2, ECF 9-7 ("Angelica S. Decl."). Although her sister's application was complete in February 2025, Angelica was awaiting vaccines for her newborn daughter and has now had her release blocked altogether as a result of these policy changes. *Id.* ¶ 8; Deisy S. Decl. ¶¶ 22-25. Leo B. is missing his opportunity to finish high school because ORR is refusing to release him to his sister, even though ORR previously vetted and approved release to his sister and he lived with her safely for two years. Declaration of Leo B. ¶¶ 3, 6-9, ECF 9-10 ("Leo B. Decl.").

### C.  New Sponsor Proof of Income Requirements

On April 15, 2025, ORR again amended Policy Guide § 2.2.4 to require specific documentation of proof of income from all sponsors. *See* de Gramont Decl. Ex. 1-G. All sponsors must now provide either their previous year's tax return, 60 days of continuous paystubs, or a letter from their employer on company letterhead verifying their employment and salary information. *Id.* Once again, the policy change differed from the requirements of the FRA and was applied retroactively to all pending sponsorship applications. Rosa M. Decl. ¶ 8; Ximena Decl. ¶ 10. The Policy Guide includes no exceptions for parents or legal guardians and no other mechanism to prove financial stability and ability to care for the child. Policy Guide § 2.2.4.

These new policies have already led to significant delays in children's reunification with their families. Eduardo M. and his 7-year-old brother have been in ORR custody since January 2025 but have not yet reunified with their mother despite her diligent efforts to fulfill ORR's ever-changing sponsor requirements. Rosa M. Decl. ¶¶ 3-9; Declaration of Eduardo M. ¶¶ 3-6, April 16, 2025, ECF 9-8. Although Rosa M. provided bank statements and a letter about her

income, she has been waiting for over 10 days without a response on whether ORR will make an exception to the strict new requirements in the Policy Guide. Rosa M. Decl. ¶¶ 8-9.

These children's experiences are far from unique. Plaintiff Immigrant Defenders reports that the children it represents are remaining in custody far longer because of ORR's new identification and proof of income requirements. Ex. 4, Declaration of Cynthia Felix ¶¶ 7-8, May 6, 2025 ("Felix Decl."). ORR's data indicates that it is now detaining children for dramatically longer periods as a result of its new policies. The average length of care for children discharged from ORR custody has climbed precipitously from 37 days in January 2025 to 49 days in February 2025 to 112 days in March 2025. *See* de Gramont Decl. Ex. 1-H.

### D.  Proposed Revisions to Family Reunification Application

On April 25, 2025, ORR published a notice of information collection under the Paperwork Reduction Act to revise the Family Reunification Application (to be renamed the "Sponsor Application"), with a 60-day comment period. *See* Proposed Information Collection Activity: Unaccompanied Alien Children Sponsor Application Packet (OMB # 0970-0278), 90 Fed. Reg. 17438 (Apr. 25, 2025). The proposed Sponsor Application changes the Supporting Documents to match ORR's recent changes to Policy Guide 2.2.4 related to proof of identification, proof of income, and other documents. *See* de Gramont Decl. Ex. 1-C at 6-7. The new proposed Authorization for Release of Information removes language stating that the Department of Homeland Security ("DHS") generally cannot use the sponsor's information for enforcement purposes. *Compare id.* Ex. 1-D, *with id.* Ex. 1-B.

The burden estimate for this proposed information collection acknowledges that these policies are likely to lead to increased lengths of detention, stating that ORR expects "a decrease

in the number of sponsors applying to sponsor a child and an increase in the number [of] care provider facilities." 90 Fed. Reg. at 17439. Even though the comment period is still open on this revised information collection and ORR has yet to receive OMB approval for its new requirements as required by the Paperwork Reduction Act, 44 U.S.C. § 3507(a), ORR is already enforcing the new documentation requirements on sponsors as if the new Sponsor Application was already in force.

### E.  Expanded Collection of Biometric Data on Sponsors

In addition to implementing restrictive proof of identification and proof of income requirements, ORR has simultaneously and dramatically increased the amount and sensitivity of information collected from sponsors by requiring that all adult sponsors, all adult household members, and all backup adult caregivers submit to fingerprint-based background checks prior to release, including when the child is seeking release to a parent. *See* Office of Refugee Resettlement, Field Guidance #26 ("FG-26"): Fingerprint Background Checks and Acceptable Supporting Documentation for a Family Reunification Application (Feb. 14, 2025), https://perma.cc/3R26-GK9Y.

ORR also now requires DNA testing of the child and sponsor in every case where a sponsor claims a biological relationship with the child. *See* Office of Refugee Resettlement, Field Guidance #27 ("FG-27"): DNA Testing Expansion (Mar. 14, 2025), https://perma.cc/67MF-ELB8. This DNA requirement has led to additional delays of weeks and potentially months in children's cases, including the cases of children whose release was previously interrupted by ORR's new proof of identification requirements. *See* Sofia W. Decl. ¶ 8; Rosa M. Decl. ¶ 7.

### III.    Information Sharing with DHS

#### A.  Prior Information Sharing with DHS

In 2018, ORR expanded fingerprinting requirements for potential sponsors and entered into a memorandum of agreement ("MOA") with DHS to share information obtained through the sponsorship vetting process directly with U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"), which they planned to use for enforcement purposes. This policy change led to a reduction in sponsors willing to come forward to sponsor children, dramatically increased lengths of stays in detention, and serious harms to children's mental health and wellbeing. *See* Dorn-Lopez Decl. ¶¶ 5-6; Smyers Decl. ¶¶ 7, 17; *see also* Dep't of Health & Hum. Servs., Office of the Inspector Gen., Report No. OEI-09-18-00431, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* 13 (Sept. 2019) ("Facilities reported that it became more difficult to identify sponsors willing to accept children after the new fingerprinting requirements were implemented, which delayed placing children with sponsors, adding further stress and uncertainty."); *id.* at 12-13 ("According to facility staff, longer stays resulted in higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation."). ORR itself acknowledged that information-sharing was leading to unnecessary delays in release. As a result, in 2019, it suspended reconciliation of sponsor background checks with ICE.[2]

---

[2] *See* Testimony of Jonathan Hayes before the Subcomm. on Lab., Health & Hum. Services, Educ., & Related Agencies, U.S. House Comm. on Appropriations (Sept. 18, 2019) at 1:29:00-1:31:00, https://www.c-span.org/video/?464368-1/administration-officials-testify-migrant-children-mental-health.

### B.  Restrictions on Using ORR Data for Immigration Enforcement

In response to the serious and well-documented harm caused by ORR's prior information-sharing policy, Congress placed explicit restrictions on DHS's use of information obtained from HHS regarding unaccompanied children and their potential sponsors. Congress did so after a House of Representatives report described how ORR sharing information about a sponsor's immigration status with DHS undermined children's wellbeing and access to immigration relief. H.R. Rep., No. 116-450, at 185 (2021). These appropriations restrictions began in fiscal year 2020 and have been extended each year through fiscal year 2025. *See* Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, Div. D, § 216(a), 133 Stat. 2317, 2513 (2019); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L.  No. 119-4, Div. A, §§ 1104-05, 139 Stat. 9, 12 (2025).  With narrow exceptions for specific crimes, Congress has prohibited DHS from using information shared by HHS "to place in detention, remove, refer for a decision whether to initiate removal proceedings, or initiate removal proceedings against a sponsor, potential sponsor, or member of a household of a sponsor or potential sponsor of an unaccompanied alien child (as defined in section 462(g) of the Homeland Security Act of 2002 (6 U.S.C. 279(g))." Pub. L. No. 116-93, Div. D, § 216(a), 133 Stat. at 2513.

In December 2024, ORR published a notice of a new system of records in the Federal Register as required by the Privacy Act. *See* Office of Refugee Resettlement, Privacy Act of 1974; System of Records, 89 Fed. Reg. 96250 (Dec. 4, 2025). Because ORR maintains a mixed system of records that includes some information related to individuals covered by the Privacy Act and some not, ORR exercised its discretion to treat all information in its system of records as protected by the Privacy Act. *Id.* at 96250. Like the Foundational Rule, the notice emphasizes

that "ORR is not an immigration enforcement agency and does not maintain records for immigration enforcement purposes," so sharing information with entities such as DHS for immigration enforcement purposes is "incompatible with ORR's program purpose" and is not a permissible routine use under the Privacy Act. *Id.* at 96251, 96253.

The family reunification packet currently in use by ORR specifically states, "I also understand that DHS cannot use my information for immigration enforcement actions, including placement in detention, removal, referral for a decision whether to initiate removal proceedings, or initiation of removal proceedings, unless I have been convicted of a serious felony, am pending charges for a serious felony, or I have been directly involved in or associated with any organization involved in human trafficking." de Gramont Decl. Ex. 1-B. The FRA also states that "ORR prefers to release a child to a parent or legal guardian, regardless of your immigration status. ORR is not an immigration enforcement agency." de Gramont Decl. Ex. 1-A at 2.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "These factors interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356, 360 (D.C. Cir. 1999). The same standard applies to a request for preliminary relief under the APA, 5 U.S.C. § 705. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 168 (D.D.C. 2020).

Plaintiffs are entitled to an order staying the IFR and enjoining ORR from enforcing its new proof of identification and proof of income policies because they are likely to succeed on

the merits, they are currently suffering irreparable harm, and the balance of the equities and the public interest favor a preliminary injunction. For the reasons set forth in Plaintiffs' Motion for Class Certification, ECF 9, Plaintiffs are also entitled to provisional class certification. *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 328 (D.D.C. 2018).

I.    **Plaintiffs are Likely to Succeed on the Merits**

Plaintiffs are likely to succeed on the merits of their claims for multiple independent reasons, including that the IFR lacks good cause and is arbitrary and capricious on its face and that the new policy changes are contrary to ORR's binding regulations, arbitrary and capricious, contrary to the requirements of the Paperwork Reduction Act, and impermissibly retroactive.

A.  **The Interim Final Rule is Unlawful and Must be Set Aside**

1.   The IFR is procedurally invalid because ORR bypassed notice and comment and made the IFR effectively immediately without good cause.

a.  *ORR had no good cause to skip notice and comment.*

Under the Administrative Procedure Act, when promulgating a rule, an agency must publish a proposed rule and give the public "an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(c). Only after considering the public's comments can the agency finalize the rule. *Id.* § 553(c). The notice-and-comment requirement is meant "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).

The statute allows the agency to skip notice and comment if it finds that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest" and provides a "brief statement of reasons." 5 U.S.C. § 553(b)(B). "Because notice-and-comment procedures are vital to ensuring informed agency decisions," *Purdue Univ. v. Scalia*, No. CV 20-3006 (EGS), 2020 WL 7340156, at *6 (D.D.C. Dec. 14, 2020), the "good cause" exception "is to be narrowly construed and only reluctantly countenanced." *Tri-Cnty. Tel. Ass'n, Inc. v. FCC*, 999 F.3d 714, 719 (D.C. Cir. 2021); *see also Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012). It generally "should be limited to emergency situations." *Am. Fed. of Govt. Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ("*AFGE*"). Courts owe no deference to an agency's legal conclusion that good cause exists; courts review those conclusions de novo. *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014).

Here, ORR claimed there was good cause to repeal 45 C.F.R. § 410.1201(b) in its entirety without notice and comment because:

> 45 CFR 410.1201(b) contravenes 8 U.S.C. 1373. ORR had no authority to promulgate such a rule; revoking it immediately is in the public interest; and notice and comment is unnecessary and contrary to the public interest because no amount of public input could give ORR the power to contravene a duly-enacted law of Congress via regulation.

90 Fed. Reg. at 13555. This reasoning is insufficient to establish good cause for multiple reasons.

First, ORR did not apply the relevant legal standards. ORR does not contend that notice and comment would be "impracticable." The "unnecessary" prong of the good cause inquiry is "confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public," *Mack Trucks, Inc.*, 682 F.3d at 94, such as "the issuance of a minor rule in which the public is not

particularly interested." *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 755 (D.C. Cir. 2001) (quoting Dep't of Just., Attorney General's Manual on the Administrative Procedure Act 31 (1947)). The IFR does not match any of those descriptions.

The IFR rescinds regulations that go to the heart of the agency's purpose—to ensure unaccompanied children are placed in the least restrictive setting that is in their best interest. The IFR significantly impacts children and their potential sponsors, who are usually close family members. Allowing ORR to deny sponsors based solely on immigration status and to collect and share immigration status information for immigration enforcement purposes causes vulnerable children to stay detained in federal immigration custody much longer than they otherwise would. Dorn-Lopez Decl. ¶¶ 5-6; Smyers Decl. ¶¶ 5-7; Felix Decl. ¶¶ 7-9. Sponsors who have already gone through lengthy questioning, biometric appointments, and in some cases home studies are being told they cannot sponsor their children or other family member because they lack immigration documentation accompanying their passport. Rosa M. Decl. ¶¶ 3-5; Deisy S. Decl. ¶¶ 11, 24-27; Ximena L. ¶¶ 6-8, 10. The longer the IFR is in place, the more harm will be caused.

Furthermore, the IFR is not a "routine determination" or a "minor rule in which the public is not particularly interested." The Foundational Rule, part of which the IFR repealed, received over 73,000 comments. *See* Comments, Unaccompanied Children Program Foundational Rule, https://perma.cc/DL56-J2TT. Although the comment period is still open, as of the time of filing the IFR itself has already received numerous comments addressing serious policy concerns regarding the harm of such policies to unaccompanied children. *See* UC Program Foundational Rule Update on Info Sharing, https://perma.cc/HB8B-CDZ8.

And "[the public interest prong of the good cause exception is met only in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." *Mack Trucks, Inc.*, 682 F.3d at 95. For example, this prong may apply "when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal," such as cases where "announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent." *Id.* (quoting *Util. Solid Waste Activities Grp.*, 236 F.3d at 755). But ORR failed to explain how following normal APA notice-and-comment procedures would affirmatively harm the public.

Second, the premise underlying ORR's good cause assertion—that 45 C.F.R. § 410.1201(b) so clearly contravenes 8 U.S.C. § 1373 that considering the public's views would be pointless—is overbroad and incorrect. 45 C.F.R. § 410.1201(b) places three different restrictions on ORR:

> [(1)] ORR shall not disqualify potential sponsors based solely on their immigration status and [(2)] shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement related purposes. [And [(3)],] ORR shall not share any immigration status information relating to potential sponsors with any law enforcement or immigration enforcement related entity at any time.

Taking the first two of these provisions together, the Disqualification and Information Collection provisions clearly do not contravene § 1373. Nothing in § 1373 requires ORR to disqualify sponsors based solely on immigration status or to collect immigration status information for enforcement purposes. The statute simply does not address those topics. ORR claims in a footnote that Disqualification and Information Collection provisions are "inextricably linked" to the Information Sharing provision. 90 Fed. Reg. at 13555 n.1. But they are not. Even if, under § 1373, ORR could not restrict the sharing of any immigration status information it has

18

with DHS, ORR could continue to consider all potential sponsors regardless of immigration status and refrain from collecting immigration status information for enforcement purposes. Rescinding the Disqualification and Information Collection provisions is a major substantiative change to ORR's program that is not mandated by § 1373 and requires an opportunity for notice and comment. *See World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 65 (D.D.C. 2000) (holding that ATF "unreasonably determined that notice-and-comment was unnecessary" where the rules went "beyond a mere recitation of the statutory language to provide definitions not found in the statute").

As for the Information Sharing provision, ORR incorrectly assumed that it contravenes § 1373. The agency read § 1373 as an affirmative grant of authority, and requirement, to share immigration-related information with DHS. But that statute does not affirmatively grant that authority, and it does not override other Congressional statutes that restrict the sharing of immigration-related information. Instead, the statute operates to limit the discretion of federal agencies to withhold information from DHS where they otherwise have statutory authority to share that information *See* Office of Legal Counsel, *Relationship Between Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and Statutory Requirement for Confidentiality of Census Information* at 6, 1999 WL 34995963 (O.L.C. May 18, 1999). And the TVPRA, which was enacted after 8 U.S.C. § 1373, imposes obligations on ORR that the agency could not fulfill if it were to share immigration status information with DHS. In particular, Congress required ORR to ensure that "an unaccompanied alien child in the custody of the Secretary of Health and Human Services shall be promptly placed in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A). ORR cannot fulfill this instruction if potential sponsors

are unable to come forward out of fear that their information would be shared with immigration authorities.

Further, even if the Information Sharing provision was arguably legally flawed, that is not a sufficient reason to skip notice and comment. "[T]he question whether the [previous] regulations are indeed defective is one worthy of notice and an opportunity to comment." *Consumer Energy Council of Am. v. Fed. Energy Reg. Comm'n*, 673 F.2d 425, 448 (D.C. Cir. 1982) (rejecting argument that "notice and comment requirements do not apply to 'defectively promulgated regulations'"), *aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983); *see also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017); *Nat'l Parks Conservation Ass'n v. Salazar*, 660 F. Supp. 2d 3, 5 (D.D.C. 2009); *Nat'l Treasury Emps. Union v. Cornelius*, 617 F. Supp. 365, 371 (D.D.C. 1985). Also, even if ORR believed the Information Sharing provision was illegal, ORR should still have considered whether it had discretion to wind it down in a way that accounts for children's and sponsors' reliance interests. *See DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (requiring the government to consider whether it had "flexibility in addressing any reliance interests of DACA recipients" when rescinding DACA even though the Attorney General determined that the DACA program was illegal).

Had there been a notice and comment period, the public could have provided "data, views, or arguments," 5 U.S.C. § 553(c), regarding the interaction between § 1373 and the statutes and regulations governing ORR's program and suggested regulatory alternatives to reduce harms to children, sponsors, and other regulated parties. Instead, ORR abruptly repealed § 410.1201(b) based on flawed reasoning with no notice to the many parties involved and

without a sufficient showing of good cause for its haste. Courts' review of an agency's

determination of good cause "is meticulous and demanding," *Sorenson Commc'ns Inc.*, 755 F.3d

at 706 (quotation marks omitted). ORR's statement of good cause simply does not pass muster.

Thus, the IFR should be set aside.

> b.  *ORR failed to establish good cause to hasten the IFR's effective date.*

The Administrative Procedure Act also "requires that a rule be published not less than

thirty days before its effective date." *AFGE,* 655 F.2d at 1155; 5 U.S.C. § 553(d). This

requirement "serve[s] the laudable purpose of informing affected parties and affording them a

reasonable time to adjust to the new regulation." *AFGE*, 655 F.2d at 1156. An agency can make a

rule effective fewer than 30 days after publication for "good cause found and published with the

rule," 5 U.S.C. § 553(d)(3), but this good cause exception, like the § 553(b) exception, is also

"narrowly construed and only reluctantly countenanced" and is reserved for emergency

situations. *AFGE*, 655 F.2d at 1156.

ORR claims that "[g]ood cause exists for immediate effect, *see* 5 U.S.C. 553(d)(3),

because this IFR brings an ORR regulation into compliance with a federal statute and regulated

entities do not need time to adjust their behavior before this rule takes effect." 90 Fed. Reg. at

13555. For the reasons stated above, ORR's assertion that the IFR is necessary to bring the

agency "into compliance with a federal statute" is incorrect. At a minimum, this assertion raises

issues that public commenters should have had an opportunity to address. Moreover, Defendants'

assertion that regulated entities do not need time to adjust their behavior is patently incorrect,

given the substantial reliance interests that Plaintiffs and others have in the protections

guaranteed them by the Foundational Rule, which had been in effect since the spring of 2024,

21

and which reflected longstanding policy. As described in more detail below, ORR's changes to sponsor requirements to increase scrutiny of sponsor's immigration status and permit denials based on immigration status have caused significant disruption and delays in ORR's release process. Thus, for the same reasons that ORR lacked good cause to proceed without notice and comment, it also lacked good cause to make its IFR immediately effective.

      2.   <u>The IFR is arbitrary and capricious because ORR offered no reasoned explanation for significant changes in policy.</u>

In addition to failing to follow procedure required by law, the IFR must be held unlawful and set aside because it is "arbitrary, capricious, [and] an abuse of discretion." 5 U.S.C. § 706(2). An agency action is arbitrary and capricious when the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citations omitted); *see also Ohio v. E.P.A.*, 603 U.S. 279, 292 (2024). "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Here, ORR has provided *no* reasoned justification at all for rescinding the Disqualification and Information Collection provisions of the ORR Foundational Rule, beyond a conclusory statement that these provisions are inextricably linked and not severable from the Information Sharing provision. 90 Fed. Reg. at 13555 n.1. As discussed above, 8 U.S.C. § 1373

in no way requires ORR to deny sponsors based solely on immigration status or to collect sponsor information for enforcement purposes.

Moreover, severability applies to a *court's* remedial powers to strike down regulations, not to an agency's amendment of its own regulations. Courts presume that policymakers would prefer that the offending part of a statute or regulation be severed than for an entire statute or regulation to fall. The presumption "allows courts to avoid judicial policymaking or *de facto* judicial legislation in determining just how much of the remainder of a statute [or regulation] should be invalidated." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 626 (2020). That concern is not present when the agency is considering whether to amend its own regulation. Consistent with this understanding of the different roles of courts and agencies, in promulgating the severability provision as part of the Foundational Rule, ORR stated its intent that, if "any portion of the requirements arising from the final rule is declared invalid *by a court*, . . . all other parts of the final rule that are capable of operating in the absence of the specific portion that has been invalidated to remain in effect." *See* Unaccompanied Program Foundational Rule, 88 Fed. Reg. 68908, 68914 (Oct. 4, 2023) (proposed rule). The severability clause does not permit ORR itself to make major regulatory changes without reasoned justification.

Denying sponsors based solely on immigration status and collecting sponsor information for enforcement purposes represent significant policy changes and the agency has offered no rational explanation for these changes, much less acknowledged the likely consequences or considered alternatives to minimize harms. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("*State Farm* teaches that when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'") (quoting

*State Farm*, 463 U.S. at 51); *see also L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 613 (S.D.N.Y. 2018)

(holding that policy requiring ORR Director approval for release was arbitrary and capricious

because "[the ORR Director] had no factual or legal basis for adopting" this policy, "he made no

analysis of the policy's impact; and he offered no justification for the policy").

With specific regard to the Disqualification provision, permitting sponsorship denials

based solely on immigration status is a seismic change in ORR policy with far-reaching

consequences that the agency wholly fails to acknowledge in the IFR. Most of the potential

sponsors of children in ORR custody are undocumented. Dorn-Lopez Decl. ¶ 8; Smyers Decl.

¶ 7. Disqualifying sponsors without lawful immigration status is thus nearly guaranteed to

prolong children's time in custody, delay placement in the least restrictive setting as required by

the TVPRA, 8 U.S.C. § 1232(c)(2)(A), and result in some children being released to more distant

relatives or unrelated sponsors merely because they have stable immigration status, rather than

their parents or other close relatives who lack lawful status. *See J.E.C.M. v. Lloyd*, 352 F. Supp.

3d 559, 583 (E.D. Va. 2018) (noting that an "amicus brief filed on behalf of the Human

Trafficking Legal Center confirms what common sense dictates, namely that the information-

sharing policy could dissuade otherwise qualified sponsors from filing family reunification

applications, forcing ORR to hold unaccompanied minors in custody for longer than necessary or

to release them to less qualified or unrelated sponsors."). The IFR failed to "examine the relevant

data" and "entirely failed to consider [these] important aspect[s] of the problem." *State Farm*,

463 U.S. at 43.

The Foundational Rule's prohibition on denial of sponsorship applications based solely

on immigration status codified the agency's longstanding practice of considering applications

from all potential sponsors, regardless of their immigration status. *See* Preamble to ORR Foundational Rule, 89 Fed. Reg. at 34440 (noting that the Disqualification provision was "consistent with existent policy"). ORR also stated its "strong belief that, generally, placement with a vetted and approved family member or other vetted and approved sponsor, as opposed to placement in an ORR care provider facility, whenever feasible, is in the best interests of unaccompanied children." *Id*. Many commenters to the Foundational Rule supported the Disqualification provision and noted the benefits of encouraging qualified sponsors to come forward to reduce length of stay and encourage relatives with cultural competency to sponsor a child. *Id.* at 34441; Smyers Decl. ¶ 18. In response to comments on the Foundational Rule, ORR took the position that it "does not have statutory authorization to investigate the immigration status of potential sponsors" and that the HSA and TVPRA "do not imbue ORR with the authority to inquire into immigration status as a condition for sponsorship." 89 Fed. Reg. at 34442. Denying sponsors based on immigration status thus "relie[s] on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

ORR similarly fails to acknowledge or explain its change of position with regard to the Information Collection provision. Many comments to the Foundational Rule strongly supported the Information Collection restrictions and urged ORR to go further to protect undocumented sponsors from immigration enforcement. 89 Fed. Reg. at 34441-42. In response to comments, ORR noted that "it is not an immigration enforcement agency" and, consistent with its statutory mandate, "to the extent ORR does collect information on the immigration status of a potential sponsor, it would be only for the purpose of evaluating the potential sponsor's ability to provide

care for the child (*e.g.,* whether there is a plan in place to care for the child if the potential sponsor is detained)." *Id.* at 34442.

The IFR further fails to even mention ORR's still-operative Privacy Act notice, which states clearly that ORR does not collect or share information for immigration enforcement purposes because this is "incompatible with ORR's program purposes." *See* 89 Fed. Reg. at 96251; *see also J.E.C.M.*, 352 F. Supp. 3d at 583 (finding that sharing information about sponsors and household members with DHS "runs counter to ORR's mission to release the children in its custody into stable, nurturing environments"). This omission is especially significant given that, as discussed above, ORR is fully aware that the last time it collected information from sponsors for enforcement purposes, this policy deterred sponsors from coming forward and led to increased lengths of stay in custody. Dorn-Lopez Decl. ¶¶ 5, 14-15; Smyers Decl. ¶¶ 7-8, 17. Children in ORR custody are already suffering the effects. After Deisy S. was told she could not sponsor her sister and baby niece because of her lack of qualifying identification, she searched widely for other potential sponsors but was not able to find anyone willing to share their information with the government for fear of immigration consequences. Deisy S. Decl. ¶ 28. Angelica S. and her baby now have no prospects for release. Angelica S. Decl. ¶¶ 28-30. Similarly, Ximena W.'s financially-supportive partner is afraid to provide additional information to ORR for fear they will share it with immigration officials. Ximena W. Decl. ¶ 10.

Finally, the IFR fails to consider the reliance interests of sponsors such as Deisy S. and Ximena L. who already submitted sensitive information on ORR's promises that their applications would receive fair consideration and that their information was not being collected

for enforcement purposes. Deisy S. Decl. ¶ 10; Ximena L. Decl. ¶¶ 5, 10; *see also Regents of Univ. of Cal.*, 591 U.S. at 31-33 (agency must consider reliance interests); *FCC. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Breaking the agency's commitment to sponsors discourages sponsors from coming forward, which prolongs detention. Dorn-Lopez Decl. ¶ 15.

### B.  ORR's New Sponsor Documentation Requirements Are Unlawful

Plaintiffs are also likely to succeed on their claims that ORR's new sponsor documentation requirements violate the APA. The new requirements are contrary to law because they violate ORR's own regulations and the TVPRA's mandate that ORR place children "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). In addition, ORR has changed its information collection requirements without going through the statutorily-required process for agencies to modify information collections. ORR also acted arbitrarily and capriciously by drastically changing its proof of identification and proof of income requirements without any explanation and without any apparent consideration for the reliance interests of sponsors and unaccompanied children, the impact on children's length of detention and well-being, or less burdensome alternatives to verify sponsor identity and proof of income. These policies are also impermissibly retroactive, as they have been applied to applications already submitted in reliance on ORR's prior policies.

### 1.    ORR's Policy Guide revisions are final agency actions

ORR's March 7, 2025, and April 15, 2025, revisions to Policy Guide § 2.2.4 are final agency actions subject to judicial review under the Administrative Procedure Act. 5 U.S.C. §§ 702, 704. These policies represent "the 'consummation' of the agency's decisionmaking process," determine "rights and obligations," and create "legal consequences." *Bennett v. Spear*,

520 U.S. 154, 177-78 (1997) (quoting *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 113 (1948) and *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The new requirements are published in the Policy Guide as mandatory new requirements for potential sponsors and ORR has "applied the guidance as if it were binding on regulated parties," including by blocking release of children to otherwise qualified sponsors who lack requisite documentation. *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014)). Other courts considering changes to ORR release policies—including even unpublished release requirements—have found these policies to be final agency actions. *E.g.*, *L.V.M.*, 318 F. Supp. 3d at 612; *see also J.E.C.M.*, 352 F. Supp. 3d at 582 n.12 (ORR did not dispute that its policies "as reflected in ORR's amendment of the Policy Guide, amount to final agency actions.").

2.   ORR's revised identification and proof of income requirements unlawfully disqualify potential sponsors solely based on immigration status

ORR's new requirements are contrary to law as they violate ORR's own regulations. Because the IFR is unlawful for the reasons discussed above, ORR remains bound by its regulations prohibiting sponsor denials based solely on immigration status. *See* 45 C.F.R. § 410.1201(b)(2024). "[I]t is a 'well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action.'" *Fla. Inst. of Tech. v. FCC*, 952 F.2d 549, 553 (D.C. Cir. 1992) (quoting *Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356, 1359 (D.C. Cir. 1979)); *see also United States v. Nixon*, 418 U.S. 683, 695 (1974); *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). ORR's revisions to Policy Guide § 2.2.4 related to proof of identification and proof of income unlawfully disqualify sponsors based solely on their immigration status.

28

The March 7, 2025, revision to ORR's requirements for proof of identification disqualifies otherwise suitable sponsors solely based on their immigration status. This is most obvious with regard to the use of foreign passports. Deisy S., Rosa M., and Ximena L. provided copies of their passports as proof of identification. Deisy S. Decl. ¶ 11; Rosa M. Decl. ¶ 3; Ximena L. Decl. ¶ 6. ORR's Family Reunification Application states that a foreign passport is sufficient by itself to establish proof of identification. de Gramont Decl. Ex. 1-A. But under revised Policy Guide § 2.2.4, their passports are no longer acceptable unless accompanied by proof of lawful residency or work authorization. For Deisy, this means she is fully disqualified from sponsoring her sister and baby niece even though she provided proof of identification, fingerprints, and underwent a home study. *See* Deisy S. Decl. ¶¶ 12-17, 22-23, 25.

Importantly, the Foundational Rule prohibits ORR from disqualifying *any* potential sponsor based solely on their immigration status. That a minority of states allow undocumented individuals to obtain a driver's license or a state identification card does not render this policy valid; many potential sponsors are still disqualified based solely on their inability to produce required documentation because of their immigration status. *See, e.g.*, Smyers Decl. ¶ 12. Deisy, for example, cannot obtain a state identification because Texas requires proof of lawful status to obtain a state identification or driver's license. Deisy S. Decl. ¶ 22; *see* Tex. Transp. Code § 521.142(a).[3] Although some states like California and New York permit individuals to obtain a driver's license without proof of lawful status, they still require lawful presence to

---

[3] *See also* Tex. Dep't of Pub. Safety, *How to Apply for a Texas Identification Card*, https://www.dps.texas.gov/section/driver-license/how-apply-texas-identification-card (last visited May 8, 2025).

obtain a regular state identification card.[4] As a result, sponsors such as Rosa M. who do not know how to drive have no means of obtaining a qualifying identification without proof of immigration status. Rosa M. Decl. ¶ 5. Even in the few states where obtaining a state identification card is possible, sponsors have still faced delays in obtaining a new identification. Ximena L. Decl. ¶ 8.

ORR's new proof of income requirements similarly disqualifies sponsors based on their immigration status. Whereas the FRA requires only a narrative answer explaining how the sponsor will financially support the child—including potential financial support from others—revised Policy Guide § 2.2.4 requires that the sponsor provide either (1) the previous year's tax return; (2) 60 days of continuous paystubs; or (3) a letter from the sponsor's employer on company letterhead. *Compare* Ex. 1-A at 6 *with* Policy Guide § 2.2.4. This requirement is not accessible to sponsors without lawful work authorization and does not comport with child welfare best practices. Smyers Decl. ¶¶ 9-10. Although sponsors such as Rosa M. can provide bank statements showing their financial ability to care for their children, this documentation is not permitted under ORR's revised policy. Rosa M. Decl. ¶ 8.

      3.    <u>ORR refuses to accept alternate evidence of financial stability in violation of the Foundational Rule</u>

The new requirements are also contrary to another provision of the Foundational Rule, which provides that "[a]s part of its suitability assessment, ORR may require such components as . . . verification of the employment, income, *or other information provided by the potential*

---

[4] *See* Cal. Dep't of Motor Vehicles, *ID Cards*, https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/identification-id-cards/ (last visited May 8, 2025); N.Y. Dep't of Motor Vehicles, *Driver Licenses and the Green Light Law*, https://dmv.ny.gov/driver-license/driver-licenses-and-the-green-light-law (last visited May 8, 2025) ("You cannot apply for a Non-Driver ID Card").

*sponsor as evidence of the ability to support the child.*" 45 C.F.R. § 1202(c) (emphasis added).

The regulations plainly contemplate that sponsors are not limited to proof of employment and

income and instead can establish their ability to support the child through alternate evidence. By

requiring proof of income or employment only, ORR's revised Policy Guide § 2.2.4 contravenes

the agency's binding regulations and must be vacated. *See Accardi*, 347 U.S. at 268.

> 4.    ORR's revised identification and proof of income requirements lead to unnecessary delays in release to sponsors in violation of the TVPRA and the Foundational Rule

ORR's new policies are further contrary to law because they violate ORR's statutory and

regulatory duties to minimize detention of children. 5 U.S.C. § 706(2)(A). As discussed above,

the TVPRA mandates that ORR promptly place children "in the least restrictive setting that is in

the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). This is usually with "a suitable family

member." *Id.* Unnecessary delays in release to a suitable sponsor violate the TVPRA. *See*

*Saravia v. Sessions*, 905 F.3d 1137, 1143 (9th Cir. 2018); *L.V.M.*, 318 F. Supp. 3d at 613-14;

*J.E.C.M.*, 352 F. Supp. 3d at 588; *cf. Ramirez v. ICE*, 471 F. Supp. 3d 88, 178 (D.D.C. 2020)

(noting that DHS has greater discretion than HHS with regard to whether to release an 18-year

old but is nonetheless required to consider release to the least restrictive setting).

In addition, the Foundational Rule requires ORR to "release a child from its custody

without unnecessary delay, in the following order of preference, to: (1) A parent; (2) A legal

guardian; (3) An adult relative," and then to other adults or entities seeking custody. 45 C.F.R.

§ 410.1201(a). A "completed sponsor application" from parents, legal guardians, or other close

relatives must be adjudicated within 10 or 14 days, "absent an unexpected delay (such as a case

that requires completion of a home study)." 45 C.F.R. § 410.1205(b). These timelines reflect the

requirements of a summary judgment order and preliminary injunction against ORR in *Lucas R. v. Becerra* to protect the due process rights of children to family reunification. *See* 89 Fed. Reg. at 34457; *Lucas R. v. Becerra*, No. 18-5741, 2022 WL 2177454, at *27 (C.D. Cal. Mar. 11, 2022) (summary judgment); *Lucas R.*, 2022 WL 3908829, at *2 (C.D. Cal. Aug. 30, 2022) (preliminary injunction). The *Lucas R.* Court later entered a final declaratory judgment incorporating its summary judgment order. Judgment, *Lucas R.* (C.D. Cal. Sept. 16, 2024), ECF No. 449.

By blocking the release of children to otherwise suitable sponsors merely because the sponsors cannot obtain specific forms of identification or proof of income, ORR is failing to promptly place children in the least restrictive setting and creating unnecessary delay in release. *See, e.g.*, Smyers Decl. ¶ 5; *see also* Leo B. Decl. ¶¶ 11-13, 16 (describing restrictive conditions in shelter); Liam W. Decl. ¶ 9; Angelica S. Decl. ¶ 13; Ximena L. Decl. ¶¶ 11-12. Children such as Angelica and Leo seeking release to their older sisters have been left with no sponsor at all, despite their sisters being fully vetted by ORR. *See* Angelica S. Decl. ¶¶ 6, 8-9; Deisy S. Decl. ¶¶ 6-25; Leo B. Decl. ¶¶ 3-9; *see also* J.E.D.M. Decl. ¶¶ 6-7 (release blocked to uncle based on new ID policy despite submitting application, fingerprints, and home study).

Moreover, ORR is failing to adjudicate completed sponsor applications within required timelines by demanding that sponsors provide documentation not required by the application form. Despite their mother's application being indisputably complete by early March 2025, 14-year-old Eduardo M. and his 7-year-old brother have remained in custody for *two additional months* without a release decision. Rosa M. Decl. ¶ 4. Even after providing more information to attempt to satisfy all ORR's new requirements, Rosa's application has been pending final ORR approval for over 10 days. *Id.* ¶ 9; *cf.* 45 C.F.R. § 410.1205(b).

ORR does not have authority to nullify its regulatory timelines by unilaterally declaring completed sponsor applications incomplete based on new policies that were not in place at the time the application was submitted. New generally applicable policies are not the type of "unexpected delay" contemplated by the regulations. *See* 45 C.F.R. § 410.1205(b) (stating that "a case that requires completion of a home study" is an example of an unexpected delay).

Further contrary to the Foundational Rule's priority for close relatives, ORR care providers have told relatives that they cannot sponsor a child because of their lack of qualifying identification and to instead identify *any* adult they know with lawful immigration status and the correct type of identification. *See* Deisy S. Decl. ¶¶ 25, 28; J.E.D.M. Decl. ¶ 4.

     5.    <u>ORR's revised identification and proof of income requirements are arbitrary and capricious</u>

An agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate . . . when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Fox Television Stations*, 556 U.S. at 515. "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" *Regents of Univ. of Cal.*, 591 U.S. at 30 (quoting *State Farm*, 463 U.S. at 51).

ORR drastically changed its proof of identification and proof of income requirements without any explanation, without waiting to lawfully update the FRA, and without any apparent consideration for the reliance interests of sponsors and unaccompanied children, the impact on children's length of detention, or less burdensome alternatives to verify sponsor identity and proof of income. These changes are arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

Here, ORR had a longstanding policy of accepting government-issued identification from foreign governments and ORR has mechanisms to verify the validity of the foreign documentation with foreign embassies and consulates and to conduct further background investigations if there are concerns in a particular case. *See* Smyers Decl. ¶¶ 11-14; *see also* Dorn-Lopez Decl. ¶ 10; Preamble to Foundational Rule, 89 Fed. Reg. at 34445. ORR has offered no explanation for why it can no longer verify the identity of sponsors, household members, and backup caregivers through documents issued by foreign governments, much less a detailed justification. *See Fox Television Stations*, 556 U.S. at 515. ORR's purported need for U.S.-issued identification or immigration paperwork to establish identity is further undermined by its new universal fingerprinting and DNA testing requirements, which also serve to establish identity. *See supra* Section II.E, Expanded Collection of Biometric Data on Sponsors.

ORR's application of the new identity requirement for not only sponsors but also all adult household members and alternative caregivers creates further unnecessary barriers to family reunification. Rosa M., for example, was told she could not sponsor her own sons until she identified an alternative caregiver with the right form of identification. Rosa M. Decl. ¶ 6. Sofia W. similarly cannot sponsor her 15-year-old son Liam because her adult daughters and nephew lack qualifying identification, even though she has provided all the documentation required by the FRA and underwent a positive home study. Liam W. Decl. ¶¶ 4-5; Sofia W. Decl. ¶¶ 4-7.

The agency similarly lacks justification for its changed policy related to proof of income. ORR considered comments related to proof of income in the Foundational Rule and stated that although employment is "a permissible consideration as part of the suitability assessment[,] . . . ORR will not deny an otherwise qualified sponsor solely on the basis of low income or

employment status." 89 Fed. Reg. at 34446. This reflects the agency's mandate to ensure the child's well-being, not to police whether a sponsor has formal work authorization. *See* Dorn-Lopez Decl. ¶ 9; Smyers Decl. ¶¶ 9-10. As discussed above, the regulations expressly permit potential sponsors to provide information other than employment or income verification to establish their ability to support the child. 45 C.F.R. § 410.1202(c). Yet the revised Policy Guide requires proof of income as an absolute precondition for sponsorship, with no exceptions and no provision for alternate evidence. ORR has no reasonable basis for requiring proof of income as the sole means of establishing the financial ability to care for the child and excluding reasonable alternate evidence such as bank statements. *See* Rosa M. Decl. ¶ 8. ORR also appears to have failed to consider that in some cases another individual—such as the sponsor's partner—may contribute financial support to the child. *See* Ximena L. Decl. ¶ 10.

ORR recognizes that its new policies will decrease the number of potential sponsors available and increase children's length of detention. *See* 90 Fed. Reg. at 17439. Despite this acknowledgement, ORR appears to have given no consideration to whether any marginal increase in its ability to verify sponsor identity and financial stability justifies the burden on children's and sponsors' weighty interests in release and reunification. *See State Farm*, 463 U.S. at 43 (action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem"); *see also Moore v. City of E. Cleveland*, 431 U.S. 494, 504-06 (1977) ("The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition" and "the choice of relatives in this degree of kinship to live together may not lightly be denied by the State."); *Lucas R.*, 2022 WL 2177454, at *14, *25 (children in ORR custody

and close relative sponsors have significant constitutional interests in release and reunification); *L.V.M.*, 318 F. Supp. 3d at 613-14.

Moreover, by making its policy changes effective immediately to pending applications ORR appears to have given no consideration to the reliance interests of sponsors who have already provided extensive personal information to ORR because they were told they were eligible to sponsor a child. *See Fox Television Stations*, 556 U.S. at 515; *Regents of Univ. of Cal.*, 591 U.S. at 30-31. Nor did ORR appear to consider the emotional distress inflicted on children who believed they would be reunited with family members only to learn that they may never be released at all. *See, e.g.*, Leo B. Decl. ¶¶ 9-14; Angelica S. Decl. ¶¶ 8-9; Rosa M. Decl. ¶¶ 8, 10-11; Ximena L. Decl. ¶¶ 11-12.

> 6.   ORR's unapproved change in information collection is contrary to the Paperwork Reduction Act

ORR's new sponsor requirements are also contrary to law because they violate the Paperwork Reduction Act (PRA). The PRA provides that "[a]n agency shall not conduct or sponsor the collection of information unless in advance of the adoption or *revision* of the collection of information" it follows certain procedural requirements, including publication in the Federal Register, an opportunity for public comment, approval by the Office of Management and Budget (OMB), and a control number from OMB. 44 U.S.C. § 3507(a) (emphasis added). A collection of information is defined to include identical questions or reporting requirements imposed on 10 or more persons. 44 U.S.C. § 3502(3). PRA violations can be raised under the Administrative Procedure Act. *See Drs. for Am. v. Off. of Pers. Mgmt.*, No. CV 25-322, 2025 WL 452707, at *7 (D.D.C. Feb. 11, 2025).

As discussed above, the Family Reunification Application currently in use by ORR and approved by OMB permits a wide range of identification documents and includes no specific proof of income requirement. *See supra* Section II.A, Family Reunification Application; de Gramont Decl. Ex. 1-A. On April 25, 2025, ORR published a notice of information collection under the Paperwork Reduction Act to revise the Family Reunification Application to match the new requirements of ORR Policy Guide § 2.2.4. *See* 90 Fed. Reg. at 17438; Ex. 1-C (revised and renamed "Sponsor Application"). Despite recognizing that it is required to follow PRA procedures to revise its application, ORR is unlawfully enforcing specific documentation requirements that are not contemplated in or directly contravene the operative FRA In an analogous circumstance, the D.C. Circuit held that the Federal Communications Commission violated the PRA when it required a cellular license applicant to provide specific evidence of a firm financial commitment and deemed the application incomplete because the applicant's letter of credit did not provide all the evidence required by a collection of information that OMB had not yet approved. *Saco River Cellular, Inc. v. FCC*, 133 F.3d 25, 33 (D.C. Cir. 1998). The agency was instead required to "permit respondents to prove or satisfy the legal conditions in any other reasonable manner." *Id.* (quoting 5 C.F.R. § 1320.6(c)).

Here, ORR must permit sponsors to establish their proof of identification and financial ability to support the child through the reasonable means provided in the operative OMB-approved FRA. ORR is prohibited by law from penalizing sponsors for failing to provide the specific documentation required by the unapproved revisions to Policy Guide § 2.2.4.

7.    ORR's revised identification and proof of income requirements are impermissibly retroactive as applied to completed applications

When it revised Policy Guide § 2.2.4, ORR applied the new requirements immediately, including to completed sponsorship applications. "In the administrative context, '[g]enerally, an agency may not promulgate retroactive rules without express congressional authorization.'" *Kirwa v. U.S. Dep't of Defense*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018) (quoting *Arkema, Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010)). This anti-retroactivity principle applies to policy changes and agency interpretations as well as formal rulemaking. *Id.* at 271; *see also De Niz Robles v. Lynch*, 803 F.3d 1165, 1172 (10th Cir. 2015) ("[T]he more an agency acts like a legislator—announcing new rules of general applicability—the closer it comes to the norm of legislation and the stronger the case becomes for limiting application of the agency's decision to future conduct.").

"A rule operates retroactively when it 'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" *Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 289 (D.C. Cir. 2023) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). The retroactivity determination "should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *INS v. St. Cyr*, 533 U.S. 289, 321 (2001) (quoting *Martin v. Hadix*, 527 U.S. 343, 358 (1999)).

Here, by demanding new documents and information as a condition of sponsorship—contrary to longstanding policy and its own approved Family Reunification Application—ORR imposed new duties and obligations on sponsors who had already completed their applications and thereby harmed children by blocking their options for timely release. Rosa M. Decl. ¶¶ 3-8;

Sofia W. Decl. ¶¶ 4-7; Ximena L. Decl. ¶¶ 6-7. Because ORR's new policies "contradict[] its past practice, narrowing the range of options and altering the legal landscape" for sponsorship applications, its refusal to consider already completed applications "is impermissibly retroactive." *Arkema*, 618 F.3d at 9; *see also id.* (noting that effect of new EPA rule was to "undo what the EPA had, in practice, approved under" prior rules and was impermissibly retroactive); *Kirwa*, 285 F. Supp. 3d at 271-72 (Department of Defense guidance, which changed requirements for certification necessary for expedited naturalization, was impermissibly retroactive as applied to service members who enlisted prior to the new guidance).

For many sponsors who provided sensitive personal information to ORR in reliance on the fact that they would have a fair opportunity to sponsor their child or relative, ORR's new requirements "would result in serious inequities . . . that are not counterbalanced by any significant statutory interests." *Kirwa*, 285 F. Supp. 3d at 272; *see also St. Cyr*, 533 U.S. at 324-25 (explaining that "the presumption against retroactivity applies far beyond the confines of the criminal law" and applies even to applications for discretionary relief where individuals relied on prior law). Sponsors took concrete steps to comply with ORR requirements in reliance on ORR's prior policies, including providing personal information, submitting to fingerprinting, and in the case of Deisy S., purchasing prenatal vitamins, a crib, and other items for her sister's baby. *See* Deisy S. Decl. ¶¶ 10, 15, 23; *see also Treasure State Resource Industry Ass'n v. EPA*, 805 F.3d 300, 305 (D.C. Cir. 2015).

The retroactive application of these requirements was also arbitrary and capricious because they were applied without regard to whether these requirements were actually necessary to adjudicate the potential sponsor's ability to care for the well-being of the child. *See* Smyers

Decl. ¶¶ 9-14. For example, the new proof of identification requirements was applied retroactively to sponsors who were already thoroughly vetted, including having completed fingerprinting and home studies. Deisy S. Decl. ¶¶ 14-16; Ximena L. Decl. ¶¶ 6-7. J.E.D.M. Decl. ¶ 6. ORR even applied this requirement to disqualify Leo B.'s sister, despite having previously vetted her and released Leo to her care. Leo B. Decl. ¶¶ 3, 9.

## II.    **Plaintiffs are Suffering Irreparable Injury**

As a result of ORR's unlawful polices, child Plaintiffs and the putative class are suffering irreparable harm as they remain unnecessarily detained and separated from their families. Young children such as Eduardo M. and his 7-year old brother have been deprived of the care and support of their mother for months. They "cry frequently at the program" and their mother explains that she is "desperate because I only want to be with my sons but I already provided all the documents I have." Rosa M. Decl. ¶ 11. Angelica S. lacks any viable sponsor because of ORR's changed identification and information collection and sharing policies and, absent an injunction, will have to raise her baby alone in a restrictive congregate care environment far from family support. Angelica S. Decl. ¶¶ 4-5, 12. She expresses that "being separated from my family during this time, with a new baby, has been really hard for me" and "[i]t's hard to explain how much I want to leave this place to live with my sister." *Id.* ¶ 5.

Liam W. has been detained since January despite having a mother ready and willing to care for him. Liam W. Decl. ¶ 2. He imagines that if he is finally released and arrives home to his mom, "the first thing I am going to do is hug her. I am going to hug her for a really long time. Then I just want to talk to her, about anything." *Id.* ¶ 10. Xavier L. and his 13-year-old sister have a history of trauma and are suffering from their prolonged separation from their mother and

the uncertainty about their release. Ximena L. ¶¶ 11-12. Leo B. was living with his sister and attending high school in Georgia, played on the school soccer team, and hoped to graduate next year, but is now making no educational progress and is separated from family, friends, and the liberty he enjoyed at home. Leo B. Decl. ¶¶ 6, 10-17. He notes that "[w]hen I start to think about what's happening I get really sad and it affects me. All the effort I was putting into school was for nothing." *Id.* ¶ 10.

Plaintiffs' experiences are echoed in the experiences of other children in ORR custody and research on the devastating effects of family separation and detention on children. *See, e.g.*, Dorn-Lopez Decl. ¶ 6 ("I have met with children who were so negatively impacted by prolonged [ORR] detention, that they struggled with deciding whether to continue to remain in a facility or return to their home country knowing that their lives would be in danger if they were to return."). Researchers have found that children in prolonged immigration custody are at increased risk of experiencing somatic symptoms of stress and trauma (e.g., headache, stomachache), as well as difficulties with sleeping and eating.[5] Even outside the context of immigration detention, child welfare research highlights the distress children experience from family separation, especially when they are placed in foreign cultural environments.[6]

Unsurprisingly, courts have consistently found that family separation and unnecessarily prolonged ORR detention creates irreparable injury. *E.g.*, *Jacinto-Castanon de Nolasco v. U.S.*

---

[5] M. von Werthern, *et al.*, *The Impact of Immigration Detention on Mental Health: A Systematic Review*, 18 BMC Psychiatry 382 (2018), https://doi.org/10.1186/s12888-018-1945-y (research not specific to detention in ORR facilities); Julie M. Linton, *et al.*, *Detention of Immigrant Children*, 139 Pediatrics no. 5 (2017), https://doi.org/10.1542/peds.2017-0483.

[6] *See, e.g.*, Maurice Anderson & L. Oriana Linares, *The Role of Cultural Dissimilarity Factors on Child Adjustment Following Foster Placement*, 34 Child. and Youth Servs. Rev. 597, 597-601 (2012), https://doi.org/10.1016/j.childyouth.2011.11.016.

*Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018) (family "[s]eparation irreparably harms plaintiffs every minute it persists."); *L.V.M.*, 318 F. Supp. 3d at 618 (holding that delayed release from ORR custody "incidental to the challenged director review policy (more than 35 days) is clearly long enough to cause irreparable harm to Plaintiffs" and noting that "neither party questions that prolonged detention is deleterious to young children, and, obviously, the longer the detention, the greater the harm."); *Lucas R.*, 2022 WL 2177454, at *33; *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1200 (N.D. Cal. 2017).

### III.    <u>Balance of Harm and Public Interest Favor Plaintiffs</u>

The remaining stay factors, "the harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the balance of equities and the public interest strongly favor Plaintiffs. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). ORR's IFR and new sponsor documentation requirements violate the Administrative Procedure Act in numerous ways and conflict with ORR's statutory mandate under the HSA and the TVPRA.

The public also has a strong interest in the well-being of children and protecting the constitutional right to family integrity. *See Troxel v. Granville,* 530 U.S. 57, 64 (2000); *Moore*, 431 U.S. at 504-06; *see also M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 124 (D.D.C. 2018) ("[T]he public also has an interest in ensuring that its government respects the rights of immigrants to family integrity while their removal proceedings are pending."). The IFR sets out no justification for denying sponsors based on immigration status and ORR's new sponsor requirements

improperly presume sponsors unfit based on the lack of specific forms of documentation without conducting a holistic review. Although the government has an interest in caring for children, this interest "is de minimis" if their parent or other potential sponsor is in fact suitable. *Stanley v. Illinois*, 405 U.S. 645, 657-58 (1972). Because ORR's present policy is based on presumption rather than actual evidence of unfitness and "needlessly risks running roughshod over the important interests of both parent and child," it is not in the public interest. *Id.* at 657. ORR retains many tools to vet the safety of potential sponsors without unnecessarily preventing release of children to loving family members and other suitable sponsors.

## IV. __Relief Requested__

Plaintiffs request that the Court provisionally certify the putative class and enter a preliminary injunction staying the IFR and prohibiting ORR from enforcing the new identification requirements contained in the March 7, 2025 revision of Policy Guide § 2.2.4 and the new proof of income requirements contained in the April 15, 2025 revision of Policy Guide § 2.2.4. Within 10 days of the Court's order, ORR should further be required to inform all potential sponsors who were disqualified or denied based on the unlawful policies described here that they may now continue with their sponsorship applications.

Additionally, Plaintiffs and the putative class are entitled to adjudication of their sponsors' applications as if the unlawful requirements had not been applied to their case. *See Public Utilities Comm'n of State of Cal. v. FERC*, 988 F.2d 154, 168 (D.C. Cir. 1993) ("We have held, in a similar context, that when the Commission commits legal error, the proper remedy is one that puts the parties in the position they would have been in had the error not been made."); *Milliken v. Bradley*, 418 U.S. 717, 746 (1974) ("[T]he remedy is necessarily designed, as all

remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct."). In cases where a complete sponsorship application was submitted and adjudication of the application was delayed because of ORR's unlawful IFR and unlawful revisions to its proof of identification and/or proof of income requirements, ORR must therefore adjudicate the application according to the requirements in place at the time the application was submitted and should be enjoined from retroactively applying any later-imposed requirements. *See* 45 C.F.R § 410.1205(b) (setting timelines for adjudication of sponsor applications).

Such relief is especially important given ORR's continued rollout of new sponsor requirements and ORR's application of its multiple new requirements to already completed applications, which have led to significant delays and harm in Plaintiffs' cases. *See, e.g.,* Rosa M. Decl. ¶¶ 4-8; Ximena L. Decl. ¶¶ 6-10. Significantly, ORR imposed new DNA testing requirements for all related sponsors on March 14, 2025, which have caused significant delays to children's release. *See supra-Section II*.E, Expanded Collection of Biometric Data on Sponsors; Some families have waited over a month for a DNA testing appointment. *See* Sofia W. Decl. ¶ 8. Once a DNA test is done, families have then had to wait several weeks for DNA test results. *See* Rosa M. Decl. ¶ 7; *see also* Felix Decl. ¶ 8. Moreover, ORR has not taken any steps to schedule DNA tests for children such as Plaintiff Angelica S. and putative class member J.E.D.M., whose sponsors were disqualified altogether by the new identification requirements and have no exception available. *See* Deisy S. Decl. ¶¶ 25-26; J.E.D.M. Decl. ¶ 6. Permitting ORR to retroactively apply new DNA and other requirements to their cases—when those requirements

were not in effect at the time their sponsor completed their applications—would compound the

unlawful delay caused by the ORR's invalid proof of identification and proof of income policies.

### CONCLUSION

Plaintiffs respectfully request that the Court provisionally certify the putative class and

grant a preliminary injunction to remedy Plaintiffs' significant and ongoing irreparable injuries.


May 9, 2025                          ___/s/ *David Hinojosa*_____

David Hinojosa (D.C. Bar No. 1722329)
Rebecca Wolozin (D.C. Bar No. 144369)*
NATIONAL CENTER FOR YOUTH LAW
818 Connecticut Avenue NW, Suite 425
Washington, DC 20006
(202) 868-4792
dhinojosa@youthlaw.org
bwolozin@youthlaw.org

Neha Desai**
Mishan Wroe**
Diane de Gramont **
NATIONAL CENTER FOR YOUTH LAW
1212 Broadway, Suite 600
Oakland, California 94612
(510) 835-8098
ndesai@youthlaw.org
mwroe@youthlaw.org
ddegramont@youthlaw.org

Cynthia Liao***
Joel McElvain (D.C. Bar No. 448431)
Skye L. Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
cliao@democracyforward.org
jmcelvain@democracyforward.org
sperryman@democracyforward.org

\* Application for D.D.C. admission pending
\*\* *Pro hac vice* pending
\*\*\* *Pro hac vice* forthcoming