UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ANGELICA S. *et al.*,<br><br>        Plaintiffs,<br><br>      v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>        Defendants. | ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 25-01405-DLF |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 2

I.    Statutory and Regulatory Background .................................................... 2

    A.    The Homeland Security Act of 2002. ......................................... 3

    B.    The Trafficking Victims Protection Reauthorization Act of 2008 . .......... 4

    C.    The Foundational Rule (2024). ................................................... 4

    D.    The Interim Final Rule (2025). ................................................... 5

    E.    ORR Release Policies and Practices. ........................................... 6

    F.    Recent Reports Concerning ORR's Sponsor Vetting Process (2022-24). ................................................................................................ 8

    G.    Updated ORR Guidance Regarding UAC Sponsor Vetting (2025)......... 10

II.    This Lawsuit........................................................................................ 13

STANDARD OF REVIEW ............................................................................. 15

I.    Rule 65 – Preliminary Injunction........................................................ 15

II.    5 U.S.C. § 705 – Relief Pending Review............................................. 16

ARGUMENT ................................................................................................... 16

I.    Plaintiffs cannot demonstrate that they are likely to succeed on the merits. ........ 17

    A.    Plaintiffs lack standing............................................................. 17

    B.    The Interim Final Rule is Lawful and Should Not be Enjoined ............. 22

    C.    The Interim Final Rule Does Not Constitute "Final Agency Action" Subject to Judicial Review Under the APA............................................. 28

    D.    ORR's sponsor documentation requirements are lawful. ........................ 32

    E.    ORR's Revised Identification and Income Verification Requirements are Not Impermissibly Retroactive. ......................................................... 33

    F.    Plaintiffs lack standing to assert a claim under the Paperwork Reduction Act ........................................................................................ 34

II.    Plaintiffs have not demonstrated they will suffer irreparable harm without the extraordinary relief of a preliminary injunction............................................................. 34

III.   Plaintiffs' request for preliminary injunctive relief is contrary to the public interest............................................................................................................................. 36

      A.    Any relief must be sharply limited......................................................... 36

      B.    The balance of equities and public interest establish that no relief should be granted. ................................................................................ 39

IV.    The Court should deny Plaintiffs' request for provisional class certification. ..... 42

V.     If the Court grants a preliminary injunction, it should require bond. ................... 43

CONCLUSION.......................................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) ............................................................................................ 39

*All. for Hippocratic Med.*, 602 U.S. at 395 ................................................................ 19

*Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ............... 26

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011) ..................................................................................................... 18

*ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) .................................... 19

*Barton v. District of Columbia*, 131 F. Supp. 2d 236, 243 n.6 (D.D.C. 2001) ............ 17

*Bauer v. DeVos*, 325 F. Supp. 3d 74, 106-07 (D.D.C. 2018) ...................................... 16

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................... 29

*Berge v. United States*, 949 F. Supp. 2d 36, 49 (D.D.C. 2013) .................................. 42

*Califano v. Sanders*, 430 U.S. 99 (1977) .................................................................. 31

*City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983) ........................................ 17

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) ........................................................................................ 15

*Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1156–57 (D.C. Cir. 2005) ...... 17

*Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020) ................ 15

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 203 (3d Cir. 2024) ..................................................................................... 42

*Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) ............................ 16

*El Paso Cnty., Texas v. Trump*, 982 F.3d 332, 344 (5th Cir. 2020) ............................ 19

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) .................................... 17

*Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) .......... 27, 34

*Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) ............................................. 15

*Flores v. Garland*, No. CV 85-4544-DMG (AGRX), 2024 WL 3467715, at *9 (C.D. Cal. June 28, 2024) ....................................................................................................................................... 4

*Gen. Tel. Co. of SW v. Falcon,* 457 U.S. 147, 161 (1982)............................................................. 43

*Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 804–07 (D.C. Cir. 1987) ................................... 20

*INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301 (1993)........ 21

*Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015) ................................................................ 28

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) .................................................................... 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . 28

*Munaf v. Geren*, 553 U.S. 674, 689 (2008)................................................................................... 15

*Murthy v. Missouri*, 144 S. Ct. 1972, 1996 (2024) ...................................................................... 21

*Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev*, 456 F. Supp. 3d 16, 33 (D.D.C. 2020) ............................................................................................................................ 35

*Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*, 456 F. Supp. 3d 16, 25–26 (D.D.C. 2020) ...................................................................................................................... 17

*Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).... 38

*Neb. DHHS v. DHHS*, 435 F.3d 326, 330 (D.C. Cir. 2006) ........................................................... 38

*New York v. U.S. DHS*, 969 F.3d 42, 87-89 (2d Cir. 2020) ........................................................... 38

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179–80 (D.D.C. 2015) .................................................. 42

*Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)....................................................... 20

*Warth v. Seldin*, 422 U.S. 490, 511 (1975).................................................................................. 19

*Winter v. NRDC*, 555 U.S. 7, 20 (2008) ....................................................................................... 15

Statutes

5 U.S.C. § 553(b)(4)(B) ......................................................................................................... 5, 22, 23

5 U.S.C. § 553(d)(3) ...................................................................................................................... 23

6 U.S.C. § 279(b)(1)(A) ............................................................................................ 3

8 U.S.C. § 1232(b)(1) ........................................................................................ 4, 35

8 U.S.C. § 1232(c)(2)(A) .......................................................................................... 3

8 U.S.C. § 1373 ................................................................................ 5, 23, 27, 41

Regulations

45 C.F.R. § 410.1201 ..................................................................................... 4, 5, 6, 23
45 C.F.R. § 410.1202(b) ......................................................................................... 4
45 C.F.R. § 410.1205(b) ....................................................................................... 32

Federal Register

*Unaccompanied Children Program Foundational Rule; Update To Accord With Statutory Requirements*, 90 Fed. Reg. 13,554-01 (Mar. 25, 2025) ................................................... passim

## INTRODUCTION

This case lacks the urgency Plaintiffs attempt to invoke. As Plaintiffs acknowledge, Congress has entrusted the Office of Refugee Resettlement (ORR), a component of U.S. Department of Health and Human Services (HHS), with the responsibility for caring for the thousands of minors who each year are deemed to be unaccompanied alien children (UAC) and reunifying them where possible with their parents or other suitable sponsors. In doing so, ORR must ensure that any sponsor to whom a child may be released is able to care for the child in a safe environment. Defendant ORR therefore acted within its statutory and discretionary authority to publish an Interim Final Rule (IFR) and update guidance concerning its process for vetting potential sponsors of UACs.

To carry out this mission, ORR has developed procedures for vetting potential sponsors of UAC. These procedures include measures to verify the identity of the potential sponsor as well as any other adult living in the potential sponsor's household, background checks of the potential sponsor and household members, and, in some circumstances, home studies. From the time ORR was first charged with the care and placement of UAC, ORR has required potential sponsors to submit to a background check, including fingerprints, as part of this process in certain circumstances.

Plaintiffs are five UACs and one legal services organization, Immigrant Defenders Law Center. They challenge the legality of the IFR promulgated by ORR, *Unaccompanied Children Program Foundational Rule; Update To Accord With Statutory Requirements*, 90 Fed. Reg. 13,554-01 (Mar. 25, 2025) (IFR). Plaintiffs also challenge the legality of ORR's updated requirements for an individual to qualify as a UAC sponsor. In their Complaint, Plaintiffs allege

that the IFR and updated sponsor-vetting guidance violate various provisions of the Administrative Procedure Act (APA). *See generally* ECF No. 1, Compl.

On May 9, 2025, Plaintiffs filed the instant Motion for a Preliminary Injunction. ECF No. 10 (Mot.). Plaintiffs seek an order: (1) provisionally certifying the putative class asserted in their Motion for Class Certification, ECF No. 9; (2) staying the IFR; (3) prohibiting ORR from enforcing its updated sponsor identification and proof of income requirements; (4) requiring ORR to inform all potential sponsors whose applications were denied based on the IFR or the updated sponsor-vetting guidance that they may continue with their application; (5) requiring ORR to adjudicate delayed sponsor applications based on the requirements in place at the time the potential sponsor submitted the application; and (6) enjoining ORR from retroactively applying updated requirements to sponsor applications. *See* Mot. 43-44; Compl., Prayer for Relief.

The Court should deny Plaintiffs' Motion because their request for a stay of the IFR under 5 U.S.C. § 705 comes too late for either HHS or the Court to grant, where the effective date of the IFR passed before the Plaintiff sought a stay. Furthermore, the Court should deny Plaintiffs' request for the extraordinary remedy of a preliminary injunction, because the UAC Plaintiffs do not meet the requirements for such relief and the organizational Plaintiff lacks standing. Notably, the organizational Plaintiff is free to submit comments on the IFR because the comment period remains open until May 27, 2025, *see* 90 Fed. Reg. 13,554-01. The requested preliminary injunction would improperly intrude on HHS's statutory authority while not necessarily serving the children's interest.

## BACKGROUND

### I.    Statutory and Regulatory Background

The statutory and regulatory framework governing the federal care and custody of UAC, as well as their release and sponsorship, reflects explicit congressional intent for ORR to "mak[e]

placement determinations for all unaccompanied alien children who are in Federal custody by reason of their immigration status," and to ensure UAC "are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity." 6 U.S.C. § 279(b)(1)(C) & (b)(2)(A)(ii); *see also* 8 U.S.C. § 1232(c)(1). That framework balances the mandate that ORR protect UAC from harm with the requirement that ORR "promptly" place UAC "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A).

### A.    The Homeland Security Act of 2002 (HSA).

In 2002, Congress enacted the HSA, Pub. L. No. 107-296, 116 Stat. 2135 (codified in relevant part at 6 U.S.C. § 279), abolishing the Immigration and Naturalization Service (INS) and transferring the responsibility for the care and placement of UAC from INS to ORR. 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2).

The HSA defines a UAC as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Further, it assigns ORR broad authority over the care and custody of UAC while they are in federal custody due to their immigration status, including coordinating their care and placement, ensuring their best interests in custodial decisions and that they are protected from smugglers, traffickers, and others who might seek to victimize and exploit UAC. 6 U.S.C. § 279(b)(1)(A) & (b)(2)(A)(ii). These responsibilities are carried out through cooperative agreements and contracts with care providers under ORR policies and oversight. *See* 6 U.S.C. § 279(b)(1); 31 U.S.C. § 6305.

**B.      The Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA).**

Congress enacted the TVPRA in 2008 to strengthen protections for UAC and support their safe repatriation or appropriate placement. The statute, consistent with the HSA, makes the Secretary of HHS responsible for the care and custody of UAC. 8 U.S.C. § 1232(b)(1). The TVPRA also states that HHS, and other agencies, "shall establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity..." 8 U.S.C. § 1232(c)(1). It also requires the HHS Secretary to make a determination that a sponsor "is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). This safety and suitability determination must "at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* Thus, the TVPRA is explicit that ORR must prioritize the safety and well-being of UAC while in its care and upon release.

**C.      The Unaccompanied Children Program Foundational Rule (2024).**

In April 2024, ORR promulgated the Unaccompanied Children Program Foundational Rule, codified at 45 C.F.R. Part 410, to establish comprehensive regulations governing its UAC program consistent with its statutory responsibilities. The Foundational Rule also implements provisions of the *Flores Settlement Agreement* (FSA) relevant to ORR's care and custody of UAC and conditionally and partially terminated the FSA as to ORR in June 2024. *See Unaccompanied Children Program Foundational Rule*, 89 Fed. Reg. 34,384, 34,385 (Apr. 30, 2024); *Flores v. Garland*, No. CV 85-4544-DMG (AGRX), 2024 WL 3467715, at *9 (C.D. Cal. June 28, 2024).

Effective July 1, 2024, the Foundational Rule codified in regulation standards and practices that were previously described in ORR policies.

Specifically, the Rule provides that ORR must release UAC from its custody "[s]ubject to an assessment of sponsor suitability," 45 C.F.R. § 410.1201, which includes "verification of the potential sponsor's identity," 45 C.F.R. § 410.1202(b), "verification of the employment, income, or other information provided by the potential sponsor as evidence of the ability to support the child," 45 C.F.R. § 410.1202(c), and "[i]n all cases, ORR shall require background and criminal records checks," *id.*, which may include a criminal history check based on fingerprints. In any event, the Foundational Rule does not prohibit the collection of fingerprints in all circumstances, and it is silent regarding identity document requirements and the types of documents acceptable to prove income. The Rule reinforces congressional intent articulated in the HSA and TVPRA that HHS ensure UAC protection from human traffickers and release UAC only to those sponsors capable of protecting their well-being. 45 C.F.R. § 410.1003.

### D.    The Interim Final Rule (2025).

On March 25, 2025, HHS published an IFR notifying the public of its intention to amend one provision of one of its regulations. *Unaccompanied Children Program Foundational Rule; Update To Accord With Statutory Requirements*, 90 Fed. Reg. 13,554-01 (Mar. 25, 2025); Declaration of Toby Biswas ¶ 18, dated May 23, 2025 ("Biswas Decl."). Specifically, the IFR amended the Foundational Rule by striking 45 C.F.R. § 410.1201(b) (2024), which provided:

> ORR shall not disqualify potential sponsors based solely on their immigration status and shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement related purposes. ORR *shall not share any immigration status information* relating to potential sponsors with any law enforcement or immigration enforcement related entity at any time.

90 Fed. Reg. 13,554 (emphasis added). The IFR was effective immediately upon publication in the Federal Register and provided for a 60-day comment period ending on May 27, 2025. *Id.*

Citing 5 U.S.C. § 553(b)(4)(B), HHS asserted good cause for issuing the IFR without notice and comment because ORR had no authority to promulgate 45 C.F.R. § 410.1201(b) (2024) where the rule contravened 8 U.S.C. § 1373, and was therefore not in accordance with law under the APA, 5 U.S.C. § 706(2)(A). Section 1373 provides:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

Because the statute prohibits any restriction on sharing information regarding immigration status between governmental entities, HHS concluded that its regulation was invalid and must be removed. 90 Fed. Reg. 13,555. Thus, HHS also asserted that revoking the rule immediately was in the public interest and "no amount of public input could give ORR the power to contravene a duly-enacted law of Congress via regulation." 90 Fed. Reg. 13,555.

The stricken language in 45 C.F.R. § 410.1201(b) (2024) that precludes sharing citizenship and immigration status information with other federal agencies threatens to hamper ongoing interagency efforts to identify, investigate, and prosecute sponsor fraud and other human trafficking offenses perpetrated against UAC, thereby interfering with ORR's core statutory missions to ensure the safety and well-being of the minors in its care and custody *and* to combat human trafficking under the HSA and TVPRA. Biswas Decl. ¶ 20.

## E.    ORR Release Policies and Practices.

To carry out its statutory and regulatory mandate under the HSA and TVPRA, and the Foundational Rule, ORR has developed policies and procedures for identifying and conducting suitability assessments of, potential sponsors. These procedures are generally set out in ORR's

publicly available UAC Bureau Policy Guide (UAC Policy Guide). *See* ORR Unaccompanied Alien Children Bureau Policy Guide, *available at* https://perma.cc/Q2C3-3SC5; *see also* Biswas Decl. ¶¶ 2 & n.1, 4. A full assessment of a potential sponsor's suitability is particularly appropriate because ORR is not a law or immigration enforcement agency and lacks the authority to hold individuals accountable by reassuming care if the sponsor abuses or neglects a child after a UAC has been released from ORR custody. Biswas Decl. ¶ 5. Rather, ORR only takes children into its custody upon referral by another federal agency, as described in statute. *Id.* In this regard, ORR is also very different from state child welfare agencies, which typically retain such authority post-placement. *Id.* Accordingly, ORR must front-load child safety considerations in its identity verification and sponsor vetting policies. *Id.*

In light of ORR's obligation to protect UAC from smugglers, traffickers, and others who may seek to victimize them, "safe and timely release . . . involves several steps, including: the identification of sponsors; sponsor application; interviews; the assessment (evaluation) of sponsor suitability, including verification of the sponsor's identity and relationship to the child (if any), background checks, and in some cases home studies; and post-release planning." UAC Policy Guide § 2.1. There are four categories of potential sponsors: (1) Category 1, consisting of parents or legal guardians; (2) Category 2A, consisting of siblings, half-siblings, grandparents, immediate relatives (such as aunts, uncles, and cousins) who previously served as a primary caregiver, and other biological relatives and relatives through marriage; (3) Category 2B, consisting of immediate relatives (including biological relatives and relatives through marriage) who did not previously serve as a primary caregiver; (4) Category 3, consisting of other sponsors, such as distant relatives and unrelated adult individuals. *Id.* § 2.2.1. ORR conducts suitability assessments of any potential sponsor (with the assistance of a care provider), including a review of the potential sponsor's

strengths, resources, risk factors, and special concerns within the context of each child's needs, strengths, resources, risk factors, and relationship to the sponsor. *Id.* §§ 2.2.2, 2.4.

A potential sponsor must complete a Family Reunification Application (FRA), provide unexpired government-issued identification documentation for the sponsor and any other adults living in the household or identified in a sponsor care plan, and, along with any adult living in his or her household, undergo a background check. UAC Policy Guide §§ 2.2.4, 2.5. All potential sponsors must also submit proof of address, income, sponsor-child relationship, and criminal history documents (if applicable). *Id.* § 2.2.4. Additionally, in certain circumstances a home study, which consists of interviews, a home visit, and a written report containing the home-study case worker's findings, is performed. *Id.* § 2.4.2.

Once the assessment of the potential sponsor is complete, the care provider makes a release recommendation. UAC Policy Guide § 2.7. ORR makes the final release decision. *Id.* Release decisions include: (1) approve release to sponsor; (2) approve release with post-release services; (3) conduct a home study before a final release decision; (4) deny release; or (5) remand for further information. *Id.* ORR denies release if: (1) the potential sponsor is not willing or able to provide for the child's physical or mental well-being; (2) the potential sponsor is not willing to complete the mandatory fingerprint check; (3) the physical environment of the home presents a risk to the child's safety or well-being; or (4) release of the UAC would present a risk to him or herself, the sponsor, household, or community. *Id.* § 2.7.4.

### F.    Recent Reports Concerning ORR's Sponsor Vetting Process (2022-24).

In December 2022, the Permanent Subcommittee on Investigations within the U.S. Senate Committee on Homeland Security and Governmental Affairs ("the Subcommittee") published a report detailing the inadequate treatment of UAC in federal care and the insufficient safeguards to

ensure they are not trafficked or abused following their release. Biswas Decl. ¶ 9. The Subcommittee found that despite the increased number of UAC entering the United States in 2021 and 2022, ORR's completion of background checks significantly declined from FY 2019. *Id.* Moreover, the Subcommittee identified the lack of adequate background checks for potential sponsors and the waiver of background check requirements on household members, even when releasing a child to their parent, as areas where additional safeguard measures were necessary. *Id.* The Subcommittee specifically recommended that ORR enhance its procedures for verifying pre-existing relationships and develop formal guidance for case managers during the verification process. *Id.* The Subcommittee also recommended that ORR update the UAC Policy Guide to indicate that if a potential sponsor or household member refuses to comply with required background checks, ORR will prohibit further consideration of the release of a child into their custody. *Id.*

In March 2023 after a Florida grand jury published a report outlining over 100 allegations concerning deficiencies in ORR's UAC Program, ORR established an Integrity & Accountability (I&A) Team to detect and prevent fraud. Biswas Decl. ¶¶ 6-7. The I&A Team identified several instances of fraudulent sponsorship applications, document falsifications, and patterns of human trafficking and exploitation. Biswas Decl. ¶ 7. For instance, the Team identified instances of children and sponsors using altered birth certificates or unaltered birth certificates belonging to another person. *Id.* The Team found that the fraud often involved collusion with others, such as a family member in the country of origin. *Id.* In another example, the I&A Team identified 10 UAC who were released to sponsors who committed intentional document fraud in October 2024. *Id.*

In one particularly egregious case, the I&A Team found that a woman and her partner attempted to sponsor a total of 15 UAC over a five-year period by using multiple aliases. Biswas

Decl. ¶ 8. The woman used various aliases to attempt to sponsor eight UAC over the same period, with four UAC being released to her and four unsuccessful attempts to sponsor other UAC. *Id.* The aliases were only discovered when the sponsor underwent fingerprinting. *Id.* Of the four unsuccessful sponsorships, three were Category 1 cases, and one was a Category 2A case. *Id.* Despite this evidence, ORR's data revealed that less than 1% of sponsorship applications have been denied in recent years.

In February 2024, the HHS Office of Inspector General published its finding in *Gaps in Sponsor Screening and Follow Up Raise Safety Concerns for Unaccompanied Children* that:

1. In 16% of children's case files, one or more required sponsor safety checks lacked any documentation indicating that the checks were conducted.
2. For 19% of children who were released to sponsors with pending Federal Bureau of Investigation fingerprint or State child abuse and neglect registry checks, children's case files were never updated with the results.
3. In 35% of children's case files, sponsor-submitted identification documents contained legibility concerns.
4. ORR failed to conduct mandatory home studies in two cases and four other cases raise concerns about whether ORR guidance on discretionary home studies should offer more specificity.
5. In 5% of cases, sponsor records within ORR's case management system were not updated with child welfare outcomes or sponsorship history.

Biswas Decl. ¶ 9, Ex. A, (*also available at* https://perma.cc/2GSC-YTAJ).

As a result of these findings, HHS OIG recommended, among other things, that ORR develop additional safeguards to ensure that all safety checks are conducted and documented prior to approving the release of a child to their sponsor. Biswas Decl. ¶ 9. This recommendation is still marked as ongoing on the HHS OIG recommendation implementation tracker. *Id.*

### G.    Updated ORR Guidance Regarding UAC Sponsor Vetting (2025).

Upon his inauguration, President Trump ordered HHS, along with the U.S. Department of Justice and Department of Homeland Security, to take "all appropriate action to stop the trafficking and smuggling of alien children into the United States[.]" Executive Order 14159, "*Protecting the*

*American People Against Invasion*," 90 FED. REG. 8443, at 8447 (Jan. 20, 2025). Shortly thereafter, former Acting Director of ORR, Mellissa Harper, issued a memorandum (Harper Memo) outlining immediate changes to address ongoing concerns with gaps in ORR's sponsor vetting process, as well as fraud and trafficking. Biswas Decl. ¶ 11, Ex. B. The memorandum highlighted one particularly egregious instance of sponsor fraud, where a potential sponsor had obviously photoshopped himself into a photograph to establish kinship with the child. Biswas Decl. ¶ 11, Ex. B at 3. Subsequently, that same potential sponsor presented a foreign identification card bearing the name and photograph of another individual in an attempt to establish his identity and sponsor another child. Biswas Decl. ¶ 11, Ex. B at 4. In another example regarding age fraud, a UAC killed his sponsor months after he was released from ORR care. Biswas Decl. ¶ 11, Ex. B at 5. It was discovered during a law enforcement investigation later on that the UAC was actually 23 years old at the time of the murder. *Id.* These investigations were the rationale for implementing immediate policy changes, which included mandatory enhanced biometric collection and background checks, reassessment of the use of secondary documents that cannot be reliably verified as proof of identity, and sponsor presentation of original documents in-person. Biswas Decl. ¶ 11. The average length of care for UAC in ORR custody as of February 2025 was 25.8 days, but that length of time did not permit ORR to conduct adequate sponsor vetting measures necessary to ensure children are not released to potentially dangerous situations like those detailed in the investigations. Biswas Decl. ¶ 12.

On February 14, 2025, ORR issued Field Guidance ("FG") 26, which requires all potential sponsors, their adult household members aged 18 and above, and all adult caregivers identified in a Sponsor Care Plan to undergo national fingerprint-based FBI background checks. Biswas Decl. ¶ 13. FG 26 also requires the use of only unexpired and legible photocopies or high-resolution

digital scans/photos of identification documents to establish identity. *Id.* These updates to the guidance for vetting potential sponsors directly support ORR's efforts to combat sponsor fraud and mitigate risk of human trafficking of UAC by: requiring the same identity document be used as part of the sponsorship application, the fingerprint application, and at discharge; ensuring validation of acceptable identity documents; and re-establishing universal FBI fingerprints for all sponsors. *Id.* The universal fingerprint policy was previously in place prior to 2018, and it ensured equity in background information available for each sponsor as part of the totality of circumstances assessment conducted by ORR in release determinations. *Id.*

To further address identified gaps in the sponsor vetting process, ORR updated its UAC Policy Guide Sections 2.2.4 (concerning required supporting documents for sponsor applications to include unexpired identity documents and proof of income), 2.4.1 (concerning proof of income as part of sponsor assessment criteria), 2.7.4 (concerning lack of fingerprinting and proof of income as bases for denial of release requests), and 5.8.2 (concerning fraud reporting). Biswas Decl. ¶ 15, Ex. C. ORR made these updates to align the acceptable identity documents for identity verification purposes with the standards used for I-9 verifications as a safer framework than reliance on foreign-issued identity documents. Biswas Decl. ¶ 14. ORR has encountered difficulties authenticating foreign-issued documents, especially in a timely manner. Biswas Decl. ¶ 15. ORR is aware of widespread fraud involving the use of such documents and has had to rely on foreign consulates and embassies, often liaising with the Department of State, to authenticate documents issued outside the United States. *Id.* This process is complicated by international relations (including whether the United States maintains diplomatic relations with certain countries) and the stability of certain foreign states. *Id.*

In consideration of family reunification, the policies contemplate an exception for Category 1 sponsors on a case-by-case basis. Biswas Decl. ¶ 15. With regard to proof of address documentation, UAC Policy Guide Section 2.2.4, ORR has previously released children to addresses that did not include apartment numbers or were themselves suspected to be fraudulent; resulting in children released to locations that may not have been actual residences or for which the specific residential unit is unknown. *Id.* With regard to sponsor denial criteria (UAC Policy Guide Section 2.7.4), ORR clarified that a sponsor's or adult household member's refusal to present for fingerprinting would be sufficient for denial of release as failure to present can be an indication that the individual is trying to conceal known biometrics or criminal history, which could be grounds for sponsorship denial. *Id.* And with respect to income verification, in the state child welfare system, parents, legal guardians, and close kin must demonstrate their financial capability to support a child's needs if the child is returned to their care. Biswas Decl. ¶ 17. By requiring the submission of proof of income information and supporting documentation, case managers will be better equipped to identify potential indicators of labor exploitation. *Id.* ORR has identified instances where parents and other family members have been subjected to human trafficking and/or labor exploitation and had similar debts as the children they sponsored. *Id.* The information obtained during employment and income verification can inform the decision to refer a case for a home study or post-release services. *Id.* Finally, the guidance update to UAC Policy Guide Section 5.8.2 established clearer protocols for detecting, documenting, and responding to fraud, including preventing fraudulent actors from exploiting the UAC Bureau and UAC for trafficking or other forms of exploitation. Biswas Decl. ¶ 14.

## II.    This Lawsuit

On May 8, 2025, Plaintiffs filed this suit. ECF No. 1, Compl. Plaintiffs allege that the IFR violates the APA because: (1) HHS did not publish the IFR through notice and comment and did

not have good cause for it to take immediate effect, Compl. ¶¶ 110-16 (citing 5 U.S.C. § 706(2)(D)); (2) the IFR exceeds statutory authority because it is contrary to ORR's statutory obligation to promptly place UAC in the least restrictive setting that is in their best interest, Compl. ¶¶ 117-23 (citing 5 U.S.C. §§ 706(2)(A), (C)); (3) the IFR is contrary to the constitutional right to family unity, Compl. ¶¶ 124-28 (citing 5 U.S.C. § 706(2)(B)); and (4) the IFR is arbitrary and capricious because it does not explain why it rescinds the prohibition on denying sponsor applications based on immigration status and collecting information on sponsor immigration status, Compl. ¶¶ 129-32.

Plaintiffs claim that the updated guidance on sponsor vetting requirements violates the APA because: (1) it is contrary to the TVPRA's requirement to promptly place UAC in the least restrictive setting that is in their best interest, they violate the *Accardi* doctrine that federal agencies are required to follow their own regulations, and they violate the Paperwork Reduction Act, Compl. ¶¶ 133-43 (citing 5 U.S.C. § 706(2)(A), (C)); (2) they are contrary to the constitutional right to family unity, Compl. ¶¶ 144-47 (citing 5 U.S.C. § 706(2)(B)); (3) they are arbitrary and capricious because they result in denials of sponsorship and were promulgated without reasoned explanation, Compl. ¶¶ 148-52 (citing 5 U.S.C. § 706(2)(A)); and (4) ORR violated the APA when it promulgated the proof of identity and income requirements without notice and comment, Compl. ¶¶ 153-58 (citing 5 U.S.C. § 706(2)(D)).

The UAC Plaintiffs allege that they are irreparably harmed by the IFR and the updated guidance on sponsor vetting requirements because the IFR and updated guidance have delayed their release to sponsors and prolonged separation from their families. *E.g.*, Compl. ¶¶ 55, 146. However, the UAC Plaintiffs cannot make the connection between the length of their time in ORR

14

custody and the IFR/updated guidance where independent circumstances causing delays in their release existed in each case prior to the IFR/updated guidance. *See* Compl. ¶¶ 68-99.

Although the organizational Plaintiff alleges that the IFR/updated guidance have harmed the organization's mission to represent UAC in removal proceedings by causing it to divert and expend additional resources, Compl. ¶¶ 100-02, the organization is not subject to the IFR or the policy modifications. Indeed, the organizational Plaintiff's only alleged injury is that the IFR/updated guidance will affect their resources. Declaration of Cynthia Isabel Felix ¶¶ 10-12, 18, 20, 22.

## STANDARD OF REVIEW

### I.      Rule 65 – Preliminary Injunction.

A preliminary injunction is "an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A party seeking such relief "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "Although [the D.C.] Circuit has taken no position on the 'sliding scale approach,' the movant must, at a minimum, 'demonstrate that irreparable injury is likely in the absence of an injunction.'" *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) (internal citations omitted) (Leon, J.).

Where, as here, "an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act—the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997)

(internal quotation marks omitted), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998); *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020).

## II.    5 U.S.C. § 705 – Relief Pending Review.

Plaintiffs have moved for a stay under 5 U.S.C. § 705, which provides, in relevant part, that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may . . . postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." "[A] stay under § 705 should be imposed for one—and only one—reason: to maintain the status quo in order to allow judicial review of the underlying regulation to proceed in a 'just' manner." *Bauer v. DeVos*, 325 F. Supp. 3d 74, 106-07 (D.D.C. 2018) (emphasis added). Moreover, as the D.C. Circuit has explained, Section 705 is intended to "postpone the effective date of a not yet effective rule, pending judicial review." *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996) (emphasis added). "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020). These factors are discussed below.

## ARGUMENT

Plaintiffs' claims conflict with the authority vested in HHS over the care, custody, and release of UAC to suitable sponsors by the HSA and the TVPRA. *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978) ("[T]his much is absolutely clear. Absent constitutional constraints or extremely compelling circumstances, the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation omitted)). HHS "enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures . . . and priorities." *See Mobil Oil Expl. & Producing Se. Inc. v. United Distribution Cos.*, 498 U.S. 211,

230 (1991). Plaintiffs' attempts to interfere with explicit statutory mandates and agency discretion to implement its own rules are unavailing. They show neither that they are clearly entitled to relief nor that extreme or very serious damage will result from the denial of an injunction—the standard applicable when requesting a mandatory injunction that would alter, rather than preserve the status quo. *See Winter*, 555 U.S. at 20; *Columbia Hosp. for Women*, 15 F. Supp. 2d at 4.

## I.    Plaintiffs cannot demonstrate that they are likely to succeed on the merits.

### A.  Plaintiffs lack standing.

The UAC and organizational Plaintiffs lack standing to challenge the IFR and the updated sponsor-vetting guidance because, as explained below, they cannot show a judicially cognizable injury caused by Defendants. If a litigant lacks standing, the court has no subject-matter jurisdiction and therefore lacks constitutional authority to decide the case. *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1156–57 (D.C. Cir. 2005). "The first component of the likelihood of success on the merits prong usually examines whether the plaintiffs have standing in a given case." *Barton v. District of Columbia*, 131 F. Supp. 2d 236, 243 n.6 (D.D.C. 2001) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101, 118 S. Ct. 1003, 140 L.Ed.2d 210 (1998)). "To establish standing, … a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

#### i.  The UAC Plaintiffs.

The UAC Plaintiffs lack Article III standing to bring their APA claims because they do not "satisfy the threshold requirement" of "alleg[ing] an actual case or controversy." *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974). Where, as here, the relief sought is also prospective, a plaintiff must demonstrate a risk of future injury that is both "real" and "immediate" and neither

"conjectural" nor "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983); *see also Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*, 456 F. Supp. 3d 16, 25–26 (D.D.C. 2020). A plaintiff seeking forward-looking relief bears the burden of proving the existence of a future "threatened injury [that is] certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). Plaintiffs' request for relief falls short because it rests on the speculative effect of ORR's policies on their ability to be released to a qualified sponsor, but Plaintiffs each have individual circumstances preexisting the challenged rule and guidance, and regardless, have unique fact-specific circumstances. *See generally* Declaration of Angelica S., ECF No. 9-7; Declaration of Eduardo M., ECF No. 9-8; Declaration of Liam W., ECF No. 9-9; Declaration of Leo B., ECF No. 9-10; Declaration of Xavier L., ECF No. 9-11. They also cannot show that the injury they claim—delay in release to a sponsor—is "fairly traceable to the defendant's challenged conduct." *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011) (citing *Lujan*, 504 U.S. at 560–61, 112 S. Ct. 2130).

Plaintiffs' speculative allegations of harm do not raise any concrete injury sufficient to establish standing or obtain injunctive relief. For example, Angelica S. came into ORR custody in November 2024, approximately three months prior to the IFR/updated guidance in February/March 2025. Angelica S. Decl. ¶ 2, ECF No. 9-7. Thus, the IFR/updated guidance cannot be the reason she was not released to a sponsor prior to February/March 2025. Indeed, other factual circumstances, including that an adult caregiver in the potential sponsor's home was arrested in January 2025 for sexual abuse of an eight-year-old child. Biswas Decl. ¶ 22. Even if Plaintiffs do show a cognizable injury in fact, their claims are not redressable because the Court cannot order ORR to grant their sponsor's applications or order their release when they do not have a qualified sponsor.

ii. *The Organizational Plaintiff.*

The organizational Plaintiff, Immigrant Defenders Law Center, cannot establish organizational standing based on its claims that the IFR and updated sponsor-vetting guidance have resulted in its reallocation and expenditure of their attorneys' time and resources. Felix Decl. ¶¶ 10-12, 18, 20, 22. Where an organization sues on its own behalf, it must establish standing in the same manner as an individual. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975). Organizations may have standing in some situations where they are directly injured, as recognized in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). But as the Supreme Court has recently held, *Havens* does not stand for the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. The Court read *Havens* narrowly as regarding a situation where the defendants' "actions directly affected and interfered with [the plaintiff's] core business activities" and analogized the case to "a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* The IFR and updated guidance at issue here does not directly or indirectly apply to the organizational Plaintiff and would "not impose[] any similar impediment to [Plaintiffs'] advocacy business." *Id.* Thus, Plaintiffs cannot establish standing under *Havens*, as clarified by *All. for Hippocratic Med.*

Prior to the Supreme Court's clarification of *Havens* in *All. for Hippocratic Med.*, the D.C. Circuit developed a two-part inquiry for determining standing where an organization claims a diversion-of-resources injury: (1) "whether the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission," and, if so, (2) "whether the plaintiff used its resources to counteract that injury." *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). *All. for Hippocratic Med.* calls this test into question. But even that framework makes clear that expending time and resources alone to respond to governmental action does not cognizably injure

an organization. At most, such expenditures on their own may constitute "setback[s] to [the organization's] abstract social interests." *Havens*, 455 U.S. at 379. And "[t]he mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *El Paso Cnty., Texas v. Trump*, 982 F.3d 332, 344 (5th Cir. 2020) (quoting *Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994)); *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) ("impairment of its advocacy" not enough).

Instead, the organizational plaintiff must also demonstrate that the challenged actions have injured the plaintiff in the first instance. *See All. for Hippocratic Med.*, 602 U.S. at 394. Plaintiffs cannot do so here. They do not explain how rules strengthening documentation and identity requirements for UAC sponsorship would impair their mission to represent immigrants in removal proceedings or provide legal services to UAC. Felix Decl. ¶¶ 5-6. Instead, the harms they cite—such as spending additional time and resources on cases and communication with ORR—are part and parcel of providing legal services. *Id.* ¶¶ 10-12, 18, 20, 22.

Relatedly, in their capacity as lawyers for UAC in removal proceedings, Plaintiffs have no cognizable interest in avoiding whatever reallocation of resources they may choose to make in light of the IFR/updated guidance. Such voluntary reallocation is merely an "indirect effect[]" of the IFR/updated guidance that makes their assertion of injury "more attenuated," *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023), and with which ORR's statutory and regulatory authority are not concerned. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 804–07 (D.C. Cir. 1987). "If the law were otherwise, an enterprising plaintiff would be able to secure" the right to challenge a governmental action without any otherwise cognizable injury "simply by making an expenditure"

in response to the action. *Clapper*, 568 U.S. at 416. Under their theory, law firms may sue any time the law changes in a way that requires them to alter their business strategy due to an increase or decrease in the amount of time they must spend on cases, or even where the law becomes easier for non-attorneys to navigate such that finding clients becomes more difficult. As a practical matter, this theory would nullify the principle that a lawyer has no independent litigable interest in the legal rules applicable to the lawyer's clients. *See, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 130–34 (2004); *see id.* at 135 (Thomas, J., concurring) ("Litigants who have no personal right at stake may have very different interests from the individuals whose rights they are raising."); *cf. All. For Hippocratic Med.*, 602 U.S. at 393 (rejecting the creation of a special "doctor standing"). The Supreme Court "has 'never accepted such a boundless theory of standing.'" *Murthy v. Missouri*, 144 S. Ct. 1972, 1996 (2024) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013)).

### iii.   The organizational Plaintiff is not within the zone of interests.

The organizational Plaintiff's claims also fail because the alleged effect of the IFR/updated guidance on their expenditures and legal practices does not fall within the zone of interests of the HSA or the TVPRA. A plaintiff must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute" to sue under the APA. 5 U.S.C. § 702. And "the interest sought to be protected" must be "arguably within the zone of interests to be protected or regulated by the statute … in question." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 396 (1987) (quoting *Rusk v. Cort*, 369 U.S. 367, 379–380 (1962)). Nothing in the text, structure, or purpose of the HSA or TVPRA suggests that Congress intended to permit organizations to contest ORR's statutory and regulatory authority over the care and custody of UAC based on attenuated effects on their own spending decisions.

Organizations that "provide legal help to immigrants" do not satisfy the zone-of-interests test. *INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1302 (1993) (O'Connor, J., in chambers). Federal immigration law was "clearly meant to protect the interests of undocumented [noncitizens], not the interests of organizations." *Id.* at 1305. That an immigration regulation "may affect the way an organization allocates its resources" for representing noncitizens accordingly does not bring the organization "within the zone of interests" that the asylum and withholding statutes protect. *Id.*

Accordingly, Plaintiffs lack standing, and the Court should deny their request for a preliminary injunction.

## B.  The Interim Final Rule is Lawful and Should Not be Enjoined

### i.  *ORR properly utilized the exceptions to notice-and-comment procedures.*

ORR was not required to follow notice-and-comment procedures before publishing the IFR because good cause existed to remove the provision of the Foundational Rule that contravened a federal statute. The APA provides an exception to notice-and-comment procedures "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(4)(B). Here, ORR determined that a provision of the Foundational Rule contravened a federal statute and, thus, "ORR had no authority to promulgate such a rule." 90 Fed. Reg. 13,555. Specifically, the provision stated:

> ORR shall not disqualify potential sponsors based solely on their immigration status and shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement related purposes. *ORR shall not share any immigration status information relating to potential sponsors with any law enforcement or immigration enforcement related entity at any time*.

45 C.F.R. 410.1201(b) (emphasis supplied). This provision defied a statute enacted by Congress, which prohibits restricting agencies—like ORR—from sharing information on immigration status with immigration enforcement agencies:

> Notwithstanding any other provision of Federal, State, or local law, *a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status*, lawful or unlawful, of any individual.

8 U.S.C. § 1373. Accordingly, ORR determined that it was required to "update the Foundational Rule to strike 45 C.F.R. § 410.1201(b)." 90 Fed. Reg. 13,555. Specially, ORR issued a rule change that removed "the prohibition on sharing immigration status information relating to potential sponsors with law enforcement and immigration enforcement entities." *Id.* Additionally, ORR found that the good cause exception to notice and public comment under 5 U.S.C. § 553(b)(4)(B) applied, and that it had the authority the issue the rule change as an IFR. *Id.*

As required by 5 U.S.C. § 553(b)(4)(B), ORR incorporated its finding of why there was good cause for the exception into a brief statement of reasons in the IFR. 90 Fed. Reg. 13,555. In the statement, ORR explained that "45 C.F.R. § 410.1201(b) contravenes 8 U.S.C. § 1373," and that the agency "had no authority to promulgate such a rule." *Id.* ORR further explained that "revoking [the provision] immediately is in the public interest," and that "notice and comment is unnecessary and contrary to the public interest because no amount of public input could give ORR the power to contravene a duly-enacted law of Congress via regulation." *Id.* Finally, ORR found that there was good cause under 5 U.S.C. § 553(d)(3) for the IFR to take immediate effect on March 25, 2025, and encouraged "all interested parties to participate in this rulemaking by submitting written comments, views, and data on any or all aspects of this IFR." *Id.* The closing date for public comments is May 27, 2025. *Id.* ORR will prioritize reviewing those public

comments and publishing a final rule. Biswas Decl. ¶ 21. The timeline for publishing a final rule depends on the number of comments received, but ORR estimates that it will take "several months to finalize and clear." *Id.*

Plaintiffs argue that ORR has not adequately invoked any exception to the notice-and-comment procedures. *See* Mot. 16-20. As set forth above, however, ORR provided the justification in the IFR that "notice and comment is unnecessary and contrary to the public interest because no amount of public input could give ORR the power to contravene a duly-enacted law of Congress via regulation." 90 Fed. Reg. 13.555. As the D.C. Circuit explained in *Mack Trucks, Inc. v. E.P.A.*, "the public interest prong of the good cause exception is met only in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." 682 F.3d 87, 95 (D.C. Cir. 2012). That exception fits ORR's justification here. In the situation where a regulation limits ORR's ability to share immigration status information with federal enforcement agencies squarely contravenes a federal law that prohibits this restriction on information-sharing, delaying the resolution of the conflicting authorities to permit public commentary would jeopardize the public interest. During the entire open period for public participation, the offending regulation would remain in effect, confusing both the public and ORR as to which authority to follow. Depending on the number of comments received, this untenable situation would have continued many months before ORR would have been able to promulgate a corrective rule. Plaintiffs' suggestion that "the public could have provided 'data, views, or arguments'" about "the interaction between § 1373 and the statutes and regulations governing ORR's program and suggested regulatory alternatives," *see* Mot. 20, fails to address this interim period where ORR and the public would have been unsure of what law to follow, and the continuing public harm of requiring an agency to violate federal law. The public interest exception

under § 553(b)(4)(B) relieves ORR of operating in this untenable situation in rare circumstances like this one where notice-and-comment procedures would harm corrective rule making.

Plaintiffs also seek to separate the clauses in the first sentence of the former 45 C.F.R. 410.1201(b), arguing that eligibility and collection provisions of the first sentence are not "inextricably linked" to the information sharing provision in the second sentence, and thus should not have been removed in the IFR. *See* Mot. 18-19; *see* 90 Fed. Reg. at 13,555 n.1. The first sentence provides that,

> ORR shall not disqualify potential sponsors based solely on their immigration status and shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement related purposes.

First, the two clauses of the first sentence cannot be so neatly separated as Plaintiffs suggest. The use of the word "and" typically signifies a conjunctive list, meaning that each condition must be satisfied. Thus, absent clear intent to the contrary, the eligibility clause must be considered together with the collection clause. Second, it is difficult to imagine how ORR can fulfill its statutory obligation under § 1373 to share immigration status information that it uncovers in the course of other legal obligations (including the TVPRA)—whether affirmatively or at the request of an immigration enforcement agency—if it does not collect this information. ORR would either have to explicitly discourage potential sponsors from sharing any immigration status information, which could potentially conflict with its duty of making placements in the best interest of the child, or it would have to destroy any such information that it receives, raising both record-keeping and § 1373 compliance concerns. Thus, ORR correctly found that "45 C.F.R. 410.1201(b)'s parts are inextricably linked and there was no indication in the Foundational Rule that it was intended to treat the information-sharing and the eligibility issues as distinct." *See* 90 Fed. Reg. at 13,555, n.1. Moreover, ORR's alternative justification for removing the entire provision under former 45

C.F.R. 410.1201(b), based on the preamble of the Foundational Rule, 89 Fed. Reg. at 34,389, "that severability runs—at most—to provisions, not to portions of provisions," also justifies ORR's decision to excise the entire provision in the IFR.

ORR was also justified in invoking the good cause exception to provide for immediate effect of the IFR. The APA permits substantive rules to take immediate effect—bypassing the typical 30-day minimum requirement after publication and service—where the agency provides good cause and publishes the justification with the rule. 5 U.S.C. 553(d)(3). The section 553 exceptions, however, are to "be narrowly construed and only reluctantly countenanced." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981). Here, ORR's good cause for invoking the exception was that the "IFR brings an ORR regulation into compliance with a federal statute and regulated entities do not need time to adjust their behavior before this rule takes effect." *See* 90 Fed. Reg. at 13,555. ORR, of course, can determine whether it has had sufficient time to adjust its behavior to comport with the IFR without a 30-day period before it became effective. Plaintiffs, however, argue that this is incorrect given their reliance on the protections of the Foundational Rule, and the fact that "ORR's changes to sponsor requirements to increase scrutiny of sponsor's immigration status and permit denials based on immigration status have caused significant disruption and delays in ORR's release process." *See* Mot. 22. It is unclear, however, what changes Plaintiffs will need to make in their behavior to comport with the IFR—they offer none. To the extent that Plaintiffs may be impacted by changes in the behavior of potential sponsors due to the IFR, it is speculative that the 30-day effective date would make any meaningful difference such that the Plaintiffs would need to modify their behavior. Similarly, even if some potential sponsors may be dissuaded if they know ORR may be required to share their immigration status with immigration enforcement, there is no indication that a 30-day effective period for the

IFR would have any meaningful impact on their behavior. On this record, ORR's decision to make the IFR effective immediately was lawful.

Finally, if the Court questions whether ORR was required to comply with notice-and-comment procedures, this issue can be addressed during the merits of this case. As discussed below, none of the Plaintiffs have provided evidence sufficient to make a clear showing that they will suffer irreparable harm if the Court does not enter the requested preliminary injunction. *See Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) (plaintiffs bear "considerable burden" in the D.C. Circuit "of proving that their purported injuries are 'certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.'"). On this record, Plaintiffs are not entitled to the extraordinary relief of a preliminary injunction, and the Court should deny their motion.

## ii. The Interim Final Rule is Neither Arbitrary Nor Capricious.

ORR's decision to issue the IFR to correct the conflict between the Foundational Rule and 8 U.S.C. § 1373 was reasonable and reasonably explained and, thus, not arbitrary and capricious. As discussed previously, ORR decided to promulgate the IFR to make the Foundational Rule consistent with its legal obligation to share information with other federal agencies. Plaintiffs argue that ORR has not provided any justification for rescinding the first sentence of 45 C.F.R. 410.1201(b), which dealt with sponsor eligibility and information collection, but not information sharing. *See* Mot. 22. ORR's explanation is that these components of 45 C.F.R. 410.1201(b) are "inextricably linked," and that "there is no indication in the Foundational Rule that it was intended to treat the information-sharing and the eligibility issues as distinct." 90 Fed. Reg. at 13,555 n.1. Indeed, that these issues are in the same provision of the Foundational Rule is instructive. Additionally, ORR found significant that the preamble of the Foundational Rule made plain that

"severability runs . . . to provisions, not portions of provisions," as further evidence that information-sharing and eligibility were not intended to be treated separately. Plaintiffs, however, contend that ORR has not provided any rational basis for this policy change, and failed to consider the impact of its decisions on Plaintiffs. PI, pp. 23-36.

ORR has provided a rational basis for its decision and, thus, it is not arbitrary and capricious under the APA. "The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency[.]" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). "[This] standard of review is highly deferential to the agency," *Bean Dredging, LLC v. United States*, 699 F. Supp. 2d 118, 126 (D.D.C. 2010), and to survive the "arbitrary and capricious" standard, the agency need only articulate "a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs.*, 463 U.S. at 43. "The question is not what [the reviewing court] would have done, nor whether [the court] agree[s] with the agency action. Rather, the question is whether the agency action was reasonable and reasonably explained." *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015). Here, the Court should not substitute its judgment for ORR's, even if it were to disagree with the decision that ORR made. ORR reasonably decided to promulgate the IFR to make the Foundational Rule consistent with § 1373, and provided a reasoned explanation for doing so. Under the deferential arbitrary and capricious standard that the Court applies under the APA, ORR's decision was lawful.

### C. The Interim Final Rule Does Not Constitute "Final Agency Action" Subject to Judicial Review Under the APA.

Plaintiffs err in contending that the IFR constitutes "final agency action" subject to judicial review. As articulated below, the IFR, by its explicit nature and the procedural posture of its

promulgation, fails to meet the established legal criteria for finality. As a result, this Court may not exercise review over Plaintiffs' APA claims challenging the IFR.

The APA strictly limits judicial review to, inter alia, "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. This finality requirement is a critical prerequisite, preventing premature judicial intervention in administrative processes that are not yet conclusive. Plaintiffs' assertion that the IFR is final agency action misapprehends the governing legal standards and the nature of the challenged agency action. The Supreme Court in *Bennett v. Spear*, 520 U.S. 154 (1997) articulated the definitive two-prong test for determining whether an agency action is "final."

*First*, the action must mark the "consummation" of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. *Id*. This prong inquires whether the agency has reached a definitive and terminal point in its consideration, representing its settled position. *Second*, the action must be one by which "'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id*. This prong focuses on whether the action carries legal weight, alters the legal landscape, or has direct and appreciable legal ramifications. Indeed, a pragmatic and flexible approach is often encouraged in applying this test, particularly concerning the legal consequences prong. However, this pragmatism does not dilute the fundamental requirement that the agency has definitively spoken and its action has a tangible legal effect. Contrary to Plaintiffs' arguments, the IFR does not meet either prong of the *Bennett v. Spear* test.

The IFR, on its face and by its procedural context, is not the consummation of ORR's decision-making process. The rule is denominated as an "Interim Final Rule" and, critically, was issued with a 60-day public comment period. The very purpose of an "interim" rule coupled with

a comment period is to solicit public input—written data, views, or arguments—that the agency is expected to consider before issuing a potentially revised, truly final rule. This ongoing solicitation signifies that the agency's deliberative process has not concluded; the agency has explicitly reserved the opportunity to modify its position based on public feedback.

An action that is "tentative or interlocutory in nature" does not satisfy the consummation prong. An "Interim" rule subject to public comment and potential agency alteration is inherently tentative. It does not represent the agency's "settled position" but rather a provisional step pending further consideration. Plaintiffs acknowledge that ORR made the IFR effective immediately without first considering notice and comment. The post-promulgation comment period for an Interim rule, however, underscores that the agency's decision-making is not yet finalized. The agency has not reached a "terminal point" in its deliberations.

Indeed, the IFR does not definitively determine rights or obligations, nor do final legal consequences irrevocably flow therefrom at this stage. To be sure, though the IFR was made effective immediately, its "interim" status and the pending comment period prevent it from definitively determining rights or obligations or causing legal consequences to flow with the finality required under *Bennett v. Spear*'s precedent. For "rights or obligations [to] have been determined" or for "legal consequences [to] flow," the agency action must be a conclusive and settled pronouncement. An interim rule that the agency itself has indicated is subject to change based on public commentary lacks this definitive character.

And while immediate practical effects may arise, as Plaintiffs allege, the legal status of these effects as flowing from a finally determined agency position is undermined by the rule's provisional nature. The legal landscape is not irrevocably altered by a measure explicitly open to imminent agency revision. Any rights purportedly determined, or consequences imposed, by the

IFR are contingent upon the agency's ultimate decision after the comment period. The agency may amend or rescind the IFR, thereby altering or nullifying those initial effects. This potential for change differentiates the IFR from an action that permanently fixes legal relationships or obligations. The alleged harms, such as prolonged detention and family separation, while undoubtedly significant, do not transform an administratively non-final action into a final one for the purposes of APA review. The legal character of the agency action itself—its conclusiveness and the finality of its legal impact—is the linchpin of the *Bennett v. Spear* inquiry.

Accordingly, absent final agency action, this court lacks jurisdiction to review Plaintiffs' APA claims challenging the IFR. The requirement of "final agency action" in APA § 704 is a mandatory prerequisite to judicial review for actions not otherwise made reviewable by a specific statute. While the APA itself is not an independent grant of subject-matter jurisdiction, *see Califano v. Sanders*, 430 U.S. 99 (1977), the absence of final agency action means that a fundamental condition for invoking the APA's judicial review provisions has not been met. Plaintiffs assert that the IFR is procedurally invalid because ORR bypassed notice and comment and made the IFR effective immediately without good cause. They further argue it is arbitrary and capricious. These substantive and procedural challenges under the APA, however, are premature if the threshold requirement of finality is not satisfied. This court cannot reach the merits of an APA claim if the challenged action is not final.

The Interim Final Rule, by virtue of its "interim" designation and the ongoing 60-day comment period which contemplates potential agency revision, is not the "consummation" of ORR's decision-making process. Furthermore, it does not definitively determine rights or obligations, nor do final legal consequences irrevocably flow therefrom at this stage. Accordingly, the IFR does not constitute "final agency action" under 5 U.S.C. § 704 as interpreted *by Bennett*

*v. Spear*. Plaintiffs' APA claims challenging the IFR are therefore not ripe for judicial review, and this court should decline to exercise review over them.

**D.  ORR's sponsor documentation requirements are lawful.**

Plaintiffs contend that ORR's updated sponsor-vetting guidance is unlawful and violates the APA because the guidance violates ORR's own regulations and the TVPRA's mandate that ORR place UAC in the least restrictive setting. Mot. at 27-40. However, Plaintiffs fail to contend with the TVPRA's equally compelling mandate that ORR ensure UAC safety and protection from human traffickers. 8 U.S.C. 1232(a)(1).

Plaintiffs argue that ORR's refusal to accept other proof of financial stability, instead of requiring proof of income, is contrary to the Foundational Rule and that ORR is acting in contravention of their own regulations in violation of the *Accardi* doctrine. Mot. 30-31. However, the language of the Foundational Rule that as part of the suitability assessment ORR "may" require verification of income or other information that a sponsor can support a child does not preclude ORR from requiring certain types of documents to prove a suitability factor.

In addition, Plaintiffs argue that the updated proof of income requirements lead to unnecessary delays in violation of the TVPRA and the Foundational Rule. Mot. 31-33. Plaintiffs fail to acknowledge that ORR has concluded in its discretion that to implement the TVPRA's mandate that ORR protect UAC from human traffickers that it was necessary to strengthen its proof of income requirements. Biswas Decl. ¶ 17. Plaintiffs offer no justification for elevating the TVPRA's mandate to promptly place children in the least restrictive setting over the mandate to ensure the safety of UAC and protect them from smugglers or human traffickers. 8 U.S.C. 1232(c)(2)(A). Further, while the Foundational Rule provides a timeframe of 10-14 days for adjudication of completed sponsor applications, the Foundational Rule also provides that the

timeframe applies in cases "absent unexpected delay." 45 C.F.R. 410.1205(b). In cases where potential sponsors decline to submit required documentation, the exception to the timeline where there is an unexpected delay applies.

Further, Plaintiffs argue that the identification and income requirements are arbitrary and capricious under the APA. Mot. at 33-36. Citing *Fox Television Stations*, 556 U.S. at 515, and *Regents of Univ. Of Cal.*, 591 U.S. at 30, Plaintiffs contend that ORR failed to explain its updated sponsor-vetting guidance and to consider reliance interests when updating its guidance. Mot. at 33-36. However, those cases do not negate ORR's broad discretion to fashion its own rules of procedure nor have they shown that notice and comment rulemaking apply to ORR's decision concerning the types of documents it will accept to implement the Foundational Rule. *See Vt. Yankee*, 435 U.S. at 543; *Mobil Oil*, 498 U.S. at 230.

### E. ORR's Revised Identification and Income Verification Requirements are Not Impermissibly Retroactive.

Plaintiffs' contention that ORR's revised identification and income verification requirements in Policy Guide § 2.2.4 are impermissibly retroactive when applied to pending sponsorship applications is unavailing. The presumption against retroactivity primarily protects against impairing vested rights, increasing liability for past conduct, or imposing new duties regarding transactions already completed. The submission of a sponsorship application, however, does not create a vested right to approval under standards subsequently deemed insufficient by ORR to ensure child safety and well-being—the agency's paramount statutory mandate. Unlike cases where past actions irrevocably fixed rights, *see*, *e.g.*, *St. Cyr*, 533 U.S. 289 (2001), concerning past criminal conduct, the sponsorship process is inherently forward-looking and discretionary, focused on the prospective release of a child. Applying updated requirements to pending applications to ensure they meet current safety standards before a child is released does

33

not impair rights a party possessed when they acted, as the transaction—the release decision—is not yet complete. ORR's obligation to ensure a child's safety necessitates applying the most current and appropriate standards, and sponsors do not have a settled expectation to be judged by potentially outdated criteria when the overarching consideration is child welfare.

### F. Plaintiffs lack standing to assert a claim under the Paperwork Reduction Act

Plaintiffs also assert that ORR's updated sponsor-vetting guidance is contrary to law because it violates the Paperwork Reduction Act (PRA) and thus ORR "is prohibited from penalizing sponsors for failing to provide the specific documentation required by the unapproved revisions to Policy Guide § 2.2.4." *See* Mot. 36-37. Plaintiffs, however, are not subject to the collection requirement that they challenge—potential sponsors are. Accordingly, Plaintiffs lack standing to assert this claim because they have not suffered an injury in fact. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). For this reason, they cannot demonstrate a likelihood of success on the merits of this claim.

### II. Plaintiffs have not demonstrated they will suffer irreparable harm without the extraordinary relief of a preliminary injunction.

Plaintiffs have not established that they are suffering irreparable harm that warrants a preliminary injunction. The "standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017). The Supreme Court has made clear that a court may not issue "a preliminary injunction based only on a *possibility* of irreparable harm . . . [since] injunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (emphasis added). In fact, if a party makes no showing of imminent irreparable injury, the court may deny the motion for injunctive relief without considering the other factors. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). "[P]roving 'irreparable' injury is a

considerable burden, requiring proof that the movant's injury is '*certain, great*[,] *and actual*—not theoretical—and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm." *Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev*, 456 F. Supp. 3d 16, 33 (D.D.C. 2020) (alterations in original) (quoting *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005)).

The organizational Plaintiff does not allege any irreparable harm. The UAC Plaintiffs contend that they suffer irreparable harm "as they remain unnecessarily detained and separated from their families." Mot. 40. Specifically, Plaintiffs assert that they are experiencing emotional distress and contend that some children have experienced stress that led to physical symptoms such as headaches, stomachaches, and difficulty sleeping and eating. *Id.* at 40–41. Even if accepted as true, these assertions of irreparable harm are mitigated by the government's provision of healthcare to UAC in ORR custody. While placed at ORR standard programs, Plaintiffs are provided comprehensive health care, including mental health care and emergency care. 45 C.F.R. § 410.1307(b)(1), (6).

More broadly, the government contests Plaintiffs' premise that being cared for in one of ORR's standard programs constitutes irreparable harm. UAC are in ORR custody, but almost never detained. Almost all UAC are placed in standard programs that are not restrictive. 45 C.F.R. § 410.1104. In the context of UAC, the Supreme Court has recognized that "'juveniles, unlike adults, are always in some form of custody,' and where the custody of the parent or legal guardian fails, the government may (indeed, we have said *must*) either exercise custody itself or appoint someone else to do so." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citation omitted) (quoting *Schall v. Martin*, 467 U.S. 253, 265 (1984)). By definition, when a child is a UAC, the custody of the parent or legal guardian has failed. 6 U.S.C. § 279(g). Congress mandates that HHS take responsibility

for the care and custody of all UAC. 8 U.S.C. § 1232(b)(1). ORR's standard programs provide numerous services to care for UAC. *See generally* 45 C.F.R. § 410.1302. Of course, ORR prefers to place UAC with a vetted, suitable family member in the community. But when ORR cannot confirm that the "proposed custodian is capable of providing for the child's physical and mental well-being," ORR abides by its statutory mandate to maintain custody. 8 U.S.C. § 1232(c)(3)(A). This provision for children's welfare does not constitute irreparable harm.

To the extent Plaintiffs allege that ORR custody becomes an irreparable injury at some number of days, they do not identify what that point it. Even if some length of ORR custody were to constitute irreparable harm, much of Plaintiffs' alleged harm would not be attributable to the updated policies. For example, Angelica S. was in ORR custody for several months before the updates to the UAC Policy Guide because of her pregnancy and because the initial sponsorship process was interrupted by the arrest of an adult caregiver. Biswas Decl. ¶ 22.

In addition, Plaintiffs have not made any showing that the IFR has caused them irreparable harm. Plaintiffs may believe that fewer potential sponsors may be willing to come forward because they are concerned that their immigration status will be shared with DHS, but on this record Plaintiffs' showing is insufficient to meet their "considerable burden" of proving that the alleged injury is "certain, great, and actual," as well as "imminent." *Nat'l Immigr. Project*, 456 F. Supp. 3d at 33. Plaintiffs have not made a clear showing of irreparable harm, so this Court should not grant injunctive relief.

III.    **Plaintiffs' request for preliminary injunctive relief is contrary to the public interest.**

A. **Any relief must be sharply limited.**

Even if this Court were to grant relief, universal relief would be inappropriate, and any relief must be tailored to the specific claims made and to the individual and organizational

Plaintiffs here. But Plaintiffs argue that the Court should enjoin the IFR and prohibit ORR from enforcing or implementing its updated sponsor-vetting guidance entirely. Mot. at 4, 14, 43-44. The Court should not heed Plaintiffs' request.

First, under Article III, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill*, 138 S. Ct. at 1934, and the rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Plaintiffs bear the burden of showing that something short of the nationwide injunction they seek will not fully redress their particular injuries. *See Winter*, 555 U.S. at 20. Here, any relief must be tailored to remedying Plaintiffs' alleged harms. Plaintiffs' claims are case specific. For example, Plaintiffs argue that Angelica S., who gave birth in February 2025, "lacks any viable sponsor because of ORR's changed identification and information collection and sharing policies and, absent an injunction, will have to raise her baby alone in a restrictive congregate care environment far from family support." Mot. at 40. However, Plaintiffs neglect to mention a key fact likely lending to the delayed release in her case—"her potential sponsor disclosed that Angelica's adult caregiver was arrested on January 23, 2025, for sexual abuse toward an eight-year-old child." Biwas Decl. ¶ 22. An injunction should not preclude ORR from implementing policies to protect UAC without case specific analysis.

Second, nothing in the APA indicates that a nationwide injunction is appropriate at this preliminary stage. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) ("No statute expressly grants district courts the power to issue universal injunctions."). The APA provides only that a court may "hold unlawful and set aside agency action." 5 U.S.C. § 706(2); *see also* Mot. at 15, 22 (arguing IFR should be set aside). But no part of that text specifies whether any action, if found likely to be invalid, should be set aside on its face or as applied to the

challenger. In the absence of a clear statement to the contrary, this Court should adopt the reasonable reading of the "set aside" language. *See, e.g.*, *New York v. U.S. DHS*, 969 F.3d 42, 87-89 (2d Cir. 2020); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018); *Va. Soc'y for Human Life v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) ("Nothing in the language of the APA, however, requires us to exercise such far-reaching power."). The APA itself should be read to limit interim relief to the parties before it. *See* 5 U.S.C. § 705 (relief pending review is appropriate only "to the extent necessary to prevent irreparable injury").

Indeed, the APA's very reference to actions for "declaratory judgments" makes clear that no injunction—much less a nationwide one—is compelled by the APA when agency action is held unlawful. *See* 5 U.S.C. § 705; H.R. Rep. No. 1980, 79th Cong., 2d Sess. 42 (1946) (referring to possibility of suits for declaratory relief to "determine the validity or application of a rule or order"); *see also* S. Rep. No. 752, 79th Cong., 1st Sess. 26 (1945). A different result is not compelled under *Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998), or *Grace v. Barr*, 965 F.3d 883, 887 (D.C. Cir. 2020). Those cases dealt with final judgments, "where the court had already held that the rule at issue was unlawful and should be vacated." *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 125, 128 (D.D.C. 2015), *aff'd sub nom. U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131 (D.C. Cir. 2017). However, in adjudicating a preliminary injunction motion, "the Court has not finally determined that the [action] is unlawful," so "the need for narrow tailoring . . . is particularly important," and any "injunction should be limited in scope to protect only" parties to the case. *Id.* at 126, 129; *see Neb. DHHS v. DHHS*, 435 F.3d 326, 330 (D.C. Cir. 2006) (district court erred by not limiting injunction to plaintiff alone).

If the Court decides any relief is warranted, the circumstances of this case would warrant remand without vacatur. As explained, the decision to order relief under the APA must be exercised in conformity with equitable principles. *See Allied-Signal*, 988 F.2d at 150; *see also Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (vacatur a question of the court's remedial "discretion"). In this Circuit, that equitable balance is assessed by looking to "the seriousness of the order's deficiency … and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d at 150–51. Applying this balance here, if the Court were to find the IFR and updated sponsor-vetting guidance invalid, it should remand without vacatur for ORR to allow the IFR comment period to close, and for ORR to consider Plaintiffs' fact-specific claims regarding their allegedly delayed release to sponsors. The asserted defects that Plaintiffs identify could be remedied through re-issuance of the IFR and updated guidance without the purported procedural defects claimed here. *See, e.g., id.* at 151 (remand without vacatur appropriate where agency can "explain" on remand issues found arbitrary and capricious). Thus, vacatur is unwarranted.

## B.  The balance of equities and public interest establish that no relief should be granted.

The Court should deny Plaintiffs' motion because the balance of equities and the public interest weigh strongly in the government's favor. Any injunctive relief—preliminary or permanent—"is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32. Plaintiffs have not met their burden to prove that the Court should exercise its equitable discretion to enter an injunction here. Indeed, the public interest factors that Plaintiffs identify show that the Court should not enter an injunction. Thus, a "proper consideration of these factors alone requires denial of the requested injunctive relief." *Id.* at 23.

Plaintiffs assert that the Court should enter a preliminary injunction because of the public's "strong interest in the well-being of children." Mot. 42. But the reverse is true. Because of the public's interest in the well-being of children, the Court should permit ORR to conduct the vetting procedures that it has determined to be necessary to ensure children's safety. Plaintiffs discount the government's interest in "caring for children" by arguing that parents or other potential sponsors are available. Mot. 43. Plaintiffs, however, assume that the potential sponsors are "in fact suitable." *Id.* ORR cannot make that assumption. Facts about some of the potential sponsors for the named Plaintiffs illustrate the point. An adult caregiver for Angelica S. was arrested on January 23, 2025, for sexual abuse toward an eight-year-old child, requiring ORR to investigate the home further. Biswas Decl. ¶ 22. On February 25, 2025, Eduardo M.'s adult caregiver "withdrew following background check results." *Id.* ¶ 23. And ORR was aware that Xavier L.'s mother had been arrested in February and May of 2024. *Id.* ¶ 26. Through experience, ORR learned that its prior vetting procedures were insufficient to protect children. *Id.* ¶¶ 4–17. For that reason, in its professional judgment, ORR determined that the updates to the UAC Policy Guide are necessary to ensure that potential sponsors are suitable. The Court must give substantial deference to ORR's experience and predictive judgments about the risks of fraud and human trafficking in the absence of the improved vetting requirements. *See Winter*, 555 U.S. at 27.

Plaintiffs also contend that the public interest favors "protecting the constitutional right to family integrity." Mot. 42. But Plaintiffs have not shown that any such constitutional right is being violated. In the motion for a preliminary injunction, Plaintiffs do not try to show a likelihood of success on their constitutional claims. Therefore, the Court should not give the constitutional allegations any weight when balancing the equities.

Next, Plaintiffs maintain that an injunction is warranted by the substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." Mot. 42 (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). This contention fails to meet Plaintiffs' burden for several reasons. First, as discussed above, the IFR and updates to the UAC Policy Guide were adopted in accordance with law. Second, far from ignoring the federal laws governing ORR, HHS enacted the IFR to conform its regulations to federal law—specifically, 8 U.S.C. § 1373. Third, while Plaintiffs emphasize Congress's and the Foundational Rule's use of the word *promptly*, Congress set forth several other requirements that ORR must satisfy before releasing a child to a sponsor. ORR must ensure that potential sponsors are, in fact, suitable and that UAC "are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity." 6 U.S.C. § 279(b)(2)(A)(ii). And ORR must ensure that UAC are "placed in a setting in which they are not likely to pose a danger to themselves or other." *Id.* § 279(b)(2)(A)(iii). Further, ORR must determine that a sponsor "is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). This safety and suitability determination must "at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* ORR's experience and professional expertise have shown that the updated provisions of the UAC Policy Guide are necessary to meet those statutory requirements. Biswas Decl. ¶¶ 4–17.

In addition, Plaintiffs fail to acknowledge that the government has weighty interests in "protecting the community from crime." *Schall v. Martin*, 467 U.S. 253, 264 (1984). ORR enacted the IFR and updated the UAC Policy Guide to "combat sponsor fraud and mitigate risk of human

trafficking," crimes that victimize children and harm communities. Biswas Decl. ¶¶ 13–17. Similarly, the IFR removed a regulatory restriction that "threatens to hamper ongoing interagency efforts to identify, investigate, and prosecute sponsor fraud and other human trafficking offenses." Biswas Decl. ¶ 19. "A rushed judgment is a dangerous one[.]" *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 203 (3d Cir. 2024), *cert. denied sub nom. Gray v. Jennings*, 145 S. Ct. 1049 (2025). At their current placements in ORR custody, Plaintiffs are cared for in safe environments. Based on this preliminary record and expedited briefing, the Court should not set aside the government's judgments on those children's safety.

Finally, the Court should "rightly hesitate to interfere with exercises of executive ... authority" such as ORR's decisions here. *Del. State Sportsmen's Ass'n*, 108 F.4th at 205. The balance of equities and the public interest show that this Court should not grant a preliminary injunction.

While these factors establish that the Court should not grant *any* preliminary injunctive relief, the balance of equities and public interest especially underscore why this Court should not grant nationwide relief or relief on the basis of a provisionally certified class. The Court has some information about the named Plaintiffs and their potential sponsors, but the Court has no information about the hundreds of other children in ORR care or about the individuals who may be trying to sponsor those children. The Court should not enjoin the procedures ORR deems necessary to ensure the suitability of those sponsors. The public interest supports deferring to ORR's professional judgment about the steps needed to properly vet sponsors.

## IV.    The Court should deny Plaintiffs' request for provisional class certification.

Plaintiffs have failed to demonstrate that they are entitled to class certification on a provisional basis because they have not shown in their preliminary injunction that they satisfy the requirements of Federal Rule of Civil Procedure 23. In granting such provisional certification, in

support of preliminary injunctive relief, a plaintiff must satisfy all the requirements of class certification under Rule 23. *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179–80 (D.D.C. 2015) (citing *Berge v. United States*, 949 F. Supp. 2d 36, 49 (D.D.C. 2013)).   In deciding whether class certification is appropriate, a district court must ordinarily undertake a "rigorous analysis" to see that the requirements of the Rule have been satisfied. *See Gen. Tel. Co. of SW v. Falcon,* 457 U.S. 147, 161 (1982). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011).

Rather, the party seeking class certification bears the burden of "affirmatively demonstrat[ing] his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* (emphasis in original). In short, should the Court even consider issuing classwide relief, it must first thoroughly consider Rule 23 requirements, which Defendants should have an opportunity to address.  Because Plaintiffs have failed to make that showing here, the Court should deny their request for provisional class certification.

## V.    If the Court grants a preliminary injunction, it should require bond.

Finally, if the Court deems preliminary injunctive relief warranted (which it should not), Plaintiffs must be required to post security pursuant to Federal Rule of Civil Procedure 65(c). The Rule mandates that a court "may issue a preliminary injunction or a temporary restraining order *only if the movant gives security* in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction and their request to provisionally certify the putative class.

Dated: May 23, 2025                              Respectfully submitted,

                                                 YAAKOV M. ROTH
                                                 Acting Assistant Attorney General

                                                 DREW C. ENSIGN
                                                 Deputy Assistant Attorney General
                                                 Civil Division

                                                 WILLIAM C. SILVIS
                                                 Assistant Director

                                                 s/
                                                 LINDSAY VICK
                                                 MICHAEL A. CELONE
                                                 CHRISTINA PARASCANDOLA
                                                 Senior Litigation Counsel
                                                 JOSHUA C. MCCROSKEY
                                                 Trial Attorney
                                                 United States Department of Justice
                                                 Office of Immigration Litigation – General
                                                 Litigation and Appeals Section
                                                 P.O. Box 878, Ben Franklin Station
                                                 Washington, DC 20044
                                                 (202) 532-4023
                                                 Fax: (202) 305-7211
                                                 Lindsay.Vick@usdoj.gov