UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGELICA S., *et al.*,

    Plaintiffs,

v.

U.S. DEPARTMENT OF HUMAN AND HUMAN SERVICES, *et al.*,

    Defendants.

Case No. 1:25-cv-1405

## DECLARATION OF TOBY BISWAS

I, **Toby Biswas**, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Director of the Division of Unaccompanied Alien Children (UAC) Policy in the Office of Refugee Resettlement (ORR), UAC Bureau, an entity within the Administration for Children and Families (ACF), U.S. Department of Health and Human Services (HHS).

2. I have held various roles within ORR since joining the agency in November 2009, and I have held my current role since April 2023. My responsibilities encompass the development and implementation of ORR's policies and procedures concerning the care and custody UAC. In this capacity, I am responsible for ensuring ORR's implementation of and compliance with programmatic policy prerogatives and statutory responsibilities, including those arising under the Homeland Security Act of 2002 (HSA), 6 U.S.C. § 279; Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232; and ORR's regulations, including the Foundational Rule, 45 CFR part 410.[1]

3. This declaration is based upon my personal knowledge, information acquired in the course of performing my official duties, information contained in the records of ACF and ORR, and information conveyed to me by current agency employees and contractors.

---

[1] ORR policies with respect to UAC are also embodied in the ORR UAC Bureau Policy Guide ("UAC Policy Guide"), which is publicly available on ORR's website at https://acf.gov/orr/policy-guidance/unaccompanied-children-bureau-policy-guide.

**POLICY CHANGES DUE TO INVESTIGATIONS REGARDING SPONSOR FRAUD AND HUMAN TRAFFICKING CONCERNS**

4. ORR's goal is to release UAC to suitable sponsors when consistent with our mandate to ensure that placement does not result in danger to the UAC, to the community, or risk of flight by the UAC. *See* 6 U.S.C. §279, 8 U.S.C. § 1232. Nevertheless, there are instances where a release subsequently poses a danger to a UAC. Numerous press accounts and investigations have revealed UAC released to bad actors who have harmed the minors.

5. Thus, it is important for ORR to fully assess a sponsor (even a parent) before making any release determination. This is particularly appropriate because ORR is not a law or immigration enforcement agency and lacks the authority to hold individuals accountable by reassuming care if the sponsor abuses or neglects a child after a UAC has been released from ORR custody; rather, ORR only takes children into its custody upon referral by another federal agency, as described in statute. In this regard, ORR is also very different from state child welfare agencies, which typically retain such authority post-placement. Accordingly, ORR must front-load child safety considerations in its identity verification and sponsor vetting policies.

6. In mid- 2023, ORR established an Integrity & Accountability (I&A) to detect and prevent fraud. The I&A Team identified several instances of fraudulent sponsorship applications, document falsifications, and patterns of human trafficking and exploitation. For instance, the Team has identified instances of children and sponsors using altered birth certificates or unaltered birth certificates belonging to another person. The Team found that the fraud often involved collusion with other people, such as a family member in the Country of Origin. For example, the I&A Team identified 10 UAC who were released to sponsors who committed intentional document fraud in October 2024. The Team believes, however, that this level of fraud is underreported. The volume of fraud is difficult to capture because the different categories of sponsors require varying documentation and scrutiny levels. For example, category 1 sponsors (parents or legal guardians) and category 2A (close relatives who have previously served as primary caretakers for the UAC) and 2B (close relatives who have not previously served as primary caretakers for the UAC) may be subject to less vigorous background check requirements than the category 3 sponsors (distant relatives and unrelated adults). ORR believed there was a significant risk that bad actors realized there were diminishing levels of scrutiny with increasing degrees of (alleged) relatedness to UAC and gamed the system under ORR's previous sponsor supporting documentation policies.

7. In one particularly egregious case, the I&A Team found that a woman and her partner attempted to sponsor a total of 15 UAC over a five-year period by using multiple aliases. The woman used various aliases to attempt to sponsor eight UAC over the same period, with four UAC being released to her and four unsuccessful attempts to sponsor other UAC. The aliases were only discovered when the sponsor underwent fingerprinting. Of the four successful sponsorships, three were Category 1 cases, and one was a Category 2A case. Despite these evidence, ORR's data revealed that less than 1% of sponsorship applications have been denied in recent years, highlighting systemic gaps in oversight that create dire child safety concerns.

8. In December 2022, the Permanent Subcommittee on Investigations within the U.S. Senate Committee on Homeland Security and Governmental Affairs ("the Subcommittee") published a report detailing the inadequate treatment of unaccompanied alien children in federal care and the insufficient safeguards to ensure they are not trafficked or abused following their release. The Subcommittee found that despite the increased number of unaccompanied alien children entering the United States in 2021 and 2022, the completion of background checks by ORR significantly declined from FY 2019. Moreover, the Subcommittee identified the lack of adequate sponsor background checks and the waiver of certain background check requirements on household members, even when releasing a child to his parent, as areas where additional safeguard measures were necessary. The Subcommittee specifically recommended that ORR enhance its procedures for verifying pre-existing relationships and develop formal guidance for case managers during the verification process. The Subcommittee also recommended that ORR update the UAC Policy Guide to indicate that if a potential sponsor or household member refuses to comply with required background checks, ORR will prohibit further consideration of the release of a child into their custody.

9. In February 2024, HHS OIG published its finding in *Gaps in Sponsor Screening and Follow-up Raise Safety Concerns for Unaccompanied Children* that

- In 16 percent of children's case files, one or more required sponsor safety checks lacked any documentation indicating that the checks were conducted.
- For 19 percent of children who were released to sponsors with pending FBI fingerprint or State child abuse and neglect registry checks, children's case files were never updated with the results.
- In 35 percent of children's case files, sponsor-submitted IDs contained legibility concerns.

- ORR failed to conduct mandatory home studies in two cases and four other cases raise concerns about whether ORR guidance on discretionary home studies should offer more specificity.

- In 5 percent of cases, sponsor records within ORR's case management system were not updated with child welfare outcomes or sponsorship history. [Exhibit A].

As a result of these findings, HHS OIG recommended, among others, that ORR develop additional safeguards to ensure that all safety checks are conducted and documented prior to approving the release of a child to their sponsor. This recommendation is still marked as ongoing on the HHS OIG recommendation implementation tracker.

10. On January 20, 2025, President Trump signed Executive Order 14159, "*Protecting the American People Against Invasion*" which ordered the Secretary of Health and Human Services, along with the Attorney General and the Secretary of Homeland Security, to take "all appropriate action to stop the trafficking and smuggling of alien children into the United States[.]" 90 FR 8443, at 8447.

11. On February 4, 2025, former Acting Director of ORR, Mellissa Harper, issued a memorandum ("Harper Memo") outlining immediate changes to address ongoing concerns with gaps in ORR's sponsor vetting process, as well as fraud and trafficking. [Exhibit B]. The memorandum highlighted one particularly egregious instance of sponsor fraud, where a potential sponsor had obviously photoshopped himself into a photograph to establish kinship with the child. Subsequently, that same potential sponsor presented a foreign identification card bearing the name and photograph of another individual in an attempt to establish his identity and sponsor another child. In another example regarding age fraud, a UAC killed his sponsor months after he was released from ORR care. It was later discovered during a law enforcement investigation that the UAC was actually 23 years old at the time of the murder. In the memorandum, former Acting Director Harper specifically cited the results of the aforementioned investigations as the rationale for implementing immediate policy changes, which include mandatory enhanced biometric collection and background checks, reassessment of the use of secondary documents that cannot be reliably verified as proof of identity, and sponsor presentation of original documents in-person.

12. The Harper Memo noted that the average length of care, which at the time was 25.8 days, did not permit ORR to conduct the adequate sponsor vetting measures necessary to ensure

that children are not released to potentially dangerous situations like the ones detailed in the numerous investigations.

13. In response to the Harper Memo, on February 14, 2025, ORR issued Field Guidance ("FG") 26 which requires all potential sponsors, their adult household members aged 18 and above, and all adult caregivers identified in a Sponsor Care Plan undergo national fingerprint-based FBI background checks. FG 26 also restricts the acceptable list of identification to only unexpired and legible photocopies or high-resolution digital scans/ photos of identification documents for establishing identity purposes. These sponsor vetting changes directly support ORR's efforts to combat sponsor fraud and mitigate risk of human trafficking of unaccompanied alien children by: requiring the same identity document be used as part of the sponsorship application, the fingerprint application, and at discharge; ensuring that acceptable identity documents are easily validated as expired documents or unoriginal copies are not able to be consistently authenticated by issuing agencies; and re-establishing universal FBI fingerprints for all sponsors, a policy that was previously in place prior to 2018 – ensuring equity in background information available for each sponsor as part of the totality of circumstances assessment conducted by ORR in making release decisions.

14. On March 7, 2025, in alignment with ORR's statutory and regulatory requirements (*see* 8 U.S.C. § 1232(c)(3)(A) and 45 C.F.R. § 410.1202) and to address identified gaps in the reporting of fraud incidents to HHS Office of the Inspector General (HHS/OIG), ORR updated its UAC Policy Guide Sections 2.2.4, 2.7.4, and 5.8.2 to align the acceptable identity documents for identity verification purposes with the standards used for I-9 verifications as a safer framework to mitigate reliance on foreign-issued identity documents, and establish clear protocols for detecting, documenting, and responding to fraud, including preventing fraudulent actors from exploiting the UAC Bureau and unaccompanied alien children for trafficking or other forms of exploitation. The updated list of documents ensures that the accepted documents from potential sponsors meet similar criteria as those used for I-9 verifications. In balance, ORR continues to afford due process protections for most relative sponsors, including providing written notice of the reason for the denial and opportunity to pursue an administrative appeal available to parents or other close relatives.

15. In further justification of this revision, ORR stated, in an accompanying decision memo, that while its former policies permitted the acceptance of a wide variety of identity documents, including many foreign-issued documents, ORR has encountered difficulties

authenticating foreign-issued documents, especially in a timely manner. ORR is aware of widespread fraud involving the use of such documents and has had to relied on foreign consulates and embassies, often liaising with the Department of State, to authenticate documents issued outside the United States. This process is complicated by international relations (including whether the United States maintains diplomatic relations with certain countries) and the stability of certain foreign states. [Exhibit C].  Therefore, to address concerns regarding sponsor fraud involving identity documents, ORR's revised policy relies on documents that the federal government relies on to establish identity for both citizens and non-citizens. In consideration of family reunification, the policies contemplate an exception for category 1 sponsors on a case-by-case basis. With regard to proof of address documentation, ORR has previously released children to addresses that did not include apartment numbers or were themselves suspected to be fraudulent; resulting in children released to locations that may not have been actual residences or for which the specific residential unit is unknown. With regard to sponsor denial criteria, ORR clarified that sponsor or adult household member refusal to present for fingerprinting would be sufficient for denial of release as failure to present can be an indication that the individual is trying to conceal known biometrics or criminal history, which could themselves be grounds for sponsorship denial. In balance, ORR continues to afford due process protections for most relative sponsors, including providing written notice of the reason for the denial and opportunity to pursue an administrative appeal available to parents or other close relatives.

16. On March 14, 2025, in the effort to combat fraud and consistent with statutory requirements to place a UAC with an appropriate custodian (*see* 8 U.S.C. 1232(c)(3)(A), ORR issued FG 27 which utilizes DNA testing to confirm kinship of any potential sponsor who claims a biological relationship with the child. While the FG states that submitting a DNA sample is not mandatory, failing to do so may result in ORR's recategorizing the sponsorship as an unrelated category 3 sponsorship and necessitating enhanced vetting procedures.[2]

---

2 On May 15, 2025, FG 27 was updated to address the following process matters:
- Clarifying that the DNA Diagnostic Center (DDC), not Point Comfort Underwriters (PCU) issues a reference number for DNA results
- Directing case managers to email DDC when a child with pending DNA test results transfers to another ORR facility
- Directing care providers to complete and send Treatment Authorization Request to PCU, then submit approved TAR to DDC according to DNA Testing Instructions.
- Clarifying that appointments may take between 5-7 days to schedule.

6

17. On April 15, 2025, to support child safety and further mitigate the risk of human trafficking, ORR revised its UAC Policy Guide Sections 2.2.4 and 2.4.1 to include income verification measures. This revision aims to ensure that sponsors can financially support the children they sponsor. The accompanying decision memo elucidates that 45 C.F.R. § 410.1202(c) requires a suitability assessment to include all necessary steps to determine the potential sponsor's ability to provide for the child's physical and mental well-being, which is a statutory requirement, (*see* 8 U.S.C. §1232(c)(3)(A)). This includes verifying the employment, income, or other information provided by the potential sponsor as evidence of their capacity to support the child. [Exhibit D]. Additionally, in the state child welfare system, parents, legal guardians, and close kin must demonstrate their financial capability to support a child's needs if the child is returned to their care. By requiring the submission of proof of income information and supporting documentation, case managers and Federal Field Specialists ("FFS") will be better equipped to identify potential indicators of labor trafficking or labor exploitation. The Office on Trafficking in Persons has identified instances where parents and other family members have been subjected to human trafficking and/or labor exploitation and had similar debts as the children they sponsored. The information obtained during employment and income verification can inform the safety assessment, safety planning, decision to refer a case for a home study or not, and the appropriate level of Post-Release Services to recommend.

**ISSUANCE OF THE INTERIM FINAL RULE TO CONFORM WITH INFORMATION SHARING REQUIREMENTS UNDER 8 U.S.C. § 1373**

18. On March 25, 2025, ORR published an Interim Final Rule ("IFR") amending 45 C.F.R. § 410.1201(b) which was previously published on April 30, 2024, in the Unaccompanied Children Program Foundational Rule. 90 FR 13554. ORR's amendment of 45 C.F.R. § 410.1201(b) is motivated by the discovery that 45 CFR 410.1201(b) (2024) contravenes 8 U.S.C. § 1373 and, as such, ORR lacked the authority to promulgate this section of the rule.

19. The stricken language in 45 C.F.R. § 410.1201(b) (2024) restricting sharing citizenship/immigration status information with other federal agencies threatens to hamper ongoing interagency efforts to identify, investigate, and prosecute sponsor fraud and other human trafficking offenses perpetrated against UAC, thereby interfering with ORR's core statutory missions to ensure the safety and well-being of the minors in its care and custody and to combat

human trafficking under the Homeland Security Act of 2002 (HSA), 6 U.S.C. § 279, and Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232.

20. As stated in the Good Cause section of the Federal Register notice, notice and comment is unnecessary and contrary to the public interest because no amount of public input could give ORR the power to contravene a duly-enacted law of Congress via regulation. 90 FR 13555. Additionally, because the IFR brings an ORR regulation into compliance with a federal statute, regulated entities do not need time to adjust their behavior before this rule takes effect. *Id*.

21. The public comment period for the IFR concludes on May 27, 2025. ORR will be prioritizing its review of public comments and eventually, publication of a final rule. The specific timeline is, to some extent, dependent on the number of comments that ORR receives in addition to other policy priorities. Typically for a rule this size, it would take several months to finalize and clear.

**CASE STATUS OF NAMED PLAINTIFFS**

*Angelica S.*

22. ORR made contact with Angelica's potential sponsor on November 23, 2024, and received an updated Family Reunification Application on December 12, 2024. Although her potential sponsor received a positive home study determination, on January 23, 2025, Angelica was no longer cleared to travel due to her pregnancy. On January 30, 2025, her potential sponsor disclosed that Angelica's adult caregiver was arrested on January 23, 2025, for sexual abuse toward an eight-year-old child. Angelica gave birth to her child on February 6, 2025. On February 19, 2025, ORR requested a home study addendum to confirm that the adult caregiver is no longer living in the home. On March 11, 2025, ORR informed Angelica's potential sponsor of the new identification document requirements. Her potential sponsor indicated that she did not possess any form of identification due to her lack of legal immigration status. On March 18, 2025, her potential sponsor withdrew her sponsorship application. On March 27, 2025, the FFS concurred with the sponsorship withdrawal. As recently as May 12, 2025, Angelica's sister has not been able to identify a viable sponsor; therefore, Angelica is currently on track for placement in long term foster care, and any placement consideration will include keeping her together with her child.

*Eduardo M.*

23. ORR received the amended Family Reunification Application from Eduardo's mother on January 30, 2025. On February 15, 2025, Eduardo's mother and adult caregiver initiated their fingerprinting process. However, on February 25, 2025, Eduardo's adult caregiver withdrew following background check results. On March 11, 2025, Eduardo's mother informed ORR that she does not have a form of acceptable identity document that would meet the new requirements and that she is unable to obtain an identification card and driver's license. On March 15, 2025, Eduardo's mother was informed of the DNA testing requirement. On March 24, 2025, she attended the test appointment and results were received on April 16, 2025. On April 20, 2025, one of Eduardo's adult caregivers had to withdraw due to his inability to obtain an acceptable identification document and a new adult caregiver was identified in his place. Eduardo's mother notified ORR that she was unable to obtain her proof of income on April 24, 2025, and Eduardo's FFS identified his case for a waiver of the proof of income requirement. As of April 29, 2025, the exemption waiver was submitted for consideration and currently pending ORR adjudication.

*Liam W.*

24. Liam's mother submitted an updated Family Reunification Application around January 15, 2025. On February 6, 2025, a home study was completed based on the potential sponsor's two previous sponsorships. On April 11, 2025, a DNA test appointment was requested. On April 16, 2025, Liam's mother was informed of the proof of income policy update. She stated that she would reach out to ORR once she obtains a verification letter from her employer. As of April 23, 2025, the DNA test provider did not confirm the appointment request. On May 2, 2025, Liam's mother withdrew from the sponsorship process. Neither she nor her household members could obtain an acceptable form of identity document in their state of Florida.

*Leo B.*

25. Leo was re-admitted into ORR custody on March 15, 2025, after he had been taken into ICE custody after he violated his probation for driving without a license; he had previously been reunified with his sister in March 2023. On March 20, 2025, Leo's sister withdrew the sponsorship application, citing an inability to meet the updated identification document requirement. On May 6, 2025, Leo's sister informed his case manager that there are no other potential sponsors available. Leo will reach the age of 18 in July 2025, at which point he will no longer be in ORR care.

*Xavier L.*

26. Xavier's mother withdrew from the sponsorship process because she was unable to provide an acceptable form of identity document that met the updated requirements. Xavier was subject to a mandatory home study because his mother had previously attempted to sponsor one or more children with one being biologically unrelated to her. Xavier's mother had also been arrested in February and May of 2024, for prostitution and battery respectively. Due to the concern that Xavier may age out soon, his mother withdrew so as to allow her sister to apply for sponsorship instead. That second sponsorship application is pending receipt of DNA results to confirm kinship.

27. I declare under penalty of perjury that the foregoing is true and correct.

**Dated: Washington, D.C.**
**May 22, 2025**

_____
**Toby Biswas**