UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGELICA S. *et al.*,<br><br>            Plaintiffs,<br><br>      v.<br><br>U.S. DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES, *et al.*,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 25-01405-DLF

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 3

I.      Statutory and Regulatory Background................................................................... 3

        A.      The Homeland Security Act....................................................................... 3

        B.      The William Wilberforce Trafficking Victims Protection Reauthorization
                Act of 2008. ............................................................................................... 4

        C.      The Unaccompanied Children Program Foundational Rule (2024). ......... 5

        D.      The Interim Final Rule (2025). .................................................................. 6

        E.      ORR Release Policies and Practices. ......................................................... 7

        F.      Recent Reports Concerning ORR's Sponsor Vetting Process (2022-24).. 9

        G.      Updated ORR Guidance Regarding UAC Sponsor Vetting (2025)......... 11

II.     This Lawsuit......................................................................................................... 15

III.    The Individual Plaintiffs ..................................................................................... 16

STANDARD..................................................................................................................... 18

ARGUMENT .................................................................................................................... 20

I.      The proposed class is impermissible because it includes, or potentially includes,
individuals who have not suffered, or will not suffer, the same injury—or have not suffered
or will not suffer any injury. ........................................................................................... 20

II.     No common questions drive the resolution of the litigation as to the proposed class,
and the individual Plaintiffs' claims are not typical of all class members' claims........... 23

        A.      Plaintiffs have not shown that their claims depend upon a common
                contention capable of classwide resolution............................................. 24

        B.      The Individual Plaintiffs' claims would not be typical of a class under
                Plaintiffs' proposed class definition......................................................... 25

III.    Certification under Rule 23(b)(2) is inappropriate because the relief Plaintiffs seek
would not benefit all class members. ............................................................................... 27

IV.     Certification under Rule 23(b)(1)(A) is inappropriate because Plaintiffs have not shown that the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants. ................................................................................................. 30

CONCLUSION ............................................................................................................. 31

# TABLE OF AUTHORITIES

Cases

*AmChem Prods. v. Windsor,*
   521 U.S. 591 (1997)................................................................................................ 20
*Califano v. Yamasaki,*
   442 U.S. 682 (1979)................................................................................................ 19
*Daskalea v. Washington Humane Soc.,*
   275 F.R.D. 346 (D.D.C. 2011)............................................................................... 31
*Gen. Tel. Co. of Southwest v. Falcon,*
   457 U.S. 147 (1982)................................................................................................ 19
*Howard v. Liquidity Servs. Inc.,*
   322 F.R.D. 103 (D.D.C. 2017)............................................................................... 25
*In re Lorazepam & Clorazepate Antitrust Litig.,*
   202 F.R.D. 12 (D.D.C. 2001)................................................................................. 26
*J.D. v. Azar,*
   925 F.3d 1291 (D.C. Cir. 2019)............................................................................. 24
*Kas v. Financial General Bankshares, Inc.,*
   105 F.R.D. 453 (D.D.C. 1984)............................................................................... 26
*Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL–CIO,*
   216 F.3d 577 (7th Cir. 2000) ................................................................................. 28
*Lightfoot v. D.C.,*
   273 F.R.D. 314 (D.D.C. 2011)............................................................................... 28
*McCarthy v. Kleindienst,*
   741 F.2d 1406 (D.C. Cir. 1984)............................................................................. 19
* *Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) .............................................. 18, 19, 20, 22, 23, 27, 28, 30

Statutes

5 U.S.C. § 706(2)(A)........................................................................................................ 15
5 U.S.C. § 706(2)(B ......................................................................................................... 15
5 U.S.C. § 706(2)(D)........................................................................................................ 15
5 U.S.C. § 706(2)(A), (C) ................................................................................................ 15
6 U.S.C. § 279 ............................................................................................................ 1, 3, 4
6 U.S.C. § 279(a) ............................................................................................................... 4
6 U.S.C. § 279(b)(1)(C)..................................................................................................... 3
6 U.S.C. § 279(b)(1)(A)..................................................................................................... 4
6 U.S.C. § 279(g)(2) .......................................................................................................... 4
8 U.S.C. § 1232(b)(1) ........................................................................................................ 4
8 U.S.C. § 1232(c)(1) ................................................................................................. 1, 3, 5
8 U.S.C. § 1232(c)(2)(A) ................................................................................................... 3
8 U.S.C. § 1232(c)(3)(A) ............................................................................................. 4, 14
8 U.S.C. § 1373 ................................................................................................................. 6

Regulations

45 C.F.R. § 410.1003 ........................................................................................ 5
45 C.F.R. § 410.1201 ..................................................................................... 5, 6
45 C.F.R. § 410.1201(b) (2024) (rescinded 2025) ........................................... 6
45 C.F.R. § 410.1202(b) ................................................................................... 5
45 C.F.R. § 410.1202(c) ............................................................................. 5, 14

Federal Register

*Unaccompanied Children Program Foundational Rule*,
   89 Fed. Reg. 34,384 (Apr. 30, 2024) ....................................... 5, 6, 7, 14
*Unaccompanied Children Program Foundational Rule; Update to Accord with Statutory
   Requirements*,
   90 Fed. Reg. 13,554 (Mar. 25, 2025) ................................. 1, 6, 15, 16, 25, 26, 28, 30

Treatises

2 H. Newberg & A. Conte, Newberg on Class Actions § 4:4 (4th ed. 2002) .............................. 30
7A Wright et al., Federal Practice and Procedure § 1764 ............................................. 24

Federal Rules of Civil Procedure

Rule 23(a) ................................................................... 19, 20, 23, 24, 25, 30
Rule 23(b)(1) ................................................................ 2, 3, 20, 30, 31
Rule 23(b)(2) ..................................................................................... 2, 3

# INTRODUCTION

In the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Congress imposes on U.S. Department of Health and Human Services (HHS), a paramount obligation to "establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity . . ." 8 U.S.C. § 1232(c)(1). As the agency entrusted with the responsibility for caring for the thousands of unaccompanied alien children (UAC), under the Homeland Security Act of 2002, 6 U.S.C. § 279, the Office of Refugee Resettlement (ORR) must balance the TVPRA's purpose of protecting UAC from human trafficking and exploitation, with its obligation to promptly reunify UAC where possible with their parents or other suitable sponsors, 8 U.S.C. § 1232(c)(2)(A).

ORR recently has changed its policies and procedures to better ensure that ORR evaluates potential sponsors' ability to provide for UACs' physical and mental well-being and protects UACs from smugglers, traffickers, and others who might seek to victimize UACs or engage them in criminal, harmful, or exploitative activity. By implementing more stringent documentation requirements for establishing a potential sponsor's identity and relationship to the child (on March 7, 2025), and proof of income (on April 15, 2025), ORR is trying to effectively close these gaps that give way to sponsor fraud, and to ensure that children are placed in safe and nurturing environments. Further, to bring ORR's regulations into full compliance with federal law, ORR promulgated an interim final rule *Unaccompanied Children Program Foundational Rule; Update to Accord with Statutory Requirements*, 90 Fed. Reg. 13,554 (Mar. 25, 2025) (IFR), which precludes any restriction on government entities sharing information regarding an individual's

immigration status. These new policy changes are critical steps in protecting children from the dangers posed by human traffickers and other criminal elements.

The individual Plaintiffs are five UAC who were transferred to ORR custody before, or around the same time that, ORR enhanced its documentation requirements and promulgated the IFR. Plaintiffs challenge the lawfulness of ORR's updated documentation requirements for establishing identity, relationship to the UAC, and income of potential sponsors. Plaintiffs also challenge the lawfulness of the IFR. The thrust of Plaintiffs' claims is that the updated document requirements base sponsorship qualification on immigration status and thereby prolong "custody of unaccompanied children who are denied release to their sponsors because of their sponsor's immigration status." Plaintiffs' Mem. in Support of Mot. for Class Certification (Mot.), ECF No. 9-1 at 1. Plaintiffs also claim that the IFR, which ORR made effective on the date of issuance, March 25, 2025, dissuades potential sponsors from coming forward. *Id.*

The Individual Plaintiffs seek to represent a class of "all unaccompanied children who are or will be in the custody of HHS and who (a) have or had a potential sponsor who has been identified; and (b) have not been released to a sponsor in whole or in part because they are missing documents newly required on or after March 7, 2025." ECF No. 9-1 at 1. The proposed class, however, is impermissibly overbroad and indefinite and fails to satisfy the commonality, typicality, and cohesiveness required for an injunctive-relief class under Federal Rules of Civil Procedure 23(b)(1) or (b)(2).

The proposed class cannot satisfy commonality or typicality because it includes UAC who have not been released, but who have or had a sponsor who could qualify for an exception to the document requirement. Further, the proposed class is overbroad because it includes UAC who have not been released to a sponsor "in part" because of the updated document requirements. Mot.

1. The proposed class also does not satisfy Rule 23(b)(2) because a single injunction or declaratory judgment would not benefit all class members. Finally, the proposed class does not satisfy Rule 23(b)(1)(A) because prosecuting the action as a class, as opposed to separate actions by individuals, does not mitigate the risk of creating "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for" Defendants.

For these reasons, the Court should not certify the proposed class.

## BACKGROUND

### I.    Statutory and Regulatory Background

The statutory and regulatory framework governing the federal care and custody of UAC reflects explicit congressional intent for ORR to "mak[e] placement determinations for all unaccompanied alien children who are in Federal custody by reason of their immigration status," and to ensure UAC "are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity." 6 U.S.C. § 279(b)(1)(C) & (b)(2)(A)(ii); *see also* 8 U.S.C. § 1232(c)(1), (c)(3)(A). That framework balances the mandate that ORR protect UAC from harm with the requirement that ORR "promptly" place UAC "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A).

### A.    The Homeland Security Act.

In 2002, Congress enacted the HSA, Pub. L. No. 107-296, 116 Stat. 2135 (codified in relevant part at 6 U.S.C. § 279), abolishing the Immigration and Naturalization Service (INS) and transferring functions under the immigration laws of the United States with respect to the care of

unaccompanied alien children, including the responsibility for the care and placement of UAC from INS to ORR. 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2).

The HSA defines a UAC as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Further, it assigns ORR broad authority over the care and custody of UAC while they are in federal custody due to their immigration status, including coordinating their care and placement, ensuring that the interests of the child are considered in custodial decisions, implementing policies with respect to the care and placement of UACs, and that they are protected from smugglers, traffickers, and others who might seek to victimize and exploit UAC. 6 U.S.C. § 279(b)(1)(A), (B), (E) & (b)(2)(A)(ii). These responsibilities are carried out through cooperative agreements and contracts with care providers under ORR policies and oversight. *See* 6 U.S.C. § 279(b)(1); 8 U.S.C. § 1232(i); 31 U.S.C. § 6305.

### B. The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008.

Congress enacted the TVPRA in 2008 to strengthen protections for UAC and support their safe repatriation or appropriate placement. Through the TVPRA Congress makes the Secretary of HHS responsible, consistent with the HSA, for the care and custody of UACs. 8 U.S.C. § 1232(b)(1). Congress also provides that HHS, and other agencies, "shall establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity." 8 U.S.C. § 1232(c)(1). It also requires the HHS Secretary to make a determination that a sponsor "is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). This safety and suitability determination must "at a

minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* Thus, the TVPRA is explicit that ORR must prioritize the safety and well-being of UAC while in its care and upon release.

  **C. The Unaccompanied Children Program Foundational Rule (2024).**

  In April 2024, ORR promulgated *Unaccompanied Children Program Foundational Rule*, 89 Fed. Reg. 34,384, 34,385 (Apr. 30, 2024) (Foundational Rule), codified at 45 C.F.R. Part 410, to establish comprehensive regulations governing its UAC program consistent with HHS's statutory responsibilities. The Foundational Rule became effective July 1, 2024.

  The Foundational Rule codified standards and practices that were previously described in ORR policies. Specifically, it provides that ORR must release UAC from its custody "[s]ubject to an assessment of sponsor suitability," 45 C.F.R. § 410.1201, which includes "verification of the potential sponsor's identity," 45 C.F.R. § 410.1202(b), "verification of the employment, income, or other information provided by the potential sponsor as evidence of the ability to support the child," 45 C.F.R. § 410.1202(c), and "[i]n all cases, ORR shall require background and criminal records checks," *id.*, which may include a criminal history check based on fingerprints. The Foundational Rule does not prohibit the collection of fingerprints in all circumstances, and it is silent regarding identity document requirements and the types of documents acceptable to prove income. The Rule reinforces congressional intent articulated in the HSA and TVPRA that HHS ensure UAC protection from human traffickers and release UAC only to those sponsors capable of protecting their well-being. 45 C.F.R. § 410.1003.

D.    **The Interim Final Rule (2025).**

On March 25, 2025, HHS published an IFR notifying the public of its intention to amend

one provision of one of its regulations. *Unaccompanied Children Program Foundational Rule;*

*Update To Accord With Statutory Requirements*, 90 Fed. Reg. 13,554 (Mar. 25, 2025); Declaration

of Toby Biswas (May 23, 2025), ECF No. 21-1 ¶ 18. Specifically, HHS amended the Foundational

Rule by striking 45 C.F.R. § 410.1201(b) (2024) (rescinded 2025), which provided:

> ORR shall not disqualify potential sponsors based solely on their immigration
> status and shall not collect information on immigration status of potential sponsors
> for law enforcement or immigration enforcement related purposes. ORR *shall not*
> *share any immigration status information* relating to potential sponsors with any
> law enforcement or immigration enforcement related entity at any time.

90 Fed. Reg. 13,554 (emphasis added). The IFR was effective immediately upon publication in

the Federal Register and provided for a 60-day comment period ending on May 27, 2025. *Id.*

In the preamble HHS observed that ORR had no authority to promulgate 45 C.F.R. §

410.1201(b) where that regulation contravened 8 U.S.C. § 1373. Section 1373 provides, in part:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State,
> or local government entity or official may not prohibit, or in any way restrict, any
> government entity or official from sending to, or receiving from, the Immigration
> and Naturalization Service information regarding the citizenship or immigration
> status, lawful or unlawful, of any individual.

HHS concluded that 45 C.F.R. § 410.1201(b) (2024) (rescinded 2025) was invalid and must be

removed, because, in section 1373, Congress prohibits any restriction on sharing information

regarding immigration status between governmental entities. 90 Fed. Reg. 13,555.

The stricken language in 45 C.F.R. § 410.1201(b) (2024) (rescinded 2025) that precluded

sharing citizenship and immigration status information with other federal agencies threatened to

hamper ongoing interagency efforts to identify, investigate, and prosecute sponsor fraud and other

human trafficking offenses perpetrated against UAC, thereby interfering with ORR's core

statutory missions to ensure the safety and well-being of the minors in its care and custody *and* to combat human trafficking under the HSA and TVPRA. ECF No. 21-1 ¶ 20.

E.    **ORR Release Policies and Practices.**

To carry out its statutory and regulatory mandate under the HSA and TVPRA, and the Foundational Rule, ORR has developed policies and procedures for identifying and conducting suitability assessments of, potential sponsors. These procedures are generally set out in ORR's publicly available UAC Bureau Policy Guide (UAC Policy Guide). *See* ORR Unaccompanied Alien Children Bureau Policy Guide, *available at* https://perma.cc/Q2C3-3SC5; *see also* ECF No. 21-1 ¶¶ 2 & n.1, 4. A full assessment of a potential sponsor's suitability is particularly appropriate because ORR is not a law or immigration enforcement agency and lacks the authority to hold an unsuitable sponsor accountable by reassuming care if the sponsor abuses or neglects a child. *Id.* ¶ 5. Rather, ORR only takes children into its custody upon referral by another federal agency. *Id.* In this regard, ORR is also very different from state child welfare agencies, which typically retain such authority post-placement. *Id.* Accordingly, ORR must front-load child safety considerations in its identity verification and sponsor vetting policies. *Id.*

In light of ORR's obligation to protect UAC from smugglers, traffickers, and others who may seek to victimize them, "safe and timely release . . . involves several steps, including: the identification of sponsors; sponsor application; interviews; the assessment (evaluation) of sponsor suitability, including verification of the sponsor's identity and relationship to the child (if any), background checks, and in some cases home studies; and post-release planning." UAC Policy Guide § 2.1. There are four categories of potential sponsors: (1) Category 1, consisting of parents or legal guardians; (2) Category 2A, consisting of siblings, half-siblings, grandparents, immediate relatives (such as aunts, uncles, and cousins) who previously served as a primary caregiver, and

other biological relatives and relatives through marriage; (3) Category 2B, consisting of immediate relatives (including biological relatives and relatives through marriage) who did not previously serve as a primary caregiver; (4) Category 3, consisting of other sponsors, such as distant relatives and unrelated adult individuals. *Id.* § 2.2.1. ORR conducts suitability assessments of any potential sponsor, including a review of the potential sponsor's strengths, resources, risk factors, and special concerns within the context of each child's needs, strengths, resources, risk factors, and relationship to the sponsor. *Id.* §§ 2.2.2, 2.4.

A potential sponsor must complete a Family Reunification Application (FRA), provide unexpired government-issued identification documentation for the sponsor and any other adults living in the household or identified in a sponsor care plan, and, along with any adult living in his or her household, undergo a background check. UAC Policy Guide §§ 2.2.4, 2.5. All potential sponsors must also submit proof of address, income, sponsor-child relationship, and criminal history documents (if applicable). *Id.* § 2.2.4. Additionally, in certain circumstances a home study, which consists of interviews, a home visit, and a written report containing the home-study case worker's findings, is performed. *Id.* § 2.4.2.

Once the assessment of the potential sponsor is complete, the care provider makes a release recommendation. UAC Policy Guide § 2.7. ORR makes the final release decision. *Id.* Release decisions include: (1) approve release to sponsor; (2) approve release with post-release services; (3) conduct a home study before a final release decision; (4) deny release; or (5) remand for further information. *Id.* ORR denies release if: (1) the potential sponsor is not willing or able to provide for the child's physical or mental well-being; (2) the potential sponsor is not willing to complete the mandatory fingerprint check; (3) the physical environment of the home presents a risk to the

child's safety or well-being; or (4) release of the UAC would present a risk to him or herself, the sponsor, household, or community. *Id.* § 2.7.4.

F.      **Recent Reports Concerning ORR's Sponsor Vetting Process (2022-24).**

In December 2022, the Permanent Subcommittee on Investigations within the U.S. Senate Committee on Homeland Security and Governmental Affairs ("the subcommittee") published a report detailing the inadequate treatment of UAC in federal care and the insufficient safeguards to ensure they are not trafficked or abused following their release. ECF No. 21-1 ¶ 9. The subcommittee found that despite the increased number of UAC entering the United States in 2021 and 2022, ORR's completion of background checks significantly declined from FY 2019. *Id.* The subcommittee specifically recommended that ORR enhance its procedures for verifying pre-existing relationships and develop formal guidance for case managers during the verification process. *Id.* The subcommittee also recommended that ORR update the UAC Policy Guide to indicate that if a potential sponsor or household member refuses to comply with required background checks, ORR will prohibit further consideration of the release of a child into their custody. *Id.*

In March 2023 after a Florida grand jury published a report outlining over 100 allegations concerning deficiencies in ORR's UAC Program, ORR established an Integrity & Accountability (I&A) Team to detect and prevent fraud. ECF No. 21-1 ¶¶ 6-7. The I&A Team identified several instances of fraudulent sponsorship applications, document falsifications, and patterns of human trafficking and exploitation. ECF No. 21-1 ¶ 7. For instance, the Team identified instances of children and sponsors using altered birth certificates or unaltered birth certificates belonging to another person. *Id.* The Team found that the fraud often involved collusion with others, such as a

family member in the country of origin. *Id.* In another example, the I&A Team identified 10 UAC who were released to sponsors who committed intentional document fraud in October 2024. *Id.*

In one particularly egregious case, the I&A Team found that a couple attempted to sponsor a total of 15 UAC over a five-year period by using multiple aliases. ECF No. 21-1 ¶ 8. The aliases were only discovered when the sponsor underwent fingerprinting. *Id.* Yet, the team observed, fewer than 1% of sponsorship applications have been denied in recent years.

In February 2024, the HHS Office of Inspector General published its finding in *Gaps in Sponsor Screening and Follow Up Raise Safety Concerns for Unaccompanied Children* that:

1. In 16% of children's case files, one or more required sponsor safety checks lacked any documentation indicating that the checks were conducted.

2. For 19% of children who were released to sponsors with pending Federal Bureau of Investigation fingerprint or State child abuse and neglect registry checks, children's case files were never updated with the results.

3. In 35% of children's case files, sponsor-submitted identification documents contained legibility concerns.

4. ORR failed to conduct mandatory home studies in two cases and four other cases raise concerns about whether ORR guidance on discretionary home studies should offer more specificity.

5. In 5% of cases, sponsor records within ORR's case management system were not updated with child welfare outcomes or sponsorship history.

ECF No. 21-1 ¶ 9, Ex. A, (*also available at* https://perma.cc/2GSC-YTAJ).

As a result of these findings, HHS OIG recommended, among other things, that ORR develop additional safeguards to ensure that all safety checks are conducted and documented prior to approving the release of a child to their sponsor. ECF No. 21-1 ¶ 9.

**G.    Updated ORR Guidance Regarding UAC Sponsor Vetting (2025).**

**Executive Order 14159 -** Upon his inauguration, President Trump ordered HHS, along with the U.S. Department of Justice and Department of Homeland Security, to take "all appropriate action to stop the trafficking and smuggling of alien children into the United States[.]" Executive Order 14159, "*Protecting the American People Against Invasion*," 90 Fed. Reg. 8443, at 8447 (Jan. 20, 2025). Shortly thereafter, former Acting Director of ORR, Mellissa Harper, issued a memorandum (Harper Memo) outlining immediate changes to address ongoing concerns with gaps in ORR's sponsor vetting process, as well as fraud and trafficking. ECF No. 21-3, ECF No. 21-1 ¶ 11. Investigations into events in which UAC were released to unsuitable sponsors, sometimes with tragic consequences, led to policy changes at issue in this action. ECF No. 21-1 ¶ 11. The average length of time for UAC in ORR custody as of February 2025 was 25.8 days, but that length of time did not permit ORR to conduct adequate sponsor vetting measures necessary to ensure children are not released to potentially dangerous situations like those detailed in the investigations. *Id*. ¶ 12.

**Field Guidance 26 for fingerprint-based background checks  -** On February 14, 2025, ORR issued Field Guidance ("FG") 26, which requires all potential sponsors, their adult household members aged 18 and above, and all adult caregivers identified in a Sponsor Care Plan to undergo national fingerprint-based FBI background checks. ECF No. 21-1 ¶ 13. FG 26 also requires the use of only unexpired and legible photocopies or high-resolution digital scans/photos of identification documents to establish identity. *Id.* These updates to the guidance for vetting

potential sponsors directly support ORR's efforts to combat sponsor fraud and mitigate risk of human trafficking of UAC by: requiring the same identity document be used as part of the sponsorship application, the fingerprint application, and at discharge; ensuring validation of acceptable identity documents; and re-establishing universal FBI fingerprints for all sponsors. *Id.* The universal fingerprint policy was previously in place prior to 2018, and it ensured equity in background information available for each sponsor as part of the totality of circumstances assessment conducted by ORR in release determinations. *Id.*

**Updates to Policy Guide Sections 2.2.4, 2.4.1, 2.7.4, and 5.8.2 -** On March 7, 2025, and to further address identified gaps in the sponsor vetting process, ORR updated its UAC Policy Guide Sections 2.2.4 (concerning required supporting documents for sponsor applications to include unexpired identity documents and proof of income), 2.4.1 (concerning proof of income as part of sponsor assessment criteria), 2.7.4 (concerning lack of fingerprinting and proof of income as bases for denial of release requests), and 5.8.2 (concerning fraud reporting). ECF No. 21-1 ¶ 14, Mem. from Anglie Salazar, Acting Director, ORR, to Toby Biswas (Mar. 7, 2025), ECF No. 21-4. ORR made these updates to align the acceptable identity documents for identity verification purposes with the standards used for I-9 verifications as a safer framework than reliance on foreign-issued identity documents. ECF No. 21-1 ¶ 14. The update to UAC Policy Guide Section 5.8.2 established clearer protocols for detecting, documenting, and responding to fraud, including preventing fraudulent actors from exploiting the UAC Bureau and UAC for trafficking or other forms of exploitation. *Id*. ORR had encountered difficulties authenticating foreign-issued documents, especially in a timely manner. *Id*. ¶ 15. Because of widespread fraud involving the use of such documents, ORR had to rely on foreign consulates and embassies, often liaising with the Department of State, to authenticate documents issued outside the United States. *Id.* This process

is complicated by international relations (including whether the United States maintains diplomatic relations with certain countries) and the stability of certain foreign states. *Id.*

To facilitate family reunification, ORR allows exceptions for Category 1 sponsors on a case-by-case basis. *Id*. With regard to proof of address documentation, UAC Policy Guide Section 2.2.4, ORR has previously released children to addresses that did not include apartment numbers or were themselves suspected to be fraudulent; resulting in children released to locations that may not have been actual residences or for which the specific residential unit is unknown. *Id.* With regard to sponsor denial criteria (UAC Policy Guide Section 2.7.4), ORR clarified that a sponsor's or adult household member's refusal to present for fingerprinting would be sufficient for denial of release as failure to present can be an indication that the individual is trying to conceal known biometrics or criminal history, which could be grounds for sponsorship denial. *Id.*

**Field Guidance 27 regarding DNA testing -** On March 14, 2025, in the effort to combat fraud and consistent with statutory requirements to place a UAC with an appropriate custodian (see 8 U.S.C. 1232(c)(3)(A), ORR issued FG 27 which utilizes DNA testing to confirm kinship of any potential sponsor who claims a biological relationship with the child. *Id*. ¶ 16. In FG 27, ORR established that to enhance its sponsor-vetting procedures, it generally requires DNA testing to support proof of relationship between a potential sponsor and a UAC where the sponsor purports to be biologically related to the child.[1] Submission of a DNA sample by the potential sponsor is

---

[1] See FIELD GUIDANCE – Revised May 15, 2025 (First Issued March 14, 2025) RE: Field Guidance #27 – DNA Testing Expansion, available at https://acf.gov/sites/default/files/documents/orr/FG-27_-_DNA_Testing_Expansion.pdf (viewed June 4, 2025). ORR requires DNA results that confirm biological parentage, biological grand-parentage, avuncular relationship, or siblingship (full or half). *Id*. Submitting a DNA sample is not mandatory, but failing to submit a DNA sample may result in ORR recategorizing the sponsorship as an unrelated category 3 sponsorship, thereby necessitating enhanced vetting procedures. *Id*.; ECF No. 21-1 ¶ 16.

not mandatory, but refusal to submit a DNA sample may be grounds for ORR to recategorize the sponsorship as an unrelated Category 3 sponsorship and to require enhanced vetting procedures pursuant to ORR Policy. The Field Guidance also provides, among other things, that DNA test results must never be the sole reason for denying release to a potential sponsor, unless the sponsor misrepresented his or her relationship with the child; however, results of DNA tests may result in ORR updating the potential sponsor's Sponsor Category under its existing policies.

**Updates to Policy Guide Sections 2.2.4 and 2.4.1 -** On April 15, 2025, to support child safety and further mitigate the risk of human trafficking, ORR revised its UAC Policy Guide Sections 2.2.4 and 2.4.1 to include income verification measures. *Id*. ¶ 17. This revision aims to ensure that sponsors can financially support the children they sponsor. In the Foundational Rule, ORR requires a suitability assessment to include all necessary steps to determine the potential sponsor's ability to provide for the child's physical and mental well-being, a requirement under 8 U.S.C. § 1232(c)(3)(A). *Id*. (citing 45 C.F.R. § 410.1202(c)). This includes verifying the employment, income, or other information provided by the potential sponsor as evidence of their capacity to support the child. *Id*. By requiring the submission of proof of income information and supporting documentation, ORR's case managers and Federal Field Specialists will be better equipped to identify potential indicators of labor trafficking or labor exploitation. *Id*. The Office on Trafficking in Persons has identified instances where parents and other family members have been subjected to human trafficking or labor exploitation and had debts similar to those of children they sponsored. *Id*. The information obtained during employment and income verification can inform the safety assessment, safety planning, decision to refer a case for a home study or not, and the appropriate level of Post-Release Services to recommend. *Id*.

## II.    This Lawsuit

On May 8, 2025, Plaintiffs filed this suit, ECF No. 1, and the next day, moved for class certification and a preliminary injunction, ECF Nos. 9, 10. Plaintiffs claim that the IFR violates the APA because: (1) HHS did not publish the IFR through notice and comment and did not have good cause for it to take immediate effect, ECF No. 1 ¶¶ 110-16 (citing 5 U.S.C. § 706(2)(D)); (2) the IFR exceeds statutory authority because it is contrary to ORR's statutory obligation to promptly place UAC in the least restrictive setting that is in their best interest, *id*. 1 ¶¶ 117-23 (citing 5 U.S.C. §§ 706(2)(A), (C)); (3) the IFR is contrary to the constitutional right to family unity, *id*. ¶¶ 124-28 (citing 5 U.S.C. § 706(2)(B)); and (4) the IFR is arbitrary and capricious because it does not explain why it rescinds the prohibition on denying sponsor applications based on immigration status and collecting information on sponsor immigration status, *id*. ¶¶ 129-32.

Plaintiffs claim that the updated guidance on sponsor vetting requirements violates the APA because: (1) it is contrary to the TVPRA's requirement to promptly place UAC in the least restrictive setting that is in their best interest, they violate the *Accardi* doctrine that federal agencies are required to follow their own regulations, and they violate the Paperwork Reduction Act, ECF No. 1 ¶¶ 133-43 (citing 5 U.S.C. § 706(2)(A), (C)); (2) they are contrary to the constitutional right to family unity, *id*. ¶¶ 144-47 (citing 5 U.S.C. § 706(2)(B)); (3) they are arbitrary and capricious because they result in denials of sponsorship and were promulgated without reasoned explanation, *id*. ¶¶ 148-52 (citing 5 U.S.C. § 706(2)(A)); and (4) ORR violated the APA when it promulgated the proof of identity and income requirements without notice and comment, *id*. ¶¶ 153-58 (citing 5 U.S.C. § 706(2)(D)).

Through their motion for preliminary injunction, Plaintiffs sought an order: (1) provisionally certifying the putative class, ECF No. 10-1 at 4, 15, 43, 45; (2) staying the IFR; (3)

prohibiting ORR from enforcing its new identity verification requirements in the revisions of March 7, 2025 to Policy Guide § 2.2.4 and the proof-of-income requirements in the revisions of April 15, 2025, to Policy Guide § 2.2.4; (4) requiring ORR to inform all potential sponsors whose applications were denied based on the IFR or the updated sponsor-vetting guidance that they may continue with their application; (5) requiring ORR to adjudicate delayed sponsor applications based on the requirements in place at the time the potential sponsor submitted the application; and (6) enjoining ORR from retroactively applying updated requirements to sponsor applications, *id*. at 43-44; ECF No. 1 Prayer for Relief.

In their motion for class certification, Plaintiffs argue that the putative class has two legal issues in common: (1) whether the IFR and changes to the ORR Policy Guide were improperly promulgated; and (2) whether the new sponsorship requirements are unlawful, beyond statutory authority, contrary to law, and arbitrary and capricious. ECF No. 10-1 at 14.

On May 30, 2025, the Court heard Plaintiffs' motion for a preliminary injunction and took the motion under advisement.

### III.    The Individual Plaintiffs

Each of the Individual Plaintiffs had been encountered by the U.S. government as a UAC. Each Individual Plaintiff was transferred to ORR custody before March 7, 2025, the date on which ORR updated its Policy Guide and the date after which UAC in ORR custody would be members of the proposed class.

As of April 16, 2025, Angelica S. was 17 years old. Declaration of Angelica S., ECF No. 9-7 ¶ 2. Angelica has been in ORR custody since November 2024. *Id*. ORR first made contact with Angelica's potential sponsor, her sister Deisy S., on November 23, 2024, and received an updated sponsor application from Deisy on December 12, 2024. ECF No. 21-1 ¶ 22; ECF No. 9-7 ¶¶ 2, 9.

Deisy received a positive home study determination, on January 23, 2025, but Angelica was no longer cleared to travel due to her pregnancy. ECF No. 21-1 ¶ 22. On January 30, 2025, Deisy disclosed that Angelica's adult caregiver was arrested on January 23, 2025, for sexual abuse toward an eight-year-old child. *Id.* Angelica gave birth to her child on February 6, 2025. *Id.* On February 19, 2025, ORR requested a home study addendum to confirm that the adult caregiver was no longer living in the home. *Id.* On March 11, 2025, ORR informed Deisy of the new identification document requirements. *Id.* Deisy indicated that she did not possess any form of identification due to her lack of legal immigration status. *Id.* On March 18, 2025, Deisy withdrew her sponsorship application. *Id.* As of May 12, 2025, Deisy had not identified another viable sponsor. *Id.* ORR attests that Angelica is on track for placement in long term foster care, and that any placement consideration will include keeping her together with her child. *Id.*

As of April 16, 2025, Eduardo M. was 14 years old and had been in ORR custody with his younger brother from January 2025 until May 21, 2025, when they were released to their mother. Declaration of Eduardo M., ECF No. 9-8 ¶¶ 2-3; Pls' Reply in Support of Mot. for Prelim. Injunction, ECF No. 27 at 4 n.1. Because Eduardo was released from ORR custody, he would not be a class member under Plaintiffs' proposed class definition.

As of May 6, 2025, Liam W. was 15 years old and had been in ORR custody since January 2025. Declaration of Liam W., ECF No. 9-9 ¶¶ 2, 6. Liam's mother submitted an updated sponsor application around January 15, 2025. ECF No. 21-1 ¶ 24. On February 6, 2025, a home study was completed based on the Liam's mother's two previous sponsorships. *Id.* On April 11, 2025, a DNA test appointment was requested. *Id.* On April 16, 2025, Liam's mother was informed of the proof of income policy update. *Id.* She stated that she would reach out to ORR once she obtains a verification letter from her employer. *Id.* As of April 23, 2025, the DNA test provider did not

confirm the appointment request. *Id.* On May 2, 2025, Liam's mother withdrew from the sponsorship process. *Id.* Neither she nor her household members provided an acceptable form of identity document in their state of Florida. *Id.*

As of May 8, 2025, Leo B. was 17 years old. Declaration of Leo B., ECF No. 9-10 ¶ 2. ORR readmitted Leo B. on March 15, 2025, after he had been taken into U.S. Immigration and Customs Enforcement custody for violating his probation for driving without a license. ECF No. 21-1 ¶ 25. Leo previously had been reunified with his sister in March 2023. *Id.* On March 20, 2025, Leo's sister withdrew the sponsorship application, citing an inability to meet the updated identification document requirement. *Id.* On May 6, 2025, Leo's sister informed his case manager that there are no other potential sponsors available. *Id.* Leo will reach the age of 18 in July 2025, at which point he will no longer be in ORR care. *Id.*

As of May 6, 2025, Xavier L. was 17 years old. Declaration of Xavier L., ECF No. 9-11 ¶ 2. Xavier L. entered ORR custody in December 2024. *Id.* Xavier's mother withdrew from the sponsorship process because she was unable to provide an acceptable form of identity document that met the updated requirements. ECF No. 21-1 ¶ 26. Xavier was subject to a mandatory home study because his mother had previously attempted to sponsor one or more children with one being biologically unrelated to her. *Id.* Xavier's mother had also been arrested in February and May of 2024, for prostitution and battery, respectively. *Id.* Xavier's mother's sister applied to sponsor Xavier. *Id.* That application is pending receipt of DNA results to confirm kinship. *Id.*

## STANDARD

The class action "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To fall within this narrow

exception, Plaintiffs must "affirmatively demonstrate" their compliance with each element of Rule 23—"that is, [they] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores*, 564 U.S. at 350; *see also McCarthy v. Kleindienst*, 741 F.2d 1406, 1414 n. 9 (D.C. Cir. 1984) ("It is the party seeking class certification that bears the burden of establishing the class action requirements."). This is not just a "mere pleading standard." *Id.* "[A]ctual, not presumed, conformance" with Rule 23 is "indispensable," *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982), and certification is proper only if the Court is satisfied "after a rigorous analysis" that Plaintiffs have shown that each requirement of the Rules has been met. *Wal-Mart Stores*, 564 U.S. at 350–51.

Thus, Plaintiffs must demonstrate each element of Rule 23(a) is met: (1) the class is so numerous that joinder is impractical ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the Named Plaintiffs are typical of claims or defenses of the class ("typicality"); and (4) the Named Plaintiffs and counsel will fairly and adequately protect the interests of the class ("adequacy of representation").[2] Fed. R. Civ. P. 23(a).

To satisfy the commonality element, identifying one or more common questions is not enough. "It is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation"

---

[2]    For purposes of this opposition to Plaintiffs' motion for class certification, Defendants concede that Plaintiffs have established the numerosity requirement in Rule 23(a)(1) and that the Individual Plaintiffs would be adequate representatives, under Rule 23(a)(4), if the Court certifies a class. Defendants, at a future date, might oppose class certification or, if the Court certifies a class, seek decertification of the class based on numerosity and adequacy of representation.

that makes a case appropriate for class treatment. *Wal-Mart Stores*, 564 U.S. at 350 (emphasis in original).

In addition to meeting the requirements set forth in Rule 23(a), the proposed class must also qualify under Rule 23(b)(1), (2), or (3). *AmChem Prods. v. Windsor*, 521 U.S. 591, 614 (1997). Plaintiffs seek certification under Federal Rule of Civil Procedure 23(b)(2), which permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the individual nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores*, 564 U.S. at 360. Plaintiffs alternatively seek certification under Federal Rule of Civil Procedure 23(b)(1)(A), which permits a class action to proceed when "prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class . . ."

## ARGUMENT

**I.    The proposed class is impermissible because it includes, or potentially includes, individuals who have not suffered, or will not suffer, the same injury—or have not suffered or will not suffer any injury.**

Courts in this District interpret Rule 23 as imposing a "requirement that a class be clearly defined." *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998). This requirement ensures that the class is "neither amorphous, nor imprecise." *Lewis v. Nat'l Football League*, 146 F.R.D. 5, 8 (D.D.C. 1992). "A class sought to be certified under Rule 23(b)(2) must "accurately articulate[] the general demarcations of the class of individuals who are being harmed." *Thorpe v. District of Columbia*, 303 F.R.D. 120, 139 (D.D.C. 2014). A class definition may be fatally overbroad if it

"sweeps within it persons who could not have been injured by the defendant's conduct." *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017) (quoting *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009)). Having an inadequately defined or overbroad class often implicates multiple Rule 23 requirements, including typicality, commonality, and the standards for certifying an injunctive-relief class under Rule 23(b)(2).

The proposed class is overbroad for several reasons. First, the class definition by operation would include, all UACs for part of the time they are in ORR custody. This is because the phrase "have not been released to a sponsor . . . because" is temporally imprecise. While ORR is required to promptly place UACs in the least restrictive setting that is in the best interest of the child, which potentially includes release to a sponsor, release to a sponsor is not instantaneous. As part of ORR's multi-step sponsor vetting process, nearly every UAC transferred to ORR custody must wait for a potential sponsor to submit the required documents.[3] Thus, while the UAC is waiting for a potential sponsor to submit the documents, the UAC is not released to a sponsor "because" the sponsor is "missing" the required documents. The duration of the wait depends upon a potential sponsor's willingness and ability to provide the documents. For some UACs, the wait could take one day, for others, months. But under the class definition, each UAC in the care and custody of an ORR contractor would be a class member, even if release is imminent. For the UAC in this situation, any injury arising out of spending time in ORR custody would not necessarily be traceable to the ORR Policy Update.

---

[3]     In certain exceptional cases, ORR may begin vetting the potential sponsors of UACs likely to enter ORR care, prior to their physical transfer to ORR's custody, to further diminish the time a child would remain in ORR care. Policy Guide §§ 2.1, 2.2. In these cases, ORR will not wait for children to be placed in an ORR care provider facility to begin its reunification process, but will instead follow discrete guidance, published as Field Guidance, tailored to the requirements and legal authorities of the specific circumstance. Policy Guide § 2.2. But these are the exceptions to the rule.

Second, the proposed class is overbroad because the term "in whole or in part" is not sufficiently definite. Plaintiffs do not explain how not releasing a UAC to a potential sponsor would happen "in part" because a sponsor did not provide the required types of documents. Under ORR's procedures for evaluating sponsors, when a potential sponsor does not provide the required type of document or biometric information, the case manager is not able to assess the potential sponsor, and the rest of the steps in the evaluation of the proposed sponsor, such as a Home Study (if necessary), Sponsorship Assessment Background Check Investigation, and the preparation of Recommendations and Decisions on Release, do not proceed. *See* Policy Guide § 2; HHS Office of Inspector General Report (Feb. 2024), ECF No. 21-2 at 10. The evaluation does not proceed because the potential sponsor did not submit the required documents. An ORR case manager might not proceed for other reasons but the failure to submit the required documents alone would be a reason not to proceed with the evaluation.

Third, the class would include UAC who do not share in the claimed class injury resulting from the updated document requirements—delay in release to a family member or sponsor and sponsors not coming forward out of fear of consequences from sharing information related to immigration status. *See* ECF No. 9-1 at 7-8; *Wal-Mart Stores*, 564 U.S. at 348 ("[A] class representative must . . . possess the same interest and suffer the same injury as the class members."). Rather, some sponsors would not submit the required documents because they lack the documents, not because they fear any consequences from submitting them.

Fourth, the proposed class would include UAC whose sponsors lack the requisite proof of identity or income, and ORR may nevertheless not release the UAC to a sponsor for a reason other than missing documents. The class includes those UAC whose potential sponsors established themselves as parents or legal guardians (Category 1 sponsors) who may be excepted from certain

proof of identity documents. ECF No. 21-1 ¶ 15 ("In consideration of family reunification, the policies contemplate an exception for category 1 sponsors on a case-by-case basis."); Policy Guide § 2.2.4 ("For Category 1 Sponsors Only: Any deviation from this requirement must be supported by clear justification and exceptions may be made on a case-by case basis by HHS ORR Headquarters.").

In sum, the breadth of the proposed class means the claims of the proposed class are too disparate to be measured at once. And, as explained below, this precludes a finding of commonality and typicality among the asserted class claims. *See infra* § II; *cf. AmChem Prods.*, 521 U.S. at 626 (concluding that named plaintiffs with diverse medical conditions were not adequate representatives of a single class because the "the interests of those within the single class are not aligned").

## II.    No common questions drive the resolution of the litigation as to the proposed class, and the individual Plaintiffs' claims are not typical of all class members' claims.

For the same reasons that the class is overbroad, commonality and typicality are lacking. Rule 23(a)(2) permits class certification only if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" *Wal-Mart Stores, Inc.*, 564 U.S. at 349. Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury" *Id.* (quoting *Falcon*, 457 U.S. at 161). This does not mean merely that they have all suffered a violation of the same provision of law. *Id.* Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. *Id.* What matters to class certification "is not the raising of common questions, but rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal punctuation omitted). Plaintiffs must show that their

claims "depend upon a common contention" "capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

Typicality of class differs from commonality in that typicality concerns the relationship between the representative's individual claims and the class's claims rather than the relatedness of the entire class's claims. *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019). Yet, both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical. *Id.* (citing Fed. R. Civ. P. 23(a)(2), 23(a)(3)). To destroy typicality, a distinction must differentiate the "*claims or defenses*" of the representatives from those of the class. *Id.* (emphasis added in original) (citing Fed. R. Civ. P. 23(a)(3)). As a result, typicality is ordinarily met "if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *Id.* (quoting 7A Wright et al., Federal Practice and Procedure § 1764 (footnote omitted)).

### A. Plaintiffs have not shown that their claims depend upon a common contention capable of classwide resolution.

Commonality is not met here because the proposed class includes disparate groups of UACs, including UACs who are in ORR custody before a potential sponsor has an opportunity, or is able, to submit the required documents, but later is able to submit the documents. The proposed class also would include UACs whose sponsor is excepted from the challenged document requirements and to whom ORR does not release the UAC for reasons other than missing documents.

Further, the determination of whether a class member is entitled to relief would require examination of individualized facts concerning sponsorship. In some cases, a potential sponsor could be unable to submit the newly-required documents under the Policy Guide updates but also

would be an unsuitable sponsor. In such cases, any injury to the class member is not likely to be traceable to the Policy Guide updates or the IFR. Whether the UAC in this situation was injured at all would have to be determined on a case-by-case basis. For these same reasons, Eduardo M., the Individual Plaintiff who has been released from ORR custody, is not an "appropriate representative" of the class. *See Coleman*, 306 F.R.D. at 83; *see also Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 119 (D.D.C. 2017) ("Class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."). Accordingly, resolving the legal questions that Plaintiffs assert will not resolve the claims of each class member in one stroke.

### B.    The Individual Plaintiffs' claims would not be typical of a class under Plaintiffs' proposed class definition.

To prove typicality, the representative Plaintiffs must establish that they "possess the same interest and suffer the same injury" as the other class members. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 331 (D.D.C. 2018). The typicality requirement asks whether distinctions differentiate the claims and defenses of the representatives from the class. *Harris v. Med. Transportation Mgmt., Inc.*, 77 F.4th 746, 759 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 818 (2024).

The typicality requirement of Rule 23(a)(3) ensures that the interests of the named representative align with the interests of the class. As long as the claims "resemble or exhibit the essential characteristics of those of the representatives," Rule 23(a)(3) will be satisfied. *Kas v. Financial General Bankshares, Inc*., 105 F.R.D. 453, 461 (D.D.C. 1984). The typicality requirement is not met, however, if the proposed class representatives are subject to unique defenses. *Id*. The typicality requirement is used to ascertain "whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of the

absent class members so as to assure that the absentees' interests will be fairly represented." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 27 (D.D.C. 2001) (citations omitted).

The representative Plaintiffs have not established that they have typical claims for the same reasons that they have not shown commonality. Plaintiffs challenge at least three separate agency actions: (1) policy changes regarding identification documents; (2) policy changes regarding proof-of-income documents; and (3) the IFR. Angelica S., Liam W., and Leo B. allege harm caused by the requirements for identification documents. ECF No. 9-7 ¶¶ 2–3, 6–7; Sofia W. Decl., ECF No. 9-14 ¶ 7; ECF No. 9-10 ¶ 9. Their claims would be distinct from any class members who allege harm caused by the updated requirements for proof-of-income documents. Eduardo M. has been released to a sponsor, ECF No. 27 at 4, n.1. Eduardo's claims are moot and therefore are not typical of the proposed class's claims.

In addition, the representative Plaintiffs' claims are not typical of the class because, while the named Plaintiffs challenge the IFR, it is not clear that anyone in the proposed class would be challenging the IFR. The class definition includes only those who "have not been released to a sponsor in whole or in part because they are missing documents newly required on or after March 7, 2025." Mot. 1. The IFR does not require sponsors to provide any documents.

To the extent the proposed class encompasses individuals affected by the IFR, the named Plaintiffs do not have typical claims and would not be adequate representatives because none of them have standing to challenge the IFR. The named Plaintiffs have not presented any competent evidence showing that they have suffered an injury-in-fact fairly traceable to the IFR. While Plaintiffs assert that some potential sponsors are afraid of immigration enforcement, ECF No. 27 at 5, they do not present evidence linking that fear to the IFR.

Further, the named Individual Plaintiffs are not typical of the class, as proposed, because each Individual Plaintiff was transferred to ORR custody before or around the time when ORR updated its Policy Guide, which was on March 7, 2025. Each named Individual Plaintiff therefore spent some time in ORR custody without being released to a sponsor, before ORR updated the Policy Guide. Plaintiffs claim that the Policy Guide updates are unlawful because they apply retroactively to sponsors who already completed sponsor applications, before ORR issued the Policy Guide updates. ECF No. 1 ¶ 141. The Individual Plaintiffs and their potential sponsors would not have been aware of the new documentation requirements when the Individual Plaintiffs were transferred to ORR custody. *See* ECF No. 9-7 ¶ 2 (Angelica-transferred to ORR in December 2024); ECF No. 9-1 at 5 (Eduardo – end of January 2025); *id*. at 6 (Liam – January 2025, Xavier – December 2024). Plaintiff Leo was transferred to ORR custody on March 15, 2025, ECF No. 9-1 at 6-7, which was one week after ORR updated its policy guidance (March 7, 2025). The sponsor of any new class member who was transferred to ORR custody after March 7, 2025, if challenging the identity document requirements in Policy Guide Sections 2.2.4, 2.4.1, 2.7.4, and 5.8.2, or transferred to ORR custody after April 15, 2025, if challenging the income document requirements in Policy Guide Sections. 2.2.4 and 2.4.1, would have been on notice of the new document requirements. The defense to any claim, by the proposed class, that the Policy Guide updates are unlawful because ORR applies them impermissibly retroactively, would be different from the defense to such a claim by the current Individual Plaintiffs. In this way, the current named Individual Plaintiffs would not be typical of the class.

### III.    Certification under Rule 23(b)(2) is inappropriate because the relief Plaintiffs seek would not benefit all class members.

A court may certify a class under Rule 23(b)(2) only when a single injunction or declaratory judgment "is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The "key to

the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores*, 564 U.S. at 360 (citation omitted). Class certification under Rule 23(b)(2) therefore "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.*; *see also Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL–CIO,* 216 F.3d 577, 580 (7th Cir. 2000) ("By virtue of its requirement that the plaintiffs seek to redress a common injury . . . Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive."); *Lightfoot v. D.C.*, 273 F.R.D. 314, 329 (D.D.C. 2011).

Plaintiffs' request to hold unlawful and set aside the IFR would not provide relief to each member of the class. The proposed class is limited to UAC who have not been released at least in part because they "are missing documents newly required on or after March 7, 2025." But the IFR does not provide any "new" document requirements. Rather, the IFR removes from ORR's regulation the language prohibiting the sharing of information with immigration-enforcement agencies. Holding unlawful and setting aside the IFR therefore would not affect which documents sponsors must produce to take custody of a UAC. Because the relief related to the IFR would not "provide relief to each member of the class," *Wal-Mart Stores*, 564 U.S. at 360, class certification under Rule 23(b)(2) would be inappropriate.

Further, holding unlawful and setting aside the ORR policy guide revisions would not change the situation for many of the UAC who are "in part" affected by the revisions. Many proposed class members would not be released to a sponsor for reasons unrelated to identification documents and income verification, such as a negative background check. For example, the relief sought in the complaint likely would not change the sponsorship process for named Plaintiff

Angelica because one of her proposed adult caretakers in the sponsor's home has been arrested for child-sexual abuse. ECF No. 21-1 at 8. Likewise, named Plaintiff Xavier likely would not have been released to his mother regardless of ORR's additional safeguards because she had been arrested in February and May of 2024, for prostitution and battery respectively, and had sponsored multiple children in the past. *Id.* at 10. Consequently, even without the additional safeguards imposed by the policy-guide revisions, UAC like Angelica and Xavier likely would not be released to their proposed sponsors due to child-abuse concerns. Because the injunctive relief that Plaintiffs seek would not provide relief to similarly situated class members, certification under Rule 23(b)(2) is unwarranted.

Enjoining the additional safeguards could also harm many class members who are at risk of being trafficked, abused, or neglected by their potential sponsors. *See* ECF No. 21-3 at 6 (describing discovery that sponsor had provided ORR with false Guatemalan identification documents to demonstrate that he was the brother of a 15-year-old UAC when the sponsor actually was not the UAC's brother and has been charged with sexually abusing the minor); *see also* U.S. Dep't of Justice, Guatemalan Man Unlawfully Residing in the United States and Convicted of Sexual Battery Indicted for Fraudulently Obtaining Custody of an Unaccompanied Alien Child in the United States, Apr. 18, 2025, https://www.justice.gov/opa/pr/guatemalan-man-unlawfully-residing-united-states-and-convicted-sexual-battery-indicted. Had ORR's additional safeguards been in place, this sponsor likely would not have been able to obtain custody of the 15-year-old UAC. Absent these additional safeguards, however, UAC will continue to be at a heightened risk of abuse, trafficking, and neglect, because sponsors are not properly vetted due to the difficulty verifying foreign documents to establish identity and relationship. Likewise, releasing a UAC to an individual who cannot provide income verification could also result in the child's neglect. If a

sponsor does not have sufficient funds from legal sources to ensure the wellbeing of the UAC, the UAC may be forced to work to support himself or herself, or may lack sufficient food, clothing, and amenities due to insufficient financial support. In turn, the relief that Plaintiffs seek will ultimately harm many of the very UAC they seek to represent.

Because enjoining the IFR would not change the "new document" requirement that defines the class, and because enjoining the additional safeguards for sponsorship would harm many proposed class members, Plaintiffs cannot show that the relief sought would benefit each member of the class. Accordingly, this Court should decline to certify the class under Rule 23(b)(2).

## IV.    Certification under Rule 23(b)(1)(A) is inappropriate because Plaintiffs have not shown that the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.

A class that meets all the requirements of Rule 23(a) should be certified if "prosecuting separate actions by or against individual class members would create a risk of: [] an inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). The language of Fed. R. Civ. P. 23(b)(1)(A) "is susceptible to a broad, but ultimately untenable, reading: in the absence of certification, there will always be the risk that the party opposing the class 'may be exposed to individual suits and conflicting judgments on liability.'" *Daskalea v. Washington Humane Soc*., 275 F.R.D. 346, 365 (D.D.C. 2011) (quoting 2 H. Newberg & A. Conte, Newberg on Class Actions § 4:4 (4th ed. 2002)). Certification under Rule 23(b)(1)(A), therefore, requires something more—namely, a legitimate risk that separate actions may establish "incompatible standards of conduct." Fed. R. Civ. P. 23(b)(1)(A). This requirement is an outgrowth of the justification for certification under subdivision (b)(1)(A)—"that individual adjudications would be impossible or unworkable." *Wal-Mart Stores, Inc*., 564 U.S. at 361.

The concern about incompatible standard of conduct is not present here. In this action, ORR might not release a UAC to a potential sponsor for any one of several reasons unrelated to the Policy Guide updates that ORR issued in March and April 2025—or ORR might not release the UAC to a potential sponsor because of the potential sponsor's failure to submit the documents as required under the Policy Guide updates. It is reasonable to expect inconsistent judgments due to the lack of commonality of the proposed class. The Court, therefore, should decline to certify the class under Rule 23(b)(1)(A).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Class Certification.

Dated: June 4, 2025                     Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

GLENN M. GIRDHARRY
Acting Deputy Director

WILLIAM C. SILVIS
Assistant Director

s/ *Christina Parascandola*
CHRISTINA PARASCANDOLA
LINDSAY VICK
MICHAEL A. CELONE
Senior Litigation Counsel
JOSHUA C. MCCROSKEY
Trial Attorney
United States Department of Justice
Office of Immigration Litigation – General
Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 514-3097
christina.parascandola@usdoj.gov