**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANGELICA S., *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 25-cv-1405 (DLF) |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OPINION**

The Immigrant Defenders Law Center, along with five minor plaintiffs proceeding pseudonymously, bring this case challenging an Interim Final Rule (IFR) and changes to procedures promulgated by the Office of Refugee Resettlement (ORR) within the Department of Health and Human Services (HHS). Before the Court is the plaintiffs' Motion for Class Certification, Dkt. 9, and Motion for Preliminary Injunction, Dkt. 10. For the reasons that follow, the Court will grant the motion for class certification and grant in part the motion for preliminary injunction.

I.    **BACKGROUND**

When unaccompanied minors arrive to the United States border without entrance papers, they are placed in the care of the Office of Refugee Resettlement. 45 C.F.R. § 410.1101(a); Compl. ¶ 2, Dkt. 1. ORR is responsible for "making placement determinations for all unaccompanied alien children" in their custody, 6 U.S.C. § 279(b)(1)(C), and ensuring these children "are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity," *id.* § 279(b)(2)(A)(ii). ORR must balance that statutory

dictate with its obligation to promptly place these minors "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A).

Two statutes inform ORR's authority and responsibilities. The Homeland Security Act of 2002 abolished the Immigration and Naturalization Service and transferred duties regarding the care of unaccompanied children to ORR. 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2). The Act requires ORR to provide for the children in their custody, organize their care and placement, and protect the children from those who might seek to exploit them. *Id.* § 279(b)(1)(A) & (b)(2)(A)(ii). The Trafficking Victims Protection Reauthorization Act, enacted in 2008, provides in relevant part that HHS must "establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity." 8 U.S.C. § 1232(c)(1).

Against this statutory backdrop, ORR promulgated the Unaccompanied Children Program Foundational Rule in 2024, formalizing preexisting ORR procedures. 45 C.F.R. pt. 410 (2024). The Rule states that if ORR determines that "detention of the unaccompanied child is not required either to secure the child's timely appearance before [the Department of Homeland Security] or the immigration court, or to ensure the child's safety or that of others," ORR will release the child to a suitable sponsor, prioritizing parents, legal guardians, or adult relatives over non-related adults. *Id.* § 410.1201(a). Potential sponsors must submit an application and be vetted by ORR to determine their suitability. *Id.* § 410.1202(a). The suitability assessment must include determining the sponsor's ability to care for the child, verifying the sponsor's identity and relationship to the child, and assessing the suitability of the sponsor's home. *Id.* § 410.1202(b). In addition, ORR "may require such components as . . . verification of the employment, income, or other information provided by the potential sponsor as evidence of the ability to support the

child, interviews with members of the household, [and] a home visit or home study." *Id.*
§ 410.1202(c).  Potential sponsors and any adult residents in the potential sponsor's home may
also be required to submit their fingerprints for background checks.  *Id.*

On March 25, 2025, HHS published a notice of an immediately effective Interim Final
Rule revising the Foundational Rule.  Unaccompanied Children Program Foundational Rule;
Update to Accord with Statutory Requirements, 90 Fed. Reg. 13,554 (Mar. 25, 2025).  In
particular, the Interim Final Rule rescinded one provision of the Foundational Rule that stated:

> ORR shall not disqualify potential sponsors based solely on their immigration status and
> shall not collect information on immigration status of potential sponsors for law
> enforcement or immigration enforcement related purposes.  ORR shall not share any
> immigration status information relating to potential sponsors with any law enforcement or
> immigration enforcement related entity at any time.

45 C.F.R. §410.1201(b) (2024); *see* 90 Fed. Reg. at 13,554–56.  HHS concluded that it had good
cause to make the rule effective immediately because the provision conflicted with a statutory
mandate in 8 U.S.C. § 1373 and was therefore contrary to law.  90 Fed. Reg. 13,555.  Section 1373
states that a federal official "may not prohibit, or in any way restrict, any government entity or
official from sending to, or receiving from, the Immigration and Naturalization Service
information regarding the citizenship or immigration status, lawful or unlawful, of any individual."
8 U.S.C. § 1373.  Because the rescinded provision prohibited that form of information sharing,
HHS concluded it had lacked authority to promulgate that provision and therefore had good cause
to rescind it immediately.  *See* 90 Fed. Reg. at 13,555.

In addition to the Foundational Rule, ORR has internal policies and procedures for carrying
out its statutory purpose, made publicly available in its UAC Bureau Policy Guide.  Biswas Decl.
¶¶ 2 & n.1, 4, Dkt. 21-1; Off. of Refugee Resettlement, Unaccompanied Alien Children Bureau
Policy Guide (2025) [hereinafter Policy Guide].  The Policy Guide outlines the process for

assessing sponsor suitability and releasing children to sponsors.  Potential sponsors fall into one of four categories: (1) Category 1 for parents and legal guardians; (2) Category 2A for immediate relatives who previously served as a primary caregiver; (3) Category 2B for immediate relatives who did not previously serve as a primary caregiver; and (4) Category 3 for all other sponsors. Policy Guide § 2.2.1.  Potential sponsors must submit an application identifying an alternative adult caregiver, listing all household members, establishing ability to support the child, and providing identification to demonstrate identity and relationship to the child.  *Id.*

In December 2022, the U.S. Senate Committee on Homeland Security and Governmental Affairs published a report identifying concerns with ORR's sponsor vetting process.  Minority Staff of S. Comm. on Homeland Sec. and Governmental Affs., 117th Cong., Federal Care of Unaccompanied Children: Minors Remain Vulnerable to Trafficking and Abuse (2022).  In particular, the report noted that ORR's completion of background checks had significantly declined despite an increase in the number of unaccompanied children entering the United States over the same period.  *Id.* at 34.  In 2023, ORR established an Integrity & Accountability Team to detect fraud in the sponsor application process.  Biswas Decl. ¶¶ 6–7.  The Team found multiple instances of fraud—often involving collusion with family members—including ten occasions in one month where children were released to sponsors with falsified documents.  *Id.* ¶ 6.  Despite the prevalence of fraud, less than 1% of sponsor applications were denied in recent years.  *Id.* ¶ 7. In 2024, the HHS Office of Inspector General found widespread failures in ORR's completion of case files and follow-through during the sponsor vetting process.  *Id*. ¶ 9; *see generally* Off. of Inspector Gen., Dep't of Health and Hum. Servs., OEI-07-21-00250, Gaps in Sponsor Screening and Followup Raise Safety Concerns for Unaccompanied Children (2024) [hereinafter OIG Report], Dkt. 21-2.  The Office recommended developing additional safeguards.  *See* OIG Report

at 22.  Upon entering office, President Trump issued an Executive Order directing HHS to take "all appropriate action to stop the trafficking and smuggling of alien children into the United States."  Exec. Order No. 14,159, 90 Fed. Reg. 8443, 8447 (Jan. 20, 2025).

In response, ORR issued a memorandum in February 2025 proposing various changes to the sponsor-vetting process.  Biswas Decl. ¶ 11; *see generally* Harper Memo., Dkt. 21-3.  Among other changes, ORR amended its Policy Guide in March to eliminate certain forms of identification such as foreign passports, birth certifications, and foreign national ID cards from its list of acceptable identification.  Compl. ¶¶ 48, 50.  ORR explained that it had experienced difficulties authenticating foreign documents in a timely manner and was concerned with widespread fraudulent activity in the use of these documents.  Biswas Decl. ¶¶ 14–15; *see* Biswas Memo. at 3, Dkt. 21-4.  The Policy Guide allowed for a case-by-case consideration of exemptions for Category 1 sponsor applications.  Biswas Decl. ¶ 15.  In April, HHS once again amended the Policy Guide by implementing new proof of income requirements.  Compl. ¶ 53.  While before, potential sponsors could employ a variety of methods to demonstrate their financial ability to support an unaccompanied minor, the amended guide required potential sponsors to submit either (1) the previous year's tax return; (2) paystubs from the last 60 days; or (3) a letter from the sponsor's employer verifying salary and employment.  *Id.*

The plaintiffs allege that due to these changes, unaccompanied minors have spent a longer period of time in ORR custody while potential sponsors seek to comply with the new requirements.  *Id.* ¶ 54.  The pseudonymous plaintiffs are minors currently in ORR custody.[1]  They attest that

---

[1] Eduardo M.'s mother submitted a request for a waiver of the proof of income requirement on April 29, 2025, and Eduardo was released to his mother on May 21, 2025.  Biswas Decl. ¶ 23; Pls.' Reply at 4 n.1, Dkt. 27.  The Court will therefore only consider the remaining four plaintiffs still in custody.

they had sponsors who had fully complied with ORR documentation requirements before the March and April amendments.  Angelica S. Decl. ¶ 6, Dkt. 9-7; Liam W. Decl. ¶ 4, Dkt. 9-9; Leo B. Decl. ¶ 8, Dkt. 9-10; Xavier L. Decl. ¶ 4, Dkt. 9-11.  But their sponsors' approval was delayed or cancelled when ORR implemented the new documentation and proof of income requirements.  *See* Deisy S. Decl. ¶¶ 22–25, Dkt. 9-12 (terminated sponsorship due to lack of compliant ID); Angelica S. Decl. ¶¶ 6-7 (same); Sofia W. Decl. ¶ 7, Dkt. 9-14 (stalled application due to lack of new compliant ID documentation); Liam W. Decl. ¶ 7 (same); Leo B. Decl. ¶¶ 8–9 (terminated application due to lack of new compliant ID); Ximena L. Decl. ¶¶ 7–8, 10, Dkt. 9-15 (application stalled to obtain a compliant ID and terminated due to lack of compliant proof of income documentation from partner); Xavier L. Decl. ¶ 5 (application stalled due to lack of proof of income documentation).

The remaining plaintiff, Immigrant Defenders Law Center (ImmDef), is a nonprofit organization that provides legal services to unaccompanied minors in California.  Compl. ¶ 100.  ImmDef alleges that due to HHS's revised policies, its clients on the "detained docket"—a faster-paced docket to address immigration claims of unaccompanied minors who have not been released to sponsors—have significantly increased, requiring more time and resources than before.  *Id.* ¶ 101.  In addition, ImmDef has expended resources revising educational presentations for unaccompanied minors who are not represented.  *Id.* ¶ 102.

The pseudonymous plaintiffs and ImmDef bring this suit on behalf of themselves and a putative class of similarly situated unaccompanied minors.  They challenge the Interim Final Rule and the new sponsor requirements as arbitrary and capricious and not in accordance with law, in excess of statutory authority, and implemented without observance of procedure required by law, in violation of the Administrative Procedure Act.  *See* 5 U.S.C. § 706(2)(A)–(D).  They seek a

preliminary injunction staying the Interim Final Rule and preventing the enforcement of the new sponsor requirements.

## II.    LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To prevail, a party seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citations and internal quotation marks omitted). Where a federal agency is the defendant, the last two factors merge. *See Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 36 (D.D.C. 2020).

Rule 23 of the Federal Rules of Civil Procedure requires a "party seeking class certification [to] affirmatively demonstrate his compliance with the" requirements of the rule. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "A district court exercises broad discretion in deciding whether to permit a case to proceed as a class action," given that "trial courts are uniquely well situated to make class certification decisions." *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994) (quotation marks omitted); *see also DL v. District of Columbia*, 860 F.3d 713, 724 (D.C. Cir. 2017). But the district court must perform a "rigorous analysis" to ensure compliance with Rule 23. *Wal-Mart*, 564 U.S. at 351. Actual compliance with the rule is "indispensable," *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982), and the burden of demonstrating compliance lies with the plaintiff, *see e.g.*, *Hoyte v. District of Columbia*, 325 F.R.D. 485, 491 (D.D.C. 2017) (a plaintiff bears the burden of proof by a preponderance of the evidence).

### III.    ANALYSIS

#### A.    Likelihood of Success on the Merits

To succeed on the merits, "[a] plaintiff must show a likelihood of success encompass[ing] not only substantive theories but also establishment of jurisdiction," including standing to sue. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)). "In the context of a preliminary [relief] motion, [courts] require the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,* 878 F.3d 371, 377 (D.C. Cir. 2017). The plaintiff "bear[s] the burdens of production and persuasion." *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)). A plaintiff's "inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction." *Food & Water Watch*, 808 F.3d at 913.

##### 1.    *Standing*

To establish standing, a plaintiff must show: (1) an "injury in fact"; (2) a "causal connection between the injury" and the challenged action; and (3) a likelihood that the "injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted). Both the individual plaintiffs and ImmDef, the organizational plaintiff, contend that they have sustained injuries from the new document requirements and the Interim Final Rule that are redressable by an order of this Court. The Court will first address whether the individual plaintiffs have standing before turning to the organizational plaintiff.

Each of the individual plaintiffs alleges similar ongoing injuries to support their challenges to the policy changes: detention and separation from their families. Mot. for Prelim. Inj. at 40.

Contrary to the government's contention, their injuries are not merely "speculative" risks of future injury.  Opp'n at 18, Dkt. 21.  They are ongoing injuries that will continue for as long as the children are in custody.  *See* Mot. for Prelim. Inj. at 41; *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018).

With respect to the new documentation requirements, the plaintiffs also demonstrate causation and redressability.  The new requirements caused the plaintiffs' injuries by delaying or eliminating family-member sponsorships.  The government points out that one of the plaintiffs, Angelica S, already was experiencing delays before the new documentation requirements.  Opp'n at 18.  Even so, the document changes caused additional delays by forcing Angelica S.'s sister to withdraw her application, thereby preventing any sponsorship possibility.  Biswas Decl. ¶¶ 22. Although the Court cannot order ORR to approve sponsor applications, a remedy from this Court could still address this injury by requiring ORR to process her application under the previous documentation requirements, which the sponsors have already provided.  *See, e.g.*, Sofia W. Decl. ¶ 7.  Thus, the Court finds that the plaintiff class has standing to challenge the new sponsorship documentation requirements.

On the other hand, the plaintiffs lack standing to challenge the Interim Final Rule because they cannot show causation and redressability.  As discussed, the interim rule rescinds a regulation prohibiting the disqualification of sponsors based exclusively on immigration status and preventing the collection and sharing of information with other agencies for immigration enforcement.  The plaintiffs attest that their injuries—detention and separation from their families due to sponsorship delays—began when the ORR imposed new identification requirements on March 7, 2025.  Deisy S. Decl. ¶ 22 (new documentation rule in early March); Sofia W. Decl. ¶ 7 (same); Leo B. Decl. ¶ 9 (noting change in documentation rules); Ximena L. Decl. ¶ 7 (new

document requirements in March 2025). Yet the Interim Final Rule was not promulgated until March 25, 2025. The plaintiffs cannot rely on a preexisting injury to challenge a later policy change, especially when that change did not change the circumstances of the injury.

Nor can the plaintiffs show that Interim Final Rule caused any additional injury. The plaintiffs contend that the sponsorship delays were exacerbated in April, after ORR implemented the proof of income requirements. *See* Rough Hr'g Tr. at 7. But any injury attributable to the income requirements promulgated in April 2025 also were not caused by the interim rule's publication on March 25, 2025.

And even if the Court were to enjoin the interim rule as improperly promulgated, potential sponsors could not be assured that their information would be protected under any forthcoming final rule. Biswas Decl. ¶ 21 (explaining that the substantive policy changes expressed in the interim rule are currently undergoing notice and comment so that a final rule can be promulgated). In other words, the interim rule is merely the first step in a process that will not conclude "for several months." *Id.* Given the ongoing regulatory uncertainty, it is implausible—and the plaintiffs put forth no evidence to the contrary—that a sponsor would come forward now, while the agency presses for these same policy changes to be incorporated into a final rule. Indeed, neither of the two declarants on which the plaintiffs rely attest that they would be willing to come forward as a sponsor, absent the interim rule. One declarant testified that her partner, who financially supports her, was "afraid to give" any more information to ORR. Ximena L. Decl. ¶ 10. But nothing in her declaration suggests that her partner knew about or was unwilling to share documentation because of the interim rule. *See* Rough Hr'g Tr. at 5 (confirming the declarants do not point to the IFR). Another declarant, Deisy S., asserted that she has been unable to find an alternative sponsor because people are "too afraid to give the government all [their] information,"

as "[t]hey don't know what will happen with the laws."  Deisy S. Decl. ¶ 28.  That statement, too, suggests that sponsors are deterred by the uncertainty of ongoing regulatory changes, rather the interim rule.[2]

On this record, the plaintiffs have not established "substantial evidence" that potential sponsors' unwillingness to come forward is due to the Interim Final Rule, as opposed to continuing fears about the ongoing rescission process.  *Arpaio*, 797 F.3d at 20 (requiring a plaintiff to present "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress").  For the same reasons, a favorable decision enjoining the Interim Final Rule would not redress the plaintiff's specific injuries.

The plaintiffs resist this conclusion, arguing that the Interim Final Rule and the new documentation requirements must be viewed together because the agency could not change the document requirements without also promulgating the interim rule.  Rough Hr'g Tr. at 14–15.  But the timeline does not support this assertion—ORR imposed the new identification documents requirement almost three weeks before it promulgated the Interim Final Rule.  And even if the agency acted ultra vires in doing so, Rough Hr'g Tr. at 14, it is clear that the policy changes reflected in the new document requirements and the rule must be reviewed separately, as the plaintiffs themselves recognize.  Their complaint alleges separate claims challenging the Interim Final Rule (Counts I–IV) and the sponsor document requirements (Counts V–VIII).  And, as noted,

---

[2] The plaintiffs also allude more generally to other unaccompanied children having difficulty finding sponsors due to fear of immigration enforcement.  Rough Hr'g Tr. at 6.  But these generalized assertions based on hearsay, absent more, do not amount to "substantial evidence" establishing the necessary causal relationship, especially since even without the IFR, the threat of information sharing looms large as long as the agency continues the rulemaking process.  *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015).

a remedy addressing the new documentation requirements alone would redress the plaintiffs' asserted injuries.

ImmDef also lacks standing. Unlike the individual plaintiffs, it cannot demonstrate injury sufficient to challenge any of the agency's new policies. To establish organizational injury, an organization must do more than allege diversion of resources or a "setback to the organization's abstract social interests." *Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Rather, the challenged action must cause a "direct conflict between the defendant's conduct and the organization's mission." *Prevention of Cruelty*, 659 F.3d at 25.

ImmDef's asserted mission is to provide legal representation to unaccompanied immigrant minors in California. Compl. ¶ 100. The organization does not allege that the government has revoked their licenses or prevented them from accessing their clients. It instead claims that it must spend more time with each client and that it must do so on an expedited basis. Felix Decl. ¶ 12, Dkt. 10-15. But neither of these operational costs are "beyond those normally expended" to support ImmDef's mission. *Nat'l Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1434 (D.C. Cir. 1995). ImmDef's current-day representation is in line with its usual work. The organization is still able to perform its fundamental purposes by representing unaccompanied minors through the sponsorship and release process.

"The mere fact that an organization redirects some of its resources" as a result of the government's action is not enough to confer standing. *Id.; see also Elec. Priv. Info. Ctr. v. Dep't of Educ.*, 48 F. Supp. 3d 1, 24 (D.D.C. 2014) (redirecting some organizational resources from one legislative agenda to another is insufficient to confer standing). At most, ImmDef's concerns amount to "complaining that the organization's ultimate goal has been made more difficult." *New*

*England Anti-Vivisection Soc'y v. U.S. Fish and Wildlife Serv.*, 208 F. Supp. 3d 142, 166 (D.D.C. 2016). That is not a cognizable injury to challenge the new agency policies.

> 2. *APA Claims: New Sponsorship Documentation Requirements*

Having found that the plaintiffs have standing to challenge the documentation requirements, the Court turns to the merits of the plaintiffs' APA claims. Under the APA, a reviewing court shall set aside a final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Absent exceptions not relevant here, *see* 5 U.S.C. § 701(a), the APA authorizes judicial review of each "final agency action for which there is no other adequate remedy in a court," *id.* § 704. The plaintiffs argue they are likely to succeed on the merits of their challenge to the new sponsor requirements because the requirements are arbitrary and capricious and contrary to law. The Court agrees that the government acted arbitrarily and capriciously by failing to provide a reasoned explanation for certain sponsor requirements and applying them retroactively.

> i.    Arbitrary and Capricious

To set aside final agency action as arbitrary and capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). As the Supreme Court has instructed, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted). An action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Because an agency must draw a rational connection between the factual findings and the choices made, *State Farm,* 463 U.S. at 43, the Court will start by examining the factual basis for the document changes before determining whether ORR drew the required connection for the policy changes.

*Identity Documents.* ORR offers a compelling reason to modify its existing policies: The Integrity and Accountability Team's report identified serious breaches of ORR's statutory duty to protect children from trafficking and to identify fraud. Harper Memo. at 1. Among other things, the Team found multiple instances in which potential sponsors submitted altered photographs or documents to establish identity and relationship—often to sponsor multiple children. *Id.* at 3–4. In one case, a woman and her partner submitted various fake documents in an attempt to sponsor 15 children over a five-year period. *Id.* at 6. At least seven of those attempts were successful, including three where the woman claimed to be a Category 1 sponsor. *Id.* During the Team's investigation, ORR's field staff also observed an increase in sponsor and age fraud and recommended stricter document verification policies. *Id.* at 5. The Team's report concluded that the average length-of-care time was so fast that "only a cursory review of sponsor applications" was feasible, with "very few enhanced safety measures like fingerprinting, home studies, and DNA testing." *Id.* at 8–9.

Although ORR made adequate findings to support stricter documentation policies to identify and prevent fraud and trafficking, it fell short in explaining how it weighed the relevant factors. As an initial matter, the Court questions certain policy choices ORR made. For instance, the document amendments eliminate the use of foreign passports for proof of identity unless the passport contains an immigrant visa or work authorization. Pl.'s Ex 1-C at 6, Dkt. 10-7. The

memorandum justifies this change as aligning with the United States Citizenship and Immigration Services I-9 document requirements, but it does not explain how the I-9 documents—which are used for employment eligibility—are a rational choice to balance the competing interests of avoiding unnecessary delay and effectively preventing fraud.

More importantly, because ORR revised its preexisting policies, it needed to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (cleaned up). The ORR memoranda appear to acknowledge that the document changes would significantly impact children and their sponsors who act in reliance on the previous documentation policies. The Harper Memorandum, for instance, proposed implementing a "communication campaign warning aliens not to send their children to the US." Harper Memo. at 11. Indeed, the unaccompanied plaintiff children arrived in the United States with the expectation that they had family members or friends who could sponsor them, based on the earlier documentation requirements. *See, e.g.*, Liam W. Decl. ¶ 3. Had these children and their families been aware of ORR's new policies, they might not have decided not to enter the United States.

Even though ORR recognized the importance of providing notice, Harper Memo. at 11, the agency changed the document requirements without warning and applied them retroactively, leaving children stranded without viable sponsor options. *See, e.g.*, *id.* ¶ 4, 7. What is more, ORR offered no explanation for why it determined that notice was unnecessary. The impact of these new document requirements was particularly stark in the case of Leo B., who was released to his sister under the earlier documentation requirements but was readmitted into ORR custody after driving without a license. Leo B. Decl. ¶ 6; Biswas Decl. ¶ 25. Although he had lived with his sister for two years without incident, Leo is now stuck in ORR custody without any potential

sponsor because of the retroactive document changes. Leo B. Decl. ¶ 9. An agency need not "consider all policy alternatives in reaching [its] decision," *State Farm*, 463 U.S. at 51, or explore "every alternative device and thought conceivable by the mind of man," *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978). But at a minimum, an agency ORR must address the concerns *the agency itself identified* before changing the status quo.

Similarly, ORR acknowledged that certain stakeholders might be disadvantaged by the document changes, Biswas Memorandum at 5, but it did not explain how it weighed those impacts against other policy objectives and statutory obligations. *See Regents*, 591 U.S. at 33. And although the Integrity and Accountability Team's report evaluated and determined that delays for fingerprinting were justified, it did not address delays resulting from a potential sponsor's inability to acquire the new proof of identity documents, particularly without notice of the changes. Harper Memo. at 9. Once an agency identifies an element as worthy of consideration, it cannot take action without explaining how it weighed that element against other relevant factors. *Cf. FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021) (applying arbitrary-and-capricious review to the FCC's weighing of a policy factor even though the FCC was not statutorily required to consider that factor). Because the agency provided no explanation at all, *cf. Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 5–6 (D.C. Cir. 2006), the plaintiffs have demonstrated a substantial likelihood that the identity requirements are not supported by a rational explanation.

*Proof of Income Requirements.* ORR's factual findings regarding income similarly justified tightening its proof of income requirements. The Integrity and Accountability Team identified multiple instances of attempted or successful extortion of sponsors and other involved individuals. Harper Memo. at 7. And ORR pointed to findings from the Office on Trafficking in Persons that even parents and family members pose risks of trafficking or labor exploitation of

minors they were seeking to sponsor.  Salazar Memo. at 2, Dkt. 21-5.  ORR also observed that demonstrating the ability to provide for a child was a standard requirement in domestic child welfare cases.  *Id.*  With these factual findings, ORR established a basis for implementing stricter proof of income requirements.

But as before, the agency falters when connecting its factual findings to its new policy. Although the agency acknowledged that its new income requirements were likely to cause disruption for sponsors who do not have the requisite documents, Salazar Memo. at 5, the agency offers only the conclusory assertion that the new income verification requirement are not a concern, even without advanced notice, *id.*  The record does not reveal whether and how ORR balanced its competing statutory duties and concluded that upsetting reliance interests was justified when weighed against the risk of exploitation and the lack of sufficient vetting in the past.  *See Regents*, 591 U.S. at 33.  As with the new identification document requirements, the plaintiffs have shown that it is substantially likely that ORR acted arbitrarily and capriciously in applying the new income documentation requirements without notice to preexisting sponsor applications.

### B.    Remaining Injunction Factors

#### 1.    *Irreparable Harm*

The plaintiffs attest that they are suffering by remaining in the care of ORR and separated from their families.  *See, e.g.*, Angelica S. Decl. ¶¶ 4-5, 12; Ximena L. ¶¶ 11-12; Leo B. Decl. ¶¶ 6, 10-17.  Courts have found that family separation and prolonged detention qualify as irreparable injury.  *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 502 (determining that family "[s]eparation irreparably harms plaintiffs every minute it persists"); *Andreiu v. Ashcroft,* 253 F.3d 477, 484 (9th Cir. 2001) (en banc).  In response, the government merely restates its standing arguments.  The Court rejects them for the same reasons as before.  *See* Section III.A.1.

2.    *Balance of Harms and Public Interest*

The two remaining factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors also favor a preliminary injunction. The defendants argue that the Court should defer to ORR's expertise in balancing the harms and risks of conflicting policy goals and that an injunction would expose vulnerable children to risk of fraud and human trafficking. Opp'n at 40. But the Court need not wade into the quagmire of admittedly complex and nuanced policy considerations regarding the best way to protect unaccompanied minors. After all, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And the public interest is served when the government follows the APA's procedural requirements by offering a reasoned explanation for its decisions. *N. Mariana Islands v. United States,* 686 F. Supp. 2d 7, 21 (D.D.C. 2009). These factors therefore support an injunction.

**C.    Provisional Class Certification**

The plaintiffs ask this Court to provisionally certify a class for purposes of the preliminary injunction. *See* Cert. Mot. at 25, Dkt. 9-1. To merit provisional certification, the plaintiffs bear the burden of showing that each of the four prerequisites of Federal Rule of Civil Procedure 23(a) have been met. *See Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 529 (D.C. Cir. 2006). Those prerequisites are "(1) [that] the class is so numerous that joinder of all members is impracticable; (2) [that] there are questions of law or fact common to the class; (3) [that] the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) [that] the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P.

23(a).  In addition, the Court must determine whether the proposed class is maintainable under at least "one of Rule 23(b)'s subdivisions." *Richards*, 453 F.3d at 529.  The plaintiffs seek to certify an injunctive class under Rule 23(b)(2) because "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Conscious of its authority to "alter[] or amend[]" the certification before adjudication on the merits, *see R.I.L-R.*, 80 F. Supp. 3d at 179–80, the Court will certify a class consisting of all unaccompanied children (1) who were in or transferred to the custody of HHS on or before April 22, 2025; (2) who have identified a potential sponsor; and (3) whose sponsor's family reunification application has been denied, closed, withdrawn, delayed, or cannot be completed because the sponsor is missing documents newly required on or after March 7, 2025.

### 1.  *Numerosity*

To satisfy Rule 23(a)(1), a plaintiff must show that the "class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Although the requirement includes no "hard rules for when joinder will be found to be impracticable," *Coleman ex. rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 76 (D.D.C. 2015), courts generally find numerosity satisfied when a plaintiff presents credible evidence that "a proposed class has at least forty members," *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 196 (D.D.C. 2013); *see Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1456 n.10 (D.C. Cir. 1988).  The defendants do not contest numerosity.  Cert. Opp'n at 19 n.2, Dkt. 31.  Given that more than two thousand children are in ORR custody, on average, and a large percentage of these children rely on illegal immigrant sponsors, Cert. Mot. at 11–12, the plaintiffs have easily met their burden of demonstrating a sufficiently numerous class.

2.    *Commonality*

To satisfy Rule 23(a)(2), the plaintiff must establish that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The "claims [by class members] must depend upon a common contention," and "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 564 U.S. at 350.  "[C]lass members must have suffered the same injury *for the same reason*, such as a uniform policy or practice that is illegal."  *D.L. v. District of Columbia*, 302 F.R.D. 1, 12 (D.D.C. 2013).

Although the plaintiffs frame the issues slightly differently, the Court identifies two distinct policy changes: (1) the promulgation of the Interim Final Rule; and (2) the imposition of the new sponsor document requirements as revised in the Policy Guide.[3]  Because no individual plaintiff has established standing to challenge the Interim Final Rule, the Court will address commonality for the sponsor requirements in the Policy Guide only.  The named plaintiffs satisfy commonality because they suffered the same injury—extended detention by ORR—as a result of the new sponsor requirements.  They also had a sponsor who submitted the necessary documentation but whose application was subsequently delayed or terminated due to the new requirements.

---

[3] The plaintiffs seek to characterize the legal issues as "(1) whether the IFR and changes to the ORR Policy Guide were improperly promulgated; and (2) whether the new sponsorship requirements are unlawful, beyond statutory authority, contrary to law, and arbitrary and capricious."  Cert. Mot. at 14.  But the plaintiffs also claim the Interim Final Rule is unlawful, in excess of statutory authority, contrary to law, and arbitrary and capricious.  Consistent with the complaint, the Court considers the IFR and the Policy Guide separately because the changes to the sponsorship document requirements imposed by each are separate actions that occurred on different dates.

The defendants contend that the plaintiffs' proposed class lacks commonality, Cert. Opp'n at 24, but minor adjustments to the plaintiffs' proposed class definition will ensure that the class is comprised solely of plaintiffs who were injured by the new documentation requirements. *See Wagner v. Taylor*, 836 F.2d 578, 590 (D.C. Cir. 1987) (noting a court's "broad discretion to redefine and reshape the proposed class to the point that it qualifies for certification under Rule 23"). To this end, the Court limits the plaintiff class to unaccompanied children whose "sponsor's family reunification application has been denied, closed, withdrawn, delayed, or cannot be completed because the sponsor is missing documents newly required on or after March 7, 2025." Under that definition, the entire class suffers the same injury—a delayed release due to the new documentation requirements imposed on March 7, 2025. And an order requiring ORR to permit sponsors to submit previously allowed documentation would remedy that injury.

### 3. *Typicality*

Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality "concerns the relationship between the representative's individual claims and the class's claims rather than the relatedness of the entire class's claims." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019). The requirement is satisfied "if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Little v. WMATA*, 249 F. Supp. 3d 394, 420 (D.D.C. 2017) (internal quotation omitted). The typicality and commonality inquiries "tend to merge." *Falcon*, 457 U.S. at 157 n.13.

The defendants contend that the named plaintiffs are not typical of the class because each was transferred to ORR custody before or around the time ORR updated its Policy Guide, while

the majority of potential class members arrived in the United States after the policies were imposed. Cert. Opp'n at 27. Even so, the defendants appear to acknowledge that arriving "around the time" of the new policy, even if slightly after, would engender reliance interests. Class Cert. Opp'n at 27.

To ensure that the class is comprised of members who are able to raise "similar legal arguments to prove the defendant's liability," *Little*, 249 F. Supp. 3d at 420, the Court will—at least at this early stage—limit the class to children who were transferred into ORR custody on or before April 22, 2025, shortly after the new document changes became effective. The Court recognizes that this date may need to be altered or amended as the record develops. *R.I.L-R.*, 80 F. Supp. 3d at 179–80. It also recognizes either party may in time provide sufficient grounds to establish a separate class. But at this preliminary stage, the Court finds that a class that is comprised of children who likely experienced a retroactive application of the new sponsor documentation requirements best ensures that the typicality and other requirements of Rule 23(a) are met.

### 4. *Adequacy*

Per Rule 23(a)(4), the representative parties must "fairly and adequately protect the interests of the class." The named representative must not have "antagonistic or conflicting interests with the unnamed members of the class," and "the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997). The defendants concede adequacy for the purposes of provisional class certification, Cert. Opp'n at 19 n.2, and the Court agrees that no antagonistic or conflicting interests and are represented by qualified counsel. The plaintiffs have therefore satisfied the adequacy requirement.

the majority of potential class members arrived in the United States after the policies were imposed. Cert. Opp'n at 27. Even so, the defendants appear to acknowledge that arriving "around the time" of the new policy, even if slightly after, would engender reliance interests. Class Cert. Opp'n at 27.

To ensure that the class is comprised of members who are able to raise "similar legal arguments to prove the defendant's liability," *Little*, 249 F. Supp. 3d at 420, the Court will—at least at this early stage—limit the class to children who were transferred into ORR custody on or before April 22, 2025, shortly after the new document changes became effective. The Court recognizes that this date may need to be altered or amended as the record develops. *R.I.L-R.*, 80 F. Supp. 3d at 179–80. It also recognizes either party may in time provide sufficient grounds to establish a separate class. But at this preliminary stage, the Court finds that a class that is comprised of children who likely experienced a retroactive application of the new sponsor documentation requirements best ensures that the typicality and other requirements of Rule 23(a) are met.

### 4. *Adequacy*

Per Rule 23(a)(4), the representative parties must "fairly and adequately protect the interests of the class." The named representative must not have "antagonistic or conflicting interests with the unnamed members of the class," and "the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997). The defendants concede adequacy for the purposes of provisional class certification, Cert. Opp'n at 19 n.2, and the Court agrees that no antagonistic or conflicting interests and are represented by qualified counsel. The plaintiffs have therefore satisfied the adequacy requirement.

5.    *Rule 23(b)(2)*

Rule 23(b)(2) requires that defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  This entails showing that "(1) [t]he defendant's action or refusal to act must be generally applicable to the class, and (2) plaintiff must seek final injunctive relief or corresponding declaratory relief on behalf of the class."  *Steele v. United States*, 159 F. Supp. 3d 73, 81 (D.D.C. 2016) (quotations and citations omitted).  "There must . . . be a named plaintiff who has [a live] case or controversy at the time the complaint is filed[] and at the time the class action is certified."  *Sosna v. Iowa*, 419 U.S. 393, 402 (1975).

As discussed, the new sponsor documentation requirements apply generally to the class.  In addition, four of the named plaintiffs remain in ORR custody.  The class suffers no deficiencies with regards to commonality or typicality.  *Contra* Cert. Opp'n at 24–27.  Nor does setting aside the new requirements harm class members who are at risk of being trafficked or abused by potential sponsors*, contra* Cert. Opp'n at 29, because ORR is not required to release any particular child to any particular sponsor.  Even without the new sponsor requirements, ORR retains its authority to conduct thorough assessments of sponsors on a case-by-case basis, using all of its resources and procedures already in place.  *See generally* 8 U.S.C. § 1232(c)(3).  Injunctive relief is therefore appropriate for the class as a whole.

**CONCLUSION**

This decision is a narrow one:  The Court concludes that it is substantially likely that ORR acted arbitrarily and capriciously by not providing adequate justification for its new sponsor documentation requirements.  This ruling does not obligate ORR to approve any particular sponsor or to release any individual child.  Nor does it prevent ORR from imposing more rigorous sponsor documentation requirements and thoroughly vetting sponsors on a case-by-case basis.  It merely prevents the agency from creating a new blanket policy that departs from its previous one without explaining how it weighed the disrupted reliance interests against other valid considerations.

Accordingly, and for the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the plaintiffs' Motion for Preliminary Injunction, Dkt. 10 and **GRANTS** the plaintiffs' Motion for Class Certification, Dkt. 9.  A separate order consistent with this decision accompanies this memorandum opinion.


DABNEY L. FRIEDRICH
United States District Judge

June 9, 2025