# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

ANGELICA S.,                                    )
    address omitted per LCvR 5.1;        )
                                                )
EDUARDO M.,                                  )
    address omitted per LCvR 5.1;        )
                                                )   No. 25-cv-01405-DLF
LIAM W.,                                          )
    address omitted per LCvR 5.1;        )
                                                )   **FIRST AMENDED COMPLAINT FOR**
LEO B.,                                             )   **DECLARATORY AND INJUNCTIVE**
    address omitted per LCvR 5.1;        )   **RELIEF**
                                                )
XAVIER L.,                                       )
    address omitted per LCvR 5.1;        )
                                                )
MATEO N.,                                       )
    address omitted per LCvR 5.1;        )
                                                )
YAIR G.,                                           )
    address omitted per LCvR 5.1;        )
                                                )
DAVID D.,                                        )
    address omitted per LCvR 5.1; and  )
                                                )
IMMIGRANT DEFENDERS LAW CENTER,  )
634 S. Spring Street, 10th Floor             )
Los Angeles, CA 90014                        )
                                                )
          Plaintiffs,                    )
                                                )
v.                                                     )
                                                )
U.S. DEPARTMENT OF HEALTH AND      )
HUMAN SERVICES,                            )
200 Independence Avenue, S.W.           )
Washington, DC 20201;                        )
                                                )
ROBERT F. KENNEDY, JR., in his official  )
capacity as Secretary of Health and Human  )
Services,                                            )
200 Independence Avenue, S.W.           )
Washington, DC 20201; and                   )

ANGIE SALAZAR, in her official capacity as
Acting Director of the Office of Refugee
Resettlement,
330 C Street, S.W., Room 5123
Washington, DC 20201,

               Defendants.

## INTRODUCTION

1.      This is a class action brought on behalf of unaccompanied children currently in the custody of the Office of Refugee Resettlement ("ORR") challenging recent policy changes that impede their prompt release to caring sponsors. Every year, unaccompanied children arrive at our borders without parents or legal guardians, seeking safety. Some of these children are very young, most of them have experienced complex trauma both before leaving their home country and during their journey to seek refuge. Overwhelmingly, these children are fleeing violence and persecution in hopes of reunifying with family members in the United States so they can grow up safely, with the support of their families.

2.      After arriving to the United States, unaccompanied children are held in the custody of the ORR within the Department of Health and Human Services ("HHS") while they wait for release to a sponsor. Despite having close family members or other suitable sponsors available to care for them, new government policies recently implemented by Defendants have made it nearly impossible for Plaintiffs and other unaccompanied children to be released from government custody. Instead of reunifying with their families who are ready, willing, and able to care for them, children languish month after month in congregate care facilities—some of which are not even licensed by state agencies. These children frequently suffer from anxiety and depression that only worsens as their time in government custody is prolonged further.

3.      More than twenty years ago, Congress decided that unaccompanied children should be cared for by an agency focused on their welfare. Accordingly, then-President George W. Bush signed into law the Homeland Security Act that, in relevant part, moved the care of unaccompanied children out of an immigration enforcement agency to an agency charged with protecting the interests of the child. 6 U.S.C. § 279(b)(1)(B). Since then, Congress has entrusted

ORR with the placement, care, custody, and release of these vulnerable children. 6 U.S.C. § 279; 8 U.S.C. § 1232. ORR's core mandate is to promptly place unaccompanied children "in the least restrictive setting that is in the best interest of the child," usually with a "suitable family member." 8 U.S.C. § 1232(c)(2)(A).

4.      In 2024, ORR promulgated regulations "to codify policies, standards, and protections for [unaccompanied children], consistent with the [Homeland Security Act] and [Trafficking Victims Protection Reauthorization Act], and to implement the substantive requirements of the [*Flores* Settlement Agreement] as they pertain to ORR" in what is known as the Foundational Rule. *Unaccompanied Children Foundational Rule*, 89 Fed. Reg. 34384, 34385 (Apr. 30, 2024) (the "Foundational Rule"). Prior to finalizing the regulations, ORR underwent notice and comment rulemaking and received and responded to tens of thousands of comments. With respect to the release of unaccompanied children to their sponsors, the agency sought to "reflect[] its strong belief that, generally, placement with a vetted and approved family member or other vetted and approved sponsor, as opposed to placement in an ORR care provider facility … is in the best interests of unaccompanied children." *Id.* at 34440. To effectuate its purpose, ORR created policies and procedures "regarding release, without unnecessary delay, of an unaccompanied child from ORR custody to a vetted and approved sponsor." *Id.* at 34399.

5.      Consistent with its statutory and regulatory obligations, ORR's Foundational Rule provided that "ORR shall not disqualify potential sponsors based solely on their immigration status and shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement related purposes." 45 C.F.R. § 410.1201(b) (2024). The Foundational Rule further provided that "ORR shall not share any immigration status

information relating to potential sponsors with any law enforcement or immigration enforcement related entity at any time." *Id*.

6.    Beginning in March 2025, ORR began violating its own regulations by refusing to consider release of children to their parents, siblings, and other family members simply because their sponsors or other adults required to participate in the sponsorship application lacked specific identity documentation that they could not obtain because of their immigration status. ORR unilaterally amended Section 2.2.4 of its Policy Guide to impose these new identification requirements.[1] In April 2025, ORR further amended Section 2.2.4 to begin requiring sponsors to provide specific documents to prove their income, which are not accessible to individuals without work authorization. Both these changes were made effective immediately and applied retroactively to all pending sponsorship applications, including those applications otherwise ready for approval. Collectively, these policy changes have resulted in children across the country being separated from their loving families, while the government denies their release, unnecessarily prolonging their detention.

7.    On March 24, 2025, HHS issued an Interim Final Rule ("IFR") rescinding all three restrictions in 45 C.F.R. § 410.1201(b). HHS offered no substantive justification for rescinding the portions of § 410.1201(b) relating to denials based on immigration status and information collection for immigration enforcement purposes. The issuance of the IFR lacks good cause, is contrary to law, and is arbitrary and capricious.

8.    Plaintiffs are children detained in federal immigration custody at the time of filing of the initial and/or amended complaint, seeking to represent a putative class of unaccompanied

---

[1] Office of Refugee Resettlement, *ORR Unaccompanied Alien Children Bureau Policy Guide* (current as of Apr. 24, 2025), https://perma.cc/U7ZA-BHSA ("ORR Policy Guide").

children who are or will be in the custody of HHS and who have not been released to a sponsor because of ORR's new documentation requirements, and a nonprofit organization whose ability to fulfill its mission of zealous advocacy on behalf of their immigrant clients is thwarted by the IFR and by ORR's policy changes regarding release to sponsors. This is a class action for injunctive and declaratory relief challenging the issuance of the IFR and the changes to ORR's sponsor requirements under the Administrative Procedures Act.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1346, because this action arises under federal law and is against the United States. Defendants have waived sovereign immunity for purposes of this suit. 5 U.S.C. § 702.

10.    The claims for declaratory and injunctive relief are authorized by 5 U.S.C. §§ 702–706, 28 U.S.C. §§ 1651, 2201, 2202, Federal Rules of Civil Procedure 57 and 65, and the inherent and equitable powers of this Court.

11.    Venue is proper in this district under 28 U.S.C. § 1391(e), because at least one of the Defendants is headquartered in Washington, D.C., and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here.

## PARTIES

12.    Plaintiff Angelica S. was detained by ORR at a shelter in California at the time of the initial Complaint on May 8, 2025. She was born in 2007 and is 17 years old. Angelica is, and at all relevant times was, an unaccompanied child within the meaning of 6 U.S.C. § 279(g)(2). Pursuant to Federal Rule of Civil Procedure 17(c)(2), Angelica appears through her Next Friend and sister Deisy S., a resident of Texas. ORR refused to release Angelica to her Next Friend and sister on the ground that Deisy was unable to provide the documents required by the updated

ORR Policy Guide Section 2.2.4. After the Court issued a preliminary injunction in this case on June 9, 2025, ORR reconsidered Deisy S.'s application and Angelica S. was released to Deisy S. on August 10, 2025.

13.     Plaintiff Eduardo M. and his 7-year-old brother were detained by ORR at a transitional foster care program in California at the time of the initial Complaint on May 8, 2025. Eduardo was born in 2010 and is 14 years old. Eduardo is, and at all relevant times was, an unaccompanied child within the meaning of 6 U.S.C. § 279(g)(2). Pursuant to Federal Rule of Civil Procedure 17(c)(2), Eduardo appears through his Next Friend and mother Rosa M., a resident of California. As of the date of Plaintiffs' Complaint on May 8, 2025, ORR had not released Eduardo and his brother to their mother because she was unable to provide the documents required by the updated ORR Policy Guide Section 2.2.4. Eduardo and his brother were released to their mother on May 21, 2025—over three weeks after their case was submitted to ORR headquarters for consideration of an exception to ORR's new proof of identification and proof of income requirements.

14.     Plaintiff Liam W. was detained by ORR at a shelter in New York at the time of the initial Complaint on May 8, 2025. He was born in 2010 and is 15 years old. Liam is, and at all relevant times was, an unaccompanied child within the meaning of 6 U.S.C. § 279(g)(2). Pursuant to Federal Rule of Civil Procedure 17(c)(2), Liam W. appears through his Next Friend and mother Sofia W., a resident of Florida. ORR refused to release Liam W. to his mother because his mother and other household members were unable to provide the documents required by the updated ORR Policy Guide Section 2.2.4. After the Court issued a preliminary injunction in this case on June 9, 2025, ORR reconsidered Sofia W.'s sponsorship application and Liam W. was approved for release on August 5, 2025.

15.    Plaintiff Leo B. was detained by ORR at a shelter in California at the time of the initial Complaint on May 8, 2025. He was born in 2007 and was 17 years old when he re-entered ORR custody in 2025. He is currently 18 years old. As of the date of the initial Complaint, Leo was an unaccompanied child within the meaning of 6 U.S.C. § 279(g)(2). Pursuant to Federal Rule of Civil Procedure 17(c)(2), Leo appears through his Next Friend and immigration case worker Ivan Santiago H., a resident of California. ORR refused to release Leo to his sister on the ground that she was unable to provide the documents required by the updated ORR Policy Guide Section 2.2.4. ORR released Leo to a short-term shelter in late June 2025, shortly before his 18th birthday.

16.    Plaintiff Xavier L. and his 13-year-old sister were detained by ORR at a shelter in New York at the time of the initial Complaint on May 8, 2025. He was born in 2007 and was 17 years old while in ORR custody. Xavier is currently 18 years old. As of the date of the initial Complaint, Xavier was an unaccompanied child within the meaning of 6 U.S.C. § 279(g)(2). Pursuant to Federal Rule of Civil Procedure 17(c)(2), Xavier appears through his Next Friend and mother Ximena L., a resident of Illinois. ORR refused to release Xavier and his sister to their mother on the ground that she is unable to provide the documents required by the updated ORR Policy Guide Section 2.2.4. Xavier was released to his aunt in June 2025.

17.    Plaintiff Mateo N. is currently detained by ORR at a shelter in New York. Mateo was born in 2008 and is 17 years old. He entered ORR custody for the first time in May 2025. Mateo is, and at all relevant times was, an unaccompanied child within the meaning of 6 U.S.C. § 279(g)(2). Pursuant to Federal Rule of Civil Procedure 17(c)(2), Mateo appears through his Next Friend and brother Steven N., a U.S. citizen and resident of Massachusetts. Steven lives with his wife and two U.S. citizen children. Steven provided ORR with information ORR

requested regarding all members of his household, including his two U.S. citizen children. ORR refuses to release Mateo to his brother because his brother's wife, a household member, is unable to provide the documents required by the updated ORR Policy Guide Section 2.2.4.

18.    Plaintiff Yair G. is currently detained by ORR at a shelter in New York. He was born in 2008 and is 17 years old. Yair entered ORR custody for the first time in May 2025. Yair is, and at all relevant times was, an unaccompanied child within the meaning of 6 U.S.C. § 279(g)(2). Pursuant to Federal Rule of Civil Procedure 17(c)(2), Yair G. appears through his Next Friend and sister, Milagro G., a resident of Georgia. ORR refuses to release Yair to his sister because his sister is unable to provide the documents required by the updated ORR Policy Guide Section 2.2.4.

19.    Plaintiff David D. is currently detained by ORR at a shelter in California. He was born in 2011 and is 14 years old. David entered ORR custody for the first time in May 2025. David is, and at all relevant times was, an unaccompanied child within the meaning of 6 U.S.C. § 279(g)(2). Pursuant to Federal Rule of Civil Procedure 17(c)(2), David appears through his Next Friend and mother, Isabel D., a resident of California. ORR has not released David to his mother because his mother is unable to provide the documents required by the updated ORR Policy Guide Section 2.2.4.

20.    Plaintiff Immigrant Defenders Law Center ("ImmDef") is a non-profit organization headquartered in Los Angeles, California, with additional offices in Santa Ana, Riverside, and San Diego. ImmDef serves unaccompanied children in three Immigration Courts: Van Nuys, West Los Angeles, and Santa Ana. ImmDef currently represents nearly 2,000 unaccompanied children in their immigration cases. It is ImmDef's vision that no immigrant

should have to face deportation proceedings alone and it is ImmDef's mission to ensure that every person facing removal has zealous, competent counsel at their side.

21.     Defendant U.S. Department of Health and Human Services is a federal agency headquartered in Washington, D.C., and responsible for the care, custody, and prompt reunification of unaccompanied immigrant children with their sponsors.

22.     Defendant Robert F. Kennedy Jr. is the Secretary of the Department of Health and Human Services, the department of which the Office of Refugee Resettlement is part. Mr. Kennedy is sued in his official capacity.

23.     Defendant Angie Salazar is the Acting Director of ORR. ORR is the government entity directly responsible for the custody of child plaintiffs and for promptly reunifying them with their sponsors. Ms. Salazar is sued in her official capacity.

## FACTUAL ALLEGATIONS

### *The Care, Custody, and Release of Unaccompanied Immigrant Children*

24.     Prior to 2002, the Office of Juvenile Affairs in the former INS was responsible for the custody of unaccompanied immigrant children in the United States. The *Flores* Settlement Agreement, originally signed by the INS in 1997, establishes national minimum standards for the treatment and placement of minors in immigration custody. Stipulated Settlement Agreement, *Flores v. Reno,* No. CV 84-4544-RJK(Px) (C.D. Cal. Jan. 17, 1997) ("*Flores* Settlement"). It remains under the supervision of U.S. District Judge Dolly M. Gee in the Central District of California. *Flores v. Bondi*, No. CV 85-4544-DMG (AGRx).[2]

---

[2] Following the promulgation of the Foundational Rule, the *Flores* Settlement Agreement was partially terminated as to children in Department of Health and Human Services ("HHS") custody.

25.    In 2002, Congress passed the Homeland Security Act ("HSA"), transferring functions of the former INS to other government entities. Pub. L. No. 107-296, 116 Stat. 2153 (2002). Specifically, the HSA transferred authority over the care and custody of unaccompanied immigrant children from the INS to ORR, housed within HHS. 6 U.S.C. § 279.

26.    Congress' decision to transfer responsibility for the care and custody of unaccompanied children from the INS to ORR reflected Congress' determination that caring for children who arrive to the United States without their parent or legal guardian and immigration enforcement were incompatible roles for a single agency.[3] Within HHS, ORR is responsible for children's safety and welfare and is explicitly not a law enforcement agency. *See* Foundational Rule, 89 Fed. Reg. at 34399, 34423 ("it is not a law enforcement agency, unlike the former INS…"), 34591.

27.    The Homeland Security Act likewise transferred data collection and storage requirements regarding the care and custody of unaccompanied children from the prior INS to ORR (rather than to the Department of Homeland Security). 6 U.S.C. § 279 (b)(1)(J)–(K). ORR collects sensitive information about unaccompanied children in their custody as well as potential sponsors, some of which is subject to protection under the Privacy Act. 5 U.S.C. §§ 552a, (a)(7), (b), (r).

---

[3] *See, e.g.*, 148 Cong. Rec. S11295 (Nov. 18, 2002) (statement of Sen. Feinstein); 148 Cong. Rec. S8189 (Sept. 4, 2002) (reprinting letter from Sens. Kennedy and Brownback). *See also* 148 Cong. Rec. S5960 (Oct. 1, 2002) ("As we transfer and reshape the INS in this legislation, it is imperative to relieve the agency of its responsibility of the care and custody of unaccompanied children. Doing so would accomplish two ends: one, it would permit the INS to focus its energies, efforts, and attention on its core missions; and two, it would transfer the care and custody of these children to the Office of Refugee Resettlement, ORR, an office that is better suited and much more experienced in handling the complexities of the children's situations.")

28.     With strong bipartisan support, Congress then expanded protections for unaccompanied children in the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), reaffirming Congress' intent to treat unaccompanied children differently than adults are treated by the Department of Homeland Security ("DHS"), both in detention and in immigration proceedings. 8 U.S.C. § 1232 *et seq*.

29.     The TVPRA requires federal officials who discover an unaccompanied child to transfer the child to the care and custody of HHS within 72 hours (absent exceptional circumstances). *Id.* § 1232(b)(3). The TVPRA also tasks ORR with ensuring that unaccompanied children are "promptly placed in the least restrictive setting that is in the best interest of the child." *Id.* § 1232(c)(2)(A). This is usually with a sponsor. *See, e.g.*, *Saravia v. Sessions*, 905 F.3d 1137, 1142–43 (9th Cir. 2018). Congress enacted the TVPRA specifically to facilitate the safe, speedy release and minimally restrictive placement of unaccompanied children. *See, e.g.*, 154 Cong. Rec. S10886 (daily ed. Dec. 10, 2008) (statement of Sen. Leahy, sponsoring senator).

30.     Neither the HSA nor the TVPRA make any mention of a sponsor's potential immigration status as a prerequisite to receive an unaccompanied child into their custody. Similarly, neither statute gives ORR authority to: (1) inquire into immigration status as a condition for sponsorship; (2) collect information about potential sponsors for immigration or law enforcement purposes; or (3) share potential sponsor's immigration status with law enforcement or immigration enforcement entities.

### *Prior Attempts to Collect Sponsor Information for Immigration Enforcement*

31.     In 2018, under the first Trump Administration, ORR changed pre-existing sponsor vetting procedures by expanding fingerprinting requirements to include all potential sponsors, any adult household members living with the potential sponsor, and proposed alternate

caregivers. Simultaneously, ORR entered into a memorandum of agreement ("MOA") with DHS to share information obtained through the reunification process directly with U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"), which they planned to use for enforcement purposes. This policy led to the arrest of potential sponsors by immigration enforcement and significant delays in release.[4] *See J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559, 579 (E.D. Va. 2018) (describing the information-sharing policy as "ORR's policy of demanding biographical and biometric information from all adult members of a sponsor's household and of systematically sharing that information with DHS").

32.     As a result of this policy change, unaccompanied children's length of custody in ORR increased significantly, with children spending months in congregate care designed to hold children for only a few weeks. *See, e.g.*, Dep't of Health and Hum. Servs., Office of the Inspector Gen., *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody*, 13 (Sept. 2019), https://perma.cc/YLT7-R3HP ("HHS OIG Report") ("[C]hildren's average length of stay in ORR custody increased markedly after ORR implemented the new fingerprinting policy in June 2018", from 61 days in June 2018 to 93 days in November 2018 and then decreased after ORR ended fingerprinting requirements for adult household members and then for parents, reaching 48 days in April 2019).

---

[4] This policy and its impacts were widely documented and publicized. *See, e.g.*, Daniella Silva, *ICE arrested 170 immigrants seeking to sponsor migrant children*, NBC News (Dec. 11, 2018), https://perma.cc/H7XZ-3WS9; Aileen Flores, *1,500 Unaccompanied Immigrant Children at Shelter in Tornillo; FBI Checks Delay Release*, El Paso Times (Oct. 12, 2018), https://perma.cc/4NHB-LQ3M; Manny Fernandez & Caitlin Dickerson, *Inside the Vast Tent City Housing Migrant Children in a Texas Desert*, N.Y. Times (Oct. 12, 2018), https://perma.cc/49BN-GAGN; Caitlin Dickerson, *Detention of Migrant Children Has Skyrocketed to Highest Levels Ever*, N.Y. Times (Sept. 12, 2018), https://perma.cc/DG6F-KKA8.

33.    It quickly became clear even to the Trump Administration that the mandatory fingerprinting and ORR-ICE information-sharing of sponsors' household members did not improve child safety or ORR's ability to conduct sponsor vetting. The then-Assistant Secretary for the Administration for Children and Families later conceded that the policy did not "add[] anything to the protection and safety of the children."[5] The Trump Administration ultimately rescinded the MOA and "incorporated the rescission into its internal and external guidance". *J.E.C.M.*, 1:18-cv-903 (LMB) (E.D. Va. 2021) ECF No. 331.

34.    Extended lengths of stay in ORR custody harmed children's mental health and wellbeing. *See, e.g.*, HHS OIG Report, 13 (following expanded fingerprinting and information-sharing with immigration enforcement, "[f]acilities reported that it became more difficult to identify sponsors willing to accept children after the new fingerprinting requirements were implemented, which delayed placing children with sponsors, adding further stress and uncertainty."); *see also id*. at 12–13 ("According to facility staff, longer stays resulted in higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation.").

35.    In response to the serious and well-documented harm caused by the policy changes, Congress placed explicit restrictions on DHS's use of information obtained from HHS regarding unaccompanied children and their potential sponsors. Congress did so after a House of Representatives report described how ORR sharing information about a sponsor's immigration status with DHS undermined children's wellbeing and access to immigration relief. H.R. Rep. No. 116-450, at 185 (2020). These appropriations restrictions began in fiscal year 2020 and have

---

[5] *See* John Burnett, *Several Thousand Migrant Children In U.S. Custody Could Be Released Before Christmas*, NPR (Dec. 18, 2018), available at https://perma.cc/6WHS-BNR6. *J.E.C.M.*, 352 F. Supp. 3d at 583 (citing amicus brief filed by Human Trafficking Legal Center).

been extended each year through fiscal year 2025. *See* Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, Div. D, § 216(a), 133 Stat. 2317, 2513 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, § 217, 134 Stat. 1182, 1458 (2020); Consolidated Appropriations Act 2022, Pub. L. No. 117-103, Div. F, § 218, 136 Stat. 49, 323 (2022); Consolidated Appropriations Act 2023, Pub. L. No. 117-328, Div. F, § 217, 136 Stat. 4459, 4737 (2022); Further Consolidated Appropriations Act 2024, Pub. L. No. 118-47, Div. C, § 216, 138 Stat. 460, 604 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, Div. A, §§ 1104-05, 139 Stat. 9, 12 (2025). With narrow exceptions for specific crimes, Congress has prohibited DHS from using information shared by HHS "to place in detention, remove, refer for a decision whether to initiate removal proceedings, or initiate removal proceedings against a sponsor, potential sponsor, or member of a household of a sponsor or potential sponsor of an unaccompanied alien child (as defined in section 462(g) of the Homeland Security Act of 2002 (6 U.S.C. 279(g))." Pub. L. No. 116-93, Div. D, § 216(a), 133 Stat. at 2513.

36.     Consistent with Congressional restrictions, the authorization for release of information form ORR provided to potential sponsors as of early May 2025 stated: "I also understand that DHS cannot use my information for immigration enforcement actions, including placement in detention, removal, referral for a decision whether to initiate removal proceedings, or initiation of removal proceedings, unless I have been convicted of a serious felony, am pending charges for a serious felony, or I have been directly involved in or associated with any organization involved in human trafficking." Office of Refugee Resettlement, *Authorization for Release of Information (FRP-2)* at 1 (revised Mar. 25, 2024), *available at* https://perma.cc/D8MV-54KD (document "FRP-2" in the ZIP file hyperlinked as "Family

Reunification Packet – English"). As of May 28, 2025, ORR's sponsorship application, including the authorization for release of information form, is no longer publicly available. *See* ORR Sponsor Application Packet, https://acf.gov/orr/programs/uac/family-reunification-packet.

### *The Foundational Rule*

37.     In 2024, ORR promulgated regulations ("The Foundational Rule") codifying the "policies, standards, and protections for [unaccompanied children], consistent with the HSA and TVPRA, and to implement the substantive requirements of the [*Flores* Settlement Agreement] as they pertain to ORR." 89 Fed. Reg. at 34385 (promulgating 45 C.F.R. §§ 410.1000 *et seq.*).

38.     The Foundational Rule includes "policies and procedures regarding release, without unnecessary delay, of an unaccompanied child from ORR custody to a vetted and approved sponsor." 89 Fed. Reg. at 34439. The Foundational Rule is consistent with the agency's "strong belief that, generally, placement with a vetted and approved family member or other vetted and approved sponsor, as opposed to placement in an ORR care provider facility … is in the best interests of unaccompanied children." *Id.* In response to comments on their proposed regulations, ORR explained that "[t]he HSA and the TVPRA do not make any mention of a sponsor's potential immigration status as a prerequisite to receive an unaccompanied child into their custody and do not imbue ORR with the authority to inquire into immigration status as a condition for sponsorship." *Id.* at 34442.

39.     The Foundational Rule establishes that "ORR shall release a child from its custody without unnecessary delay" to sponsors in a specific order of preference with parents and legal guardians taking first priority and other family members following. 45 C.F.R. § 410.1202(c). As required by the regulation, sponsor suitability assessments must include various investigations and background checks, and "may include" background checks "based on fingerprints for some potential sponsors and adult residents of the potential sponsor's

16

household." *Id.* ORR is required to adjudicate sponsor applications within 10 to 14 days, absent

an unexpected delay. *Id.* § 410.1205(b)–(c). Other completed sponsor applications by close

relatives must be adjudicated within 14 days, absent unexpected delay. *Id.* § 410.1205(c).

40.     As part of its sponsor suitability process, ORR may require "verification of the

employment, income, or other information provided by the potential sponsor as evidence of the

ability to support the child." 45 C.F.R. § 410.1202(c). In the Preamble to the Foundational Rule,

ORR stated that although employment is "a permissible consideration as part of the suitability

assessment[,] . . . ORR will not deny an otherwise qualified sponsor solely on the basis of low

income or employment status." 89 Fed. Reg. at 34446.

41.     When it was promulgated, the Foundational Rule included a subsection stating:

"ORR shall not disqualify potential sponsors based solely on their immigration status and shall

not collect information on immigration status of potential sponsors for law enforcement or

immigration enforcement related purposes. ORR shall not share any immigration status

information relating to potential sponsors with any law enforcement or immigration enforcement

related entity at any time." 45 C.F.R. § 410.1201(b) (2024). ORR's Ombuds office is likewise

prohibited from sharing information for immigration enforcement related purposes. 45 C.F.R.

§ 410.2004(a). In addition, the Preamble repeatedly reiterates that ORR "is not an immigration

enforcement authority." 89 Fed. Reg. at 34399; *see also* 89 Fed. Reg. at 34442, 34443, 34452,

34568.

42.     These protections against denying sponsors based on immigration status and

collecting and sharing sponsor immigration status information for enforcement purposes are

necessary for ORR to carry out its statutory mission. *See J.E.C.M.*, 352 F. Supp. 3d 559, 583

(E.D. Va. 2018) ("A policy that systematically elevates immigration enforcement over child

welfare, one whose effects are to destabilize would-be sponsors' home environments and to discourage potential sponsors from applying for reunification, is flatly inconsistent with ORR's statutory responsibility to care for unaccompanied minors in its custody and release them promptly to safe and stable environments.").

43.    During the rulemaking process ORR received 73,927 public comments. *See* Admin. for Child. & Fams., *Unaccompanied Children Program Foundational Rule*, Doc. No. ACF-2023-0009 (Oct. 4, 2023), *available at* https://perma.cc/UU7Z-367H.

44.    ORR rejected comments suggesting increased information sharing with DHS because "ORR already has policies in place to refer such cases to the proper Federal agency" and "ORR does not maintain 'A-files' on either unaccompanied children or potential sponsors, as that is a function performed by other Federal agencies, which are responsible for immigration enforcement." 85 Fed. Reg. at 34442. ORR stated, "Safeguarding and maintaining the confidentiality of unaccompanied children's case file records is critical to carrying out ORR's responsibilities under the HSA and the TVPRA." *Id.* at 34442.

45.    Shortly after the Foundational Rule was finalized, in December 2024, ORR also published and finalized two Systems of Records notices ("SORNs") under the Privacy Act that addressed information sharing with DHS. 89 Fed. Reg. at 96250; 89 Fed. Reg. at 100500. Both SORNs state that information about immigration status would not be shared with DHS for immigration enforcement purposes because ORR is not an immigration enforcement agency, and such sharing is inconsistent with ORR's program purposes. *Id.*

### Expanded Collection of Biometric Data through Sponsorship Applications

46.    Beginning in February 2025, ORR dramatically increased the amount and sensitivity of information collected from potential sponsors.

47.    On February 14, 2025, ORR issued Field Guidance # 26 requiring that all adult sponsors, all adult household members, and all backup adult caregivers submit to fingerprint-based background checks prior to release, including when the child is seeking release to a parent. *See* Office of Refugee Resettlement, *Field Guidance #26 ("FG-26") — Fingerprint Background Checks and Acceptable Supporting Documentation for a Family Reunification Application* (Feb. 14, 2025), https://perma.cc/5CC4-Y3NH. Previously, ORR did not require fingerprints from sponsors who were parents, legal guardians, siblings, grandparents, or other immediate relatives who previously served as the child's primary caregiver, except if there was a specific safety concern or if the case was referred for a home study. *See* ORR Policy Guide §§ 2.2.1, 2.5.1 (revised Aug. 1, 2024). Fingerprints were also not required for adult household members or adult caregivers identified in a sponsor care plan unless there was a specific safety concern, or the case was referred for a home study. ORR Policy Guide § 2.5.1 (revised Feb. 13, 2024). Similarly, expired identification documents were previously permitted in certain circumstances where sponsors and/or household members may not have had access to unexpired identity documents, but their identities were not in question. ORR Policy Guide § 2.2.4 (revised Aug. 1, 2024).

48.    On March 14, 2025, ORR issued additional field guidance requiring DNA testing of the child and sponsor in every case where a sponsor claims a biological relationship with the child. *See* Office of Refugee Resettlement, *Field Guidance #27 ("FG-27") — DNA Testing Expansion* (Mar. 14, 2025), https://perma.cc/BB55-ZWE7.

### *New Barriers to Release Based on Immigration Status*

49.    In addition, beginning in March 2025, ORR changed its Policy Guide to impose various new requirements on potential sponsors in direct violation of the Foundational Rule's prohibition on denying release to sponsors based solely on immigration status.

50.     Prior to March 2025, ORR had long accepted foreign identification documents to verify the identity of sponsors and household members. ORR had developed systems and protocols to verify foreign identification documents. *See* Preamble to ORR Foundational Rule, 89 Fed. Reg. at 34445 (ORR verifies sponsor identity and "may consult with the issuing agency (e.g., consulate or embassy) of the sponsor's identity documentation to verify the validity of the sponsor identity document presented"); *see also* 89 Fed. Reg. at 34450–51 (noting that "ORR does not believe it is practical to require standardization of identity documents if they serve to identify the individual in their country of origin"). The Family Reunification Application provided to sponsors and still in use by ORR permits sponsors and household members to establish their identity through a variety of documents, including foreign passports and certain other identification documents issued by foreign governments. *See* Office of Refugee Resettlement, *Family Reunification Application (FRP-3)* (revised Mar. 25, 2024), *available at* https://perma.cc/D8MV-54KD.

51.     On March 7, 2025, ORR revised section 2.2.4. of their Policy Guide to change the list of acceptable documents to prove sponsor identity. The revised Policy Guide requires that all sponsors, adult household members, and adult caregivers identified in a sponsor care plan provide specific forms of identification generally available only to people with legal status in the United States. *Id*. For example, ORR previously accepted a foreign passport with a photograph as a form of identification without reference to immigration status. *See* Office of Refugee Resettlement, ORR Unaccompanied Children Bureau Policy Guide (current as of Feb. 4, 2025), § 2.2.4 (effective Aug. 1, 2024), *archived a*t https://perma.cc/5TMM-7EAA (Feb. 14, 2025); *see also* Office of Refugee Resettlement, *ORR Unaccompanied Alien Children Program Policy Guide: Record of Posting and Revision Dates* (Apr. 15, 2025), https://perma.cc/W92W-R4K7.

Under the revised Policy Guide, however, foreign passports are now acceptable as proof of identity only if they "contain[] a temporary I-551 stamp or temporary I-551 printed notation on a machine-readable immigrant visa" or are accompanied by "Form I-94 or Form I-94A with Arrival-Departure Record, and containing an endorsement to work." ORR Policy Guide § 2.2.4 (effective Apr. 15, 2025). An I-551 stamp indicates permanent resident status valid for one year.[6] A Form I-194 is issued to noncitizens who are admitted to the U.S., adjusting status, or extending their stay.[7]

52.     The only document on the current list of acceptable forms of identification that appears open to some people without legal status is a driver's license or photo ID card issued by a U.S. federal, state, or local government, or a Canadian driver's license. ORR Policy Guide § 2.2.4. This is only an option in a minority of states[8] and usually requires the sponsor to be able to pass a driver's test. For potential sponsors in states where driver's licenses are not available without proof of legal status or potential sponsors who are unable to drive, the identification requirements can make it impossible to sponsor a child without stable legal immigration status.

53.     The revised Policy Guide also removed nearly all the secondary forms of acceptable identification that could be used if primary forms were unavailable. For example, birth certificates, marriage certificates, and foreign national ID cards were removed.

---

[6] *Temporary I-551 Stamps and MRIVs*, U.S. Citizenship & Immigr. Servs., https://perma.cc/HBL5-CUYT.

[7] *Form-194, Arrival/Departure Record, Information for Completing USCIS Forms*, U.S. Citizenship & Immigr. Servs., https://perma.cc/5JL7-AMCK.

[8] As of March 2023, the National Conference of State Legislatures identified 19 states and the District of Columbia with state legislation allowing individuals to get State drivers' licenses (not Real ID compliant) without proof of lawful presence. Brief, Nat'l Conf. of State. Legislatures, *States Offering Driver's Licenses to Immigrants* (updated Mar. 13, 2023), https://perma.cc/6TZU-JP7U. United We Dream states that 16 states and the District of Columbia allow undocumented people to obtain driver's licenses. United We Dream, *Can I Get A Driver's License If I Am Undocumented?*, https://perma.cc/G7VX-4GFP.

54.    The revised ORR Policy Guide Section 2.2.4 also requires "original, unexpired" identification documents, where policy previously allowed expired versions. Some adults required to provide identification for family reunification applications do not have access to the original documents because those original documents are held by ICE and returned only at ICE's discretion.[9] Others may be unable to get new unexpired government-issued IDs from their countries of origin because they are fleeing persecution from the governments who would provide them. Even when adults are able to apply for or renew government-issued photos IDs, that process can take weeks or months, significantly prolonging children's time in custody.

55.    The Policy Guide states that, for parents and legal guardians *only*, "[a]ny deviation from this requirement must be supported by clear justification and exceptions may be made on a case-by case basis by HHS ORR Headquarters." ORR Policy Guide § 2.2.4. The Policy Guide does not specify any process, timeline, or decision criteria for such exceptions, and does not require that parents and legal guardians be notified of the possibility of an exception. Even when a parent can obtain an exception to the new photo identification requirements, sponsor parents have been told that adult household members living with the parent and backup caregivers—all of whom must also provide the required documentation—are not eligible for an exception.

---

[9] *See* U.S. Immigr. & Customs Enf't, Enf't & Removal Ops., *Confiscation and Return of Original Documents, Policy No. 11311* (Jan. 13, 2023), https://perma.cc/V4AB-R6HN ("ERO Officers will generally confiscate any foreign and domestic government-issued documents either in the noncitizen's possession or submitted to ERO by the noncitizen. ERO will generally retain all confiscated documents of noncitizens . . ."). *See also* Conor Wight, CNY Central, *Syracuse immigration lawyer says ICE has taken clients' passports under President Trump*, CNY Central (Jan. 24, 2025), https://perma.cc/RS8J-UQGV.

56.     On April 15, 2025, ORR amended the Policy Guide yet again, this time adding restrictive proof of income requirements that are inconsistent with ORR's regulatory obligation to consider sponsors regardless of legal status. ORR now requires proof of income as a prerequisite for sponsorship and will only accept a "[p]revious year's tax return if in the United States during prior year," a "copy of paystubs for at least the past 60 days continuously," or "[a]n original letter from the sponsor's employer verifying their employment and salary information, signed within the past 60 days" which an ORR representative must confirm with a supervisor or Human Resources contact. *Id.* Working legally in the United States requires work authorization. Work authorization is only available to sponsors with some form of legal status permitting employment.

57.     Under this April 15, 2025, proof of income policy, ORR will not accept alternate proof of financial ability to care for a child, such as a bank statement.

58.     Plaintiff children who would ordinarily have been released to their parents or other sponsors are languishing in custody because of ORR's new identification and proof of income requirements. ORR's own child welfare experts have long stated that best practice is to discharge unaccompanied children to their families within 30 days of admission. *See*, *e.g.*, Exhibit 21 Part 2, *J.E.C.M. v. Hayes*, 18-cv-903 (E.D. Va. Sept. 16, 2019), ECF No. 242-13. In fiscal years 2021 through 2024, the average length of time a child remained in ORR custody ranged from 27 days to 33 days.[10] The average length of care for children discharged from ORR custody climbed precipitously from 37 days in January 2025 to 49 days in February 2025 to 112

---

[10] Fact Sheets and Data, Office of Refugee Resettlement, *Average Length of Care* (current as of Apr. 7, 2025), https://perma.cc/SPV6-3KBD.

days in March 2025 to 217 days in April 2025 before falling slightly to 171 days in July 2025.[11] The average length of care for children who remain in ORR custody was 187 days in July 2025.[12] Between fiscal year 2015 and fiscal year 2024, the average length of ORR custody ranged between 30 days and 69 days.[13]

59.    The result of these agency actions is that thousands of children are stranded in ORR custody despite having loving family members available to care for them. Not only do these children suffer from the ongoing family separation they experience, but they also experience the cumulative and severe impacts of being detained in government custody for prolonged periods of time. For example, children in prolonged immigration custody are at increased risk of experiencing somatic symptoms of stress and trauma (i.e., headache, stomachache), as well as difficulties with sleeping and eating.[14] Researchers attribute these psychological and health problems specifically to the experience of detention, as multiple studies in a systemic review of prior research on immigration detention demonstrated that such problems onset or intensified following placement in detention.[15] Furthermore, comparison studies indicated that children who are separated from family members due to detention have worse mental health outcomes than children who are detained with caregivers or family members.[16]

---

[11] Fact Sheets and Data, Office of Refugee Resettlement, *Average Monthly Data* (current as of August 11, 2025), https://perma.cc/25ZT-Z976.

[12] Fact Sheets and Data, Office of Refugee Resettlement, *Average Monthly Data* (current as of August 11, 2025), https://perma.cc/25ZT-Z976.

[13] Fact Sheets and Data, Office of Refugee Resettlement, *Average Length of Care* (current as of August 11, 2025), https://perma.cc/25ZT-Z976.

[14] M. von Werthern, et al., *The impact of immigration detention on mental health: a systematic review*, 18 BMC Psychiatry no. 382, 2018, https://perma.cc/7UK3-LQB5 (research not specific to detention in Office of Refugee Resettlement facilities); Julie M. Linton, MD, et al., *American Academy of Pediatrics Policy Statement, Detention of Immigrant Children*, 139 Pediatrics, no. 5, 2017, https://perma.cc/KZ9T-4MQX.

[15] *Id.*

[16] *Id.*

### *Issuance of the Interim Final Rule*

60.    On March 25, 2025, the Department of Health and Human Services issued an Interim Final Rule ("IFR"), with a 60-day comment period, which rescinded a portion of the Foundational Rule found at 45 C.F.R. § 410.1201(b) and was effective immediately.

61.    Prior to its rescission, 45 C.F.R. § 410.1201(b) stated, "ORR shall not disqualify potential sponsors based solely on their immigration status and shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement related purposes. ORR shall not share any immigration status information relating to potential sponsors with any law enforcement or immigration enforcement related entity at any time."

62.    The sole justification for the immediate rescission of § 410.1201(b) is a purported need to comply with a 1996 statute, 8 U.S.C. § 1373. HHS claims there is a conflict between that statute and the second sentence of § 410.1201(b), which prohibits ORR from sharing immigration status information relating to potential sponsors with law enforcement or immigration enforcement. The TVRPA, however, was enacted after 8 U.S.C. § 1373, and it imposes obligations on ORR that the agency could not fulfill if it were to share sponsor's immigration status information with DHS for purposes of law enforcement or immigration enforcement. In particular, Congress required ORR to ensure that "an unaccompanied alien child in the custody of the Secretary of Health and Human Services shall be promptly placed in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A), and ORR could not fulfill this instruction if potential sponsors could not come forward out of fear that their information would be shared with immigration authorities. 8 U.S.C. § 1373 is not an affirmative grant of authority to the agency to share information with DHS, but instead a restriction on the agency's exercise of discretion to decline to withhold information that it is

otherwise lawfully permitted to share with DHS. No other statute authorizes ORR to share the immigration status of adults required to be involved in the sponsorship application for purposes of immigration enforcement. HHS thus made critical, and incorrect, assumptions about the operation of 8 U.S.C. § 1373 and could have avoided these errors if the public had the opportunity to comment on this issue.

63.     Moreover, although HHS identified no conflict between the first sentence of § 410.1201(b) and federal law, the IFR rescinds the entire section. The agency has identified no good cause to rescind the portion of § 410.1201(b) providing that ORR shall not deny release to sponsors based solely on immigration status and that ORR shall not collect information on sponsors' immigration status for law enforcement or immigration enforcement purposes.

64.     The IFR has already caused profound harm to children in ORR custody by permitting the disqualification of their potential sponsors based solely on immigration status—even if that sponsor is best able to care for the child's safety and well-being. The majority of potential sponsors lack the requisite immigration status,[17] dramatically decreasing children's options for release from custody. The harm caused by the IFR will magnify over time, both in the number of children impacted by these requirements, and in the average length of time for children in custody.

65.     Children in ORR custody are further harmed by the IFR's lifting restrictions on collecting and sharing sponsor information for enforcement purposes. As discussed above, permitting ORR's sponsor vetting process to be used for immigration enforcement purposes

---

[17] *See* William A. Kandel, Cong. Rsch. Serv., R43599, *Unaccompanied Alien Children: An Overview* 24 (Sept. 5, 2024), https://perma.cc/DRE3-M7TH (in 2018, ICE "estimated that 80% of active UAC sponsors and accompanying family members were residing in the country illegally").

deters potential sponsors and their household members from participating in the family reunification process, prolongs children's detention, blocks release, erodes children's mental health, destabilizes family systems, and, ultimately, contradicts Congress's intention to have children placed in the least restrictive setting that is in the best interest of the child. *See J.E.C.M.*, 352 F. Supp. 3d at 584 ("Indiscriminately sharing sensitive information about all adults in a sponsor's household with DHS could result in DHS's taking immigration enforcement action against those individuals, which could destabilize the home environments into which unaccompanied minors may be released.").

### Changes to Sponsor Information Collection in Violation of the Paperwork Reduction Act

66.    The Paperwork Reduction Act provides that "[a]n agency shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information" it follows certain procedural requirements, including publication in the Federal Register and an opportunity for public comment. 44 U.S.C. § 3507(a).

67.    As of May 6, 2025, the family reunification application available on ORR's website and provided to sponsors uses the prior list of acceptable identifications and does not mention specific requirements for proof of income. *See* Office of Refugee Resettlement, *Family Reunification Application (FRP-3)* (revised Mar. 25, 2024), *available at* https://perma.cc/D8MV-54KD (document "FRP-3" in the ZIP file hyperlinked as "Family Reunification Packet – English"). This application form was approved by the Office of Management and Budget and has a control number of OMB 0970-0278. *Id.* Even though ORR still uses this version of the family reunification application and requires sponsors to complete it, ORR has unilaterally revised the information collection requirements by informing sponsors that the "Supporting Documents" listed in the application are no longer acceptable and they need to provide different documents.

68.     The Privacy Notice in the family reunification packet states that "DHS cannot use your information for immigration enforcement actions, including placement in detention, removal, referral for a decision whether to initiate removal proceedings, or initiation of removal proceedings, unless you have been convicted of a serious felony, are pending charges for a serious felony, or you have been directly involved in or associated with any organization involved in human trafficking." Office of Refugee Resettlement, *Privacy Notice: Sponsors, their Adult Household Members, and Adult Caregivers (FRP-11A)* (revised Mar. 25, 2024), *available at* https://perma.cc/D8MV-54KD (document "FRP-11A" in the ZIP file hyperlinked as "Family Reunification Packet – English").

69.     The new identification and proof of income requirements published in the March 7 and April 15 revisions of ORR Policy Guide Section 2.2.4 constitute collection of information within the meaning of the Paperwork Reduction Act. *See* 44 U.S.C. § 3502(3)(A)(i); *see also* 5 C.F.R. § 1320.3(c) ("Collection of information means, except as provided in § 1320.4, the obtaining, causing to be obtained, soliciting, or requiring the disclosure to an agency, third parties or the public of information by or for an agency by means of identical questions posed to, or identical reporting, recordkeeping, or disclosure requirements imposed on, ten or more persons, whether such collection of information is mandatory, voluntary, or required to obtain or retain a benefit."). Collections of information can include "application forms." 5 C.F.R. § 1320.3(c)(1).

70.     On April 25, 2025, ORR published a notice of information collection under the Paperwork Reduction Act to revise the family reunification application (to be renamed the "Sponsor Application"), with a 60-day comment period. *See* Proposed Information Collection Activity: Unaccompanied Alien Children Sponsor Application Packet (OMB # 0970-0278), 90

Fed. Reg. 17438 (Apr. 25, 2025). The proposed form removes language regarding restrictions on the use of sponsor information by DHS, revises the list of acceptable identifications for proof of identity, and requests additional information on proof of income. The proposed information collection notice states that ORR will "[r]evise the burden estimate to account for a decrease in the number of sponsors applying to sponsor a child and an increase in the number of care provider facilities." *Id*. at 17438. The proposed new Sponsor Application revises the acceptable proof of identity documents to match the March 7 revision of ORR Policy Guide Section 2.2.4 and adds a new requirement for proof of income documentation that is not present in the currently operative application.

71.     On August 14, 2025, ORR published a notice of Submission for OMB Review of the Sponsor Application Packet, with a comment period ending on September 15, 2025. *See* Submission for Office of Management and Budget Review; Unaccompanied Alien Children Sponsor Application Packet (OMB # 0970-0278), 90 Fed. Reg. 39194 (August 14, 2025). The proposed Sponsor Application form revises the acceptable proof of identity documents to match the March 7 revision of ORR Policy Guide Section 2.2.4. The proposed Sponsor Application form adds a new requirement for proof of income documentation that includes the documentation in ORR Policy Guide Section 2.2.4 as well as additional documentation options.

72.     Despite not yet completing the procedures required by the Paperwork Reduction Act to revise its family reunification application, ORR unlawfully revised its information collection requirements for all sponsors. This includes requiring new documentation regarding identification and proof of income of all sponsors that differ from the documentation requirements set out in the application, including documentation that is not generally available to individuals without lawful immigration status.

### *Plaintiffs are Harmed by HHS's Unlawful Actions*

Angelica S.

73.     On or about November 22, 2024, ORR assumed custody of Plaintiff Angelica S. after she arrived at the U.S.-Mexico border. ORR placed her at a shelter in California. Angelica's sister, Deisy S. began the sponsorship process as soon as Angelica's case manager contacted her, in November 2024. Deisy provided ORR with a copy of her passport as proof of identification and she and her household members provided ORR with extensive additional personal information, including their identification documents and fingerprints, and consented to a home study. Angelica's case manager assured Deisy that this information would not be used for immigration enforcement. Angelica and Deisy have a close relationship, and they grew up together in their home country. Deisy is also the mother of an eight-year-old daughter.

74.     Angelica was pregnant when she entered custody, and due to give birth in February 2025. Angelica and her sister understood the sponsorship application to be complete in February 2025. However, due to Angelica's pregnancy, and the birth of her daughter in custody, ORR would not release Angelica from custody until April 2025 after her daughter was born and received vaccinations. In anticipation of Angelica and her infant daughter coming home to live with her, Deisy had prepared a room complete with a crib and infant clothing for her sister and her new niece.

75.     In early March, Angelica's case manager informed Deisy that there was a new rule that required Deisy to provide a new identification document to be able to sponsor Angelica. Her passport was no longer acceptable because it was not accompanied by a required form of immigration documentation. When Deisy was unable to obtain the required documentation, Angelica's case manager instructed Deisy to provide a letter withdrawing her application, and

informed Deisy that her sponsorship application would be terminated. Angelica's case manager repeatedly urged Deisy to find another sponsor—even a person unknown to Angelica—who could provide the required documents. Despite tireless efforts, as of the date of the initial Complaint on May 8, 2025, the potential sponsors Deisy approached to sponsor Angelica were too afraid to provide their information to ORR because of a fear that ORR would share that information with immigration enforcement agencies.

76.     The prolonged stay in ORR custody, and in particular the abrupt interruption to her planned release was very difficult for Angelica. She worried about continuing to raise her daughter in custody, away from the support of her family. Angelica was desperate to be reunified with her sister whom she loves very much. As a result of ORR's IFR and new policies requiring certain documentation for sponsorship, Angelica faced the prospect of having to raise her daughter in custody, separated from her family, until Angelica turned 18 and her daughter was 10 months old.

77.     Following the Court's preliminary injunction in this matter on June 9, 2025, ORR reopened Deisy S.'s application and approved Angelica's release to her sister. Angelica and her baby daughter were reunited with Deisy S. on August 10, 2025.

78.     Angelica was and will be harmed if ORR collects and/or shares information about her sister or other adults involved in the sponsorship application for immigration or law enforcement purposes. Angelica's alternative sponsors were deterred from applying to sponsor her because of fear their information would be used for immigration enforcement. ORR's collection and sharing of information for enforcement purposes significantly threatens the stability of Angelica's post-release placement and her family.

Eduardo M.

79.    ORR took custody of Plaintiff Eduardo M. and his 7-year-old brother on or about January 30, 2025. ORR placed them in a transitional foster care program in California. Eduardo is 14 years old. Their mother, Rosa M., did everything she could to get her boys released to her care.

80.    As soon as the boys arrived, Rosa began the process to sponsor her sons, and she worked diligently to meet each of the requirements the government has put before her. Rosa submitted all the paperwork required by the Family Reunification Application, provided a copy of her passport, and submitted her fingerprints to the government. She found a backup caregiver in case she became unavailable. Despite all of this, she waited for months to be reunited with her boys.

81.    At the beginning of March, a caseworker told Rosa that her case was complete, and that ORR was only waiting on one document for medical clearance for release but since the office was closed, they would have to wait until the following Monday to get that document. The following week, the caseworker informed Rosa that ORR had changed the requirements for sponsorship and now she and the backup caregiver identified in her application would need to provide a different type of identification. Her passport was no longer acceptable under ORR's policies because it was not accompanied by immigration documentation. Rosa and the backup caregiver could not obtain the required identification. Rosa was told that she might qualify for an exception to the identification requirements because she was a parent, but she needed to have a backup caregiver with the right form of identification. Rosa, Eduardo, and his little brother were all devastated.

82.    In mid-March, Rosa, Eduardo, and his brother were told that because of another change in ORR policy they would now need to undergo DNA testing before they could be released. Rosa was told she could not request an exception to the identification requirement until ORR received DNA test results.

83.    Rosa was finally able to identify a backup caregiver with an acceptable form of identification but in mid-April, Rosa was informed that under another new policy she needed to provide specific forms of proof of income that she does not have. Rosa provided her bank statements and a letter about her income to establish that she was able to financially support her sons in an attempt to meet ORR's new requirements.

84.    Eduardo felt chronic stress because of the delay. Both he and his brother often cried during visits with their mother at the shelter because they could not understand why they were not allowed to go home with their mom.

85.    Rosa's sponsorship application was finally submitted to ORR headquarters on April 28, 2025. Rosa and her sons waited for over three weeks on a decision as to whether ORR would approve an exception to the proof of identification and proof of income requirements in the updated Policy Guide Section 2.2.4. Eduardo and his brother were released to their mother following waiver approval on May 21, 2025.

86.    Eduardo will be harmed if ORR collects and/or shares information about his mother or other adults involved in the sponsorship application for immigration or law enforcement purposes because doing so significantly threatens the stability of his placement.

<u>Liam W.</u>

87.    15-year-old Plaintiff Liam W. entered ORR custody in January 2025 and sought to reunify with his mother Sofia W. and his adult sisters and cousin, all of whom live together.

88.    Sofia completed the family reunification application to sponsor Liam and provided a copy of her passport as proof of identification. His adult sisters also provided passports as proof of identification, and his cousin provided his immigration paperwork. ORR conducted a home study, which was positive.

89.    In March 2025, Liam was told that the rules had changed, and his mom, sisters, and cousin would have to provide new proof of identification. Sofia's and her daughters' passports were no longer acceptable because they were not accompanied by the requisite immigration documentation. Despite multiple attempts, Sofia was unable to obtain proof of identification that complied with ORR's new policies. Liam's sisters and nephew have also been unable to provide compliant forms of identification. As a result, Liam's reunification process stalled, and he was uncertain whether he would ever be released.

90.    Liam missed his mother whom he loves very much and he struggled with prolonged confinement in a shelter. He desperately wanted to reunite with family.

91.    After the Court issued a preliminary injunction in this case, on June 9, 2025, ORR reconsidered Sofia W.'s sponsorship application. Liam W. was approved for release to Sofia W. on August 5, 2025.

92.    Liam will be harmed if ORR collects and/or shares information about his mother or other adults involved in the sponsorship application for immigration or law enforcement purposes because doing so significantly threatens the stability of his family and his placement.

Leo B.

93.    Plaintiff Leo B. first arrived in the United States on or about February 2023. ORR took custody of Leo and placed him in a shelter. After approximately 41 days, Leo was released to his sister who was approved by ORR to be Leo's sponsor.

94.     Leo spent the next two years happily living with his sister and integrating into his community. He and his sister are very close, and she has lovingly cared for him, provided him a home, and has made sure he attends school for the last several years. Leo was in high school, learning English, and playing for his school's soccer team. He was enjoying his life as a teenager, spending time with his friends at the lake and dreaming about his future.

95.     Then, unexpectedly, Leo was once again placed in the custody of ORR in March 2025, when he was 17 years old. He was detained in a shelter in California. His sister reapplied to be his sponsor. However, because she did not have and could not obtain the identification documents required by ORR's new Policy Guide Section 2.2.4, ORR refused to release Leo to his sister. Leo's case manager told him his sister could not be approved because she did not have U.S. identification. Leo was told he had only two options: (1) find another sponsor who had legal status, even if Leo doesn't know them well or (2) remain in ORR custody until he turned 18. Leo's sister was not able to find another sponsor for him.

96.     This second time in ORR custody was much harder for Leo than the first time. The loss of his freedom and independence to enjoy his life as a teenager was a very difficult adjustment for Leo. He was lonely, bored, and worried about missing school and delaying the progress he was making toward graduating from high school.

97.     ORR released Leo to a short-term shelter in late June 2025, shortly before his 18th birthday.

98.     Leo will be harmed if ORR shares information it collected about his sister or other adults involved in his sponsorship application for immigration or law enforcement purposes because doing so significantly threatens the stability of sponsors' families and UC's placements. Leo will suffer deep psychological harm if information related to his sponsorship process—

which was never completed—is used to carry out immigration enforcement action against his loved ones.

Xavier L.

99.     Plaintiff Xavier L. was 17 years old when he first arrived in the United States in December 2024 with his 13-year-old sister. Xavier and his sister wished to be reunited with their mother Ximena L.

100.     Ximena completed the Family Reunification Application to sponsor Xavier and his younger sister and worked with family in Venezuela to obtain all the documents required by the application. Ximena provided a copy of her passport as verification of her identity and completed fingerprinting. ORR conducted a home study of Ximena's home, and it was positive. She also completed a DNA test.

101.     Ximena's partner also submitted his information to ORR. Ximena and her partner relied on the statements in ORR's application forms indicating that their information would not be used for immigration enforcement purposes.

102.     In March 2025, Xavier's case manager told Ximena that her foreign passport was no longer sufficient proof of identity under ORR's new identification requirements. As a result, Ximena began the process of applying for an Illinois state identification card and was finally able to obtain a provisional Illinois state ID after several weeks.

103.     Despite working to obtain qualifying identification, Ximena was told in April that the rules had changed again, and she needed to provide specific proof of income to sponsor her children. Ximena is currently unable to work for medical reasons but provided her bank statements and answered questions about her financial status early in the sponsorship process. After the rule-change, Ximena was told this was insufficient. Ximena's partner helps support the

family financially but is unable to provide the specific proof of income documentation required by ORR and is now also afraid to share more information with ORR for fear of immigration enforcement.

104.    Xavier recently turned 18 years of age. As of the filing of the initial Complaint on May 8, 2025, Xavier feared that he would be transferred to an adult ICE detention facility if he was not released before his 18th birthday. Because of the urgency of his upcoming birthday, Xavier made the difficult decision to change his sponsor and sought release to his aunt because his aunt could provide the documentation of income required by ORR. Xavier wished to live with his mother and preferred to be released to his mother if ORR had been willing to accept the documentation she could provide. Xavier was released to his aunt in June 2025.

105.    Ximena was also working to sponsor her 13-year-old daughter but was told by her daughter's caseworker that if Ximena could not provide the newly required documents showing proof of income, she would not be able to reunify with her daughter and ORR would transfer her daughter to long-term foster care.

106.    Xavier and his sister struggled in ORR custody and felt stuck and imprisoned. Their time in ORR custody and separation from their mother was especially difficult because of trauma they experienced prior to arriving in the United States. They cried frequently and Xavier's younger sister has experienced severe deterioration of her mental health. She remains in ORR custody.

107.    Xavier will be harmed if ORR shares information it collected about his mother, aunt, or other adults involved in the sponsorship application for immigration or law enforcement purposes. His mother's partner has already been deterred from providing further information to help the sponsorship process, which impeded release to Xavier's mother. Further, if ORR shares

information it collected about Xavier's family with DHS for immigration or law enforcement purposes, it will significantly threaten the stability of his family.

Mateo N.

108.    Plaintiff Mateo N. is 17 years old. He arrived in the United States in May 2025 and was taken into ORR custody. He wishes to be reunited with his brother, Steven N.

109.    Steven is a U.S. Citizen. He completed a sponsorship application to sponsor Mateo and submitted his U.S. Passport as his form of identification. He also submitted information about his wife and his two U.S. citizen children who live with him. Steven's wife submitted her passport from her country of origin as her form of identification. Both adults in the household completed fingerprinting. ORR conducted a home study of their home. In early July 2025, Steven and Mateo completed DNA tests with results showing they were biologically related.

110.    ORR informed Steven that his sponsorship could not proceed until his wife provided a form of identification acceptable under its post-March 2025 rules. Steven's wife has not yet been able to obtain a state-issued ID. She is attempting to get a state-issued driver's license in order to satisfy this requirement.

111.    Upon information and belief, Mateo remains in custody rather than with his sponsor because of this "missing" form of identification.

112.    Mateo deeply wants to be living with his family and outside of confinement. He struggles with the impacts of prolonged detention on his mental health.

113.    Mateo will be harmed if ORR collects and/or shares information about his sister-in-law or other adults involved in the sponsorship application for immigration or law enforcement purposes. Sharing this information may destabilize the family to which he wishes to

be released and may cause significant psychological harm to Mateo if his sponsorship process leads to immigration enforcement action against his family members.

Yair G.

114.    Plaintiff Yair G. is 17 years old and arrived in the United States in May 2025. He was placed in ORR custody and is seeking to reunify with his sister, Milagro G.

115.    Milagro completed a sponsorship application and provided a copy of her passport from her country of origin as proof of her identity. She also completed a fingerprint-based background check in July 2025.

116.    After Milagro had completed fingerprinting, ORR informed her that she could not move forward with her sponsorship application for Yair without a form of identification from her home state. She is unable to obtain any of the types of identification documents newly required since March 2025.

117.    Yair's case manager asked Milagro to find another family member with the required forms of identification to sponsor Yair. Milagro does not have other family members with the right forms of identity documents, so she asked a close friend to sponsor her brother. Milagro's friend accepted, and upon information and belief, ORR recently initiated the sponsorship process with her.

118.    Yair wants to be free from government custody and to live with his sister. He wants to be able to live with his family and be loved and cared for.

119.    Yair will be harmed if ORR collects and/or shares information about his sister or other adults involved in the sponsorship application for immigration or law enforcement purposes. Sharing this information may destabilize the family to which he wishes to be released

and may cause significant psychological harm to Yair if his sponsorship process leads to immigration enforcement action against his sister.

David D.

120.    Plaintiff David D. is 14 years old. He arrived in the United States in May 2025 and was transferred to ORR custody. He wishes to live with his mother, Isabel D.

121.    Isabel completed an application to sponsor David and provided her consular identification card as her identification and completed fingerprinting. Isabel and David both completed DNA testing, which confirmed their relationship.

122.    When she began the sponsorship process, Isabel lived with other members of her immediate family. Because her family members lacked identification newly required by ORR in March 2025, Isabel was required to move out of her home to a more expensive apartment to continue the sponsorship process. Isabel's new housemate completed a fingerprint-based background check and provided identification acceptable to ORR. ORR conducted a home study of Isabel's new apartment, and it was positive.

123.    Isabel is unable to obtain identification newly required by ORR after March 2025. David's case manager instructed her to try to obtain a driver's license, but Isabel does not know how to drive and is fearful of driving. She attended a driver's license appointment in an effort to do everything possible to sponsor her son but failed her examination.

124.    In late July, David's case worker told Isabel that her case would be submitted to ORR for an exception to the identification requirements. Isabel was later told that she would have to present her identification to an ORR official in person. On July 31, 2025, Isabel attended an appointment at a federal government office to present her identification in person.

125.    Isabel has not yet received a decision on whether she will be granted an exception to ORR's new identification requirements. Upon information and belief, David remains detained in ORR custody because Isabel lacks identification newly required after March 2025.

126.    David wants to grow up with his family and he feels sad and bored at his ORR shelter.  If he is released to his mother, he hopes to study and live a normal childhood.

127.    David will be harmed if ORR collects and/or shares information about his mother or other adults involved in the sponsorship application for immigration or law enforcement purposes. Sharing this information may destabilize the family to which he wishes to be released and may cause significant psychological harm to David if his sponsorship process leads to immigration enforcement action against his family members.

Immigrant Defenders Law Center

128.    Immigrant Defenders Law Center is a nonprofit organization headquartered in Los Angeles, California. ImmDef is the largest provider of legal services to unaccompanied children in California and currently provides legal services to children housed in seventeen ORR facilities throughout Southern California. It is ImmDef's vision that no immigrant should have to face deportation proceedings alone and it is ImmDef's mission to ensure that every person facing removal has zealous, competent counsel at their side.

129.    ImmDef currently represents over 1,900 unaccompanied children in their removal proceedings. Because of the IFR and the changes to Policy Guide Section 2.2.4, children's lengths of stay in ORR custody are significantly higher than in years past and ImmDef has been forced to allocate a significantly higher portion of its limited resources to advocating for their clients on issues related to release, meeting with their clients more frequently to answer questions related to the release process, supporting the mental stability of their detained

unaccompanied child clients, and meeting with more children forced to consider Long-Term

Foster Care or voluntary departure because ORR has determined that they no longer have an

available sponsor or because their intended sponsor withdrew from the process because of fears

regarding information sharing with DHS. ImmDef also spends time responding to inquiries from

potential sponsors and ORR-subcontracted facility staff themselves regarding new policies and

procedures related to the new sponsorship requirements.

130.    Additionally, the proportion of cases ImmDef now has on the "detained docket"

for unaccompanied children who are still in detention, as opposed to released children living in

the community with their sponsors, is significantly higher as a result of these policy changes.

Cases on the "detained docket" take significantly more time and resources for ImmDef's

attorneys and support staff and are processed on an expedited timeline, which prevents ImmDef

from carrying out other ongoing and planned work central to furthering ImmDef's mission.

131.    Children's immigration cases take time and require trauma informed and child-

friendly practices to prepare children to participate. Children are often unable to fully participate

in their removal defense until they have reached a place of stability with their family or sponsor.

This is because children experience serious mental health impacts from detention and separation

from their families, making it difficult for them to provide the information their attorney needs to

defend them. Furthermore, especially in the case of young children, their families are likely to

have much of the information central to their applications for immigration relief. When children

are separated from the trusted adults in their lives who have evidence necessary to the child's

deportation defense, it impedes ImmDef's ability to fully and zealously represent them.

132.    Because of the increased time children are spending in custody, and the

corresponding increased time working on their cases, ImmDef has been forced to divert its

limited resources away from accepting the typical projected number of new clients due to the

unexpected increased demands of existing clients' cases, thereby hampering ImmDef's ability to

fulfill its mission to provide zealous advocacy to all detained children in the ORR shelters that it

serves. Additionally, they've been forced to expend resources, that would otherwise be spent

representing individuals in their immigration cases, to revise long-steady know-your-rights

presentations and screening materials to account for the diminished potential for immigration

relief that is accessible only to non-detained children, and to notify children of a litany of new

policy changes that impact primarily detained children.

## CLASS ACTION ALLEGATIONS

133.    Plaintiffs bring this action on behalf of themselves and all others who are

similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2). A class action

is proper because this action involves questions of law and fact common to the class, the class is

so numerous that joinder of all members is impractical, Plaintiffs' claims are typical of the claims

of the class, and Plaintiffs will fairly and adequately protect the interests of the class. Defendants

have acted in ways that apply generally to the class by (1) promulgating the IFR; (2) revising

ORR Policy Guide Section 2.2.4 to bar common forms of identification used by sponsors; and

(3) requiring specific documents from all sponsors to establish proof of income in the United

States. Therefore, injunctive and declaratory relief and relief under the APA are appropriate with

respect to the class as a whole.

134.    Individual named plaintiffs seek to represent the following class: All

unaccompanied children who are or will be in the custody of HHS and who (a) have or had a

potential sponsor who has been identified; and (b) the sponsor's family reunification application

has been denied, closed, withdrawn, delayed, or cannot be completed because the sponsor is

missing documents newly required on or after March 7, 2025. The proposed class meets the numerosity requirements of Federal Rule of Civil Procedure 23(a)(1). The class is so numerous that joinder of all members is impracticable. The precise number of class members is unknown at the current time, but as of April 4, 2025, more than 2,200 children were subjected to the release requirements and more than 2,200 children were subjected to the rescission of the protections in 42 C.F.R. § 410.1201(b).

135.    The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2) and share common issues of fact and law. The members of the class are all unaccompanied children in the custody of Defendant ORR and all members of the class are subject to the IFR and the revisions of ORR Policy Guide Section 2.2.4, which prevent timely release to family members and other suitable sponsors and undermine the stability of their potential placements with family, thereby undermining their best interests. These uniform policies harm the children in ORR's custody and violate the agency's statutory obligations.

136.    The proposed class's claims meet the typicality requirements of Federal Rule of Civil Procedure 23(a)(3). The members of the class seek uniform injunctive and declaratory relief—namely an injunction that holds unlawful and sets aside the IFR and holds unlawful and sets aside the March 7 and April 15, 2025, revisions of the ORR Policy Guide Section 2.2.4.

137.    The proposed class meets the adequacy requirements of the Federal Rule of Civil Procedure 23(a)(4). The representative Plaintiffs seek the same final relief as the other members of their class. Plaintiffs will fairly and adequately protect the interests of the proposed class members because they seek relief on behalf of the class as a whole and have no interest antagonistic to other class members.

138.    Plaintiffs are represented by competent counsel with extensive experience in complex class actions, children's and family's rights, and immigration law. In particular, the counsel from the National Center for Youth Law involved in this case have represented plaintiffs in several other class action lawsuits on behalf of detained immigrant youth including *Flores v. Bondi*, *Lucas R. v. Becerra*, 2:18-cv-05741-DMG-PLA (C.D. Cal.), *Duchitanga v. Lloyd ,*1:18-cv-10332-PAC-JW (S.D.N.Y.), and *J.E.C.M. v. Dunn Marcos*.

139.    The proposed class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the proposed classes, thereby making final injunctive, declaratory, and APA relief appropriate.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(D)**
***Without Observance of Procedure Required by Law – Interim Final Rule***

140.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

141.    The APA requires a court to "hold unlawful and set aside agency action" that is "without observance of procedures required by law." 5 U.S.C. § 706(2)(D).

142.    The IFR is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations" and creates "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); *id.* § 706(2)(D); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 17 (2020).

143.    With limited exceptions, the APA requires agencies to publish a proposed rule and give the public "an opportunity to participate in the rule making through submission of written

data, views, or arguments." 5 U.S.C. §§ 553(b)–(c). Only after considering the public's

comments can the agency finalize the rule. *Id*. § 553(c).

144.     Instead of proposing changes to the Foundational Rule through notice and

comment rulemaking, HHS and ORR promulgated the IFR with immediate effect and thereby

immediately rescinded important protections for unaccompanied children without any

opportunity for notice and comment.

145.     The IFR was not supported by good cause to bypass notice and comment or good

cause to take immediate effect. The agency has articulated no substantive justification at all for

rescinding important protections in the Foundational Rule related to sponsor denials based on

immigration status and collecting information for enforcement purposes. The issuance of the IFR

and consequent revision of the Foundational Rule is not in observance of procedure required by

law.

146.     The IFR has already injured Plaintiffs and will continue to do so until enjoined or

vacated. Injunctive relief is necessary to prevent further harm and to mitigate the harm already

caused by the IFR.

### COUNT II
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A), (C)**
*Contrary to Law and Beyond Statutory Authority – Interim Final Rule*

147.     Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

148.     The APA requires a court to "hold unlawful and set aside agency action" that is

"not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5

U.S.C. § 706(2)(A), (C).

149.     The IFR is contrary to ORR's statutory obligation to "promptly place[]"

unaccompanied children "in the least restrictive setting that is in the best interest of the child,"

which is usually with a "suitable family member." 8 U.S.C. § 1232(c)(2)(A); *see also Saravia*, 905 F.3d at 1143; *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 612 (S.D.N.Y. 2018).

150.    The IFR exceeds the statutory authority of ORR—a child welfare authority— because the TVPRA directs ORR to consider children's best interests and does not give ORR authority to deny sponsors based on immigration status or to engage in immigration enforcement.

151.    The IFR further exceeds ORR's statutory authority because neither the HSA nor the TVPRA give ORR authority to collect and broadly share information and data in ORR databases for law enforcement or immigration enforcement purposes.

152.    The IFR's rescission of 42 C.F.R. § 410.1201(b) exceeds the authority granted by Congress to HHS and is therefore unlawful. The Court should enjoin its issuance.

153.    The IFR has already injured Plaintiffs and will continue to do so until enjoined or vacated. Injunctive relief is necessary to prevent further harm and to mitigate the harm already caused by the IFR.

## COUNT III
### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)
### *Arbitrary and Capricious – Interim Final Rule*

154.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

155.    The APA, 5 U.S.C. § 551 *et seq.*, authorizes suits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant strategy." *Id.* § 702. Section 706 of the APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

156.    The issuance of the IFR is arbitrary and capricious. The IFR represents a full reversal of a critical section of ORR's Foundational Rule without a reasoned explanation, particularly with respect to rescission of the prohibition on denying sponsor applications based solely on immigration status and collecting information on the sponsor's immigration status and those within the household for enforcement purposes. Moreover, the agency failed to consider important aspects of the problem, including but not limited to the impact on children's length of stay in custody and mental health, the rights of children and their families to family integrity, and deterrence of potentially suitable sponsors. The agency further relied on factors that Congress did not intend it to consider, failed to consider reasonable alternatives to the IFR, failed to account for reliance interests, and offered explanations for their decision which run counter to the evidence before the agency.

157.    The IFR has already injured Plaintiffs and will continue to do so until enjoined or vacated. Injunctive relief is necessary to prevent further harm and to mitigate the harm already caused by the IFR.

## COUNT IV
### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A), (C)
*Contrary to Law and Beyond Statutory Authority – New Sponsor Requirements*

158.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

159.    The APA requires a court to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

160.    The new sponsor requirements related to proof of identification and proof of income outlined in ORR Policy Guide § 2.2.4 are final agency actions because they are "the consummation of the agency's decisionmaking process" and they determine "rights and

obligations" and create "legal consequences." *Bennett*, 520 U.S. at 177–78. Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); *id.* § 706(2)(D); *see also Regents of the Univ. of Cal.*, 591 U.S. at 17.

161.    By unnecessarily denying and delaying release, ORR's new sponsor requirements violate the TVPRA's command to promptly place children "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A).

162.    Federal agencies and their officials are required to follow their own "existing valid regulations." *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). This Circuit recognizes that "*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others." *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005). When the agency fails to comply with binding regulations, such actions are "not in accordance with law." *See Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959) ("Because the proceedings attendant upon petitioner's dismissal from government service on grounds of national security fell substantially short of the requirements of the applicable departmental regulations, we hold that such dismissal was illegal and of no effect."); *Fla. Inst. of Tech. v. FCC*, 952 F.2d 549, 553 (D.C. Cir. 1992) ("[I]t is a 'well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action." (quoting *Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356, 1359 (D.C. Cir. 1979)).

163.    For all the reasons stated above, the IFR must be vacated. As a result, ORR is still bound by the prohibition in 42 C.F.R. § 410.1201(b) against denying sponsor applications based solely on the basis of immigration status. The new identification and proof of income requirements outlined in ORR Policy Guide § 2.2.4 are unlawful under the original 42 C.F.R.

§ 410.1201(b) because these new requirements serve to disqualify individual sponsors based solely on their immigration status.

164.    The Foundational Rule also requires release without unnecessary delay, sets an order of preference for sponsors depending on their relationship to the child, and sets defined timelines for the adjudication of completed sponsorship applications. 42 C.F.R. §§ 410.1200, 410.1201(a), 410.1205(b)–(c). ORR's new proof of identification and proof of income requirements are unlawful because they result in unnecessary delays in release and result in ORR preferencing more distant relatives or unrelated sponsors with United States documentation over parents, guardians, and other close relative sponsors who lack such documentation, in violation of 45 C.F.R. § 410.1201(a).

165.    The Foundational Rule further provides that "[a]s part of its suitability assessment, ORR may require such components as . . . verification of the employment, income, *or other information provided by the potential sponsor as evidence of the ability to support the child . . ..*" 45 C.F.R. § 1202(c) (emphasis added). The regulations plainly contemplate that sponsors are not limited to proof of employment and income and instead can establish their ability to support the child through alternate evidence. By requiring proof of income from all sponsors without exception, ORR's revised Policy Guide § 2.2.4 is thus contrary to the agency's binding regulations.

166.    The revised documentation requirements in ORR Policy Guide Section 2.2.4 are further unlawful to the extent they are applied retroactively to sponsors who already completed their sponsor applications and thereby prevent adjudication within the timelines set out by regulation. 45 C.F.R. §§ 410.1205(b), (c); *see also Nat'l Mining Ass'n v. Dep't of Lab.*, 292 F.3d

849, 859 (D.C. Cir. 2002) ("An agency may not promulgate retroactive rules absent express congressional authority.").

167.    In addition, ORR's revised sponsor identification and proof of income requirements violate the Paperwork Reduction Act, 44 U.S.C. § 3507(a), because ORR is requiring all sponsors to provide information regarding their identities and proof of income that differs from the information required in the family reunification application approved by the Office of Management and Budget ("OMB"), with a control number of OMB 0970-0278. ORR has not yet obtained OMB approval for its new identification and proof of income information collection requirements. Such requirements are thus unlawful and ORR must permit sponsors to establish their identification and financial stability through the other reasonable means provided for in the approved family reunification application. *See Saco River Cellular, Inc. v. FCC*, 133 F.3d 25, 33 (D.C. Cir. 1998).

168.    The new sponsorship requirements have already injured Plaintiffs and will continue to do so until enjoined or vacated. Injunctive relief is necessary to prevent further harm and to mitigate the harm already caused by the new sponsorship requirements.

### COUNT V
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)**
*Arbitrary and Capricious – New Requirements for Sponsors*

169.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

170.    The APA, 5 U.S.C. § 551 *et seq.*, authorizes suits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant strategy." *Id.* § 702. Section 706 of the APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

171.    The new requirements for sponsors as delineated by changes to the ORR Policy Guide in March and April of 2025 are final agency actions because they are "the consummation of the agency's decisionmaking process" and it determines "rights and obligations" and creates "legal consequences." *Bennett*, 520 U.S. at 177–78. Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); *Id.* § 706(2)(A); *see also Regents of Univ. of Cal.*, 591 U.S. at 17.

172.    The new identification requirements and new required documentation regarding income are arbitrary and capricious. These requirements result in denials of sponsorship based solely on a proposed sponsor's immigration status. This is in direct contradiction to years of ORR policy and the Foundational Rule, without any reasoned explanation. Additionally, the new sponsorship requirements are arbitrary and capricious because, in adopting the requirements, Defendants have failed to take into account important aspects of the problem, including but not limited to the impact on children's length of stay in custody, children's mental health, and the rights of children and their families to family integrity. ORR also relied on factors that Congress did not intend the agency to consider, failed to articulate a reasoned explanation for their decision, failed to consider reasonable alternatives to the new requirements, failed to take into account reliance interests, impermissibly applied these requirements retroactively, and offered explanations for their decision which run counter to the evidence before the agency.

173.    The new sponsor requirements have already injured Plaintiffs and will continue to do so until enjoined or vacated. Injunctive relief is necessary to prevent further harm and to mitigate the harm already caused by ORR's new sponsor requirements.

## COUNT VI
### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(D)
### *Without Observance of Procedure Required by Law – New Requirements for Sponsors*

174.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

175.    The APA, 5 U.S.C. § 553, requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation. *See* 5 U.S.C. §§ 553(b)–(c).

176.    The new sponsorship identification and proof of income requirements are legislative rules within the meaning of the APA. They "impose legally binding obligations" on individuals seeking family reunification and significantly impact children's legal rights. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). Legislative rules like the new sponsorship requirements must go through notice and comment rulemaking. *See* 5 U.S.C. § 553(b)–(c).

177.    ORR did not properly promulgate the changed the sponsorship requirements outlined in the Policy Guide because ORR failed to provide notice and an opportunity for comment as required by the APA.

178.    Defendants' failure to provide for notice and comment violates 5 U.S.C. §§ 553(b), (c), and 706(2)(D).

179.    The new sponsor requirements have already injured Plaintiffs and will continue to do so until enjoined or vacated. Injunctive relief is necessary to prevent further harm and to mitigate the harm already caused by the new sponsor requirements.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

 a.    Assume jurisdiction over this matter;

b.  Certify this action as a class action under Federal Rule of Civil Procedure 23 and appoint National Center for Youth Law and Democracy Forward as class counsel;

c.  Order Defendants to promptly identify all class members to class counsel and to notify all class members (and their attorneys of record, if any) of their status as class members in this action;

d.  Hold unlawful and set aside the IFR under 5 U.S.C. § 706;

e.  Hold unlawful and set aside the March 7, 2025 and April 15, 2025 revisions of ORR Policy Guide Section 2.2.4 on identification and proof of income requirements under 5 U.S.C. § 706;

f.  Declare, pursuant to 28 U.S.C. § 2201, that Defendants' actions as set forth above are unlawful;

g.  Maintain the preliminary injunction entered by this Court on June 9, 2025, ECF No. 34;

h.  Enter a permanent injunction (1) prohibiting ORR from enforcing the new identification requirements contained in the March 7, 2025, revision of Policy Guide Section 2.2.4 or the new proof of income requirements contained in the April 15, 2025, revision of Policy Guide Section 2.2.4; (2) requiring ORR to inform all potential sponsors who were disqualified or denied based on the unlawful policies described here that they may now continue with their sponsorship applications; (3) requiring that, in all cases where (i) a potential sponsor submitted a complete family reunification application and (ii) the application was denied or closed or adjudication of the application was delayed in whole or in part because of ORR's IFR and/or ORR's revised proof of

identification and/or proof of income requirements, ORR adjudicate the

application without regard to the IFR and the revised requirements and in

accordance with the policies and requirements otherwise in place when the

application was submitted.

    i.    Award costs and fees for this action, including attorneys' fees; and

    j.    Award such further relief as this Court deems just and proper.


August 15, 2025                Respectfully submitted,

                            _____/s/ *Mishan Wroe*

                            Mishan Wroe (admitted *pro hac vice*)
                            Diane de Gramont (admitted *pro hac vice*)
                            NATIONAL CENTER FOR YOUTH LAW
                            1212 Broadway, Suite 600
                            Oakland, California 94612
                            (510) 835-8098
                            mwroe@youthlaw.org
                            ddegramont@youthlaw.org

                            David Hinojosa (D.C. Bar No. 1722329)
                            Rebecca Wolozin (D.C. Bar No. 144369)
                            NATIONAL CENTER FOR YOUTH LAW
                            818 Connecticut Avenue NW, Suite 425
                            Washington, DC 20006
                            (202) 868-4792
                            dhinojosa@youthlaw.org
                            bwolozin@youthlaw.org

                            Cynthia Liao (admitted *pro hac vice*)
                            Joel McElvain (D.C. Bar No. 448431)
                            Skye L. Perryman (D.C. Bar No. 984573)
                            DEMOCRACY FORWARD FOUNDATION
                            P.O. Box 34553
                            Washington, D.C. 20043
                            (202) 448-9090
                            cliao@democracyforward.org
                            jmcelvain@democracyforward.org
                            sperryman@democracyforward.org