# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANGELICA S., *et al.*,<br>        Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br>        Defendants. | No. 1:25-cv-01405 (DLF)<br><br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

**I.    ORR's Statutory Mandate and Regulations** ................................................ 3

**II.   Sponsor Application Process** ......................................................................... 4

    A.  Changes to Proof of Identity Requirements ................................................ 5

    B.  New Sponsor Proof of Income Requirements ............................................. 6

    C.  Proposed Revisions to Application for Sponsorship .................................. 6

    D.  Prolonged and Indefinite Detention of Children ........................................ 7

**III.  Information Sharing with the Department of Homeland Security** ............. 7

    A.  Prior Information Sharing with DHS ........................................................... 7

    B.  Restrictions on Using ORR Data for Immigration Enforcement ................ 8

**IV.   Procedural History** ....................................................................................... 9

LEGAL STANDARD ......................................................................................................... 10

ARGUMENT ...................................................................................................................... 10

**I.    Plaintiffs Have Standing** ............................................................................... 11

    A.  Child Plaintiffs Have Standing to Challenge the ORR Documentation
    Requirements ................................................................................................ 11

    B.  Child Plaintiffs Have Standing to Challenge the IFR ................................ 12

    C.  Plaintiff ImmDef has Organizational Standing .......................................... 14

**II.   The Interim Final Rule is Unlawful and Must Be Set Aside** ..................... 18

    A.  ORR Bypassed Notice and Comment and Made the IFR Effective Immediately
    Without Good Cause ..................................................................................... 18

    B.  The IFR is Arbitrary and Capricious Because ORR Offered No Reasoned
    Explanation for Significant Changes in Policy. .......................................... 22

    C.  The IFR Exceeds ORR's Statutory Authority ............................................ 25

**III.  ORR's New Sponsor Documentation Requirements Are Unlawful** ......... 27

    A.  ORR's Policy Guide Revisions Are Final Agency Actions ....................... 27

    B.  ORR's New Proof of Identity and Proof of Income Requirements Violate the
    TVPRA and ORR's Own Regulations ....................................................... 27

        1.  *The new documentation requirements disqualify sponsors based on immigration
        status in violation of the pre-IFR Foundational Rule* ............................. 27

        2.  *ORR's new documentation requirements unnecessarily delay children's release to
        sponsors in violation of the TVPRA and the Foundational Rule.* ......................... 29

    C.  ORR's New Documentation Requirements are Arbitrary and Capricious .................. 31

        1.  *Failure to consider relevant factors* ....................................................... 31

       *2. Lack of justification for specific document requirements* ..................................... 35

   D.  ORR's New Documentation Requirements Violate the Paperwork Reduction Act.... 38

   E.  ORR was Required, but Failed to, Engage in Notice-and-Comment Rulemaking..... 39

**IV.  The IFR and New Documentation Requirements Should be Vacated** ...................... **40**

**V.   Plaintiffs are Also Entitled to a Permanent Injunction** ................................................. **41**

   A.  Plaintiffs Are Irreparably Harmed by a Delay in Release And Have No Other Adequate Remedy. ...................................................................................................... 42

   B.  Balance of the Equities and Public Interest Support an Injunction. .......................... 43

**VI.  Plaintiffs are Entitled to Declaratory Relief** ................................................................. **45**

CONCLUSION ......................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AFL-CIO v. DOL*,
    778 F. Supp. 3d 56 (D.D.C. 2025) ................................................................................14, 17

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    539 F. Supp. 3d 29 (D.D.C. 2021) ........................................................................................41

*Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014) ............................................................................................41

*Alpharma, Inc. v. Leavitt*,
    460 F.3d 1 (D.C. Cir. 2006) ..................................................................................................36

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ............................................................................10, 40, 41

*\*Am. Fed. of Govt. Emps., AFLCIO v. Block*,
    655 F.2d 1153 (D.C. Cir. 1981) ..................................................................................19, 22

*Am. Fed. Of Labor and Congress of Industrial Orgs. v. NLRB*,
    57 F. 4th 1023 (D.C. Cir. 2023) ...........................................................................................40

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
    No. CV SAG-25-628, 2025 WL 2374697 (D. Md. Aug. 14, 2025) ......................................38

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017) .............................................................................................21

*Andreiu v. Ashcroft*,
    253 F.3d 477 (9th Cir. 2001) (en banc) ...............................................................................42

*Ascendium Educ. Solutions, Inc. v. Cardona*,
    78 F.4th 470 (D.C. Cir. 2023) ..............................................................................................13

*ASPCA v. Feld Entm't, Inc.*,
    659 F.3d 13 (D.C. Cir. 2011) ...............................................................................................17

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    591 U.S. 610 (2020) ..............................................................................................................23

*\*Bennett v. Spear*,
    520 U.S. 154 (1997) ..............................................................................................................27

*Bowman Transp. Inc. v. Arkansas-Best Freight System*,
    419 U.S. 281 (1974) ..............................................................................................................31

*Bragdon v Abbott*,
  524 U.S. 624 (1998)..................................................................26

*Bridgeport Hosp. v. Becerra*,
  108 F.4th 882 (D.C. Cir. 2024)................................................40

*\*Cap. Area Immigrants' Rts. Coal. v. Trump*,
  471 F. Supp. 3d 25 (D.D.C. 2020)....................................... *passim*

*Cath. Soc. Serv. v. Shalala*,
  12 F.3d 1123 (D.C. Cir. 1994)................................................13

*CC Distributors, Inc. v. United States*,
  883 F.2d 146 (D.C. Cir. 1989)................................................12

*Centro de Trabajadores Unidos v. Bessent*,
  2025 WL 1380420 (D.D.C. May 12,2025)............................11, 12

*Chicago & S. Air Lines v. Waterman S. S. Corp.*,
  333 U.S. 103 (1948).................................................................27

*Consumer Energy Council of Am. v. Fed. Energy Reg. Comm'n*,
  673 F.2d 425 (D.C. Cir. 1982)................................................21

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024)...........................................................12, 41

*CREW v. OMB*,
  No. 25-cv-1111, 2025 WL 2025114 (D.D.C. July 21, 2025) ................................42

*\*Ctr. for Biological Diversity v. EPA*,
  861 F.3d 174 (D.C. Cir. 2017)...........................................12, 14

*D.B. v. Cardall*,
  826 F.3d 721 (4th Cir. 2016) ................................................33

*\*DHS v. Regents of the Univ. of California*,
  591 U.S. 1 (2020)........................................................... *passim*

*Drs. for Am. v. Off. of Pers. Mgmt.*,
  766 F. Supp. 3d 39 (D.D.C. 2025)........................................38

*eBay Inc. v. MercExchange, L.L. C.*,
  547 U.S. 388 (2006).................................................................42

*Eco Tour Adventures, Inc. v. Jewell*,
  174 F. Supp. 3d 319 (D.D.C. 2016)........................................45

*Elec. Priv. Info. Ctr. v. DHS*,
    653 F.3d 1 (D.C. Cir. 2011) ......................................................................40

*Elec. Privacy Info. Ctr. v. United States Dep't. of Educ.*,
    48 F. Supp. 3d 1 (D.D.C. 2014) ...............................................................17

*\*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)..........................................................................25, 34

*FDA v. All. For Hippocratic Med.*,
    602 U.S. 367 (2024)..........................................................................12, 17

*Fla. Inst. of Tech. v. FCC*,
    952 F.2d 549 (D.C. Cir. 1992) ..................................................................28

*Friends of Animals v. Ross*,
    396 F.Supp.3d 1 (D.D.C. 2019) ................................................................10

*General Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) ...........................................................39, 40

*Glenn v. Thomas Fortune Fay*,
    222 F. Supp. 3d 31 (D.D.C. 2016) ............................................................45

*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*,
    589 F.2d 658 (D.C. Cir. 1978) ..................................................................40

*\*Gutierrez v. Saenz*,
    145 S. Ct. 2258 (2025)...........................................................................12, 13

*HealthAlliance Hospitals, Inc. v. Azar*,
    346 F.Supp.3d 43 (D.D.C. 2018) ..............................................................10

*Int'l Primate Prot. League v. Admins. of Tulane Educ. Fund*,
    500 U.S. 72 (1991)....................................................................................13

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
    407 F.3d 1250 (D.C. Cir. 2005) ................................................................18

*\*J.D. v. Azar*,
    925 F.3d 1291 (D.C. Cir. 2019) ................................................................11

*\*J.E.C.M. v. Lloyd*,
    352 F. Supp. 3d 559 (E.D. Va. 2018) .................................................. *passim*

*J.E.C.M. v. Marcos*,
    689 F. Supp. 3d 180 (E.D. Va. 2023) ........................................................33

*Jacinto-Castamon de Nolasco v. ICE*,
   319 F. Supp. 3d 491 (D.D.C. 2018) ................................................................... 11, 42

*Kirwa v. U.S. Dep't of Defense*,
   285 F. Supp. 3d 257 (D.D.C. 2018) ................................................................... 25

*\*L.V.M. v. Lloyd*,
   318 F. Supp. 3d 601 (S.D.N.Y. 2018) ......................................................... 27, 29, 30, 42

*Las Ams. Immigrant Advoc. Ctr. v. United States Dep't of Homeland Sec.*,
   783 F.Supp. 3d 200 (D.D.C. 2025) ................................................................... 14, 18

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ................................................................... 44

*Lucas R. v. Becerra*,
   No. 18-5741, 2022 WL 2177454 (C.D. Cal. Mar. 11, 2022) ...................................... 31, 33, 42

*M.G.U. v. Nielsen*,
   325 F. Supp. 3d 111 (D.D.C. 2018) ................................................................... 44

*\*Mack Trucks, Inc. v. EPA*,
   682 F.3d 87 (D.C. Cir. 2012) ................................................................... 19, 20

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ................................................................... 42

*\*Moore v. City of E. Cleveland*,
   431 U.S. 494 (1977) ................................................................... 33, 44

*\*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,
   463 U.S. 29 (1983) ................................................................... *passim*

*Mozilla Corp. v. FCC*,
   940 F.3d 1 (D.C. Cir. 2019) ................................................................... 13

*N. Mariana Islands v. United States*,
   686 F. Supp. 2d 7 (D.D.C. 2009) ................................................................... 44

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007) ................................................................... 22

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ................................................................... 27

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) ................................................................... 41

*Nat'l Parks Conservation Ass'n v. Salazar*,
  660 F. Supp. 2d 3 (D.D.C. 2009) ............................................................................21

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d at 1434 ......................................................................................................17

*Nat'l Treasury Emps. Union v. Cornelius*,
  617 F. Supp. 365 (D.D.C. 1985) .............................................................................21

*New Eng. Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv.*,
  208 F. Supp. 3d 142 (D.D.C. 2016) ........................................................................17

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................................43

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
  496 F. Supp. 3d 31 (D.D.C. 2020) .....................................................................16, 18

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) ........................................................................14

*Ohio v. EPA*,
  603 U.S. 279 (2024) ................................................................................................22

*Orr v. Trump*,
  778 F. Supp. 3d 394 (D. Mass. 2025), *appeal filed* (1st Cir. June 13, 2025) .........38

*Parker v. District of Columbia*,
  478 F.3d 370 (D.C. Cir. 2007) ................................................................................13

*Pietersen v. Dep't of State*,
  138 F.4th 552 (D.C. Cir. 2025) ...............................................................................12

*Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*,
  400 U.S. 62 (1970) ..................................................................................................27

*Purdue Univ. v. Scalia*, No. CV 20-3006 (EGS),
  2020 WL 7340156 (D.D.C. Dec. 14, 2020) ............................................................19

*\*R.I.L.-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) ..........................................................................44

*Ramirez v. ICE*,
  471 F. Supp. 3d 88 (D.D.C. 2020) ..........................................................................29

*Ramirez v. ICE*, 568 F.Supp.3d 10 (D.D.C. 2021) .......................................................43

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
  No. CV 25-306 (RDM), 2025 WL 1825431 (D.D.C. July 2, 2025) .........................17

vii

*Saco River Cellular, Inc. v. FCC,*
   133 F.3d 25 (D.C. Cir. 1998) ................................................................. 39

*Saravia v. Sessions,*
   280 F. Supp. 3d 1168 (N.D. Cal. 2017) ................................................. 42

*Saravia v. Sessions,*
   905 F.3d 1137 (9th Cir. 2018) ............................................................... 29

*Sierra Club v. EPA,*
   955 F.3d 56 (D.C. Cir. 2020) ................................................................. 27

*Sierra Club v. FERC,*
   867 F.3d 1357 (D.C. Cir. 2017) ............................................................. 13

*Sierra Club v. Mainella,*
   459 F. Supp. 2d 76 (D.D.C. 2006) ......................................................... 10

*Solondz v. FAA,*
   141 F.4th 268 (D.C. Cir. 2025) ........................................................ 35, 37

*Sorenson Commc'ns Inc. v. F.C.C.,*
   755 F.3d 702 (D.C. Cir. 2014) .......................................................... 19, 21

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   985 F.3d 1032 (D.C. Cir. 2021) ............................................................. 41

*Stanley v. Illinois,*
   405 U.S. 645 (1972) ............................................................................... 44

*Tanner-Brown v. Haaland,*
   105 F.4th 437 (D.C. Cir. 2024) .............................................................. 13

*Tierney v. Schweiker,*
   718 F.2d 449 (D.C. Cir. 1983) ............................................................... 45

*Tri-Cnty. Tel. Ass'n, Inc. v. FCC,*
   999 F.3d 714 (D.C. Cir. 2021) ............................................................... 19

*Troxel v. Granville,*
   530 U.S. 57 (2000) ................................................................................. 44

*United States ex rel. Accardi v. Shaughnessy,*
   347 U.S. 260 (1954) .......................................................................... 13, 28

*United States v. Nixon,*
   418 U.S. 683 (1974) ............................................................................... 28

*United Steel v. Mine Safety and Health Admin.*,
   925 F.3d 1279 (D.C. Cir. 2019) ................................................................41

*Util. Solid Waste Activities Grp. v. EPA*,
   236 F.3d 749 (D.C. Cir. 2001) ...........................................................19, 20

*Washington v. Reno*,
   35 F.3d 1093 (6th Cir. 1994) ...................................................................44

*Way of Life Television Network, Inc. v. FCC*,
   593 F.2d 1356 (D.C. Cir. 1979) ...............................................................28

*World Duty Free Americas, Inc. v. Summers*,
   94 F. Supp. 2d 61 (D.D.C. 2000) ............................................................20

## STATUTES AND RULES

5 U.S.C. § 553 ...............................................................18, 19, 21, 22, 39

5 U.S.C. § 702 ........................................................................................27

5 U.S.C. § 703 ........................................................................................45

5 U.S.C. § 704 ........................................................................................27

5 U.S.C. § 706 ............................................................................22, 29, 38

6 U.S.C. § 279 ....................................................................................3, 8

8 U.S.C. 1373 ...............................................................................*passim*

*8 U.S.C. § 1232 ...........................................................................*passim*

28 U.S.C. § 1447 ....................................................................................13

28 U.S.C. § 2201 ....................................................................................45

44 U.S.C. § 3502 ....................................................................................38

44 U.S.C. § 3507 ................................................................................4, 38

Pub. L. No. 116-93, Div. D, § 216(a), 133 Stat. 2317, 2513 (2019) ........8, 26

Fed. R. Civ. P. 15 .....................................................................................9

Fed. R. Civ. P. 56 ...................................................................................10

Fed. R. Civ. P. 65 ...................................................................................41

## REGULATIONS AND FEDERAL REGISTER

5 C.F.R. § 1320.5 ...................................................................................................38, 39

*45 C.F.R. § 410.1201 ................................................................3, 4, 28, 29, 30, 41

*45 C.F.R. § 410.1205 ....................................................................................3, 30, 41

*Unaccompanied Children Foundational Rule, 89 Fed. Reg. 34384 (Apr. 30, 2024).........3, 23, 26

Privacy Act of 1974; System of Records, 89 Fed. Reg. 96250 (Dec. 4, 2024) ............................8

*Unaccompanied Program Foundational Rule; Update to Accord with Statutory Requirements,
90 Fed. Reg. 13554 (Mar. 25, 2025)....................................................1, 4, 19, 20, 22

## LEGISLATIVE MATERIALS

H.R. Rep., No. 116-450 (2021)...................................................................................8

## OTHER AUTHORITIES

Comment, Letter from Rob Bonta, Cal. Att'y Gen., et al., to Robert F. Kennedy, Jr., et al.,
https://www.regulations.gov/comment/ACF-2025-0004-0206 ...............................20

Relationship Between Illegal Immigr. Reform & Immigrant Resp. Act of 1996 & Statutory
Requirement for Confidentiality of Census Info.,
1999 WL 34995963 (O.L.C. May 18, 1999) ..........................................................25

Robert A. Anthony, Interpretive Rules, 41 Duke L.J. 1311, 1328–29 (1992)..............................40

## INTRODUCTION

The Office of Refugee Resettlement ("ORR") has made drastic and unreasoned changes to its sponsorship process in violation of its legal obligation to "promptly place[]" each unaccompanied child "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. §§ 1232(c)(2)(A). The Trafficking Victims Protection Reauthorization Act ("TVPRA") mandates that ORR establish policies to vet potential sponsors of unaccompanied children based on an individualized determination of that sponsor's ability to care for the individual child's safety and well-being. 8 U.S.C. § 1232(c)(3)(A). The TVPRA envisions long-term government custody only "if a suitable family member is not available to provide care," *id.* § 1232(c)(2)(A), because Congress has long agreed that children should live with family rather than in federal custody.

Under the TVPRA, ORR's release policies must advance twin goals—ensuring that release is safe *and* that it is free from unnecessary delay. *Id.* § 1232(c). Although the precise contours of sponsor vetting are open to reasonable debate, the TVPRA and the Administrative Procedure Act ("APA") require ORR to weigh the harms and benefits of any significant new obstacle to sponsorship, consider alternative options, and conform its conduct to legally required procedures. ORR and the Department of Health and Human Services ("HHS") have repeatedly failed to do so.

HHS promulgated an Interim Final Rule ("IFR") rescinding prior regulatory prohibitions on (1) disqualifying sponsors based solely on immigration status, (2) collecting sponsor immigration status information for enforcement purposes, and (3) sharing sponsor immigration status information with enforcement agencies. *See* Unaccompanied Children Program Foundational Rule; Update to Accord with Statutory Requirements, 90 Fed. Reg. 13554 (Mar. 25, 2025). Despite representing a significant change in policy with far-reaching consequences for unaccompanied children, ORR made the IFR effective *immediately* without first providing notice or an opportunity to comment, without considering the impacts on the children in its care, and without any reasoned justification for permitting sponsorship denials based on immigration status or collecting sponsor information for enforcement purposes.

In March and April 2025, ORR also abruptly and unilaterally changed its proof of identification and proof of income requirements for sponsors—categorically denying sponsors if they or their household members or alternative caregiver lack certain specific documents, regardless of other evidence of suitability. The newly required documents are generally available only to individuals with stable lawful immigration status. ORR thus began disqualifying sponsors based solely on immigration status in violation of ORR's pre-IFR regulations. The administrative record includes no reasoned justification for the specific documents chosen, no consideration of alternative documents or vetting mechanisms, and no weighing of the benefits of requiring these documents against the harms to children from blocking release to their families.

The child Plaintiffs and the putative class have suffered, and will continue to suffer, unnecessarily prolonged detention and family separation because of ORR's unlawful policies. Yair G.'s older sister Milagro, for example, is eager to care for him and completed a sponsorship application, provided her passport to ORR, and completed a fingerprint-based background check. Plaintiffs' Separate Statement of Undisputed Material Facts ("PSSUMF") ¶ 180. Because Milagro cannot obtain newly required identification, however, Yair currently has no prospects for release to family. PSSUMF ¶¶ 182, 184. Similarly, Mateo N.'s U.S. citizen brother is fully vetted and has completed fingerprinting, DNA testing, and a home study. PSSUMF ¶¶ 167, 170-171. But ORR refuses to release Mateo simply because his brother's wife only has a foreign passport and does not have a state ID. PSSUMF ¶¶ 169, 172-175. David D. has still not been reunified with his mother Isabel D. after four months in ORR custody because ORR took *five weeks* to approve a parental exception to the identification requirements, even after Isabel passed a fingerprint-based background check and DNA testing, moved apartments to satisfy ORR, had a positive home study, and presented her identification to an ORR official in person. PSSUMF ¶¶ 186, 189-193, 195-197.

ORR's IFR and concurrent policy changes are procedurally defective, arbitrary and capricious, and contrary to law. These policies must be vacated and declared unlawful, and the Court should issue an injunction to ensure ORR promptly resumes adjudication of sponsorship applications based on individualized consideration of sponsor suitability.

## BACKGROUND

### I.    ORR's Statutory Mandate and Regulations

In the Homeland Security Act ("HSA") of 2002, Congress transferred responsibility for the placement, care, custody, and release of unaccompanied children who arrive in the United States without a parent or legal guardian from the former Immigration and Nationality Service ("INS") to ORR, which is not an immigration enforcement agency. 6 U.S.C. § 279; 8 U.S.C. § 1232. The TVPRA reinforced the purposeful separation between the immigration enforcement system and ORR's child welfare mandate, requiring federal agencies to transfer unaccompanied children to HHS custody within 72 hours and requiring HHS to make prompt placements "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. §§ 1232(b)(3), (c)(2)(A).

In April 2024, ORR codified its policies related to the custody and release of unaccompanied children in its Foundational Rule. Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384 (Apr. 30, 2024) ("Foundational Rule"). The Rule's Preamble repeatedly emphasizes that ORR is a child welfare agency, not an immigration enforcement agency. *Id.* at 34399, 34442-43, 34452, 34568. The Foundational Rule requires ORR to "release a child from its custody without unnecessary delay," with preference to a parent, legal guardian, or adult relative. 45 C.F.R. § 410.1201. "ORR shall adjudicate the completed sponsor application of a parent or legal guardian" or other close relative within 10 or 14 days, depending on the closeness of the relationship, absent an unexpected delay. 45 C.F.R § 410.1205(b).

Consistent with ORR's role as a child welfare rather than an immigration enforcement agency, the Foundational Rule provided that:

> ORR shall not disqualify potential sponsors based solely on their immigration status and shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement related purposes. ORR shall not share any immigration status information relating to potential sponsors with any law enforcement or immigration enforcement related entity at any time.

45 C.F.R. § 410.1201(b). Plaintiffs will refer to the three parts of § 410.1201(b) as the Disqualification, Information Collection, and Information Sharing provisions, respectively. These

provisions are significant because most potential sponsors lack lawful stable immigration status. PSSUMF ¶ 12. Barring undocumented individuals from sponsorship necessarily restricts release.

On March 25, 2025, HHS rescinded 45 C.F.R. § 410.1201(b), without notice and comment and effective immediately. 90 Fed. Reg. 13554. The sole justification for the rescission was a purported conflict between the Information Sharing provision and 8 U.S.C. § 1373, an immigration statute regarding communication between the INS and other government entities. PSSUMF ¶ 1.

## II.    **Sponsor Application Process**

When a child enters ORR custody, ORR interviews the child and close family members to identify potential sponsors. PSSUMF ¶ 9. ORR then sends the child's potential sponsor a sponsor application packet with an application form. PSSUMF ¶ 10. Pursuant to the Paperwork Reduction Act, ORR's application form must be approved by the Office of Management and Budget ("OMB"). 44 U.S.C. § 3507(a). The last OMB-approved Family Reunification Application ("FRA") lists acceptable identification documents for sponsors and other individuals required to participate in the sponsorship process in the "Supporting Documents" section and permits these individuals to establish their identity through a primary document such as a foreign passport or two or more secondary documents such as a birth certificate, foreign national identification card, or similar documentation. PSSUMF ¶¶ 11, 18. The OMB-approved FRA also asks sponsors about their income and how they will financially support the child but does not require specific supporting documentation. PSSUMF ¶¶ 60, 64.

Starting in February 2025, ORR increased biometric requirements for sponsorship applications. As of February 14, 2025, ORR requires that all sponsors, adult household members, and alternate caregivers submit to fingerprint-based background checks prior to release.[1] PSSUMF ¶ 15. As of March 14, 2025, ORR also requires DNA testing of the child and sponsor in every case where a sponsor claims a biological relationship with the child. PSSUMF ¶ 17.

---

[1] ORR requires each sponsor application to include a sponsor care plan identifying an alternative adult caregiver who could care for the child if the sponsor becomes unavailable. PSSUMF ¶ 14.

### A. Changes to Proof of Identity Requirements

On March 7, 2025, ORR unilaterally amended its Policy Guide § 2.2.4 to include a new, more restrictive list of acceptable forms of identification for sponsors, adult household members, and alternative caregivers that differs from the requirements in the OMB-approved application. PSSUMF ¶ 19. The new list eliminates all forms of identification issued by foreign governments, except for Canadian driver's licenses and foreign passports accompanied by proof of U.S. work authorization or permanent residence. PSSUMF ¶ 21. ORR imported its new requirements from the U.S. Citizenship and Immigration Services ("USCIS") Form I-9 requirements for employees to establish identity and work authorization. PSSUMF ¶¶ 22-23. In making these changes, ORR did not explain why it chose the I-9 documents, did not consider alternative options to satisfy its goals, and did not examine the likely impact on children's release options. PSSUMF ¶¶ 24-26, 28.

ORR applied this new policy to all pending sponsorship applications, including to completed applications ready for approval. PSSUMF ¶ 36. Parents and other sponsors who had already provided a copy of their foreign passport as permitted by the FRA but lacked accompanying immigration documentation (not required by the FRA) were told that their foreign passports were now insufficient. PSSUMF ¶¶ 37, 105, 108. Many other children who entered ORR custody after April 22, 2025, like Yair G., currently have no options for release to family because their relatives presented foreign passports but cannot obtain newly required documents. PSSUMF ¶ 184. Even if a sponsor has qualifying identification, ORR requires that *all* adult household members and the alternate caregiver also have newly required identification. PSSUMF ¶ 38.

The new identification policy permits exceptions only in the case of a parent or legal guardian sponsor, and even then, only if "supported by clear justification" and approved by ORR Headquarters "on a case-by-case basis." PSSUMF ¶ 40. To the extent such an exception is possible, it is available only to the parent themselves and not to their household members. PSSUMF ¶ 41. Even for parents, there is no timeline or decision criteria for ORR's approval of exception requests and children can be forced to wait weeks for approval without information or updates. PSSUMF

¶¶ 47-48; *see also* PSSUMF ¶ 197 (Isabel D.'s identification exception request was pending for five weeks); PSSUMF ¶ 129 (Rosa M.'s sponsorship exception request took three weeks).

### B. New Sponsor Proof of Income Requirements

On April 15, 2025, ORR again unilaterally and retroactively amended Policy Guide § 2.2.4 to require specific proof of income documents from all sponsors that differs from the Family Reunification Application. PSSUMF ¶¶ 61, 64-65. Sponsors must now provide either their previous year's tax return, 60 days of continuous paystubs, or a letter from their employer on company letterhead verifying their employment and salary information. PSSUMF ¶ 62. In making this change, ORR noted that these particular documents would be very difficult for many sponsors to provide, especially if they are undocumented, and that denying a parent on this basis does not align with U.S. child welfare practices. PSSUMF ¶¶ 68-69, 76. Yet the policy does not provide an exception for parents and does not provide any alternative mechanism to prove financial stability and ability to care for the child. PSSUMF ¶¶ 66-67, 70.

This new policy has delayed and prevented release of unaccompanied children to their families. PSSUMF ¶¶ 128-129 (Eduardo M. and his 7-year-old brother were held for weeks after Rosa M. provided bank statements and a letter about her income while she waited for a response from ORR to her *sua sponte* request for an exception); PSSUMF ¶¶ 158-160 (Xavier L.'s mother had to abandon her attempts to sponsor her son because she lacked acceptable proof of income).

### C. Proposed Revisions to Application for Sponsorship

On April 25, 2025, after it had already begun to apply the new identification and income documentation requirements, ORR published a notice of information collection under the Paperwork Reduction Act to revise the FRA (to be renamed the "Sponsor Application"), with a 60-day comment period. PSSUMF ¶ 87. On August 14, 2025, ORR published a Notice of Submission for OMB Review of the Sponsor Application Packet, with a comment period ending on September 15, 2025. PSSUMF ¶ 88. The proposed changes to the sponsorship application include changes to the required "Supporting Documents" related to proof of identification and proof of income and

changes to the Authorization for Release of Information signed by sponsors. PSSUMF ¶ 89. As of the date of this motion, the comment period is not yet complete, and ORR has not yet obtained OMB approval for these changes to its information collection requirements. PSSUMF ¶¶ 88, 90.

### D. Prolonged and Indefinite Detention of Children

Named plaintiffs' prolonged detention resulting from ORR's new documentation policies are not unique. Plaintiff Immigrant Defenders ("ImmDef") reports that children they represent are routinely remaining in custody far longer because of ORR's new identification and proof of income requirements. PSSUMF ¶ 206; *see also* PSSUMF ¶ 82. ORR's data indicates it is now detaining children for dramatically longer periods since enacting these policies. The average length of custody for children discharged from ORR custody climbed precipitously from 37 days in January 2025 to 49 days in February 2025 to 112 days in March 2025 to a peak of 217 days in April before falling slightly to 182 days in August 2025. PSSUMF ¶ 84. The average length of care for children who remain in ORR custody was 179 days in August 2025. PSSUMF ¶ 85. Between fiscal year 2015 and fiscal year 2024, the average length of ORR custody ranged between 27 days and 69 days. PSSUMF ¶ 86.

### III. Information Sharing with the Department of Homeland Security

### A. Prior Information Sharing with DHS

In 2018, ORR expanded fingerprinting requirements for potential sponsors and entered into a memorandum of agreement ("MOA") with DHS to share information obtained through the sponsorship vetting process directly with U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"), which was used for enforcement purposes. PSSUMF ¶ 91. This policy change led to a reduction in sponsors willing to come forward to sponsor children, dramatically increased length of stays in detention, and led to serious harm to children's mental health and wellbeing. PSSUMF ¶¶ 91-94. A 2019 HHS Inspector General ("OIG") report found that increased lengths of stay in ORR custody led to serious mental health impacts for children, including "higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation." PSSUMF ¶ 55. ORR itself

acknowledged that information-sharing was leading to unnecessary delays in release without producing any additional information that helped make children safer, and as result, in 2019, it suspended reconciliation of sponsor background checks with ICE. PSSUMF ¶ 95.

### B.  Restrictions on Using ORR Data for Immigration Enforcement

In response to the serious harm caused by ORR's prior DHS information-sharing policy, Congress placed explicit restrictions on DHS's use of information obtained from HHS regarding unaccompanied children and their potential sponsors. Congress did so after a House of Representatives report described how ORR sharing information about a sponsor's immigration status with DHS undermined children's wellbeing and access to immigration relief. H.R. Rep., No. 116-450, at 185 (2021). These appropriations restrictions began in fiscal year 2020 and have been extended each year through fiscal year 2025. PSSUMF ¶ 96. With narrow exceptions for specific crimes, Congress prohibited DHS from using information shared by HHS "to place in detention, remove, refer for a decision whether to initiate removal proceedings, or initiate removal proceedings against a sponsor, potential sponsor, or member of a household of a sponsor or potential sponsor of an unaccompanied alien child (as defined in section 462(g) of the Homeland Security Act of 2002 (6 U.S.C. 279(g))." Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, Div. D, § 216(a), 133 Stat. 2317, 2513 (2019); PSSUMF ¶ 97.

In December 2024, ORR published a notice of a new system of records in the Federal Register as required by the Privacy Act of 1974. *See* Privacy Act of 1974; System of Records, 89 Fed. Reg. 96250 (Dec. 4, 2024) ("Privacy Act"). Because ORR maintains a mixed system of records that includes some information related to individuals covered by the Privacy Act and some not, ORR exercised its discretion to treat all information in its system of records as protected by the Privacy Act. *Id.* at 96250. Like the Foundational Rule, the notice emphasizes that "ORR is not an immigration enforcement agency and does not maintain records for immigration enforcement purposes," so sharing information with entities such as DHS for immigration enforcement purposes is "incompatible with ORR's program purpose" and is not a permissible routine use under the Privacy Act. *Id.* at 96251, 96253.

Consistent with Congressional restrictions, the authorization for release of information included in the OMB-approved sponsor application packet states: "I also understand that DHS cannot use my information for immigration enforcement actions, including placement in detention, removal, referral for a decision whether to initiate removal proceedings, or initiation of removal proceedings, unless I have been convicted of a serious felony, am pending charges for a serious felony, or I have been directly involved in or associated with any organization involved in human trafficking." PSSUMF ¶ 99. ORR has proposed to remove this language from the sponsorship application packet but has not yet received OMB approval for this change. PSSUMF ¶ 100.

## IV.    **Procedural History**

On May 8, 2025, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief. Compl. (ECF 1). On May 9, 2025, Plaintiffs moved for a preliminary injunction and to certify the Plaintiff class. Pl. Mot. for Class Certification. (ECF 9); Mem. Supp. Class Certification (ECF 9-1); Pl. Mot. for Prelim. Inj. (ECF 10); Mem. Supp. Prelim. Inj. (ECF 10-1). On June 9, 2025, the Court granted in part and denied in part Plaintiffs' Motion for Preliminary Injunction and certified a provisional class for purposes of the preliminary injunction. *See* Order on Prelim. Inj. (ECF 34); Mem. Op. on Prelim. Inj. (ECF 35). The Court's provisionally certified class consists of "all unaccompanied children (1) who were in or transferred to the custody of HHS on or before April 22, 2025; (2) who have identified a potential sponsor; and (3) whose sponsor's family reunification application has been denied, closed, withdrawn, delayed, or cannot be completed because the sponsor is missing documents newly required on or after March 7, 2025." Mem. Op., at 19. The Court's preliminary injunction prohibits ORR from enforcing its new proof of identification requirements and proof of income requirements contained in the March 7, 2025 and April 15, 2025 revisions to Policy Guide Section 2.2.4 as to the provisional class. Order at 2.

Pursuant to Fed. R. of Civ. P. 15, Plaintiffs filed their first Amended Complaint on August 15, 2025, adding three named child plaintiffs to the Complaint, updating information about the original child plaintiffs, and removing two claims. *See* Am. Compl. (ECF 48). On September 8, 2025, Plaintiffs filed a supplemental brief in support of class certification to request that newly

added named Plaintiffs, Mateo N., Yair G., and David D. be appointed class representatives along with the existing named Plaintiffs Angelica S., Eduardo M., Liam W., Leo B., and Xavier L. *See* Suppl. Br. (ECF 51). Plaintiffs seek summary judgment on all claims in the Amended Complaint.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In an APA case like this one, summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Friends of Animals v. Ross*, 396 F.Supp.3d 1, 7 (D.D.C. 2019) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). "The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "[A] court must limit its review to the 'administrative record' and the facts and reasons contained therein in order to determine whether the agency's action was 'consistent with the relevant APA standard of review.'" *HealthAlliance Hospitals, Inc. v. Azar*, 346 F.Supp.3d 43, 55 (D.D.C. 2018).

## ARGUMENT

The IFR is procedurally invalid because it was enacted without notice and comment and without good cause. It is also arbitrary and capricious because it offers no reasoned explanation for significant changes in policy, and its issuance exceeds HHS's statutory authority. Because the IFR is unlawful and must be vacated, ORR remains bound by its regulations prohibiting sponsor disqualification based solely on immigration status. ORR's new proof of identification and proof of income policies violate this regulation. They also violate the TVPRA and ORR's other regulations related to release without unnecessary delay. Further, the administrative record makes plain that these policies are arbitrary and capricious because they fail to consider critical factors such as the impact on children's prospects for release, mental health, and rights to family integrity. The new documentation policies were also imposed in violation of the Paperwork Reduction Act and the APA's procedural requirements. The IFR and these policies must be vacated and the Court

10

should issue additional injunctive relief to ensure children's sponsorship applications are promptly adjudicated in accordance with ORR's statutory and regulatory obligations.

## I.    Plaintiffs Have Standing

Child plaintiffs and the organizational plaintiff, ImmDef, have standing to challenge the IFR as well as ORR's new proof of identification and proof of income policies. When there are multiple plaintiffs, only one plaintiff with standing is necessary to proceed. *J.D. v. Azar*, 925 F.3d 1291, 1324 (D.C. Cir. 2019). The same rule applies "with equal force to a Rule 23(b)(2) class action advancing a uniform claim and seeking uniform injunctive and declaratory relief." *Id.* Here, the child Plaintiffs and ImmDef have standing with respect to the IFR and documentation policies.

### A.  Child Plaintiffs Have Standing to Challenge the ORR Documentation Requirements

As the Court correctly determined in its preliminary injunction order, PI Order at 8-9 (ECF No. 35), the child Plaintiffs have suffered and continue to suffer injury in fact traceable to ORR's conduct because their release processes were blocked or significantly delayed by ORR's new documentation requirements. *See, e.g.,* PSSUMF ¶¶ 175 (Mateo N.), 181-184 (Yair G.), 194, 197 (David D); 108 (Angelica S.); 146-147 (Leo B.); 122, 128-129 (Eduardo M.); 160 (Xavier L.).[2] These obstacles to release caused or are causing family separation, emotional distress, a disruption in educational progress, and an inability to enjoy an ordinary childhood with friends and family. *Id.*; *see also, e.g.,* David D. Decl. ¶¶ 4, 9 (ECF 56-6); Yair G. Decl. ¶¶ 10-11 (ECF 56-4); Mateo N. Decl. ¶¶ 8-11 (ECF 56-2); Leo B. Decl. ¶¶ 5-7, 11-15 (ECF 9-10). Family separation and institutional custody are injuries sufficient to establish standing. *See, e.g.*, *J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559, 579 (E.D. Va. 2018); *Jacinto-Castamon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018). These harms are immediate, concrete, and traceable to Defendants' actions. *Centro de Trabajadores Unidos v. Bessent*, 2025 WL 1380420, at *4 (D.D.C. May 12,2025).

---

[2] Although Angelica S., Leo B., Eduardo M., Xavier L., and Liam W., have now been released from ORR custody, they continue to have standing as class representatives. *See* Reply in Supp. of Class Certification at 13-15, ECF 37; *J.D.,* 925 F.3d at 1308, 1311.

Plaintiffs need not show they would be guaranteed release to establish standing, or even that release is likely. *Gutierrez v. Saenz*, 145 S. Ct. 2258, 2268-69 (2025); *Pietersen v. Dep't of State*, 138 F.4th 552, 559 (D.C. Cir. 2025). Plaintiffs have lost the opportunity for timely release to their closest relatives and in some cases the opportunity for any release at all. *See CC Distributors, Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) ("the loss of an opportunity to pursue a benefit" is "a constitutionally cognizable injury"). As to the Paperwork Reduction Act claim in particular, child Plaintiffs cannot be released until their sponsors submit the required information and thus, they are directly and predictably injured by the unlawful requirements. *See FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 384-85 (2024) ("*AHM*") (collecting cases "where government regulation of a third-party individual or business may be likely to cause injury in fact to an unregulated plaintiff"); *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring) (characterizing this type of downstream injury to unregulated parties as "a typical APA suit.").

Because ORR's new policies are the cause of Plaintiffs' lost opportunity for release and family reunification, Plaintiffs' injuries are redressable by an order vacating the new policies. *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017). Indeed, Angelica S. and Liam W. were finally released to their sister and mother, respectively, only after the Court's preliminary injunction required ORR to reopen and adjudicate their applications. PSSUMF ¶¶ 114-115, 140. While Plaintiffs and putative class members remain detained, their injuries are "ongoing" and establish standing for injunctive relief. *Centro de Trabajadores*, 2025 WL 1380420, at *4.

**B. Child Plaintiffs Have Standing to Challenge the IFR**

Child plaintiffs also have standing to challenge the IFR. Although the Court preliminarily determined Plaintiffs lack standing as to this claim, Mem. Op. at 11-12, Plaintiffs respectfully request the Court reconsider this question with the benefit of a fuller record and recent Supreme Court authority. *See Gutierrez*, 145 S. Ct. at 2266-68.

Plaintiffs' complaint alleges that ORR's new proof of identification and proof of income policies violate the pre-IFR Foundational Rule by unlawfully disqualifying sponsors based solely on their immigration status. *See* Am. Compl. ¶ 162 (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)). If Plaintiffs are correct on the merits that the documentation policies violate ORR's pre-IFR regulations—as must be assumed for purposes of analyzing standing—then the IFR is the only obstacle to relief on this claim. *See Tanner-Brown v. Haaland*, 105 F.4th 437, 445 (D.C. Cir. 2024); *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007). The IFR is thus one "of the roadblocks" between plaintiffs and vacatur of the documentation policies. *Gutierrez*, 145 S. Ct. at 2267; *see also Int'l Primate Prot. League v. Admins. of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991) (holding that plaintiffs' "injury is likely to be redressed if petitioners prevail on their claim because, if removal is found to have been improper under § 1442(a)(1), the federal courts will lose subject matter jurisdiction and the 'case shall be remanded.' 28 U.S.C. § 1447(c)") (internal quotation omitted). By contrast, if Plaintiffs cannot challenge the IFR, they cannot pursue their claim based on the pre-IFR Disqualification provision.

That Plaintiffs may be able to vacate the documentation policies through alternative claims does not undermine standing. Standing is determined based on the allegations in the complaint, not the relief granted. *Gutierrez*, 145 S.Ct. at 2267; *see also Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1125 (D.C. Cir. 1994) ("[A] plaintiff's standing must be analyzed with reference to the particular claim made."). Because Plaintiffs have a concrete interest in vacatur of the IFR, they have standing as to all their claims challenging the IFR. *Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017); *Ascendium Educ. Solutions, Inc. v. Cardona*, 78 F.4th 470, 478 (D.C. Cir. 2023); *Mozilla Corp. v. FCC*, 940 F.3d 1, 46-47 (D.C. Cir. 2019). Nor should it matter that ORR began their unlawful conduct before the IFR was issued; ORR cannot excuse the illegality of its conduct simply by jumping the gun in such a manner. It must conform its conduct to its own regulations.

The individual named plaintiffs have also suffered direct harm from ORR's sharing of sponsor immigration status with DHS. In the cases of Angelica S. and Xavier L., potential sponsors or other adults required to participate in the sponsorship process did not provide required

information to ORR for fear of immigration enforcement, depriving them of an opportunity for release. PSSUMF ¶¶ 112, 158. Released plaintiffs also now face the very real risk that their families and placements will be disrupted by immigration enforcement against their sponsors because sponsors provided sensitive information to ORR for the purposes of family reunification. Vacatur of the IFR would redress these harms under the "relaxed" redressability standard for procedural injuries. *Ctr. for Biological Diversity*, 861 F.3d at 183.

### C.  Plaintiff ImmDef has Organizational Standing

ImmDef has organizational standing because it has alleged concrete and demonstrable injuries that impact its ability to perform its fundamental purpose. To have organizational standing, a plaintiff must establish (1) that it "suffer[ed] 'a concrete and demonstrable injury to its activities, distinct from a mere setback to the organization's abstract social interests" and (2) "the presence of a direct conflict between the defendant's conduct and the organization's mission." *Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*, 783 F.Supp. 3d 200, 216 (D.D.C. 2025). Both requirements are met here.

To demonstrate a "concrete and demonstrable injury to its activities," ImmDef need only show that its "'activities have been impeded' in some way." *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 40–41 (D.D.C. 2020) (collecting cases); *AFL-CIO v. DOL*, 778 F. Supp. 3d 56, 75-76 (D.D.C. 2025) (acknowledging that organizations need only be "perceptibly impaired" to have standing); *O.A. v. Trump*, 404 F. Supp. 3d 109, 143 (D.D.C. 2019) ("Courts have never required an organization to prove that it is entirely hamstrung by challenged actions.").

One of ImmDef's primary activities, and work that is central to its mission—providing zealous, competent counsel to unaccompanied children in their immigration cases—has been impeded by the IFR and the changes to Policy Guide § 2.2.4. PSSUMF ¶¶ 198-199, 202-205. ImmDef is the largest provider of legal services to unaccompanied children in California and currently provides legal services to children housed in seventeen ORR facilities throughout Southern California. PSSUMF ¶¶ 200-201. Because the IFR and new documentation requirements

have led to prolonged detention, ImmDef must expend a significantly higher portion of its limited resources to advocate on behalf of *detained* unaccompanied child clients and can no longer accept new released clients. PSSUMF ¶¶ 206, 214-215, 218, 221-222, 239.

The IFR and the changes to the Policy Guide have significantly increased children's time in ORR custody because it is increasingly difficult for children to be released to sponsors. PSSUMF ¶ 214-215. First, the IFR and, in particular, ORR's decision to collect sponsor immigration status information for enforcement purposes and share that information with immigration enforcement, have led some sponsors to be detained during the sponsorship process. PSSUMF ¶¶ 207-209. Some sponsors have been detained by ICE at in-person identification checks newly required by ORR, which can take place at ICE and HSI offices. PSSUMF ¶¶ 208-209. This is an additional concrete obstacle to release directly traceable to the IFR. Additionally, sponsors have withdrawn their applications because of fear of information sharing and enforcement. PSSUMF ¶¶ 211-212. When sponsors are detained or withdraw their applications, children are necessarily detained for longer periods of time.

Further, the new documentation requirements are very difficult, if not impossible for many sponsors to meet, leading many children ImmDef serves to be left without a sponsor. PSSUMF ¶ 215. Even when sponsors are potentially able to meet ORR's new documentation requirements, their household members or alternate caregivers are often unable or unwilling to do so and the new requirements create significant additional delays. PSSUMF ¶¶ 216-217.

ImmDef's organizational standing is analogous to that in *Capital Area Immigrants 'Rights Coalition v. Trump*, where the organizational plaintiffs showed that a new rule would hinder their ability to provide legal services to asylum applicants, a key part of their mission. 471 F. Supp. 3d 25, 38-41 (D.D.C. 2020). The organizational plaintiffs alleged the rule required more resource-intensive preparations and required them to allocate more staff time to individual cases, limiting their capacity to serve clients by an estimated 50% and thereby reducing the number of clients they could support. *Id.* at 39.

As a result of children's increasingly prolonged detention, ImmDef has similarly had to expend significantly more resources on the cases of each of their detained clients. PSSUMF ¶ 218, 239. ImmDef had to significantly increase the proportion of detained cases added to their docket, from 44% in February through September 2024 to 84% over the same period in 2025. PSSUMF ¶ 219. Detained cases are more time and resource-intensive than non-detained cases, limiting the number of children ImmDef can serve. PSSUMF ¶¶ 220-222, 229, 240. For example, because more children lack available sponsors, the proportion of ImmDef clients seeking Voluntary Departure ("VD") or Long-Term Foster Care (LTFC) has multiplied. PSSUMF ¶¶ 226-228, 231-232. Under the terms of ImmDef's contract, ImmDef attorneys are required to spend significant additional time on a child's case if they are considering VD or LTFC, including offering full scale representation in all VD cases. PSSUMF ¶¶ 230, 234; *see also id.* ¶¶ 229, 233; *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 46-48 (D.D.C. 2020) (where a challenged rule caused organizations to spend more time and direct more resources to helping clients than usual, the injuries identified were the type of "substantial, tangible costs that are cognizable for purposes of organizational standing"). ImmDef is further hampered from effectively representing its detained clients in their immigration cases because children are experiencing severe stress about their release cases that impede the child's participation in their cases and require additional time and support from ImmDef attorneys. PSSUMF ¶¶ 236-239. ImmDef has also had to spend more time responding to inquiries from sponsors and ORR facility staff regarding sponsorship requirements and revising its know-your-rights presentations to counteract the diminished immigration relief available to detained children. PSSUMF ¶¶ 223-224.

As a result of the increased resources it must expend on detained children, ImmDef has unfortunately had to close intake to released children they otherwise would have represented. PSSUMF ¶ 221. This leaves many children who would otherwise qualify for ImmDef's services unserved, frustrating ImmDef's mission to ensure that no immigrant facing removal should have to go to court alone. PSSUMF ¶ 240; *see also Cap. Area. Immigrants' Rts. Coal*, 471 F. Supp. 3d at 41 (finding defendant's argument, that similar allegations were not cognizable injuries, to be

"unsupported by D.C. Circuit precedent."); *AFL-CIO v. DOL*, 778 F. Supp. 3d at 75-76. 3d at 75-76; *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 2025 WL 1825431 at *24 (D.D.C. July 2, 2025) ("A defendants actions need only cause a "perceptibl[e] impair[ment], and some attendant expenditure or loss of resources.") (internal citations omitted).

Unlike in *Alliance for Hippocratic Medicine,* ImmDef's injuries directly impede its ability to ethically and zealously represent its clients in immigration matters, not "abstract social interests" or the need to expend resources on outside advocacy. *AHM*, 602 U.S. at 394-95. In previously determining that ImmDef lacked organizational standing, this Court concluded that ImmDef's only injury was that it must spend additional time with each client and on an expedited basis, with no other impact on ImmDef's ability to perform its fundamental purpose of representing unaccompanied children in immigration proceedings. *See* Mem. Op. at 12. Plaintiffs respectfully disagree, and as clarified by the First Amended Complaint and herein, ImmDef's injuries go beyond mere redirection of organizational resources or a claim that its work is simply more time-consuming or difficult.

Moreover, the cases cited in support of the Court's conclusion are distinguishable from ImmDef's organizational standing in that each of those cases focused on alleged injuries to an organization's issue advocacy efforts.[3] ImmDef does not base its standing on an injury to any advocacy-related activity, nor due to funds spent on litigation or advocacy to oppose the challenged policies. *Cap. Area. Immigrants' Rts. Coal*, 471 F. Supp. 3d at 41. The only education-related injury

---

[3] *See ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 24-28 (D.C. Cir. 2011) (injury to advocacy efforts was insufficient for standing but ultimately finding no standing because the organization failed to prove causation after trial); *Elec. Privacy Info. Ctr. v. U.S. Dep't. of Educ.*, 48 F. Supp. 3d 1, 24 (D.D.C. 2014) (no standing because an organization "cannot convert an ordinary program cost — advocating for and educating about its interests — into an injury in fact"); *New Eng. Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 167 (D.D.C. 2016) (no standing where an advocacy organization's alleged injury "merely reflect[ed] shifting priorities regarding 'the expenditure of resources on advocacy'"); *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d at 1434 (distinguishing between alleged harm based on an impact to "educational and legislative initiatives" from organizational plaintiff being "forced . . . to expend resources in a manner that keeps [the plaintiff] from pursuing its true purpose," and ultimately concluding organizational plaintiff lacked standing).

alleged by ImmDef involves the diversion of funds to know-your-rights presentations, which are part of ImmDef's core responsibilities and distinct from mere advocacy. *Id*. at 41-42.

Finally, ImmDef also meets the second requirement for organizational standing because there is a direct conflict between the Defendants' conduct and ImmDef's "core business activity" to provide legal services to unaccompanied children. *Id*. at 38. The challenged policies create a "direct conflict" by limiting ImmDef's ability to take on new clients and effectively represent current ones. *See Las Ams. Immigrant Advoc. Ctr.*, 783 F.Supp.3d at 217 (where a challenged policy "'directly affect[ed]' the organizations' 'core business activities' of providing counseling and legal services," finding a "'direct conflict' between the organizations' mission to provide legal counseling . . . and the [challenged rule]"); *Nw. Immigrant Rights Project*, 496 F. Supp. 3d at 46 (disputed "Rule directly conflicts with its mission of providing a broad array of legal services to low-income immigrants and will impose new burdens and costs on the organization"). ImmDef thus has organizational standing to challenge both the IFR and ORR's new document requirements.

## II.    The Interim Final Rule is Unlawful and Must Be Set Aside

### A.  ORR Bypassed Notice and Comment and Made the IFR Effective Immediately Without Good Cause

The IFR is procedurally invalid and must be vacated. Under the APA, an agency must publish a proposed rule and give the public "an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(c). Only after considering the public's comments can the agency finalize the rule. *Id.* § 553(c). The notice-and-comment requirement is meant "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).

The statute allows the agency to skip notice and comment only if the agency finds that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public

interest" and provides a "brief statement of reasons." 5 U.S.C. § 553(b)(B). "Because notice-and-comment procedures are vital to ensuring informed agency decisions," *Purdue Univ. v. Scalia*, No. CV 20-3006 (EGS), 2020 WL 7340156, at *6 (D.D.C. Dec. 14, 2020), the "good cause" exception "is to be narrowly construed and only reluctantly countenanced." *Tri-Cnty. Tel. Ass'n, Inc. v. FCC*, 999 F.3d 714, 719 (D.C. Cir. 2021); *see also Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012). It generally "should be limited to emergency situations." *Am. Fed. of Govt. Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ("*AFGE*"). Courts owe no deference to an agency's legal conclusion that good cause exists; courts review those conclusions *de novo*. *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014).

Here, ORR has not demonstrated that bypassing notice and comment was impracticable, unnecessary, or contrary to the public interest. Indeed, ORR has made no effort to argue that notice and comment would be "impracticable." *See* 90 Fed. Reg. at 13555. In the IFR, ORR claimed that notice and comment was unnecessary and contrary to the public interest because

> 45 CFR 410.1201(b) contravenes 8 U.S.C. 1373. ORR had no authority to promulgate such a rule; revoking it immediately is in the public interest; and notice and comment is unnecessary and contrary to the public interest because no amount of public input could give ORR the power to contravene a duly-enacted law of Congress via regulation.

90 Fed. Reg. at 13555. But the "unnecessary" prong of the good cause inquiry is "confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public," *Mack Trucks, Inc.*, 682 F.3d at 94, such as "the issuance of a minor rule in which the public is not particularly interested." *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 755 (D.C. Cir. 2001) (quoting Dep't of Just., Attorney General's Manual on the Administrative Procedure Act 31 (1947)). The IFR does not match any of those descriptions.

The IFR significantly impacts children's liberty interests and their right to family unity. Because most potential sponsors of children in ORR custody lack stable lawful immigration status, PSSUMF ¶ 12, allowing ORR to deny sponsors' applications based solely on immigration status

19

necessarily cuts off many children's ability to be released to their close family members. Allowing ORR to collect and share information for immigration enforcement purposes also has significant negative impacts to detained children's welfare, as it deters sponsors rather than facilitating family reunification. PSSUMF ¶¶ 91-93, 210-212.

Furthermore, the IFR is not a "routine determination" or a "minor rule in which the public is not particularly interested." The public submitted nearly 400 comments on the IFR, PSSUMF ¶ 7, raising serious questions as to both the legality and wisdom of ORR's new approach. *See, e.g.*, Comment, Letter from Rob Bonta, Cal. Att'y Gen., et al., to Robert F. Kennedy, Jr., et al., https://www.regulations.gov/comment/ACF-2025-0004-0206. The Foundational Rule, which the IFR partially rescinded, received over 73,000 comments. PSSUMF ¶ 8.

Nor has ORR satisfied the public interest prong. Notice and comment procedures are "generally presumed to serve the public interest." *Mack Trucks, Inc.*, 682 F.3d at 95. The public interest prong "is met only in the rare circumstance when ordinary procedures . . . would in fact harm that interest," such as cases where "announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent." *Id.* (quoting *Util. Solid WasteActivities Grp.*, 236 F.3d at 755). No such risk exists here.

ORR's key claim that 45 C.F.R. § 410.1201(b) contravenes 8 U.S.C. § 1373 is overbroad and incorrect. First, 45 C.F.R. § 410.1201(b) places three distinct restrictions on ORR. The first two provisions related to sponsor disqualification and information collection for enforcement purposes clearly do not contravene Section 1373. And ORR's claims that these Disqualification and Information Collection provisions are "inextricably linked" to the Information Sharing provision is unsupported. 90 Fed. Reg. at 13555 n.1. Section 1373 does not address sponsorship of children in ORR custody and does not require ORR to collect any information from private persons. Section 1373 addresses only information that agencies "send[] to, or receiv[e] from" DHS that is already in their possession. Because there is no conflict between the Disqualification and Information Collection provisions and Section 1373, Section 1373 does not constitute "good cause" for rescinding those provisions without notice and comment. *See World Duty Free*

20

*Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 65 (D.D.C. 2000) (holding that ATF "unreasonably determined that notice-and-comment was unnecessary" where the rules went "beyond a mere recitation of the statutory language to provide definitions not found in the statute").

With respect to the rescission of Information Sharing provision, ORR's sudden belief that the Information Sharing provision is legally flawed is insufficient to justify skipping notice and comment rulemaking. Even if ORR believed the Information Sharing provision contravened Section 1373, ORR should still have considered—and allowed public comment on—"data, views, or arguments," 5 U.S.C. § 553(c) about the perceived legal discrepancy. "[T]he question whether the [previous] regulations are indeed defective is one worthy of notice and an opportunity to comment." *Consumer Energy Council of Am. v. Fed. Energy Reg. Comm'n*, 673 F.2d 425, 447 n. 79 (D.C. Cir. 1982); *see also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017); 8 U.S.C. § 1373; *Nat'l Parks Conservation Ass'n v. Salazar*, 660 F. Supp. 2d 3, 5 (D.D.C. 2009); *Nat'l Treasury Emps. Union v. Cornelius*, 617 F. Supp. 365, 371 (D.D.C. 1985). As discussed in Section II.C below, the IFR is not mandated by statute and to the contrary exceeds ORR's statutory authority and conflicts with its obligation under the TVPRA to ensure that minors are "promptly placed in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A). Commenters could also have reminded the agency of the appropriations riders in place since 2019 that prohibit the use of sponsor information shared with DHS for immigration enforcement, but which are absent from the administrative record. *See* PSSUMF ¶¶ 6, 96.

The public should also have had the opportunity to comment on alternative regulatory actions, and/or whether ORR had discretion to wind it down in a way that accounted for children's and sponsors' reliance interests before ORR made abrupt changes. *See DHS v. Regents of the Univ. of California*, 591 U.S. 1, 32 (2020) (requiring the government to consider whether it had "flexibility in addressing any reliance interests of DACA recipients" when rescinding DACA even though the Attorney General determined that the DACA program was illegal).

Courts' review of an agency's determination of good cause "is meticulous and demanding," *Sorenson Commc'ns Inc.*, 755 F.3d at 706 (quotation marks omitted). Rather than allowing public

comment and considering different legal interpretations of its obligations under section 1373 and the TVPRA, ORR abruptly repealed § 410.1201(b) with no notice to the many parties involved. Its statement of good cause simply does not pass muster. Thus, the IFR should be set aside.[4]

### B. The IFR is Arbitrary and Capricious Because ORR Offered No Reasoned Explanation for Significant Changes in Policy.

In addition to failing to follow legally required procedure, the IFR must be set aside because it is "arbitrary, capricious, [and] an abuse of discretion." 5 U.S.C. § 706(2)(A). The APA sets forth minimum standards for an agency's "reasoned decisionmaking." *Regents*, 591 U.S. 1, 16 (2020). For example, "an agency cannot simply ignore an important aspect of the problem." *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (citation omitted). Nor may it rely "on factors which Congress had not intended it to consider." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (citation omitted). It must consider "alternatives that are within the ambit of the existing policy" before rescinding a rule entirely. *Regents*, 591 U.S. at 30 (cleaned up) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 51 (1983)).

Here, ORR provided no reasoned justification at all for rescinding the Disqualification and Information Collection provisions of the ORR Foundational Rule, beyond a conclusory statement that these provisions are inextricably linked and not severable from the Information Sharing provision. 90 Fed. Reg. at 13555 n.1. The decisional memos in the administrative record contain no rationale at all for adopting either the Disqualification or the Information Collection provisions. PSSUMF ¶¶ 2, 3. Importantly, severability applies to a *court's* remedial powers, not to an agency's amendment of its own regulations. Courts presume that policymakers would prefer that the

---

[4] ORR similarly lacked good cause to make the rule effective immediately. 5 U.S.C. § 553(d)(3); *see also AFGE*, 655 F.2d at 1156 (good cause exception for immediate effect is also "narrowly construed and only reluctantly countenanced" and is reserved for emergency situations). As discussed, ORR's assertion that the IFR is necessary to bring the agency "into compliance with a federal statute" is incorrect and at a minimum should have been subject to public comment. Moreover, Defendants' assertion that regulated entities do not need time to adjust their behavior is patently incorrect, given the substantial reliance interests that Plaintiffs and others have had in the protections guaranteed them by the Foundational Rule, which had been in effect since the spring of 2024, and which reflected longstanding policy.

offending part of a statute or regulation be severed than for an entire statute or regulation to fall. The presumption "allows courts to avoid judicial policymaking or de facto judicial legislation in determining just how much of the remainder of a statute [or regulation] should be invalidated." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 626 (2020). That concern is plainly inapposite when the agency, a policymaker, amends its own regulations.[5]

Denying sponsors based solely on immigration status and collecting sponsor information for enforcement purposes represent significant policy changes and the agency has offered no rational explanation for these changes, much less considered alternatives to minimize harms. *See Regents*, 591 U.S. at 30.

With specific regard to the rescission of the Disqualification provision, permitting sponsorship denials based solely on immigration status is a seismic change in ORR policy with far-reaching consequences that the agency wholly fails to acknowledge in the IFR. Most of the potential sponsors of children in ORR custody lack stable lawful immigration status and ORR has historically accepted such sponsors for vetting and release. PSSUMF ¶¶ 12-13; *see also* 89 Fed. Reg. at 34440 (noting that the Disqualification provision was "consistent with existing policy"). Many commenters to the Foundational Rule supported the Disqualification provision and noted the benefits of encouraging qualified sponsors to come forward to reduce length of stay and encourage relatives with cultural competency to sponsor a child. 89 Fed. Reg. at 34441-42.

Disqualifying sponsors without stable lawful immigration status is guaranteed to prolong children's time in custody, delay placement in the least restrictive setting as required by the TVPRA, 8 U.S.C. § 1232(c)(2)(A), and result in some children being released to more distant relatives or unrelated sponsors, instead of parents or close relatives, merely because those distant or unrelated sponsors have stable immigration status. Despite these probable consequences, all of

---

[5] Consistent with this understanding of the different roles of courts and agencies, in promulgating the severability provision as part of the Foundational Rule, ORR stated its intent that, "[t]o the extent any subpart or portion of a subpart is declared invalid *by a court*, ORR intends for all other subparts to remain in effect." *See* Unaccompanied Program Foundational Rule, 89 Fed. Reg. 34,389 (emphasis added).

which undermine ORR's mandate to protect children from trafficking and smuggling and to release children to sponsors with a preference for parents and close family members, the IFR failed to "examine the relevant data" and "entirely failed to consider [these] important aspect[s] of the problem." *State Farm*, 463 U.S. at 43; PSSUMF ¶¶ 3-4.

ORR similarly failed to acknowledge or explain its change of position on the Information Collection provision. PSSUMF ¶¶ 2-5. Many comments to the Foundational Rule strongly supported this provision and urged ORR to go further to protect undocumented sponsors from immigration enforcement. 89 Fed. Reg. at 34441. In response, ORR stated in the Foundational Rule Preamble that "it is not an immigration enforcement agency" and, consistent with its statutory mandate, "to the extent ORR does collect information on the immigration status of a potential sponsor, it would be only for the purpose of evaluating the potential sponsor's ability to provide care for the child (e.g., whether there is a plan in place to care for the child if the potential sponsor is detained)." 89 Fed. Reg. at 34442.

The IFR further failed to even mention ORR's still-operative Privacy Act notice, which states clearly that ORR does not collect or share information for immigration enforcement purposes because this is "incompatible with ORR's program purposes." 89 Fed. Reg. at 96251; PSSUMF ¶ 6. This omission is especially significant given that, as discussed above, ORR is fully aware that the last time it collected information from sponsors for enforcement purposes, this policy deterred sponsors from coming forward and led to increased lengths of stay in custody. PSSUMF ¶¶ 91-92; *see also J.E.C.M.*, 352 F. Supp. 3d at 583 ("the information-sharing policy could dissuade otherwise qualified sponsors from filing family reunification applications, forcing ORR to hold unaccompanied minors in custody for longer than necessary or to release them to less qualified or unrelated sponsors."). Potential sponsors or household members are once again afraid to share required information with ORR for fear of immigration consequences. PSSUMF ¶¶ 112, 158, 210-212, 216-217. Nonetheless, consideration of this important aspect is conspicuously absent from the administrative record. PSSUMF ¶¶ 3-4.

With regard to the Information Sharing provision, ORR acknowledged in an internal memorandum regarding its sponsor vetting process that Congressional riders restrict information-sharing, PSSUMF ¶ 98, yet the IFR administrative record and the published IFR was silent as to their existence and as to the interaction between § 1373 and the TVPRA discussed above, PSSUMF ¶ 6. Nor did the government acknowledge the Office of Legal Counsel's reading of § 1373 as simply limiting the discretion of federal agencies to withhold information from DHS where they otherwise have statutory authority to share that information. *See* Office of Legal Counsel, *Relationship Between Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and Statutory Requirement for Confidentiality of Census Informatio*n at 6, 1999 WL 34995963 (O.L.C. May 18, 1999) ("1999 OLC Memo"). ORR acted arbitrarily and capriciously by "entirely fail[ing] to consider [these] important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.

Finally, the IFR fails to consider the reliance interests of sponsors such as Deisy S. and Ximena L. who already submitted sensitive information based on ORR's promises that their applications would receive fair consideration and that their information was not being collected for enforcement purposes. PSSUMF ¶¶ 5, 56, 80, 105-106, 154-156; *see also Regents*, 591 U.S. at 31-33 (agency must consider reliance interests); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Kirwa v. U.S. Dep't of Defense*, 285 F. Supp. 3d 257, 271 (D.D.C. 2018) (policy change impermissibly retroactive when Department of Defense changed application requirements for expedited citizenship after plaintiffs enlisted). Sponsors who trusted ORR's promises are now at high risk for immigration enforcement as a result of their disclosures. PSSUMF ¶ 207-209. Breaking the agency's commitment to sponsors discourages sponsors from coming forward, which prolongs detention. Declaration of Mari Dorn-Lopez ¶ 15 (ECF 10-13).

### C.  The IFR Exceeds ORR's Statutory Authority

ORR claimed that it was compelled by 8 U.S.C. § 1373 to adopt the Information Sharing provision. The agency, however, incorrectly read § 1373 as an affirmative grant of authority, and as a requirement, to share immigration-related information with DHS when in fact that statute does

not affirmatively grant that authority and does not override other Congressional statutes that restrict the sharing of immigration-related information.[6] Rather, the statute operates to limit the discretion of federal agencies to withhold information from DHS where they otherwise have statutory authority to share that information. *See* 1999 OLC Memo; *Bragdon v Abbott*, 524 U.S. 624, 645 (1998) (Congress is presumed to be "well aware of the position taken by OLC" and to legislate against that background).

And the TVPRA, which was enacted after 8 U.S.C. § 1373 and after OLC's opinion construing § 1373, imposes obligations on ORR that the agency could not fulfill if it were to share immigration status information with DHS. ORR cannot fulfill Congress's instruction to promptly place unaccompanied children "in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A), if potential sponsors are unable to come forward out of fear that their information would be shared with immigration authorities. *See J.E.C.M.*, 352 F. Supp. 3d at 583 (finding that this information sharing with DHS "runs counter to ORR's mission to release the children in its custody into stable, nurturing environments"). For this reason, appropriations riders have been in place since 2019 that prohibit the use of sponsor information shared with DHS for immigration enforcement. PSSUMF ¶¶ 96, 98. With narrow exceptions, Congress has prohibited DHS from using information shared by HHS "to place in detention, remove, refer for a decision whether to initiate removal proceedings, or initiate removal proceedings against a sponsor, potential sponsor, or member of a household of a sponsor or potential sponsor of an unaccompanied alien child (as defined in section 462(g) of the Homeland Security Act of 2002 (6 U.S.C. 279(g))." Pub. L. No. 116-93, Div. D, § 216(a), 133 Stat. 2317, 2513 (2019). ORR's new reading of Section 1373 cannot be reconciled with these restrictions.

---

[6] Notably, ORR guidance and regulations have always provided for sharing other types of information with DHS in circumstances that align with its statutory authority. *See, e.g.*, 89 Fed. Reg. 34404 ("DHS and ORR are continuing to work together to improve information sharing and will collaborate on improved procedures for making age determinations, as required by the TVPRA"); 89 Fed. Reg. 34442 ("ORR already has policies in place to refer [potential human trafficking] cases to the proper Federal agency.").

ORR's rescission of the Sponsor Disqualification and Information Collection provisions similarly exceed ORR's statutory authority and "rel[y] on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. Indeed, ORR itself recognized in the Preamble to the Foundational Rule that it "does not have statutory authorization to investigate the immigration status of potential sponsors" and the HSA and TVPRA "do not imbue ORR with the authority to inquire into immigration status as a condition for sponsorship." 89 Fed. Reg. at 34442.

## III.    ORR's New Sponsor Documentation Requirements Are Unlawful

### A.    ORR's Policy Guide Revisions Are Final Agency Actions

ORR's March 7, 2025, and April 15, 2025, revisions to Policy Guide § 2.2.4 related to proof of identification and proof of income, respectively, are final agency actions subject to judicial review under the Administrative Procedure Act. 5 U.S.C. §§ 702, 704. These policies represent "the 'consummation' of the agency's decisionmaking process," determine "rights or obligations," and create "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quoting *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 113 (1948), and *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). These policies are published in the Policy Guide as mandatory requirements for potential sponsors and ORR has "applied the guidance as if it were binding on regulated parties," including by blocking release of children to otherwise qualified sponsors who lack requisite documentation. *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014)). Other courts considering changes to ORR release policies—including even unpublished release requirements—have found these policies to be final agency actions. *E.g.*, *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 612 (S.D.N.Y. 2018); *see also J.E.C.M.*, 352 F. Supp. 3d at 582 n.12 (noting that ORR did not dispute that Policy Guide changes were final agency actions).

### B.    ORR's New Proof of Identity and Proof of Income Requirements Violate the TVPRA and ORR's Own Regulations

1.    The new documentation requirements disqualify sponsors based on immigration status in violation of the pre-IFR Foundational Rule

27

Because the IFR is unlawful for the reasons discussed above, ORR remains bound by its prior regulation providing that "ORR shall not disqualify potential sponsors based solely on their immigration status . . .." 45 C.F.R. § 410.1201(b) (2024). "[I]t is a 'well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action.'" *Fla. Inst. of Tech. v. FCC*, 952 F.2d 549, 553 (D.C. Cir. 1992) (quoting *Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356, 1359 (D.C. Cir. 1979)); *see also United States v. Nixon*, 418 U.S. 683, 695 (1974); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

ORR's revisions to Policy Guide § 2.2.4 related to proof of identification and proof of income unlawfully disqualify sponsors based solely on their immigration status. ORR's proof of identification requirements are imported from the USCIS I-9 form requirements for employees to establish identity and work authorization. PSSUMF ¶ 22. The I-9 form is specifically designed to disqualify individuals who lack lawful work authorization. PSSUMF ¶ 23. For example, the I-9 requirements imported by ORR require that a foreign passport be accompanied by proof of work authorization. Sibling sponsors such as Milagro G. and Deisy S. who used their foreign passport as a form of identification were thus disqualified solely based on their lack of documented work authorization. PSSUMF ¶¶ 109, 180. These sponsors were unable to obtain other qualifying identification because of their immigration status. PSSUMF ¶¶ 110, 182.

Importantly, the Foundational Rule prohibits ORR from disqualifying *any* potential sponsor based solely on their immigration status. That a minority of states allow undocumented individuals to obtain a driver's license or a state identification card does not render this policy valid; many potential sponsors are still disqualified based solely on their inability to produce required documentation because of their immigration status.[7] ORR's decision memo acknowledges—but does not rebut—a likely objection from advocates that the new identity

---

[7] Although some states like California and Massachusetts permit individuals to obtain a driver's license without proof of lawful status, they still require lawful presence to obtain a regular state identification card. PSSUMF ¶¶ 124, 173. This disqualifies sponsors such as Isabel D. and Rosa M. who cannot drive. PSSUMF ¶¶ 125, 194.

requirements will be "particularly burdensome on the ability of undocumented or out of status [individuals] to sponsor children." PSSUMF ¶ 24.

ORR's new proof of income requirements similarly disqualify sponsors based on their immigration status because the specific documents accepted all require that the sponsor themselves receive income in the United States. PSSUMF ¶ 62. This requirement serves to disqualify sponsors who lack U.S. work authorization, even if they can prove financial ability to support the child through other means. As with proof of identification, ORR's decision memo related to proof of income acknowledges, without rebutting, the likely argument "that the majority of potential sponsors engaging with UACB do not have work authorization and may not be able to provide documentation required under this update to ORR's sub-regulatory guidance." PSSUMF ¶ 68.

2. ORR's new documentation requirements unnecessarily delay children's release to sponsors in violation of the TVPRA and the Foundational Rule.

The TVPRA requires ORR to engage in an individualized sponsorship assessment to ensure that *every* unaccompanied child is "promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). This is usually with "a suitable family member." 8 U.S.C. § 1232(c)(2)(A). ORR shelters are more restrictive than living in the community, PSSUMF ¶ 83, and unnecessary delays in release to a suitable sponsor violate the TVPRA. *See Saravia v. Sessions*, 905 F.3d 1137, 1143 (9th Cir. 2018); *L.V.M.*, 318 F. Supp. 3d at 613-14; *J.E.C.M.*, 352 F. Supp. 3d at 588; *cf. Ramirez v. ICE*, 471 F. Supp. 3d 88, 178 (D.D.C. 2020). Blocking a child's release merely because their sponsor or other adults required to participate in the application cannot access a specific type of document—without individualized consideration of sponsor suitability or the child's best interests—is thus contrary to law. 5 U.S.C. § 706.

The Foundational Rule further clarifies ORR's legal obligations, requiring ORR to "release a child from its custody without unnecessary delay, in the following order of preference, to: (1) A parent; (2) A legal guardian; (3) An adult relative," and then to other adults or entities seeking custody. 45 C.F.R. § 410.1201(a). Contrary to this priority for close relatives, the new

29

documentation policies effectively prioritize distant relatives or even unrelated individuals with the requisite immigration status over closer relatives. In fact, ORR care providers have told relatives that they cannot sponsor a child because of their lack of qualifying identification and to instead identify *any* adult they know with the correct type of identification. PSSUMF ¶¶ 51, 111. Children such as Yair G. have pursued sponsorship with unrelated individuals because their close family members are unable to obtain qualifying identification as a result of their immigration status. PSSUMF ¶¶ 52, 184.

Although ORR's new identification requirements include a possible exception for parents or legal guardians, this exception requires approval from ORR headquarters in every case and creates substantial and unnecessary delays in release. ORR is taking over a month in some cases to decide applications from parents even after a home study and all other vetting requirements are complete and the case manager has submitted the case to headquarters. PSSUMF ¶¶ 48, 50, 197 (David D. waited over five weeks for a decision on his mother's exception request), 129 (Eduardo M. and his 7-year-old brother waited over three weeks for ORR headquarters to grant their mother an exception). When ORR instituted a similar policy requiring approval from the ORR Director or his designee for certain releases, a federal district court found "a clear violation of the TVPRA's mandate to promptly place the UAC in the least restrictive setting that is in the best interests of the child." *L.V.M.*, 318 F. Supp. 3d at 614. As in *L.V.M.*, the identification exception policy challenged here "is not subject to any known decision criteria," is not within the expertise of the ORR Director, and permits "unchecked exercise of discretion, with no guidance nor limitation." *Id.* at 613. Indeed, the administrative record includes no explanation of why ORR requires headquarters approval to resolve a factual question about a sponsor's identity. PSSUMF ¶ 43.

ORR's weekslong delays in adjudicating parental exception requests and retroactive application of new requirements to completed applications also violate ORR's regulatory timelines, which require adjudication of completed sponsor applications within certain timelines: 10 or 14 days for parents, legal guardians, and close relatives, "absent an unexpected delay (such as a case that requires completion of a home study)." 45 C.F.R. § 410.1205(b). PSSUMF ¶ 49.

ORR cannot nullify its regulatory timelines—particularly those promulgated to comply with court orders on minimum procedural due process requirements[8]—by unilaterally declaring completed sponsor applications incomplete based on new documentation requirements that conflict with ORR's own application or by creating a new step in the process that gives ORR unlimited discretion over the timing and outcome of release decision.

### C. ORR's New Documentation Requirements are Arbitrary and Capricious

ORR's new documentation requirements are arbitrary and capricious because they fail to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm.*, 463 U.S. at 43 (internal citations omitted). ORR "entirely failed to consider [] important aspect[s] of the problem" such as the impact on children's length in custody and mental health, *id.*, and despite dramatically changing its prior policies failed to consider either "the 'alternative[s]' that are 'within the ambit of the existing [policy]'" or "whether there was 'legitimate reliance' on" prior policies. *Regents*, 591 U.S. at 30 (quoting *State Farm*, 463 U.S. at 51).

#### 1. Failure to consider relevant factors

In creating its release policies, ORR is obligated to make decisions "based on a consideration of the relevant factors." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 286 (1974)). ORR must "balance the competing interests of avoiding unnecessary delay and effectively preventing fraud" and "[a]t a minimum . . . address the concerns *the agency itself identified* before changing the status quo." Mem. Op. at 15-16 (ECF 34); *see also* 8 U.S.C. § 1232(c)(1) (requiring ORR to both protect unaccompanied

---

[8] These timelines reflect the requirements of a summary judgment order and preliminary injunction against ORR in *Lucas R. v. Becerra* to protect the due process rights of children to family reunification. *See* 89 Fed. Reg. at 34457; *Lucas R. v. Becerra*, No. 18-5741, 2022 WL 2177454, at *27 (C.D. Cal. Mar. 11, 2022) (summary judgment); *Lucas R.*, 2022 WL 3908829, at *2 (C.D. Cal. Aug. 30, 2022) (preliminary injunction). The *Lucas R.* Court later entered a declaratory judgment incorporating its summary judgment order. Judgment, ECF 449 (C.D. Cal. Sept. 16, 2024).

children "from traffickers and other persons seeking" to harm them and ensure that children are "promptly placed in the least restrictive setting that is in the best interest of the child.").

ORR's decision memos regarding its new proof of identification and proof of income policies noted likely concerns from stakeholders regarding increased length of custody and burdens on family unity but "did not explain how it weighted those impacts against other policy objectives and statutory obligations." Mem. Op. at 16. In contrast to agency memos related to fingerprinting and DNA testing, ORR's decision memos on proof of identification and proof of income do not analyze the impact on children's length of custody and release prospects associated with the new documentation requirement, much less weigh these impacts against the safety benefits of the new documents. *See* Mem. Op. at 16-17; PSSUMF ¶¶ 53-58, 73-75, 79-81. The proof of income decision memo includes a section on relevant legal authority but cites only the TVPRA and Foundational Rule provisions related to sponsor vetting and does not mention ORR's corresponding statutory duties and regulations to release children to the least restrictive setting without unnecessary delay. PSSUMF ¶ 72.

Because ORR failed to analyze the impacts of its new documentation requirements on length of custody, it also failed to "examine the relevant data" and "entirely failed to consider" the impact on children of blocking their release to their initial sponsor—usually their closest available relative—and potentially blocking all release options altogether. *State Farm*, 463 U.S. at 43. As a result, ORR ignored its obligations under the TVPRA and its own position in the Foundational Rule "that, generally, placement with a vetted and approved family member or other vetted and approved sponsor, as opposed to placement in an ORR care provider facility, whenever feasible, is in the best interests of unaccompanied children." 89 Fed. Reg. at 34440. For instance, although the administrative record includes an HHS OIG report on gaps in sponsor screening, Angelica-00000184, ORR did not consider the HHS OIG's 2019 report on the mental health impacts of prior policies that increased length of custody, including "higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation." PSSUMF ¶ 79. Nor did ORR consider that children are also vulnerable to abuse and mistreatment

*in* ORR custody, notwithstanding a 2024 Department of Justice lawsuit alleging persistent sexual abuse and harassment of unaccompanied children in facilities operated by Southwest Key Programs, the largest operator of ORR facilities at the time. PSSUMF ¶¶ 58-59, 81.

ORR's decision-making similarly disregarded children's rights to family integrity. As the Supreme Court has explained, "[t]he tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition" and "the choice of relatives in this degree of kinship to live together may not lightly be denied by the State." *Moore v. City of E. Cleveland*, 431 U.S. 494, 504-06 (1977). Multiple courts have recognized that unaccompanied children in ORR custody and their close relative sponsors have a constitutional interest in family integrity. *Lucas R.*, 2022 WL 2177454, at *14, *25 (C.D. Cal. Mar. 11, 2022); *J.E.C.M. v. Marcos*, 689 F. Supp. 3d 180, 195 (E.D. Va. 2023); *see also D.B. v. Cardall*, 826 F.3d 721, 740-43 (4th Cir. 2016) (discussing rights of parent sponsors).

Despite these recent court decisions involving ORR, the agency's decision memos give no consideration at all to the burdens on family integrity of disqualifying close relative sponsors based on a lack of specific identification or proof of income documentation. PSSUMF ¶¶ 39, 46, 75. Even the rights of parental sponsors are almost entirely absent from ORR's decision-making. The proof of identification policy creates a *possible* exception for parent or legal guardian sponsors but, as discussed above, such exceptions can take over a month to receive a decision. PSSUMF ¶¶ 47-48, 129, 197. In practice, ORR has limited this exception to the parent or legal guardian themselves and not their household members. PSSUMF ¶ 41. This was a highly consequential decision, preventing sponsors such as Sofia W. from sponsoring their children because their household members could not obtain qualifying identification. PSSUMF ¶¶ 138-139. Yet ORR's decision memo does not explain or even acknowledge this limit on the parental exception. PSSUMF ¶ 45. ORR thus gave no consideration to the family integrity burdens of forcing parents such as Isabel D. and Sofia W. to choose between continuing to live with their close relatives or sponsoring their sons. PSSUMF ¶¶ 138, 190-191; *Moore*, 431 U.S. at 504-06.

Indeed, the decision memo includes no discussion at all of the additional impacts of requiring not just sponsors but also all household members and alternate caregivers to present one of the new forms of acceptable identification, nor does it consider whether the expansion of fingerprinting requirements to these adults sufficiently addressed prior safety concerns. PSSUMF ¶ 38, 53-54. For example, Mateo N. has not been released to his brother because although Steven is a U.S. citizen with acceptable identification, and Steven and his wife completed all background check requirements, Steven's wife has only a foreign passport. PSSUMF ¶¶ 167-175.

The proof of income decision memo includes some factual findings recognizing the relevance of family integrity but then disregards them in the final decision. Specifically, the memo notes that stricter financial screening is typically required for *non-related* foster parents and that denying a parent or legal guardian "solely based on financial hardship . . . does not align with standard child welfare practices in the United States." PSSUMF ¶ 76. Based on these facts, the memo notes that "a carve out for parents/ legal guardians [] ensures a balanced approach, protecting parental rights while maintaining child safety protections against trafficking and labor exploitation." PSSUMF ¶ 77. Despite these findings, ORR adopted the proof of income requirements without any parental exception. PSSUMF ¶ 66. ORR does not explain this disconnect "between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43; PSSUMF ¶ 78.

Finally, neither decision memo includes any consideration of the reliance interests of children and sponsors who provided extensive sensitive personal information to ORR because they believed they were eligible to sponsor a child based on the requirements in the sponsorship application. PSSUMF ¶¶ 5, 56, 80; *Fox Television Stations*, 556 U.S. at 515; *Regents*, 591 U.S. at 30-31. Notably, the current OMB-approved sponsorship application still lists the old identification and income requirements. PSSUMF ¶¶ 18, 60. Some sponsors such as Milagro G. who began the application process after the new identification rules were in place were nonetheless instructed to complete the sponsorship application and submit to fingerprinting before they were informed they were ineligible based on a lack of qualifying identification. PSSUMF ¶¶ 18, 180-181. Finally, ORR

entirely failed to consider the emotional distress inflicted on children who believed they would be reunited with family members only to learn that they may never be released at all. PSSUMF ¶ 57.

### 2.  Lack of justification for specific document requirements

In addition to disregarding relevant statutory and constitutional factors, ORR failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" to accept only certain specific documents to prove identity and financial stability. *State Farm*, 463 U.S. at 43. As a result, there are "material gaps in the agency's articulated rationale." *Solondz v. FAA*, 141 F.4th 268, 278 (D.C. Cir. 2025). Despite acknowledging that the documents selected would be inaccessible to many sponsors, the agency failed to consider alternatives that could achieve its policy goals of ensuring safe releases. *Regents,* 591 U.S. at 30.

No one disputes that ORR must verify the identity of a potential sponsor as part of its statutory duty to protect children from trafficking. 8 U.S.C.§ 1232(c)(3)(A). But ORR cannot arbitrarily limit the types of identification sponsors, or their household members, must possess without reasoned explanation. Notably, ORR's earlier February 7, 2025, memorandum regarding fraud concerns in the sponsorship process emphasized problems with ORR's internal procedures rather than the specific form of identification presented and called only for reassessing the use of certain *secondary* documents "that cannot reliably be verified." PSSUMF ¶ 29. Yet ORR's decision memo regarding its new proof of identification policy does not discuss or evaluate the reliability of different types of identity documents and instead refers vaguely to fraud concerns regarding foreign issued documents generally. PSSUMF ¶¶ 22-28. As a result, ORR did not consider whether nationally-issued documents such as foreign passports, national identification cards, or consular identification cards present the same verification challenges as secondary documents like baptismal certificates or marriage certificates. PSSUMF ¶ 30.

Rather than conducting a reasoned analysis of the risks and benefits of the different types of documentation ORR previously accepted, ORR simply imported the USCIS I-9 required documentation without explanation. PSSUMF ¶¶ 22-26. According to the administrative record, the I-9 list was the only option presented for consideration and ORR considered no alternatives.

PSSUMF ¶ 28. The sole rationale provided by the agency is ORR's unsupported "belief" that the I-9 list documents "provide a safer framework for proving and authenticating identity" and "[t]hese are documents that the federal government relies on to establish identity for both citizens and non-citizens." PSSUMF ¶ 25. The memo omits the critical fact that the I-9 list is specifically intended to establish work authorization and is used to establish identity only for non-citizens with work authorization, thus excluding the large number of key stakeholders—potential sponsors who lack work authorization and the children hoping to reunify with them. As a result, ORR did not even consider whether the I-9 list could be modified to focus on identity only and not work authorization—such as by accepting foreign passports regardless of work authorization. *See State Farm*, 463 U.S. at 49 ("Not having discussed the possibility, the agency submitted no reasons at all."). Notably, the federal government routinely accepts foreign passports as proof of identification in other contexts. PSSUMF ¶ 27. Without more in the record—and there is nothing more—the Court cannot determine whether ORR's decision is reasonable. *See Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 11 (D.C. Cir. 2006).

Even ORR's more general justification for changing its proof of identity requirements—difficulties and delays in authenticating foreign issued documents—is not rationally tied to its policy choice. The memo fails to acknowledge that ORR continues to accept and authenticate foreign issued documents for other purposes and thus changing sponsor identification requirements does not eliminate the delays or potential difficulties associated with coordinating with foreign consulates. PSSUMF ¶ 35. For example, ORR requires a birth certificate or other similar foreign documents to establish the child's identity and the sponsor-child relationship. PSSUMF ¶ 32. On March 7, 2025—simultaneously with ORR's new sponsor identification requirements—ORR amended the Policy Guide to require that "Federal staff must exhaust all available avenues to verify the authenticity of birth certificates." PSSUMF ¶ 33. ORR does not explain why it can authenticate birth certificates but not foreign passports, consular identification cards, or other foreign issued identification documents. PSSUMF ¶ 34.

ORR also failed to consider whether other existing vetting mechanisms could adequately establish a sponsor's identity without requiring categorical disqualification based on a sponsor's inability to obtain specific forms of identification. *See Solondz*, 141 F.4th at 278 (finding FAA policy to categorically deny medical certification to pilots using a specific medication was arbitrary and capricious where the agency did not consider whether existing case-by-case monitoring process was sufficient to protect safety). At the time of the proof of identification policy change, ORR had already enacted universal fingerprinting for all sponsors, adult household members, and alternate caregivers, PSSUMF ¶ 15, and was actively considering expanded DNA testing for related sponsors. PSSUMF ¶ 16. Yet ORR did not consider whether these measures would adequately address concerns about identity fraud. PSSUMF ¶ 54. Nor did ORR consider an exception for sponsors whose identities could be easily verified with their home country consulate, or any other alternatives for sponsors who could not access certain documentation. PSSUMF ¶ 31.

ORR's choice of proof of income documentation was similarly unsupported. Although the agency produced multiple memos discussing the importance of verifying sponsor financial stability, *none* explained why the agency chose these specific documents. PSSUMF ¶ 63. The agency acknowledged that potential sponsors may not have these documents and "may not be able to complete their sponsorship application" or might even attempt to submit fraudulent documents in desperation. PSSUMF ¶¶ 68-69. Yet ORR did not consider whether alternative more accessible documents could equally serve its stated purposes—such as bank statements or a letter from a small employer who lacks company letterhead. PSSUMF ¶ 69. ORR also failed to consider that in some cases another individual—such as the sponsor's partner—may contribute financial support to the child. PSSUMF ¶ 70. Nor did ORR explain why ORR's existing tools—which included inquiries about a sponsor's sources of financial support, employment, and income—were insufficient to confirm financial stability, beyond vague references to minimizing variability in decision making. PSSUMF ¶ 71.

### D. ORR's New Documentation Requirements Violate the Paperwork Reduction Act

ORR's new documentation requirements must also be set aside because ORR failed to follow the procedures required by the Paperwork Reduction Act (PRA). 5 U.S.C. § 706(2)(D). The PRA provides that "[a]n agency shall not conduct or sponsor the collection of information unless in advance of the adoption or *revision* of the collection of information" it follows certain procedural requirements, including publication in the Federal Register, an opportunity for public comment, approval by the Office of Management and Budget (OMB), and obtaining a control number from OMB. 44 U.S.C. § 3507(a) (emphasis added); 5 C.F.R. § 1320.5(a). An agency must "inform[] the potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number." 5 C.F.R. § 1320.5(b)(2)(i). A collection of information is defined to include identical questions or reporting requirements imposed on 10 or more persons. 44 U.S.C. § 3502(3). PRA violations can be raised under the Administrative Procedure Act. *See Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 51 (D.D.C. 2025); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. CV SAG-25-628, 2025 WL 2374697, at *20 (D. Md. Aug. 14, 2025); *Orr v. Trump*, 778 F. Supp. 3d 394, 426 (D. Mass. 2025), *appeal filed* (1st Cir. June 13, 2025).

As discussed above, the Family Reunification Application last approved by OMB permits a wide range of identification documents and permits a narrative answer regarding proof of income rather than requiring specific documents. *See* PSSUMF ¶¶ 18, 60. In March and April 2025, without obtaining OMB approval, ORR began requiring potential sponsors to meet proof of identification and proof of income requirements different from those in the application. PSSUMF ¶¶ 19-20, 61, 90. ORR acknowledges these are information collection requirements and is in the process of seeking OMB approval to revise them, but it has been brazenly imposing those requirements before obtaining OMB approval. PSSUMF ¶¶ 20, 87-90, 100.

In an analogous circumstance, the D.C. Circuit held that the Federal Communications Commission violated the PRA when it required a cellular license applicant to provide specific

evidence of a firm financial commitment and deemed the application incomplete because the applicant's letter of credit did not provide all the evidence required by a collection of information that OMB had not yet approved. *Saco River Cellular, Inc. v. FCC*, 133 F.3d 25, 33 (D.C. Cir. 1998). The agency was instead required to "permit respondents to prove or satisfy the legal conditions in any other reasonable manner." *Id.* (quoting 5 C.F.R. § 1320.6(c)). Here, ORR must similarly permit sponsors to establish their proof of identification and financial ability to support the child through the reasonable means provided in the OMB-approved application operative at the time the sponsor first applied. *Saco River Cellular*, 133 F.3d at 32 ("[A]n agency may not, having belatedly gotten OMB approval of an information collection requirement, punish a respondent for its faulty compliance while the collection was still unauthorized."),

### E. ORR was Required, but Failed to, Engage in Notice-and-Comment Rulemaking.

ORR's new documentation requirements are legislative rules that, under the APA, can only be promulgated through notice and comment procedures. Here, ORR did not give the public notice or the opportunity to comment before it imposed its new proof of identification and proof of income documentation requirements. Nor has ORR established that any of the notice-and-comment exceptions apply. *See* 5 U.S.C. § 553(b)-(d).

In determining whether an agency action is a legislative rule subject to notice and comment requirements, courts consider "whether the agency action (1) impose[s] any rights and obligations or (2) genuinely leaves the agency and its decisionmakers free to exercise discretion." *General Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002). "[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding or is applied by the agency in a way that indicates it is binding." *Id.* at 383 (internal citations omitted). The exception for "rules of agency organization, procedure, or practice" is a narrow "exception for internal house-keeping measures" and does not apply "[w]here a rule imposes substantive burdens… trenches on substantial private rights or interests, or otherwise alters the rights or

interests of parties." *AFL-CIO v. NLRB*, 57 F. 4th 1023, 1035 (D.C. Cir. 2023) (internal citations omitted).

Here, ORR's new documentation requirements are legislative rules because they impose new binding requirements on potential sponsors and effectively disqualify large numbers of sponsors based on immigration status rather than the individualized assessment of sponsor suitability contemplated by the TVPRA and ORR Foundational Rule. *See J.E.C.M.*, 352 F. Supp. 3d at 581-82; 8 U.S.C. 1232(c)(3). Potential sponsors are "required" to submit identification and income documents from the new, more restrictive lists of acceptable documents. PSSUMF ¶¶ 19, 21, 61-62; *see also General Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002) ("A document will have practical binding effect before it is actually applied if the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences, such as . . . denial of an application." (quoting Robert A. Anthony, Interpretive Rules, 41 Duke L.J. 1311, 1328-29 (1992))). Those who are unable to provide the specific proof of identification and proof of income documents required by ORR are not permitted to serve as sponsors. PSSUMF ¶ 19, 21, 61-62. That ORR has retained the right to grant exceptions to the proof of identification requirement for parents or legal guardians (but not their household members) does not make the requirement any less of a legislative rule. *See Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011) (TSA adoption of advanced imaging technology as primary screening tool at airports was a legislative rule even though passengers could opt for a patdown); *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 667 & n.33 (D.C. Cir. 1978) ("stringent substantive commands are not removed from section 553 because they have some provision for discretionary waiver").

### IV.    The IFR and New Documentation Requirements Should be Vacated

Because the IFR and new documentation requirements are contrary to law and arbitrary and capricious, they must be vacated. "When an agency's action is unlawful, vacatur is the normal remedy." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024); *see also Am. Bioscience*, 269 F.3d at 1084 (if a plaintiff "prevails on its APA claim, it is entitled to relief under

that statute, which normally will be a vacatur of the agency's order."). This is not one of the "rare cases" where remand without vacatur is appropriate. *United Steel v. Mine Safety and Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). Both the IFR and documentation requirements have serious legal deficiencies and vacating them would not lead to significant disruption given ORR's multiple other vetting tools. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021). In addition, "deficient notice is a 'fundamental flaw' that almost always requires vacatur." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).

Consistent with ordinary APA practice, the IFR and new documentation requirements should be vacated as to all children in ORR custody. *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 539 F. Supp. 3d 29, 43 (D.D.C. 2021) ("This Circuit has instructed that when 'regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioner is proscribed.'") (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)); *see also Corner Post*, 603 U.S. at 827 (Kavanaugh, J., concurring) (noting that the government's "far-reaching argument that the APA . . . permits a court only to enjoin an agency from enforcing a rule against the plaintiff" is wrong).

## V.    Plaintiffs are Also Entitled to a Permanent Injunction

The Court can vacate the IFR and new documentation requirements without issuing a permanent injunction or finding irreparable harm. *See American Bioscience*, 269 F.3d at 84. A permanent injunction, however, is necessary in this case to ensure prompt and effective relief to Plaintiffs and the putative class. Specifically, Plaintiffs request that ORR and its agents, Fed. R. Civ. P. 65(d)(2), (1) cease applying the vacated policies to sponsorship applications; (2) issue prompt guidance to ORR care providers regarding the changed requirements; (3) inform previously disqualified or denied sponsors of their right to continue their sponsorship applications; and (4) promptly adjudicate previously submitted applications without regard to the vacated policies and in accordance with ORR's regulatory timelines, 45 C.F.R. § 410.1205(b).

"The traditional four-factor test applies when a plaintiff seeks a permanent injunction" in an APA case. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* (quoting *eBay Inc. v. MercExchange, L.L. C.,* 547 U.S. 388, 391 (2006); *see also CREW v. OMB*, No. 25-cv-1111, 2025 WL 2025114, at *17 (D.D.C. July 21, 2025). Plaintiffs satisfy this standard.

### A. Plaintiffs Are Irreparably Harmed by a Delay in Release And Have No Other Adequate Remedy.

As a result of ORR's unlawful polices, child Plaintiffs who remain in custody and the putative class are suffering irreparable harm as they are unnecessarily detained and separated from their families. Each day children remain unnecessarily separated from their families, the greater the irreparable harm becomes. Plaintiffs therefore require injunctive relief to ensure that ORR promptly discontinues its unlawful policies.

Courts, including this one, have consistently found that family separation and unnecessarily prolonged ORR detention creates irreparable injury. *E.g.*, Mem. Op. at 17; *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018) (family "[s]eparation irreparably harms plaintiffs every minute it persists."); *L.V.M.*, 318 F. Supp. 3d at 618 (noting that "neither party questions that prolonged detention is deleterious to young children, and, obviously, the longer the detention, the greater the harm."); *Lucas R.*, 2022 WL 2177454, at *33; *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1200 (N.D. Cal. 2017); *Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc).

The irreparable injury is clear for Plaintiffs. Mateo N. describes that he "feel[s] sad all the time at the shelter. I even cry sometimes because I'm sad to be apart from my family. . . I just want to be with them and be together." Mateo N. Decl. ¶¶ 9-10. Yair G. explains, "I want to be with people who will help me and care for me. It's better to live with your family than in a shelter. It's

not right that so many kids are stuck in shelters when there are family members who want to help thema and take care of them." Yair G. Decl. ¶¶ 10-11. David D., only 14 years old, waited anxiously for five weeks with no news on whether ORR would grant his mother an exception to the identification requirements—after already waiting months for her to complete all of ORR's other requirements. PSSUMF ¶ 185-97; Isabel D. Decl. ¶ 8. David feels sad in the shelter and he wants to live with his mother instead of "with people I don't know," where he can study and "to go to the park and have a normal life." David D. Decl. ¶¶ 4, 6, 9. Plaintiffs Angelica S., Eduardo M, Liam W., Xavier L., and Leo B. experienced similar irreparable harm before they were finally released from ORR custody. *See* Angelica S. Decl. ¶¶ 4-5, 12 (ECF 9-7); Rosa M. Decl. ¶ 11 (ECF 9-13); Liam W. Decl. ¶¶ 2, 10 (ECF 9-9); Ximena L. Decl. ¶¶ 11-12 (ECF 9-15); Leo B. Decl. ¶¶ 6, 10-17 (ECF 9-10).

ORR's conduct after the preliminary injunction also illustrates the need for a permanent injunction. After the Court issued its preliminary injunction on June 9, 2025, ORR waited two weeks before issuing instructions to its care providers as to compliance with the injunction, despite repeated requests from Plaintiffs. Ex. 1, Supplemental Declaration of Cynthia Felix ("Felix Suppl. Decl.") ¶ 42, Sept. 11, 2025; Ex. 2, Declaration of Joel McElvain ¶ 5 & Ex. A, Sept. 12, 2025. During this two-week delay, children's release cases did not move forward and children experienced significant anxiety and confusion due to the lack of updates or progress on their release cases. Felix Suppl. Decl. ¶¶ 40-44. Specific injunctive relief is thus necessary to ensure a prompt remedy to children's irreparable harm. *See Ramirez v. ICE*, 568 F.Supp.3d 10, 26-27 (D.D.C. 2021) (finding that ICE's conduct in the litigation emphasized need for injunctive relief).

### B.  Balance of the Equities and Public Interest Support an Injunction.

The remaining factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the balance of equities and the public interest strongly favor Plaintiffs. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and

operations.'" *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). ORR's IFR and new sponsor documentation requirements violate the APA in numerous ways and conflict with ORR's statutory mandate under the HSA and the TVPRA. In addition, Plaintiffs proposed injunctive relief is limited to ensuring compliance with the Court's orders.

The public also has a strong interest in the well-being of children and protecting the constitutional right to family integrity. *See Troxel v. Granville,* 530 U.S. 57, 64 (2000); *Moore*, 431 U.S. at 504-06; *see also M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 124 (D.D.C. 2018) ("[T]he public also has an interest in ensuring that its government respects the rights of immigrants to family integrity while their removal proceedings are pending."). Although the government has an interest in caring for children, this interest "is *de minimis*" if their parent or other potential sponsor is in fact suitable. *Stanley v. Illinois*, 405 U.S. 645, 657-58 (1972). Because ORR's present policy is based on presumption rather than actual evidence of unfitness and "needlessly risks running roughshod over the important interests of both parent and child," it is not in the public interest. *Id.* at 657. ORR retains many tools to vet the safety of potential sponsors without unnecessarily preventing release of children to loving family members and other suitable sponsors. If the Court vacates the challenged policies, ORR has no legitimate interest in delaying reunification of children and their families.

Moreover, as this Court has already stated, "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns.' . . . And the public interest is served when the government follows the APA's procedural requirements by offering a reasoned explanation for its decisions." Mem. Op. at 18 (ECF 35); *see also R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

## VI.    Plaintiffs are Entitled to Declaratory Relief

Plaintiffs are also entitled to a declaration that holds unlawful and sets aside the IFR and the March 7 and April 15, 2025 revisions of the ORR Policy Guide Section 2.2.4. *See* 5 U.S.C. § 703 (authorizing claims for declaratory relief); 28 U.S.C. § 2201. A declaratory judgment may be granted when it "will serve a useful purpose in clarifying the legal relations in issue" or "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016); *see also Tierney v. Schweiker*, 718 F.2d 449, 456 (D.C. Cir. 1983) (same). Here, declaratory relief would inform and clarify for Defendant the lawful process for reviewing sponsorship application of detained unaccompanied minors. Therefore, should the Court find the IFR and new documentation requirements to be unlawful, Plaintiffs request the Court also issue a declaratory judgment that the IFR and new requirements are unlawful, invalid, and may not be given effect. *Tierney*, 718 F.2d at 457 ("[D]eclaratory relief is alternative or cumulative and not exclusive or extraordinary. . . . The fact that another remedy would be equally effective affords no ground for declining declaratory relief."); *see also, e.g.*, *Eco Tour Adventures, Inc. v. Jewell*, 174 F. Supp. 3d 319, 332 (D.D.C. 2016) (finding plaintiff had standing to seek both injunctive and declarative relief for APA claims).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court vacate the IFR and ORR's new proof of identification and proof of income policies and issue declaratory relief and a permanent injunction requiring ORR to promptly adjudicate sponsorship applications without regard to these policies.

Date: September 12, 2025                    Respectfully submitted,

                                            /s/ *Mishan Wroe*
                                            Mishan Wroe (admitted *pro hac vice*)
                                            Diane de Gramont (admitted *pro hac vice*)
                                            NATIONAL CENTER FOR YOUTH LAW
                                            1212 Broadway, Suite 600
                                            Oakland, California 94612

(510) 835-8098
mwroe@youthlaw.org
ddegramont@youthlaw.org

Rebecca Wolozin (D.C. Bar No. 144369)
David Hinojosa (D.C. Bar No. 1722329)
NATIONAL CENTER FOR YOUTH LAW
818 Connecticut Avenue NW, Suite 425
Washington, DC 20006
(202) 868-4792
dhinojosa@youthlaw.org
bwolozin@youthlaw.org

Cynthia Liao (admitted *pro hac vice*)
Joel McElvain (D.C. Bar No. 448431)
Skye L. Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
cliao@democracyforward.org
jmcelvain@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*