# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGELICA S., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 1:25-cv-01405 |
| ) | |
| U.S. DEPARTMENT OF HEALTH AND ) | |
| HUMAN SERVICES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**SUPPLEMENTAL DECLARATION OF CYNTHIA ISABEL FELIX**

**Supplemental Declaration of Cynthia Isabel Felix**

1. I, Cynthia Isabel Felix, make the following statements on behalf of myself and Immigrant Defenders Law Center ("ImmDef"). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

2. I am an attorney licensed to practice law in California, and I am a Directing Attorney on the Children's Representation Project ("CRP") at ImmDef where I have been employed for eight years. I directly oversee our provision of legal services to minors detained in Office of Refugee Resettlement ("ORR") custody.

3. On May 6, 2025, I signed a declaration in support of Plaintiffs in *Angelica S. v. U.S. Department of Health and Human Services, et al.* and that declaration was filed on May 9, 2025, at ECF 10-15. I now offer this declaration in support of Plaintiffs' Motion for Summary Judgment to supplement my prior declaration and add additional information about the harm to ImmDef and our clients as a result of ORR's rescission of 45 C.F.R. § 410.1201(b) and the changes to sponsorship requirements made after March 7, 2025.

4. ImmDef is a non-profit organization that believes in providing universal representation so that no immigrant is forced to face removal proceedings without an attorney or accredited representative at their side. ImmDef is the largest provider of legal services to unaccompanied immigrant children in California and represents both detained and released youth who reside in the Greater Los Angeles Area. ImmDef's mission and vision is that no immigrant should have to face deportation proceedings alone and we believe every person facing removal deserves to have zealous, competent counsel at their side.

5. Since my last declaration, ImmDef has continued to be hampered in its ability to provide legal services to detained immigrant children because of the Interim Final Rule ("IFR") and ORR Policy Guide changes that allow ORR to deny release to sponsors based on their immigration status, collect sponsor immigration status for law enforcement or immigration enforcement purposes, and share sponsor's immigration status with law enforcement for immigration

enforcement. Additionally, because of the IFR and Policy Guide changes, which have increased children's length of stay in ORR custody as described below, ImmDef has had to close intake to new clients who ImmDef would have normally served, thereby reducing the number of clients ImmDef is able to serve.

ORR Information Sharing with Immigration Enforcement Agencies

6. ORR's collection and sharing of sponsor immigration status has negatively impacted the reunification process of a significant number of minors. Sponsors have withdrawn from the sponsorship process because they are afraid to provide identifying information to ORR and in some cases, sponsors have been detained by ICE during the sponsorship process.

7. In July 2025, after the IFR permitted ORR to share sponsor immigration status with immigration enforcement agencies, ORR began requiring sponsors to appear for in-person verification of identification at Immigration and Customs Enforcement and Homeland Security Investigation offices. Sponsors have withdrawn from the sponsorship process because they are afraid to appear at these appointments and ImmDef is aware of sponsors who have been detained by ICE at these appointments.

8. In a recent case, the mother of a 17-year-old girl presented herself at an ORR identification verification appointment and was detained by ICE at said appointment. The mother was hospitalized due to the emotional toll the apprehension took on her. During the "wellness check" with this child after her mother's apprehension, the child was severely distraught and crying. The child said she would refuse to eat or drink or partake in anything required of her until she was reassured that her mother was safe. The child asked whether she still had a chance to be released from care and was informed that she would need to explore whether alternative sponsors exist and determine whether they can meet ORR's new requirements.

9. In the case of two siblings detained by ORR, their father was gathering documents in support of his reunification packet when he was grabbed by ICE while crossing the street outside of a courthouse. The father was quickly removed, and the children sought voluntary departure as they had no one else to reunify with.

10. I am also aware of children who are being forced to forgo reunification with their family members out of fear of immigration enforcement against sponsors. For example, ImmDef represents a 13-year-old child in custody whose mother lives in Washington but due to the child's fear that his mother and alternate caregiver (adult brother) could be at risk of detention, the mother agreed to withdraw her reunification packet at to the child's request.

11. Another child who was in ORR custody in July 2024, and released to her aunt, was re-detained during an ICE raid. Instead of pursuing reunification with her aunt and putting her aunt on the radar for immigration enforcement action, the child has decided to forgo reunification and pursue Long Term Foster Care. The child found it unimaginable for her aunt to potentially be detained and her young cousins to be left without their mother.

12. Even for children who still have viable sponsors, ORR's new policy of information sharing with immigration and law enforcement has increased children's length of stay in ORR custody. For example, one issue that is impacting the length of stay is the identification of alternate care givers ("ACGs") (who do not necessarily have to live with sponsors) because they are required to submit identifying information but are sometimes unwilling to do so. It is increasingly difficult for sponsors to find ACGs who are willing to provide their personal and biometric information to ORR because they are afraid that information will be used for immigration enforcement purposes.

13. Other children have experienced delays in reunification because their parents or other sponsors have had to move when other adult household members decline to provide their personal and biometric information for purposes of the reunification packet for fear of immigration enforcement.

<u>New Proof of Identity and Proof of Income Requirements</u>

14. ORR's March 7, 2025, and April 15, 2025, revisions to ORR Policy Guide Section 2.2.4 related to proof of identification and proof of income have compounded the obstacles to release for the unaccompanied children ImmDef serves.

15. In the reunification cases we have seen, it has taken sponsors at least two and a half months to get state issued driver's licenses, if they are able to get one at all; approximately two weeks for in-person identification verification appointments; and at least two weeks and sometimes over a month to receive a decision on a request for an exception to the identification requirements for Category 1 ("Cat 1" parent or legal guardian) sponsors. Children waiting for their sponsors to complete these requirements are routinely experiencing lengths of stays greater than 120 days.

16. In the case of a 3-year-old child attempting to reunify with his mother in Los Angeles, the family has experienced delay after delay. The reunification case was submitted to the ORR case coordinators and Federal Field Specialist ("FFS") on July 20, 2025. The FFS submitted the case for an exception to the sponsor identification requirement on August 1, 2025, as well as a request for exception for the requirement to provide a Social Security or Internal Transaction number ("SS/ITN requirement") on August 18, 2025. The identification exception request is still pending a response from ORR headquarters to this date. This 3-year-old child has been detained and separated from his mother since the end of June.

17. In the case of another child who has been detained since May 7, 2025, the child's father was required to move out of his home because the other adult household members refused to provide their personal information and submit to fingerprinting, creating significant delays in the case. The father lacks the required proof of income and proof of identity per revised ORR Policy Guide Section 2.2.4 and the ORR care provider finally elevated the child's reunification case to ORR Headquarters on Friday, August 15, 2025, to request an exception to these requirements. To this date, there has not been any update communicated to the child or sponsor, and the child is

4

noticeably stressed about her father's risk of detention because she knows ORR is sharing information from her father's application with immigration enforcement.

18. Another ImmDef client who has been in ORR custody since July 13, 2025, has been categorized as a "CAT 4" meaning she has no sponsor, however, the child has an uncle in the greater Los Angeles area whom she lived with prior to being detained following an ICE raid. Her uncle was unable to provide the required documentation for the reunification process and since there is no exception applicable to him, he has been completely ruled out for sponsorship. The child is lingering and fighting her immigration case in detention.

19. Another child has a sister in Santa Barbara County who initially agreed to sponsor her brother, but after only two weeks, the sibling withdrew her sponsor application as she does not have a valid identification card. This child continues to be without a viable sponsor as none of the child's family in the U.S. are willing to sponsor him due to their inability to meet requirements because of their legal status and because of their fear in providing ORR with all their personal information which they know could be shared with ICE. This child's case is at a standstill because his only intention was to reunify with family.

Impacts on ImmDef's Work

20. Since the issuance of the IFR and the changes to Policy Guide Section 2.2.4, children's lengths of stay in ORR custody are significantly higher than in years past. As a result, ImmDef has been forced to allocate a significantly higher portion of its limited resources to advocating for both existing and new clients on issues related to release and to expend increased resources on their immigration cases.

21. Currently, ImmDef is conducting about three times the normal number of consultations with detained children. As minors experience prolonged detention stays, they are presented with a greater number of setbacks and require more consultation with ImmDef.

22. If a child's sponsor withdraws or is detained, this increases the time and resources we spend on their cases because children are then presented with all other possible options (i.e., reunification with another sponsor, Long Term Foster Care ("LTFC"), or Voluntary Departure

5

("VD")). The decision to opt for LTFC placement, where children could end up in programs across the country, many hours away from their families, or to elect to pursue VD are traumatic and stressful for children. These decisions are causing visible stress for these children. For example, when we visit them for follow-up meetings, many children are disinterested in engaging with our team or conversely, are obsessive over the information they receive from their sponsors and their case managers and trying to make it all make sense. One child asked to sit with me and two other attorneys after we held a group meeting because she needed time to process her options. She sat alone in a chair, shoulders hunched, a quiet voice about to cry at any minute, asking us questions about her plan to reunify with her mom and how her mother having shared her information with the government could affect her family once she's released.

23. Of the 120 minors in care at facilities ImmDef serves, ImmDef is seeing an increase in children opting for LTFC or VD as sponsors decline to come forward. For example, from February to September 2024, representation of children in LTFC comprised approximately 12% of ImmDef's new cases, and representation for VD comprised a miniscule 0.03% of our new cases. In contrast, in the period of February to September 2025, representation of children in LTFC had more than doubled to 31% of our new cases, and representation for VD increased a whopping twenty-fold to 6% of our new offers of representation. As described below and in my prior declaration, when a child chooses LTFC or VD the process requires significant attorney-time to advise the child.

24. Because children are unable to leave ORR custody, ImmDef must spend more time representing detained children who urgently need attention and cannot spend as much time representing released children who are still in need of counsel. For example, from February to September 2024, approximately 44% of our new cases were detained children who required our representation while detained. Over that same period in 2025, that proportion had nearly doubled to approximately 84%. As outlined below, these detained cases are much more time intensive and urgent to handle, making it impossible to offer representation to released children

6

we otherwise would have represented had we had capacity. As a result, ImmDef's ability to meet its goal of universal representation is significantly harmed.

25. ImmDef has had to divert *all* of our resources to providing legal services to detained unaccompanied children, both children in short-term care as well as long-term care. Our attorneys are nearly all at capacity and experiencing high workloads and we are having to nevertheless take on new detained child matters to prevent those children from experiencing prejudice in their legal cases. Historically, ImmDef has guaranteed representation to children placed in facilities we serve who are being released to our service area. Currently, ImmDef has closed intake to these children because we have to divert staff time and resources to serve detained children. This leaves many children in our service area who would otherwise qualify for our services unserved, frustrating our mission to ensure that no immigrant facing removal should have to go to court alone.

Detained Docket

26. Detained cases are much more time and resource-intensive for ImmDef than released cases. ImmDef has been forced to divert its limited resources away from accepting the typical projected number of new clients due to the unexpected increased demands of existing clients' cases, thereby hampering ImmDef's ability to fulfill its mission to provide zealous advocacy to all children in the ORR shelters that it serves.

27. Children in ORR custody are placed on an expedited "detained juvenile docket," where immigration judges grant only short continuances (typically maximum 60 days) to prepare for pleadings and file relief. Conversely, released children on these non-expedited dockets may receive much longer continuances to allow the attorney to prepare their case.

28. Furthermore, because of the increased time children are spending in ORR custody, and the corresponding increased time working on their cases, ImmDef has been prevented from pursuing certain forms of relief for which its clients would otherwise be eligible, significantly limiting the immigration services ImmDef is able to provide to its clients. Detained children are often not able to pursue the full range of legal relief for which they may be eligible. For

7

example, Special Immigrant Juvenile Status ("SIJ") (a form of legal relief that provides a pathway to citizenship for children who have been abused, abandoned or neglected) requires a proceeding to be initiated in a State juvenile court. In California, detained children access the juvenile court via a California Probate Guardianship Petition, which requires the child's custodian (here, the ORR-subcontracted facility) to participate as proposed guardian. Many ORR-subcontracted facilities, especially short-term facilities, refuse to participate in the Guardianship process, and therefore children who would qualify for SIJ had they been released from ORR custody are blocked from accessing this form of relief. This places children with meritorious claims for relief at risk of deportation. These same children would be able to access this relief were they released to sponsors who would participate in the relevant state court proceeding to obtain the required findings regarding their best interests and abuse, abandonment or neglect so that they may petition USCIS for SIJS. Thus, detained children are placed at a disadvantage in their legal cases, and ImmDef is prevented from carrying out its mission to defend them from deportation.

29. In addition to our work on their legal cases, ImmDef has had to spend significant additional time on advocacy related to the child's release case. Additionally, if a child is unlikely to be released from ORR custody before their 18th birthday, we regularly spend two to ten hours conducting "post-18" planning for the child. This includes assisting with making travel arrangements to a final destination if a child will be released on their own recognizance to a family sponsor that was ruled out of ORR sponsorship, or securing emergency housing if a sponsor is not available (either because the child has none, or no sponsor is willing to come forward in light of the current enforcement environment).

30. As a result of prolonged detention, more children are opting for LTFC placement or voluntary departure. The increased number of Voluntary Departure and LTFC cases have posed additional specific obstacles to ImmDef's ability to fulfill its mission, as described below.

Voluntary Departure

31. When a child decides to pursue Voluntary Departure, this increases the amount of time and resources we spend on their case because ImmDef must first offer full scale representation (as opposed to general advocacy and support regarding their rights in detention) due to our contractual requirements with the Acacia Center for Justice. This requires that our team of attorneys specialized in working with detained children must meet in person with a child at the ORR facility, which requires them to drive up to an hour and a half to any given shelter. Currently, immigration cases are being docketed less than 10 days after a child's arrival, so attorneys have only a few days to enter an appearance with the Immigration Court. If a child wishes to repatriate as soon as possible, attorneys must then spend at least 3 entire workdays preparing for the Voluntary Departure hearing at the initial Master Calendar Hearing (MCH). If a child is able to wait in the shelter for the attorney to prepare their case, attorneys may seek a continuance at the initial (MCH) to prepare the case, but the Immigration Judges will generally only grant about a 30-day continuance. Attorneys require at least three meetings with a client to fully prepare for a Pre-Conclusion Voluntary Departure hearing. And the Immigration Judges require personal appearances by the attorney and any client over the age of twelve in Voluntary Departure cases. All other types of detained juvenile cases are conducted virtually.

32. Furthermore, whether or not to pursue voluntary departure is a huge, life-changing decision for anyone, much less a child. Alternative legal options available to a child (and their likelihood of success) are complex to explain, especially given the rapidly changing legal landscape. When a child expresses interest in voluntary departure due to their prolonged length of stay in light of changes to sponsorship requirements, attorneys often have to meet with them multiple times to ensure they understand their rights and options before proceeding with voluntary departure. That is, even if a child ultimately decides against pursuing voluntary departure after full advice and consultation, the detention fatigue caused by ORR's information-sharing policies and the new sponsorship ID and income requirements increases ImmDef's workload on those cases as well. The fact that there has been a twenty-fold increase in the

percentage of children choosing voluntary departure because of the government's policies has had a significant impact on ImmDef's resources and ability to represent all children in custody.

33. In the case of the two siblings whose father was detained, described in paragraph 9, our team met with the children approximately 12 separate times in the span of 3 months. This included meetings with support staff, program managers, and attorneys, to support the children in making a decision. Our team of attorneys made four court appearances during this time span to convey to the Immigration Judge that the children had yet to make a final decision. Once the children ultimately decided to pursue Voluntary Departure, our team visited them yet again to offer representation and prepare for their hearing. During the course of our representation, the case manager shared that a request for an OTIP letter (Office of Trafficking in Persons eligibility letter designating them a victim of sex or labor trafficking and qualifying them for a long list of federal benefits) had been made. Yet, despite the forced trafficking the children had suffered, they still decided to pursue Voluntary Departure as they no longer had a viable sponsor to be released to.

Long Term Foster Care

34. Rather than seeking voluntary departure, some children prevented from reunifying with sponsors will seek to enter Long Term Foster Care ("LTFC"). Children interested in pursuing LTFC must have one or more meetings with an attorney to receive consultation and advice regarding their legal options if they enter LTFC due to our contractual requirements with the Acacia Center for Justice. These consultations are often complicated and time-consuming given the rapidly changing nature of asylum law, and the fact that a child's ability to pursue Special Immigrant Juvenile Status ("SIJ") while detained varies not only by state but also by individual LTFC program. An attorney must meet with a child in person (again, often at a distant detention facility) at least once for approximately one hour (double that if interpretation is required) to explore and explain their options, and additional members of our staff must assist with processing the necessary documentation required by ORR to submit LTFC referrals. If a child has follow-up questions or changes her mind, a further legal meeting is required, and additional

paperwork needs to be prepared. These are the additional steps ImmDef must take even before the child is placed in LTFC.

35. Specifically, when a child selected LTFC we must meet with a child to develop what is referred to as an "RSL" (Recommended States List) which is required by ORR for an LTFC referral to be made by a care provider and can only be drafted by an LSP such as ImmDef. The RSL talks range anywhere from at least 45 minutes to an hour and a half as children are presented with the various options for placement. Some of the factors discussed with children include physical location, eligibility for immigration relief in certain jurisdictions, and most importantly, access to counsel (especially considering the ongoing litigation over the UCP contract). Preparation for an RSL talks requires our attorneys to ensure that shelter staff has provided the child's birth certificate (to verify their age), Notice to Appear (to verify placement in Removal proceedings and ensure accurate information), Authorized Release of Confidential Information document (granting our team permission from the child to share confidential information with the care provider), and coordination of the physical meeting at the shelter with the child. Additionally, an attorney must review the intake, determine what relief a child might be eligible for, and review any notes and history of reunification to understand where the child might have family in the United States. Once a child determines a list of states where they would feel comfortable living in LTFC, our team prepares the physical list, and sends it back to the care provider so they can upload it to the LTFC referral database. Lastly, our team is required to upload the RSL list to an internal Unaccompanied Child Online Referral Database so that a receiving LSP can review the referral and determine whether they could represent a child if placed in an LTFC program they service. RSL requests are made by care providers when children have reached the end of reunification prospects, or for concurrent planning so that a child can be placed on the referral list meanwhile also attempting reunification with a sponsor. Sometimes, our attorneys must redraft RSL letters once a child reaches a prolonged length of stay and either ORR or the Immigration Judge begins to pressure them to move their case along.

11

The total time it takes for our team to complete this process is between 4-6 hours, with an additional 3 hours every time the letter requires an update.

36. If a child is placed in an LTFC facility served by ImmDef, we must handle their case on an expedited basis. Again, since these children are considered detained, our staff must travel to distant foster care offices to conduct client meetings, often burning hours of attorney time sitting in Southern California traffic, and they are on an expedited docket. In contrast, children released to their sponsors in the community typically attend client meetings at ImmDef's offices. Furthermore, children in LTFC are at risk of "aging out" of ORR care and being detained on their 18th birthdays.

37. Children whose sponsors have been ruled out may be eligible to enter the Unaccompanied Refugee Minor ("URM") program, assuming they have obtained some form of legal relief (typically, but not necessarily, SIJ) with sufficient time before their eighteenth birthday for their URM application to be approved. The process to obtain SIJ findings in state court and receive an approved SIJ I-360 typically takes about a year. This means that any child transferred to LTFC on or after their 17th birthday is considered urgent, and the assigned attorney must drop other work to immediately prioritize their case. This means conducting initial client meetings immediately upon assignment, filing in state court on an expedited basis. It often means submitting additional filings and appearing at additional hearings to request the state court hearing to be expedited, taking an additional two to ten hours per case. It also often means significant attorney time advocating before USCIS to expedite consideration of the Form I-360. For released children, ImmDef files Form I-360 and then simply awaits adjudication. For detained children, attorneys regularly spend two to five additional hours sending emails to USCIS, contacting their call center, and communicating with the USCIS Ombudsman and Congressional Representatives to attempt to obtain approval of the Form I-360 before the child ages out of ORR custody. If the expedite is unsuccessful, or if we are not sure whether it will be, ImmDef attorneys and support staff must engage in urgent post-18 planning as described above.

38. If children have instead been released to sponsors in the community, the relevant timeline slows down dramatically.  Children released to the community typically only need to obtain SIJ findings from the state court (not approval of their I-360) before their eighteenth birthday, or before their 21st birthday depending on the facts of the case.  While Immigration Judges may set earlier timelines, in general, released children's cases proceed on a much more flexible timeline that allows more seamless prioritization of cases, without having to drop everything to respond to an "urgent age out" client matter.

Delays in Implementation of the Preliminary Injunction

39. At the time the Court issued the preliminary injunction in this matter on June 9, 2025, ImmDef was monitoring the reunification cases of multiple *Angelica S.* class members at the facilities we serve.

40. After the preliminary injunction issued, my team and I followed up with case managers of class members to ensure they were aware of the preliminary injunction and inquire on the status of the cases. Case managers informed us that they were still awaiting guidance from ORR before proceeding. On June 16, 2025, I emailed the Federal Field Specialist responsible for one of our shelters to ask for updates on how ORR was proceeding with the applications. I only received confirmation of my email but did not receive a meaningful response otherwise.

41. On June 20, 2025, a case manager informed me that one of our client's sponsors had not yet been contacted because the sponsor was a more distant relative. I asked for further guidance from the assigned Federal Field Specialist because the preliminary injunction did not distinguish between sponsor categories. On June 20, 2025, the Federal Field Specialist informed me that she was still awaiting guidance from the ORR legal team.

42. Upon information and belief, ORR did not issue guidance to its programs regarding compliance with the Court's preliminary injunction until June 23, 2025.

43. Even after ORR issued guidance to its programs regarding the preliminary injunction, one of the shelter programs we serve continued to tell us that they were awaiting further guidance from legal before proceeding with *Angelica S.* class member applications. On June 25,

13

2025, I contacted the Federal Field Specialist Supervisor responsible for our area to ask for clarification.

44. During the two-week time period between the issuance of the preliminary injunction and ORR's guidance to care providers, our clients experienced significant anxiety due to the lack of updates or progress on their reunification cases. Some of our clients were aware of the preliminary injunction but their case managers and sponsors were not, leading to confusion and worry about whether their cases would in fact be reopened. Sponsors were also aware of the preliminary injunction but were being left in limbo or given conflicting updates about the reunification status, causing them significant stress as well.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of September 2025, in Santa Ana, California.

_____
Cynthia Isabel Felix
Immigrant Defenders Law Center
634 S. Spring Street, 10th Floor Los Angeles, CA 90014
Tel: (213) 438-9014 Fax: (213) 282-3133
cynthia@immdef.org