# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGELICA S., *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 1:25-cv-01405-DLF |
| ) | |
| U.S. DEPARTMENT OF HEALTH AND ) | |
| HUMAN SERVICES, *et al.*, ) | |
| ) | |
| *Defendants*. ) | |

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendants hereby move for summary judgment on all claims in Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief, ECF No. 48, and oppose Plaintiffs' Motion for Summary Judgment, ECF No. 58. The reasons supporting this motion and the arguments and authorities on which Defendants rely are set forth in the accompanying memorandum, the Certified Administrative Record, and, pursuant to the Court's Minute Order of August 30, 2025, Defendants' Separate Statement of Undisputed Material Fact, and Defendants' Separate Concise Statement of Genuine Issues. For the reasons explained in the accompanying brief, the Court should deny Plaintiffs' motion for summary judgment and request for injunctive relief, grant Defendants' cross-motion for summary judgment, and enter judgment for Defendants. A proposed order is attached.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

By: /s/ Dean P. De Las Alas

GLENN M. GIRDHARRY
Acting Deputy Director

DEAN P. DE LAS ALAS
Trial Attorney
United States Department of Justice
Civil Division

WILLIAM C. SILVIS
Assistant Director

Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

MICHAEL A. CELONE
CHRISTINA PARASCANDOLA
Senior Litigation Counsel

Tel.: (771) 202-1393
Fax: (202) 305-7000
e-Mail: dean.delasalas@usdoj.gov

*Attorneys for Defendants*

Dated: November 28, 2025

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ANGELICA S., *et al.*,                    )
                                          )
            *Plaintiffs*,                 )
                                          )
v.                                        )        Case No. 1:25-cv-01405-DLF
                                          )
U.S. DEPARTMENT OF HEALTH AND             )
HUMAN SERVICES, *et al.*,                 )
                                          )
            *Defendants*.                 )
                                          )

## MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

BRETT A. SHUMATE
Assistant Attorney General

GLENN M. GIRDHARRY
Acting Deputy Director

WILLIAM C. SILVIS
Assistant Director

MICHAEL A. CELONE
CHRISTINA PARASCANDOLA
Senior Litigation Counsel

By:  */s/ Dean P. De Las Alas*
DEAN P. DE LAS ALAS
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel.: (771) 202-1393
Fax: (202) 305-7000
e-Mail: dean.delasalas@usdoj.gov

*Attorneys for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................1

BACKGROUND..................................................................................................................2

    I.    Statutory Framework................................................................................2

    II.    The Unaccompanied Children Program Foundational Rule (2024)....................4

    III.    ORR's Implementation of Release Policies and Practices...................................5

    IV.    Human Trafficking and UAC Sponsor Fraud ....................................................7

        A.    Reports of UAC Sponsor Fraud, 2022-24................................................7

        B.    Additional Findings and ORR Leadership's Recommendation of Policy Changes, 2025................................................................................9

        C.    Policy Changes.................................................................................10

    V.    The Interim Final Rule (2025)...........................................................13

    VI.    This Lawsuit...................................................................................14

STANDARD OF REVIEW ...............................................................................................17

ARGUMENT....................................................................................................................18

    I.    Plaintiffs lack standing to bring their claims...................................................18

        A.    Plaintiffs Mateo N. and Yair G. (the new Plaintiffs) lack standing as to all claims because they have not established that any delay in their release from ORR care and custody is attributable to any new ORR requirements. ........................................................................................18

        B.    The claims of Plaintiffs Angelica S., Eduardo M., Liam W., Xavier L., Leo B., and David D. are moot as to all claims because they have been released from ORR care and custody....................................................20

        C.    Plaintiffs lack standing to bring their claims regarding the Interim Final Rule (Counts I, II, and III).................................................................20

        D.    None of the Plaintiffs have standing to assert a claim under the Paperwork

i

    Reduction Act......................................................................22

  E. Plaintiff Immigrant Defenders lacks standing as to all claims. ...............23

II. The Interim Final Rule is not a final agency action and therefore not subject to APA review........................................................................25

III. Alternatively, the Interim Final Rule is lawful...............................................27

  A. The issuance of the Interim Final Rule, with immediate effectiveness, was necessary to bring an agency regulation in compliance with a federal statute..........................................................................27

  B. Good cause exists for ORR to issue the Interim Final Rule without notice and comment, considering that the provision that ORR removed from the Foundational Rule contravened 8 U.S.C. § 1373(a) and (b). ..................31

  C. Good cause exists for the Interim Final Rule to have immediate effect, because it brings a regulation into compliance with a statute, and nothing in the Interim Final Rule requires Plaintiffs or their potential sponsors to adjust their behavior..............................................................32

IV. The new sponsorship document requirements in the Policy Guide updates are lawful.............................................................................32

  A. Plaintiffs' assertion that ORR's updates to the ORR Policy Guide § 2.2.4 related to proof of identity and proof of income disqualify sponsors based solely on immigration status is incorrect................................................32

  B. The new proof of identity and proof of income requirements, in conjunction with enhanced biometric collection and background checks, are necessary given gaps in ORR's sponsor vetting process and egregious incidents of sponsor fraud and trafficking. ............................................35

  C. ORR's Policy Guide Updates are not arbitrary and capricious, given that ORR considered the relevant factors and articulated a satisfactory explanation................................................................37

  D. ORR has provided a reasoned justification for its updated proof of identity requirements.......................................................................40

  E. ORR provided a reasoned justification for its updated proof of income requirements.......................................................................41

  F. The new proof of identity and proof of income requirements are not legislative rules....................................................................42

V.     Even if the Court finds for Plaintiffs, then the appropriate remedy would be remand rather than injunctive or declaratory relief............................................44

CONCLUSION...................................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001)..........................................17

*Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13 (D.C. Cir. 2011)..................................................................................................................................23, 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..........................................................17

*Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020).................24, 25

*Chem. Mfrs. Ass'n v. E.P.A.*, 26 F. Supp. 2d 180 (D.D.C. 1998).........................................26

*Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173 (D.D.C. 2022)..........................19

*DHS v. Regents of the Univ. of California*, 591 U.S. 1 (2020)...............................................37

*Eastern Ky. Welfare Rights Organization*, 426 U.S. 26 (1976))............................................19

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)....................................................37

*FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2016) ...............................................18

*Friends of Animals v. Ross*, 396 F. Supp. 3d 1 (D.D.C. 2019)..............................................18

*Gutierrez v. Saenz*, 145 S. Ct. 2258 (2025) .........................................................................22

*Hisp. Affs. Project v. Acosta*, 263 F. Supp. 3d 160 (D.D.C. 2017).........................................37

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006).............................................................17

*Int'l Primate Prot. League v. Admins. of Tulane Educ. Fund*, 500 U.S. 72 (1991)...................22

*James V. Hurson Associates, Inc. v. Glickman*, 229 F.3d 277 (D.C. Cir. 2000)........................43

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).............................................................18, 19

*Mack Trucks, Inc. v. EPA*, 682 F.3d 87 (D.C. Cir. 2012)......................................................31

*Marshall Cnty. Health Care Auth. V. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993)......................18

*Monsanto Co., v. Geerston Seed Farms*, 561 U.S. 139 (2010)...............................................44

*\*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463

U.S. 29 (1983) ............................................................................................................... 38

*N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852 (D.C. Cir. 2012) ............................. 44

*Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) .................................. 42

*PPG Indus., Inc. v. United States*, 52 F.3d 363 (D.C. Cir. 1995) .............................. 44

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726 (D.C. Cir. 2003) .................................................................................................................. 26

*Sacchetti v. Gallaudet Univ.*, 181 F. Supp. 3d 107 (D.D.C. 2016) ............................ 18

*Saco River Cellular, Inc. v. FCC*, 133 F.3d 25 (D.C. Cir. 1998) .............................. 23

*Savignac v. Day*, 754 F. Supp. 3d 135 (D.D.C. 2024) ............................................... 18

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ................................................................ 44

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006) ..................................... 17

*Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270 (D.C. Cir. 2016) ................ 26

*Tanner-Brown v. Haaland*, 105 F.4th 437 (D.C. Cir. 2024) ...................................... 22

## STATUTES

5 U.S.C. § 553(b)(4)(B) ................................................................................................ 14

5 U.S.C. § 553(d)(3) ..................................................................................................... 14

6 U.S.C. § 279 ......................................................................................................... 2, 3, 35

6 U.S.C. § 279(g)(2) ....................................................................................................... 2

6 U.S.C. § 279(b)(1)(A) ............................................................................................... 35

6 U.S.C. § 279(b)(2) ..................................................................................................... 35

8 U.S.C. § 1232(b)(1) ..................................................................................................... 3

8 U.S.C. § 1232(b)(3) ..................................................................................................... 3

8 U.S.C. § 1232(c) ............................................ 1, 3, 11, 12, 30, 35, 39, 42, 43, 45

8 U.S.C. § 1232(c)(1) ........................................................................................ 3, 35, 42

8 U.S.C. § 1232(c)(2)(A) ..................................................................................... 3, 35, 39, 45

8 U.S.C. § 1232(c)(3)(A) ..................................................................................... 12, 30, 43

8 U.S.C. § 1232(i) ..................................................................................................... 3

*8 U.S.C. § 1373 .................................................................. 14, 27,28, 29, 30, 31, 32

*8 U.S.C. § 1373(a) ..................................................................................... 14, 27, 31

8 U.S.C. § 1373(b) ............................................................................................. 13, 27

31 U.S.C. § 6305 ......................................................................................................... 3

44 U.S.C. § 3502(3)(a)(i) .......................................................................................... 23

44 U.S.C. § 3507(a) .................................................................................................... 23

## PUBLIC LAW

Illegal Immigration Reform and Immigrant Responsibility Act,
   Pub. L. No. 104-208, 110 Stat. 3009-546 (Sept. 25, 1996) ................................. 27

## REGULATIONS

45 C.F.R. § 410.1000(b) ...................................................................................... 5, 30

45 C.F.R. § 410.1200 ................................................................................................. 4

45 C.F.R. § 410.1201 .............................................. 4, 13, 14, 22, 27, 29, 30, 31, 33, 35, 43

45 C.F.R. § 410.1201(a) ............................................................................................. 5

45 C.F.R. § 410.1202(b) ...................................................................................... 4, 43

45 C.F.R. § 410.1202(c) .......................................................................... 4, 11, 16, 42, 43

45 C.F.R. § 410.1203(a) ........................................................................................... 39

45 C.F.R. § 410.1302(c)(8)(ii) .................................................................................... 5

## REGULATORY HISTORY

*Unaccompanied Children Program Foundational Rule,
   89 Fed. Reg. 34,384 (Apr. 30, 2024); ..................................................................... 4

*Unaccompanied Children Program Foundational Rule, Update To Accord With Statutory Requirements*
90 Fed. Reg. 13,554 (March 25, 2025)................................................. 13, 14, 29, 30, 31, 32

**EXECUTIVE ORDER**

Executive Order 14159, *"Protecting the  American People Against Invasion,"*
90 Fed. Reg. 8443 (Jan. 20, 2025).; ........................................................................9

## INTRODUCTION

Each year, thousands of unaccompanied alien children (UAC), defined as minors lacking lawful immigration status and no available parents or legal guardians, arrive in the United States.[1] Congress assigns the Office of Refugee Resettlement (ORR), a component of the Department of Health and Human Services (HHS),  the responsibility of caring for and ultimately releasing such children to sponsors, as well as implementing policies with respect to the care and placement of unaccompanied alien children. *See* 6 U.S.C. § 279(b)(1)(A), (C)-(E); *see also* 8 U.S.C. § 1232(c). Congress directs HHS and other agencies, including the Department of Homeland Security (DHS), to establish policies and programs to ensure that UAC are protected from traffickers and other individuals seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity. And Congress directs HHS not to place a UAC with a person or entity without making a determination that the proposed custodian is capable of providing for the child's physical and mental well-being, which includes verifying the custodian's identity and relationship to the child, if any, and an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child. At the same time, ORR must make and record its prompt and continuous efforts towards the release of the UAC to fit sponsors. The competing goals of protection from trafficking and expediting the release to a sponsor require ORR to strike a balance based on the information available.

---

[1]     *See* 6 U.S.C. 279(g)(2); Unaccompanied Alien Children: An Overview, Congressional Research Svc. (updated Sept. 5, 2024), available at https://www.congress.gov/crs-product/R43599 (viewed Nov. 17, 2025), at 3, Figure I, UAC Apprehensions at the Southwest Border, by Country of Origin; U.S. Customs and Border Protection Southwest Border Apprehensions, available at https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (viewed Nov. 17, 2025) (filter for Border Patrol and UAC). Although since February 2025, Border Patrol has been apprehending hundreds and not thousands of UAC each month, the number still is significant.

This case is about two agency actions. The first concerns updates to ORR updating proof of identity and proof of income requirements during the sponsorship application process, published March 7, 2025 and April 15, 2025, respectively, in response to credible reports of confirmed and suspected trafficking and sponsor fraud. In these updates, ORR tightened the list of specified types of documents that it will accept by potential sponsors to establish their identity; and established acceptable documents to demonstrate a level of income appropriate to care for a UAC. The second action took place on March 25, 2025, when ORR issued an Interim Final Rule (IFR), effective immediately, that removes a provision of ORR's Foundational Rule on the basis that the provision directly conflicted with a federal statute. In the IFR, ORR solicited comments from the public through a 60-day notice and comment period and has not yet issued a final action based on those comments. The Court should rule in favor of Defendants on Plaintiffs' claims.

## BACKGROUND

### I.    Statutory Framework

The Homeland Security Act of 2002 ("HSA") assigned duties regarding the care and placement of unaccompanied alien children to ORR. *See* 6 U.S.C. § 279. The HSA defines a UAC as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Thus, once a UAC turns 18, the individual ceases to be a UAC, and ORR has no statutory authority over his or her care and custody.

The HSA transferred to ORR responsibilities with respect to the care of UAC in federal custody by reason of their immigration status, including coordinating and implementing such care; ensuring that the interests of the child are considered in decisions and actions relating to their care and custody; identifying a sufficient number of qualified individuals, entities, and facilities to

2

house unaccompanied alien children; implementing policies with respect to the care and placement of unaccompanied alien children, and implementing placement determinations; and, in making placement determinations, consulting with appropriate authorities to ensure that UAC are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity. *Id*. § 279(b)(1) & (b)(2)(A)(ii).

The Trafficking Victims Protection Reauthorization Act (TVPRA), enacted in 2008, provides in relevant part that HHS must "establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity." 8 U.S.C. § 1232(c)(1). Through the TVPRA, Congress entrusts the Secretary of HHS with those responsibilities, as consistent with 6 U.S.C. § 279. 8 U.S.C. § 1232(b)(1); *see id*. at 1232(b)(3) (providing that subject to exceptions any department or agency of the federal government that has a UAC in custody shall transfer the custody of the child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is a UAC). ORR must balance that statutory dictate with its obligation to promptly place these minors "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). Congress also conferred upon the HHS Secretary the responsibility to make a determination that a sponsor "is capable of providing for the child's physical and mental wellbeing." 8 U.S.C. § 1232(c)(3)(A). This safety and suitability determination must "at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id*.

These responsibilities are largely carried out through cooperative agreements and contracts with care providers under ORR policies and oversight. *See* 8 U.S.C. § 1232(i); 31 U.S.C. § 6305.

## II.    The Unaccompanied Children Program Foundational Rule (2024)

On April 30, 2024, following notice and comment, ORR promulgated the Unaccompanied Children Program Foundational Rule, codified at 45 C.F.R. Part 410, to establish comprehensive regulations governing its UAC program consistent with its statutory responsibilities. *See* 89 Fed. Reg. 34,384 (Apr. 30, 2024). Effective July 1, 2024, the Foundational Rule codified in regulation standards and practices that previously were described in ORR policies. In subpart C of the Foundational Rule, 45 C.F.R. §§ 410.1200-410.1208, ORR sets forth policies and procedures used to release, without unnecessary delay, UAC from ORR custody to a vetted and approved sponsor. 45 C.F.R. § 410.1200.

In subpart C, ORR provides that, subject to an assessment of sponsor suitability, when ORR determines that detention of a UAC is not warranted, ORR shall release a child from its custody without unnecessary delay. *See* Defs' Separate Statement of Undisputed Material Facts ("DSSUMF") ¶ 248 (citing 45 C.F.R. § 410.1201(a)). ORR must release UAC from its custody "[s]ubject to an assessment of sponsor suitability," 45 C.F.R. § 410.1201, which includes "verification of the potential sponsor's identity," 45 C.F.R. § 410.1202(b), and may include "verification of the employment, income, or other information provided by the potential sponsor as evidence of the ability to support the child," 45 C.F.R. § 410.1202(c). Further, "[i]n all cases, ORR shall require background and criminal records checks," *id.*, which may include a criminal history check based on fingerprints. *See* DSSUMF ¶ 249. The Foundational Rule is silent on specific identity document requirements and the types of documents to prove income. *See id.*

During the rulemaking process, many commenters expressed opposition to the Foundational Rule, citing concerns that it did not do enough to prevent child trafficking. *See* DSSUMF ¶ 250. The Foundational Rule codified ORR's historic practice of screening all UAC for potential trafficking concerns, including during intake assessments, and sponsors assessments.

*See* DSSUMF ¶ 251. ORR also codified the requirement that ORR refer concerns of human trafficking to ACF's Office on Trafficking in Persons (OTIP) within 24 hours, in accordance with the reporting requirements in the TVPRA. *See* DSSUMF ¶ 252 (citing 45 C.F.R. § 410.1302(c)(8)(ii)). OTIP reviews these concerns to assess whether the UAC is eligible for benefits and services. *See* DSSUMF ¶ 253.

The Foundational Rule includes a severability provision stating that provisions of the rule "are separate and severable from one another," and that "[i]f any provision is stayed or determined to be invalid, the remaining provisions shall continue in effect." *See* DSSUMF ¶ 254 (quoting 45 C.F.R. § 410.1000(b)).

## III.    ORR's Implementation of Release Policies and Practices

ORR is not a law or immigration enforcement agency and thus "lacks the authority to hold individuals accountable by reassuming care if the sponsor abuses or neglects a child after a UAC has been released from ORR custody." *See* DSSUMF ¶ 241. ORR differs from state child welfare agencies, which typically retain such authority postplacement. *See* DSSUMF ¶ 242. To carry out its statutory mandate under the HSA and TVPRA, and its regulatory mandate under the Foundational Rule, ORR developed extensive policies and procedures to protect UAC, memorialized in sub-regulatory guidance and memoranda of agreement. *See* DSSUMF ¶ 243. In response to comments, ORR noted that the Foundational Rule does not cover ORR's entire program and where the Foundational Rule contains less detail, more specific guidance is provided in sub-regulatory guidance on requirements with built-in flexibility for UAC needs. *See id*.

For example, with respect to identifying potential sponsors for UAC, ORR sub-regulatory guidance establishes four categories of potential sponsors: (1) Category 1, consisting of parents or legal guardians; (2) Category 2A, consisting of siblings, half-siblings, grandparents, immediate relatives (such as aunts, uncles, and cousins) who previously served as a primary caregiver, and

other biological relatives and relatives through marriage; (3) Category 2B, consisting of immediate relatives (including biological relatives and relatives through marriage) who did not previously serve as a primary caregiver; (4) Category 3, consisting of other sponsors, such as distant relatives and unrelated adult individuals. *See* DSSUMF ¶ 264.

A potential sponsor must complete a Family Reunification Application (FRA), provide unexpired government-issued identification documentation for the sponsor and any other adults living in the household or identified in a sponsor care plan, and, along with any adult living in his or her household, undergo a background check. *See* ECF No. 58-2, Plaintiffs' Separate Statement of Undisputed Material Facts ("PSSUMF") ¶¶ 9-10, 14-15. All potential sponsors must also submit proof of address, sponsor-child relationship, and criminal history documents (if applicable). *See* DSSUMF ¶ 244. Additionally, in certain circumstances, a home study is conducted, which consists of interviews, a home visit, and a written report containing the home-study case worker's findings, is performed. *See* DSSUMF ¶ 245.

Once the assessment of the potential sponsor is complete, the care provider makes a release recommendation to ORR. *See* DSSUMF ¶ 246. ORR makes the final release decision. *Id.* Release decisions include: (1) approve release to sponsor; (2) approve release with post-release services; (3) conduct a home study before a final release decision; (4) deny release; or (5) remand for further information. *Id.* ORR denies release if: (1) the potential sponsor is not willing or able to provide for the child's physical or mental well-being; (2) the potential sponsor is not willing to complete the mandatory fingerprint check; (3) the physical environment of the home presents a risk to the child's safety or well-being; or (4) release of the UAC would present a risk to him or herself, the sponsor, household, or community. *See* DSSUMF ¶ 247.

IV.    **Human Trafficking and UAC Sponsor Fraud**

A.    **Reports of UAC Sponsor Fraud, 2022-24**

In December 2022, the U.S. Senate's Committee on Homeland Security and Governmental Affairs ("Committee") published a report detailing the inadequate treatment of UAC in federal care and the insufficient safeguards to ensure they are not trafficked or abused following their release. *See* DSSUMF ¶ 256. A congressional subcommittee had launched its investigation in 2015, following reports that ORR placed eight children with members of a human trafficking ring that forced the children to work on an egg farm for 12 hours a day, six or seven days a week. *See* DSSUMF ¶ 255.

In its December 2022 report, the Committee observed that despite the increased number of UAC entering the United States in 2021 and 2022, ORR's completion of background checks significantly declined from FY 2019. *See* DSSUMF ¶¶ 257-58. Moreover, the Subcommittee identified the lack of adequate background checks for potential sponsors and the waiver of background check requirements on household members, even when releasing a child to their parent, as areas where additional safeguard measures were necessary. *See* DSSUMF ¶¶ 256, 259-60. The Committee recommended that ORR update the UAC Policy Guide to indicate that if a potential sponsor or household member refuses to comply with required background checks, ORR will prohibit further consideration of the release of a child into their custody. *See* DSSUMF ¶ 261.

In March 2023, after a Florida grand jury published a report outlining over 100 allegations concerning deficiencies in ORR's UAC Program, ORR established an Integrity & Accountability (I&A) Team to detect, prevent, mitigate, and report fraud and exploitation perpetrated by sponsors, parents, and UAC. *See* DSSUMF ¶ 262. The I&A Team identified several instances of fraudulent sponsorship applications, document falsifications, and patterns of human trafficking and exploitation. *See* DSSUMF ¶¶ 265-69. The Team identified instances of children and sponsors

7

using altered birth certificates or unaltered birth certificates belonging to another person. *See* DSSUMF ¶ 265. The Team found that the fraud often involved collusion with others, such as a family member in the country of origin. *See* DSSUMF ¶ 266. In one instance, the I&A Team identified 10 UAC who were released to sponsors who committed intentional document fraud in October 2024. *See* DSSUMF ¶ 267.

The I&A Team also found cases of fraud, abuse, and extortion by prospective sponsors. The I&A Team reported that in late February 2024, an individual sponsor using multiple identities and addresses to sponsor or attempt to sponsor multiple children in Cleveland, Ohio was discovered after an investigation of potential child abuse and trafficking. *See* DSSUMF ¶ 270. The individual successfully sponsored a 15-year-old female UAC whose allegations of sexual abuse and trafficking led to charges of rape against the sponsor. *See* DSSUMF ¶ 271. In another case, the I&A Team found that a woman and her partner attempted to sponsor a total of 15 UAC over a five-year period by using multiple aliases, with the aliases only discovered when the sponsor underwent fingerprinting. *See* DSSUMF ¶¶ 268-69. The I&A Team additionally found cases of individuals demanding payment to sponsor UAC. *See* DSSUMF ¶ 272. In one scheme there were 17 reported instances of successful extortion totaling $27,694. *See* DSSUMF ¶ 273. Despite this evidence, ORR's data revealed that less than 1% of sponsorship applications have been denied in recent years. *See* DSSUMF ¶ 274.

In February 2024, the HHS Office of Inspector General published its findings in *Gaps in Sponsor Screening and Follow Up Raise Safety Concerns for Unaccompanied Children* that:

> 1. In 16% of children's case files, one or more required sponsor safety checks lacked any documentation indicating that the checks were conducted.
> 2. For 19% of children who were released to sponsors with pending Federal Bureau of Investigation fingerprint or State child abuse and neglect registry checks, children's case files were never updated with the results.
> 3. In 35% of children's case files, sponsor-submitted identification documents

contained legibility concerns.
4. ORR failed to conduct mandatory home studies in two cases and four other cases raise concerns about whether ORR guidance on discretionary home studies should offer more specificity.
5. In 5% of cases, sponsor records within ORR's case management system were not updated with child welfare outcomes or sponsorship history.

*See* DSSUMF ¶ 275. As a result of these findings, HHS OIG recommended, among other things, that ORR develop additional safeguards to ensure that all safety checks are conducted and documented prior to approving the release of a child to their sponsor. *See* DSSUMF ¶ 281.

**B.    Additional Findings and ORR Leadership's Recommendation of Policy Changes, 2025**

On January 20, 2025, President Trump ordered HHS, DHS, and the U.S. Department of Justice to take "all appropriate action to stop the trafficking and smuggling of alien children into the United States[.]" Executive Order 14159, "*Protecting the American People Against Invasion,*" 90 Fed. Reg. 8443, at 8447 (Jan. 20, 2025). On February 4, 2025, former Acting Director of ORR, Mellissa Harper, issued a memorandum outlining immediate changes to address ongoing concerns regarding gaps in ORR's sponsor vetting process, as well as fraud and trafficking. *See* DSSUMF ¶ 282. Harper noted that in May 2023, the HHS Office of General Counsel conducted an internal investigation to identify which allegations in the Florida grand jury report could be substantiated, where policies were and were not compliant with, and where additional safeguards should be considered. *See* DSSUMF ¶ 283. Director Harper highlighted one particularly egregious instance of sponsor fraud in which a potential sponsor, who had tried to sponsor one child by obviously photoshopping himself into a photograph of the child's mother, presented a foreign identification card bearing the name and photograph of another individual in an attempt to establish his identity and sponsor another child. *See* DSSUMF ¶ 284. Director Harper also observed that HHS' investigations of the Florida grand jury allegations revealed other concerning situations, such as a sponsor housing ten people in a two-room apartment and having a UAC sleep in a closet with no

9

ventilation. *See* DSSUMF ¶ 285. In February 2025, the average length of care for UAC in ORR custody as of February 2025 was 25.8 days, but that length of time did not permit ORR to conduct adequate sponsor vetting measures necessary to ensure children are not released to potentially dangerous situations like those detailed in the investigations. *See* DSSUMF ¶ 286.

On March 7, 2025, ORR Director of Policy Toby Biswas recommended that ORR update Policy Guide Sections 2.2, 2.4, 7.4, and 5.8.2, and associated procedures, regarding acceptable documents used in support of a Sponsorship Application, denials of sponsorship due to fraud concerns, and clarification of fraud reporting requirements. *See* DSSUMF ¶ 290. Given that fraud in sponsorship applications poses safety risks to UAC in the UAC Bureau's care and custody, Biswas requested expedited approval to combat ongoing fraud and trafficking concerns. *See* DSSUMF ¶ 291. Biswas observed that HHS's investigations have revealed documented cases of criminals who used fraudulent foreign documents in support of Sponsor Applications where the former UAC became victims of crimes by their sponsors, including incidents of trafficking and sexual assault, that resulted in prosecutions. *See* DSSUMF ¶ 292.

### C.    Policy Changes

Based on the information received from the above-described investigations, ORR implemented immediate policy changes, which included mandatory enhanced biometric collection and background checks, reassessment of the use of secondary documents that cannot be reliably verified as proof of identity, and sponsor presentation of original documents in-person.[2]

### i.    Updates to Proof-of-Identity and Proof-of-Income Documentation

On March 7, 2025, in alignment with ORR's statutory and regulatory requirements,

---

[2]    *See* Angelica-00000254. On February 14, 2025, ORR issued Field Guidance (FG) 26, which requires all potential sponsors, their adult household members aged 18 and above, and all adult caregivers identified in a Sponsor Care Plan to undergo national fingerprint-based FBI background checks. *See* PSSUMF ¶ 15. Plaintiffs do not challenge FG 26.

8 U.S.C. § 1232(c)(3)(A); 45 C.F.R. § 410.1202, and to address identified gaps in the reporting of fraud incidents to HHS/OIG, ORR updated its UAC Policy Guide Sections 2.2.4, 2.7.4, and 5.8.2. These updates align the acceptable identity documents for identity verification purposes with the standards used for I-9 verifications as a safer framework to mitigate reliance on foreign-issued identity documents, and establish clear protocols for detecting, documenting, and responding to fraud, including preventing fraudulent actors from exploiting the UAC Bureau and unaccompanied alien children for trafficking or other forms of exploitation. *See* DSSUMF ¶¶ 300-01.

A significant reason for updating the list of documents was to address concerns related to the ability to authenticate foreign documents used in support of the Sponsorship Application. *See id.* ORR reported difficulties authenticating foreign-issued documents, especially in a timely manner. *See* DSSUMF ¶ 293. ORR has had to rely on foreign consulates and embassies, often liaising with the Department of State, to authenticate documents issued outside the United States. *See* DSSUMF ¶ 298. That process, however, is complicated by international relations (including whether the United States maintains diplomatic relations with certain countries) and the stability of certain foreign states. *See* DSSUMF ¶ 299. Additionally, ORR was aware of widespread fraud involving the use of such foreign-issued documents. *See* DSSUMF ¶ 294.

The new requirements do provide an exception for Category 1 sponsors on a case-by-case basis. *See* PSSUMF ¶ 40.

### ii.    Income Verification Measures

On April 15, 2025, to support child safety and further mitigate the risk of human trafficking, ORR revised its UAC Policy Guide Sections 2.2.4 and 2.4.1 to include income verification measures. *See* PSSUMF ¶¶ 61. This revision aims to ensure that sponsors can financially support the children they sponsor. The accompanying decision memo elucidates that 45 C.F.R. §

410.1202(c) requires a suitability assessment to include all necessary steps to determine the potential sponsor's ability to provide for the child's physical and mental well-being, which is a statutory requirement, (*see* 8 U.S.C. § 1232(c)(3)(A)). *See* DSSUMF ¶ 248. According to 45 C.F.R. § 410.1202(c), ORR may require, among other things, verification of the employment, income, or other information provided by the potential sponsor as evidence of the ability to support the child. Additionally, in the state child welfare system, parents, legal guardians, and close kin must demonstrate their financial capability to support a child's needs if the child is returned to their care. *See* DSSUMF ¶ 310.

ORR updated its requirements consistent with its statutory responsibility to make a determination that potential sponsors for UAC are capable of providing for UAC's physical and mental well-being, 8 U.S.C. § 1232(c)(3)(A), and as authorized under 45 C.F.R. § 410.1202(c). To this end, ORR considered that in state child welfare systems, parents, legal guardians, and close kin must demonstrate their financial capability to support a child's needs if the child is returned to their care. *See* DSSUMF ¶ 310. In addition, ORR considered that by requiring the submission of proof of income information and supporting documentation, case managers will be better equipped to identify potential indicators of labor exploitation. *See* DSSUMF ¶ 314. ORR has identified instances where parents and other family members have been subjected to human trafficking and/or labor exploitation and had similar debts as the children they sponsored. *See* DSSUMF ¶ 315. The information obtained during employment and income verification can inform the decision to refer a case for a home study or post-release services. *See* DSSUMF ¶ 314

ORR initially contemplated not amending the proof of income requirements. *See* Angelica-00000115. ORR acknowledged the possibility that "potential sponsors may not have appropriate documents and may not be able to complete their sponsorship applications." *See* DSSUMF ¶ 320.

12

Ultimately, however, ORR found that not amending the proof of income requirements by enumerating the specific required documents would result in significant variability across release decisions. *See* DSSUMF ¶¶ 316, 321.

## V.     The Interim Final Rule (2025)

On March 25, 2025, HHS published an IFR notifying the public of its intention to amend one provision of one of its regulations. *Unaccompanied Children Program Foundational Rule; Update To Accord With Statutory Requirements*, 90 Fed. Reg. 13,554 (Mar. 25, 2025). In the IFR HHS amended the Foundational Rule by striking the provision, at 45 C.F.R. § 410.1201(b) (2024), which stated that:

> ORR shall not disqualify potential sponsors based solely on their immigration status and shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement related purposes. ORR shall not share any immigration status information relating to potential sponsors with any law enforcement or immigration enforcement related entity at any time.

In the Federal Register announcement, HHS observed that the stricken provision contravened the existing statutory limitations on ORR's authority, at 8 U.S.C. § 1373(a) and (b). 90 Fed. Reg. at 13,554. HHS observed that in subsection 1373(a), Congress provided that:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual,

and, that in subsection 1373(b), Congress provided that

> Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity.

13

90 Fed. Reg. at 13,554-55 (quoting 8 U.S.C. § 1373(a) and (b)). ORR observed that, under the Foundational Rule's severability provision, § 410.1201(b)'s parts were inextricably linked and there was no indication that ORR had intended to treat the information sharing provisions and the eligibility issues as distinct. *Id.* at 13,555. ORR noted that, alternatively, severability runs to provisions, not portions of provisions, and, therefore, § 410.1201(b) would be removed in its entirety. *Id.*

Citing 5 U.S.C. § 553(b)(4)(B), ORR asserted good cause for dispensing with notice and comment, because 45 C.F.R. § 410.1201(b) (2024) contravened 8 U.S.C. § 1373. *Id.* ORR observed that it had no authority to promulgate § 410.1201(b) and that revocation was in the public interest, because no amount of public input could give ORR the power to contravene an act of Congress by regulation. *Id.* Citing 5 U.S.C. § 553(d)(3), ORR asserted good cause for the immediate effectiveness of the IFR, because the IFR brings ORR into compliance with a federal statute and the regulated entities do not need time to adjust their behavior before the rule take effect. *Id.* ORR also solicited public comments on the IFR, which ORR required to be received on or before May 27, 2025.[3] *Id.* at 13,555.

ORR stated in May 2025 that it intends to prioritize the public comments it receives and publish a final rule, which ORR anticipates would take several months. *See* DSSUMF ¶ 328. ORR received more than 400 comments, which are publicly available. *See* DSSUMF ¶ 329. ORR has not yet taken an official action based on the comments it received.

## VI.    This Lawsuit

Plaintiffs filed this suit on May 8, 2025. ECF No. 1. On June 9, 2025, the Court issued an order in which it provisionally certified a class consisting of

---

[3]    *See* 90 Fed. Reg. 13,554 (advising that posted comments may be viewed at www.regulations.gov by inserting ACF–2025–0003 in the search box).

> [a]ll unaccompanied children who were in or transferred to the custody of HHS on or before April 22, 2025, and who (a) have or had a potential sponsor who has been identified; and (b) the sponsor's family reunification application has been denied, closed, withdrawn, delayed, or cannot be completed because the sponsor is missing documents newly required on or after March 7, 2025.

*See* ECF No. 34 at 1. The Court also granted Plaintiffs' motion for a preliminary injunction.[4]

Essentially, the Court ordered that the new documentation proof-of-identity and proof-of-income requirements not apply to the potential sponsors of children who were transferred to ORR custody on or before April 22, 2025. *Id*.

On August 13, 2025, Defendants served Plaintiffs with the certified administrative record. ECF No. 47. On August 15, 2025, Plaintiffs filed an Amended Complaint. *See* ECF No. 48. As of that date, the five original individual named Plaintiffs—Angelica S., Eduardo M., Liam W., Leo B., and Xavier L.—had been released from ORR custody. *See* ECF No. 58-2 ¶¶ 115 (Angelica S.), 129 (Eduardo M.), 140 (Liam W.), 150 (Leo B.), 163 (Xavier L.). In their Amended Complaint,

---

[4]     In the preliminary injunction order, the Court ordered that:

(1) [ORR] is prohibited from enforcing the new proof of identification requirements and new proof of income requirements currently contained in the March 7, 2025, and April 15, 2025, revisions of its Unaccompanied Alien Children Bureau Policy Guide Section 2.2.4 against all members of the certified class.

(2) [By June 19, 2025], ORR shall inform all potential sponsors of class members who were disqualified or denied based on ORR's revised proof of identification and proof of income requirements described in section (1) above that they may now continue with their sponsorship applications

(3) In all cases where (a) a potential sponsor of a class member submitted a complete family reunification application and (b) the application was denied or closed or adjudication of the application was delayed in whole because of ORR's revised requirements, ORR is ORDERED to adjudicate the application without regard to the revised requirements.

ECF No. 34 at 2.

Plaintiffs added three new plaintiffs to their lawsuit: Mateo N., Yair G., and David D. *See id.* ¶¶ 164 (Mateo N.,), 177 (Yair G.), 185 (David D.).

Plaintiffs raise six claims. In Count I, Plaintiffs claim that ORR lacked good cause to issue the IFR without notice and comment and did not establish good cause for the IFR to take immediate effect. *See* ECF No. 48 ¶¶ 140-46. In Count II, Plaintiffs claim that in promulgating the IFR ORR exceeded its statutory authority because in the TVPRA Congress directed ORR to consider children's best interest and did not authorize ORR to deny potential sponsors based on immigration status or engage in immigration enforcement, and Congress did not authorize ORR to collect and broadly share information in ORR databases for law enforcement or immigration enforcement purposes. *Id.* ¶¶ 147-53. In Count III, Plaintiffs claim that ORR's issuance of the IFR is arbitrary and capricious because it reverses a critical section of the Foundational Rule without a reasonable explanation. *Id.* ¶¶ 154-57.

In Count IV, Plaintiffs claim that the new proof of identity and proof of income requirements in Policy Guide 2.2.4 are unlawful and exceed ORR's authority because, they "serve to disqualify individual sponsors based solely on immigration status," *id.* ¶ 163, result in unnecessary delays in release and preferencing more distant relatives or unrelated sponsors over parents, legal guardians or other close relatives, *id.* ¶ 164, by requiring proof of income from all sponsors without exception do not allow sponsors to establish ability to support a child through "alternate evidence," in contravention of 45 C.F.R. § 410.1202(c), *id.* ¶ 165, unlawfully apply retroactively to potential sponsors who already completed a sponsor application, *id.* ¶ 166, and violate the Paperwork Reduction Act, *id.* ¶ 167. In Count V, Plaintiffs claim that the new proof of identity and proof of income requirements are arbitrary and capricious because, Plaintiffs allege, they result in denials of sponsorship applications based solely upon immigration status, and

because, Plaintiffs allege, ORR failed to take into account important aspects of the problem, including impact on children's length of stay in custody, children's mental health, and family integrity. *Id*. ¶¶ 169-73. In Count VI, Plaintiffs claim that ORR issued the new proof of identity and proof of income requirements unlawfully, by not providing notice and comment. *Id*. ¶¶ 174-79. On September 12, 2025, Plaintiffs moved for summary judgment. *See* ECF No. 58-1.

On September 16, 2025, David was released from ORR custody to his mother. *See* ECF Nos. 63 at 1, 63-1, DSSUMF ¶ 305.

The preliminary injunction, which applies to the provisionally certified class, ECF No. 34, continues to be in effect. Defendants continue to comply.

## STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A material fact is one with potential to change the litigation's substantive outcome. *Friends of Animals v. Ross*, 396 F. Supp. 3d 1, 7 (D.D.C. 2019) (Friedrich, J.) (citing *Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). A dispute is genuine if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *Id*. (citing *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895). In an APA case like this one, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id*. (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (other citation omitted)). The entire case is a question of law, and the district court sits as an appellate tribunal. *Id*. (citing *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotations omitted)).

When parties file cross-motions for summary judgment, a court "must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Savignac v. Day*, 754 F. Supp. 3d 135, 163 (D.D.C. 2024). Summary judgment is a proper means by which a court can definitively resolve questions of law on the merits. *See Sacchetti v. Gallaudet Univ.*, 181 F. Supp. 3d 107, 117-18 (D.D.C. 2016) (citing *Marshall Cnty. Health Care Auth. V. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)); *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 208-13 (D.D.C. 2022) (granting partial summary judgment on a claim that "turn[ed] on pure questions of law").

## ARGUMENT

### I.    Plaintiffs lack standing to bring their claims.

Article III standing requires that a plaintiff show: (1) an "injury in fact"; (2) a "causal connection between the injury" and the challenged action; and (3) a likelihood that the "injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted). The last two "standing requirements—causation and redressability—are often flip sides of the same coin." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 338 (2016) ("*AHM*") (internal quotation omitted).

### A.    Plaintiffs Mateo N. and Yair G. (the new Plaintiffs) lack standing as to all claims because they have not established that any delay in their release from ORR care and custody is attributable to any new ORR requirements.

Additional time in ORR care and custody waiting to be reunited with family or other adult caregivers are ongoing injuries that continue for as long as the children are in custody.[5] ECF No. 35 at 9. For causation, Plaintiffs must establish that ORR's actions have a "causal connection" to

_____

[5]     Plaintiffs use the term "separation" but do not claim that the government involuntarily separated Plaintiffs from family members. Given that UAC in federal government custody must be referred to ORR within 72 hours, 8 U.S.C. § 1232(b)(3), it is well-settled law and practice that UAC spend some amount of time in ORR care and custody after they enter the United States.

the alleged injury. *Defs. of Wildlife*, 504 U.S. at 560. The injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Defs. of Wildlife*, 504 U.S. at 561 (quoting *Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)).

Plaintiffs Mateo N. and Yair G. have not demonstrated that their injuries are fairly traceable to any of the challenged agency actions. Neither they nor their sponsors allege any problem with the proof of income requirements. Plaintiffs submitted declarations from Mateo N., Mateo N.'s brother and potential sponsor Steven N., Yair G., and Yair G.'s sister and potential sponsor Milagro G. *See* ECF Nos. 56-2 through 56-7. Steven N. asserts that the only missing documentation is his wife's proof of identity. *See* PSSUMF ¶¶ 172, 175; DSSMUF ¶ 349. Steven N. asserts that he lives in Massachusetts and that his wife tried to obtain a Massachusetts identity card but "they" told him and his wife that she must complete a driving test and obtain a driver's license. *See* DSSMUF ¶ 350. Yet, according to an official Massachusetts website, a resident of that state may obtain an ID card without establishing citizenship or immigrant status. *See* PSSUMF ¶¶ 124, 173. While Massachusetts requires additional documents for a REAL ID state identification, the ORR proof-of identity requirements do not require a REAL ID state identification. *See* DSSUMF ¶¶ 304-08 (noting that sponsors could satisfy the proof of identity requirement with a "local" identity document or an employment authorization document). Thus, the delay in Mateo N.'s release from ORR care and custody appears to be attributable either to the delay by Steven N.'s wife in obtaining a state-issued identification card, Steven N.'s or his wife's misapprehension of ORR's requirements, lack of awareness of the availability of, or requirements for obtaining, a non-driver's license identification in Massachusetts, or a combination thereof—rather than reliance on the former proof of identity requirement. *See* DSSUMF ¶¶ 348-51.

19

Yair G.'s sister Milagro G. attests that in July a case manager told Milagro G. that she must provide identification from the United States or the state where she lives. *See* PSSUMF ¶ 181. Milagro G. attests that she cannot obtain any of the forms of the identification requested, but says nothing about her attempts to obtain such documentation. *See* DSSUMF ¶¶ 354. Yair G.'s prolonged detention appears to be the result of miscommunication between his sister and a case manager. *See* DSSUMF ¶¶ 355. In sum, Plaintiffs have not demonstrated that they remain in ORR care and custody because of the new documentation requirements, or lack of notice of the new documentation requirements, but rather a potential sponsor's unwillingness to obtain documents to establish identity.

**B.      The claims of Plaintiffs Angelica S., Eduardo M., Liam W., Xavier L., Leo B., and David D. are moot as to all claims because they have been released from ORR care and custody.**

The five original Plaintiffs, Angelica S., Eduardo M., Liam W., Xavier L., and Leo B., and one of the new Plaintiffs, David D., have been released from ORR care and custody. Their injuries ended because they are no longer in custody. *See* ECF No. 35 at 9 (concluding that detention and separation from families are ongoing injuries that will continue for as long as the children are in custody). Any past injury suffered by Angelica S., Eduardo M., Liam W., Xavier L., Leo B., and David D. that is traceable to ORR would not be redressable by a favorable decision in this case.

**C.      Plaintiffs lack standing to bring their claims regarding the Interim Final Rule (Counts I, II, and III).**

No Plaintiff has demonstrated harm traceable to the IFR. Aside from speculation, *see, e.g.,* ECF No. 48, at ¶ 113 ("Mateo will be harmed if ORR collects and/or shares information about his sister-in-law or other adults involved in the sponsorship application for immigration or law enforcement purposes"), neither of the two new Plaintiffs allege any injury fairly traceable to the IFR. None of the sponsors identify the IFR or allege a fear of immigration-status information being

shared with immigration or law enforcement in their declarations. *See* ECF No. 56-2-56-7 (containing the declarations of Mateo N. and Yair G. and their sponsors). None of the two new Plaintiffs allege that such a fear led to prolonged time in ORR care and custody or any other harm. Not one Plaintiff alleges that ORR disqualified a potential sponsor based solely upon immigration status. Plaintiffs suggest that the IFR in combination with the ORR Policy Guide updates work together to disqualify sponsors based on immigration status, *see* ECF No. 58-1 at 24, but have not supported their theory with any facts. Although Milagro G. attests that she was not able to obtain any of the allegedly required forms of identification, she alleges that she asked a friend who has started the process of applying to sponsor Yair G. *See* PSSUMF ¶ 184. Thus, Yair G. has the potential to be released from custody to a sponsor.

The potential sponsors of two individual Plaintiffs, Angelica S. and Xavier L., whose claims are now moot, attested that their injuries (detention and separation from family due to sponsorship delay) began with the promulgation of the new proof-of-identity requirements that were immediately effective on March 7, 2025. *See* PSSUMF ¶¶ 108 (regarding Angelica), 156 (regarding Xavier). The Interim Final Rule was not promulgated until March 25, 2025. The Court observed that Plaintiffs "cannot rely on a preexisting injury to challenge a later policy change, especially when that change did not change the circumstances of the injury." ECF No. 35 at 9. Even if they could, a vague, generalized fear about immigration enforcement is not sufficient to show injury. And any injury attributable to the income requirements promulgated in April 2025 also were not caused by the interim rule's publication on March 25, 2025. Plaintiffs have not provided any basis for concluding otherwise.

Further, nowhere in the TVPRA, Foundational Rule, or ORR Policy Guide is immigration status a basis for disqualification of potential sponsors. Plaintiffs even concede that some states

allow undocumented individuals to obtain a non-REAL ID driver's license or state identification card, which is all that is needed to satisfy the proof-of-identity requirement. *See* PSSUMF ¶¶ 124 (California), 173 (Massachusetts). The new documentation requirements might be harder to meet than those in place before March 2025, but Plaintiffs have not alleged any specific examples of a potential sponsor's disqualification based on immigration status.

Plaintiffs argue that they have standing to challenge the IFR, because, they claim, the IFR would be an obstacle to obtaining relief, assuming the Court finds for Plaintiffs on their claim that ORR's new documentation requirements violate the pre-IFR statement in 45 C.F.R. § 410.1201(b) (2024) that no sponsor shall be disqualified based solely on immigration status. ECF No. 58-1 at 23-24. But Plaintiffs have not demonstrated that they have standing to bring their claims as to the new documentation requirements, given that Plaintiffs Mateo N. and Yair G. have not identified any injury traceable to the new documentation requirements and the original Plaintiffs' claims are moot. The IFR is not a roadblock, because there is no road.[6]

**D.    None of the Plaintiffs have standing to assert a claim under the Paperwork**

---

[6]    For this reason, the judicial opinions that Plaintiffs rely upon in support of their roadblock theory are inapposite. ECF No. 58-1 at 24 (citing *Gutierrez v. Saenz*, 145 S. Ct. 2258, 2268-69 (2025) (holding that death row inmate had standing to bring § 1983 action for declaratory and injunctive relief seeking post-conviction DNA testing, even if the local prosecutor had other reasons to deny DNA testing, where inmate claimed that local prosecutor's denial of request for DNA testing deprived inmate of liberty interest in utilizing state procedure to obtain acquittal or reduction in sentence and declaratory judgment would eliminate roadblock of prosecutor's allegedly unlawful justification for denying DNA testing); *Tanner-Brown v. Haaland*, 105 F.4th 437, 445 (D.C. Cir. 2024) (holding that, in action for breach of fiduciary duty as to allotment of land held in trust for children of former slaves of Native American tribes, personal representative of allottee's estate had standing to bring suit against trustee, and assuming the merits of the claim for breach, had standing to seek an accounting regarding the property held in trust, where absence of accounting was roadblock to redressing breach); *Int'l Primate Prot. League v. Admins. of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991) (holding that plaintiffs seeking protection for laboratory monkeys under state law had standing to challenge the removal of their state law claims to federal court under 28 U.S.C. § 1442(a)(1), even though in federal court plaintiffs lacked standing to seek protection of monkeys, where federal court jurisdiction was roadblock to proceeding with state law claims).

Case 1:25-cv-01405-DLF    Document 72    Filed 11/28/25    Page 33 of 57

Reduction Act.

Under the Paperwork Reduction Act, an agency "shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information" the agency completes several procedural steps. *See* 44 U.S.C. § 3507(a). The collection of information is from the individuals or entities supplying information to the agency. *See id.* § 3502(3)(A)(i). The Paperwork Reduction Act's collection requirements do not affect Plaintiffs, but rather their sponsors. Plaintiffs analogize their claim to *Saco River Cellular, Inc. v. FCC*, 133 F.3d 25 (D.C. Cir. 1998), *see* ECF No. 58 at 38-39, in which two applicants for a license to provide cellular phone services sued the FCC over the decision to grant that license to a third applicant after the FCC found that its previous denial of that license to the third applicant was a violation of the Paperwork Reduction Act. *See Saco River Cellular*, 133 F.3d at 28-29. As Plaintiffs implicitly acknowledge, however, the proper analog to the third applicant would be the sponsors of the Individuals Plaintiffs, not Plaintiffs themselves. *See* ECF No. 58 at 39 (arguing that under *Saco River Cellular*, ORR should permit the *sponsors* to apply for UAC in ORR custody under the pre-proof of identity and proof of income requirements).

### E.    Plaintiff Immigrant Defenders lacks standing as to all claims.

When (as here) a plaintiff challenges the government's allegedly "unlawful regulation (or lack of regulation) of someone else," "standing is not precluded, but it is ordinarily substantially more difficult to establish." *AHM*, 602 U.S. at 382–83 (quoting *Lujan*, 504 U.S. at 562) (other citation omitted). That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else. *Id.* (citations omitted). To establish organizational injury, an organization must do more than allege diversion of resources or a "setback to the organization's

abstract social interests." *Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Rather, the challenged action must cause a "direct conflict between the defendant's conduct and the organization's mission." *Prevention of Cruelty*, 659 F.3d at 25. To establish causation, the plaintiff must show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff. *AHM*, 602 U.S. at 385.

ImmDef's asserted mission is to provide legal representation to unaccompanied immigrant minors in California. ECF No. 48-1 ¶ 128. ImmDef does not allege that the government has revoked their licenses or prevented them from accessing their clients. It instead claims that it must spend more time with each client and prioritize cases of children in ORR custody over all other cases and that a larger portion of its overall docket involves detained cases, which are more time intensive to handle and more urgent. *See* PSSUMF ¶¶ 218, 220. But these operational costs are not "beyond those normally expended" to support ImmDef's mission. *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). ImmDef's current-day representation is in line with its usual work. ImmDef still is able to perform its fundamental purposes by representing unaccompanied minors through the sponsorship and release process. *See* DSSUMF ¶¶ 366-69. ImmDef also asserts that it has had to divert its resources to providing legal services to detained UAC. *See* PSSUMF ¶ 222. But ImmDef asserts no reduction in its capacity to provide legal services to the children in ORR care and custody.

Plaintiffs liken their case to *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 31 (D.D.C. 2020) (*CAIR*), ECF No. 58-1 at 25-27, but this case is easily distinguishable. A core component of the *CAIR* nonprofits' mission was providing legal services directly to

applicants. CAIR challenged an interim final rule that significantly changed the United States' asylum procedures by categorically disqualifying aliens arriving at the southern border from receiving asylum unless they have already unsuccessfully sought similar protection in another country on their way to the United States. *CAIR,* 471 F. Supp. 3d at 34. The *CAIR* court observed that the rule was intended to bar many individuals from qualifying for asylum and that, as a result, individuals covered by the rule might avoid removal only by meeting the heightened "reasonable fear" screening standard that applies to withholding-of-removal cases, instead of the "credible fear" screening standard that applies to those seeking to apply for asylum. *Id*. at 39. Preparing clients to meet the higher standard, CAIR argued, was more resource intensive and would limit the number of clients that CAIR could serve such that it expected to be able to serve only 50 percent fewer asylum seekers with the new rule in effect. *Id*. ImmDef, in contrast, alleges no such reduction in its ability to provide legal services to UAC in ORR care and custody, as it had been doing before and after the ORR policy updates. For instance, both before and after the implementation of the challenged proof of identity requirements, ImmDef claims to have provided legal services to detained UAC and UAC in removal proceedings. *See* DSSUMF ¶ 362.

More importantly, ImmDef is a non-profit law firm. To find that ImmDef has standing because, ultimately, it must divert resources would be like a law firm having standing to challenge the Internal Revenue Service over a change in tax policy on the basis that the policy causes the firm to make less money advising clients on tax matters. Finding injury based on changes that amount to changes in litigation strategy would cause lawsuits to be pretext for interlopers to push agendas and company priorities rather than vehicles for resolving cases and controversies—a consequence that the Supreme Court tried to avert in *AHM*.

## II.    The Interim Final Rule is not a final agency action and therefore not subject to APA

**review.**

Although finality is not jurisdictional, "there is no doubt that [plaintiffs] would lack a cause of action under the APA" without it. *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003). For an action to be "final" and subject to review under the APA, the action must mark consummation of agency's decision-making process, rather than merely be tentative or interlocutory in nature, and the action must be one by which rights or obligations have been determined or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The challenged action must satisfy both prongs of *Bennett* to be considered final. *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016).

First, the IFR, on its face and by its procedural context, is not the consummation of ORR's decision-making process. It is an Interim Final Rule and was issued with a 60-day public comment period. *See* DSSUMF ¶ 328. The very purpose of an "interim" rule coupled with a comment period is to solicit public input—written data, views, or arguments—that the agency is expected to consider before issuing a final action. Although the IFR was made effective immediately, its interim status and comment period make it subject to change. For this reason alone, the Court should not consider the IFR a final agency action for purposes of judicial review. This solicitation for comments signifies that ORR's deliberative process has not concluded. As Plaintiffs note, ORR received more than 400 comments on the IFR. *See* PSSUMF ¶ 7.

Second, for "rights or obligations [to] have been determined" or for "legal consequences [to] flow," the agency action must be a conclusive and settled pronouncement. An interim rule that the agency itself has indicated is subject to change based on public commentary lacks this definitive character. Moreover, in the IFR ORR only excised statements of policy. *See Chem. Mfrs. Ass'n v. E.P.A.*, 26 F. Supp. 2d 180, 186 (D.D.C. 1998) (concluding that a policy in which the agency does not state a position that either binds the agency or that bears on the rights or

26

obligations of private parties does not meet the second prong of *Bennett v. Spear*). Plaintiffs' reading of the consequences of the IFR is based on the incorrect assumption that it requires ORR or Plaintiffs to take or refrain from a specified action. Plaintiffs assume that the excision of the statement that ORR shall not disqualify a sponsor based solely upon the sponsor's immigration status means that ORR affirmatively will disqualify sponsors based solely upon their immigration status. *See* ECF No 58-1 at 30. Nothing in the TVPRA, Foundational Rule, or ORR Policy Guide allows, much less requires, ORR to disqualify a sponsor based solely on immigration status. Likewise, Plaintiffs interpret the excision of the statements that ORR "shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement related purposes," and that "ORR shall not share any immigration status information relating to potential sponsors with any law enforcement or immigration enforcement related entity at any time," to mean that ORR will do those things, *id.*, at 31-33, but Plaintiffs have not claimed ORR has taken such actions. Therefore, the IFR cannot reasonably be considered a final agency action.

## III.    Alternatively, the Interim Final Rule is lawful

Plaintiffs raise several claims based on what they see as lacking in the IFR, which lend further support for Defendants' argument that the IFR is not a final agency action. Defendants nevertheless will respond to Plaintiffs' arguments below.

### A.    The issuance of the Interim Final Rule, with immediate effectiveness, was necessary to bring an agency regulation in compliance with a federal statute.

ORR issued the IFR to ensure the Foundational Rule conforms with 8 U.S.C. § 1373(a) & (b), which are part of the Clinton-era Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208 § 642(a), 110 Stat. 3009-546, 3009-707 (Sept. 25, 1996). In § 1373 Congress does not require federal government agencies to take any action, except to refrain from prohibiting the exchange of certain information unless Congress explicitly directs the agency

to implement a prohibition. By removing 45 C.F.R. § 410.1201(b), which states that ORR "shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement related purposes," and that "ORR shall not share any immigration status information relating to potential sponsors with any law enforcement or immigration enforcement related entity at any time," ORR has stricken a provision that conflicts with § 1373(a)'s mandate that federal government agencies not legislate their own prohibitions on information-sharing.

The DOJ Office of Legal Counsel (OLC) opinion supports this interpretation. *See Relationship Between Illegal Immigr. Reform & Immigrant Resp. Act of 1996 & Statutory Requirement for Confidentiality of Census Info.*, 1999 WL 34995963, at *4 (O.L.C. May 18, 1999) (concluding that § 1373(a) does not clearly invest in government officials an affirmative authority to disclose information where they might otherwise be prohibited from doing so and, "[r]ather, the provision is phrased as a limitation on the authority of government entities or officials [other than Congress] to impose prohibitions or restrictions on disclosures by government entities or officials"). OLC observed that § 1373(a) appears to be intended to constrain the lawmaking authority of government officials and authorities other than Congress. *Id*. at 7. OLC opined that § 1373(a) "may be comfortably construed" to limit the discretionary authority of federal officers or employees, or federal entities like administrative agencies, to adopt disclosure prohibitions or restrictions. This is because "federal officials or entities generally may exercise discretionary authority of this sort only to the extent that Congress allows by statute." *Id*.

OLC presciently noted that Congress may not enact laws directing itself not to enact certain laws in the future. *Id*. at 5. As Plaintiffs note, *see* PSSUMF ¶¶ 96-97, Congress more recently conditioned DHS's appropriations such that none of its funding may be used "to place in detention, remove, refer for a decision whether to initiate removal proceedings, or initiate removal

proceedings against a sponsor, potential sponsor, or member of a household of a sponsor or potential sponsor of [UAC] based on information shared by the Secretary of [HHS]."[7]  Removing 45 C.F.R. § 410.1201(b) from the Foundational Rule does not contradict the Appropriations rider. The IFR cannot reasonably be construed as a directive to start sharing information about sponsors with DHS for law enforcement or immigration enforcement purposes.[8]  Nor can the IFR be reasonably construed as a directive to DHS to start using information it receives from HHS for immigration enforcement purposes, considering that Congress expressly conditioned DHS's appropriations on DHS not using information it received from HHS about potential sponsors for specified immigration-enforcement events.

Plaintiffs' contention that ORR offered no reasoned explanation for a significant change in policy, ECF No. 58-1 at 33-35, is not supported. ORR did provide an explanation: 45 C.F.R. § 410.1201(b) contravenes 8 U.S.C. § 1373. *See* 90 Fed. Reg. at 13,554-55. ORR observed that it had not mentioned § 1373 in the preamble to the Foundational Rule. *Id*. at 13,555. The IFR fixes the omission. Given § 410.1201(b)'s contravention of the statute, there was not much more the agency could say.

Plaintiffs further contend that ORR's excision of the statement that "ORR shall not disqualify potential sponsors based solely on their immigration status," in former § 410.1201(b)

---

[7]    Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, div. D, title II, § 216(a), 133 Stat. 2317, 2513 (Dec. 20, 2019); *see* Pub. L. No. 119-4, div. A, title I, § 1101(a)(6), 139 Stat. 9, 10-11 (Mar. 15, 2025) (adopting rider in 2020 Consolidated Appropriations Act); Pub. L. No. 119-37, div. A, § 101(a) (Nov. 12, 2025) (adopting rider in 2020 Consolidated Appropriations Act by adopting that same rider in the Continuing Appropriations and Extensions Act, 2025).

[8]    Plaintiffs argue that HHS acted arbitrarily and capriciously by not mentioning ORR's Privacy Act Notice, ECF No. 58-1 at 35, and failing to consider individual Plaintiffs' reliance interests on ORR not sharing sponsor information, *id*. at 36. Plaintiffs, again, assume that under the IFR ORR affirmatively will collect sponsor application information for law enforcement or immigration enforcement purposes. Again, nothing supports Plaintiffs' reading.

was a "seismic change," and that "disqualifying sponsors without stable lawful immigration status is guaranteed to prolong children's time in custody," ECF No. 58-1 at 34. Plaintiffs' argument is based on the assumption that the excision will allow ORR to deny a sponsorship application based solely on immigration status. But no credible evidence supports the notion that the removal of former § 410.1201(b) will permit ORR to disqualify a sponsor solely on the basis of their immigration status. Immigration status is not one of the many enumerated factors that ORR must consider when determining sponsor suitability, either by statute, *see* 8 U.S.C. § 1232(c)(3)(A) (listing requirement for safety and suitability assessments), or regulation, *see* 45 C.F.R. § 410.1202 (sponsor suitability considerations). Further, no provision within the ORR Policy Guide explicitly permits ORR to disqualify potential sponsors solely based on their immigration status.[9] While immigration status could make it more difficult to obtain the necessary proof of identification, if one lacks lawful immigration status, this was the case before and after the IFR.

Thus, contrary to Plaintiffs' characterization, ECF No. 58-1 at 34, ORR's removal of "ORR shall not disqualify potential sponsors based solely on their immigration status," in former § 410.1201(b), was not a significant change in policy. But ORR did explain why it removed the entire subsection, including "shall not disqualify potential sponsors based solely on their immigration status," 90 Fed. Reg. at 13,555, and its explanation is reasonable. Under the Foundational Rule's severability provision, promulgated following notice and comment, "the provisions of this part are separate and severable from one another." 45 C.F.R. § 410.1000(b). That ORR considered the subsection as one component, even though the subsection logically could be

---

[9]    See ORR Policy Guide 2.6, available at https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2 (updated Jan. 30, 2023) (viewed Nov. 23, 2025). In practice, ORR may obtain immigration status information through background check results. *Id*.

divided into three directives, was a reasonable construction of the severability provision.

**B.   Good cause exists for ORR to issue the Interim Final Rule without notice and comment, considering that the provision that ORR removed from the Foundational Rule contravened 8 U.S.C. § 1373(a) and (b).**

ORR invoked the exception to formal notice and comment procedures for when the agency "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B). As ORR noted, no amount of public input could give ORR the authority to contravene an Act of Congress. 90 Fed. Reg. at 13,555. Even assuming that ORR somehow was mistaken that any part of 45 C.F.R. § 410.1201(b) (2024) contravened 8 U.S.C. § 1373(a) and (b)—and it was not—ORR solicited public comments, providing the public had the opportunity to identify any mistakes.

Plaintiffs argue that the IFR could not have met the "unnecessary" prong of the good cause inquiry, which is "confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public," ECF No. 58-1 at 30 (quoting *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 94 (D.C. Cir. 2012)), and situations in which the public is not particularly interested, *id*. (quoting *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 755 (D.C. Cir. 2001)). Again, Plaintiffs construe the IFR to have more impact than it does. Removing 45 C.F.R. § 410.1201(b) (2024) does not impose any obligation on ORR or Plaintiffs. Plaintiffs observe that ORR received nearly 400 comments—a testament to public interest in the IFR, *id*. at 31, and the IFR's non-finality. The Court, however, must review the agency's action at the time the agency acted, not a later-developed record.

Plaintiffs also argue that the IFR does not satisfy the public interest prong to excuse ORR from notice-and-comment, which is "met only in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest."

ECF No. 58-1 at 31 (citing *Mack Trucks*, 682 F.3d at 95). ORR's invocation of the public interest prong is based on an unusual situation, for which there exists scant judicial precedent, but it also was reasonable. The regulatory provision that ORR excised from the Foundational Rule clearly contravened an unambiguous statute. ORR lacks the authority to override an Act of Congress, and no level of public comment can change that.

C. **Good cause exists for the Interim Final Rule to have immediate effect, because it brings a regulation into compliance with a statute, and nothing in the Interim Final Rule requires Plaintiffs or their potential sponsors to adjust their behavior.**

ORR articulated its reasoning for making the IFR immediately effective, observing that the IFR brings ORR into compliance with a statute. 90 Fed. Reg. at 13,555. Plaintiffs do not agree that the IFR was necessary to bring the Foundational Rule into compliance with 8 U.S.C. § 1373. ECF No. 58-1 at 33, n.4. Given that the IFR does not require Plaintiffs or their sponsors or ORR to take or refrain from taking any specific action, ORR also reasonably considered, as a second justification for making the IFR immediately effective, that regulated entities would not need to adjust behavior. 90 Fed. Reg. at 13,555. Plaintiffs contend that the Foundational Rule guaranteed protections that Plaintiffs and others allegedly relied upon, ECF No. 58-1 at 33, n.4, but Plaintiffs do not articulate what those reliance interests were—because none exist.

IV. **The new sponsorship document requirements in the Policy Guide updates are lawful.**

A. **Plaintiffs' assertion that ORR's updates to the ORR Policy Guide § 2.2.4 related to proof of identity and proof of income disqualify sponsors based solely on immigration status is incorrect.**

Plaintiffs argue that ORR did not conduct a reasoned analysis of the risks and benefits of different types of documentation and rather "simply imported" the list of documents in U.S.

Citizenship and Immigration Services' (USCIS's) Form I-9 "without explanation." ECF No. 58-1

at 46. However, ORR reasoned that:

> [b]ased on concerns related to the ability to authenticate foreign identity documents used in support of the Sponsor Application, ORR believes aligning identity document requirements to the DHS/USCIS I-9 required documentation will provide a safer framework for proving and authenticating identity. These are documents that the federal government relies on to establish identity for both citizens and non-citizens. ORR will also focus efforts to ensure that those reviewing identity documents have an easy way to view them, as well as the pictures on the documents, to determine that the individual submitting the identity document is in fact the holder of the identity document.

*See* DSSUMF ¶ 301 (quoting Angelica-0000082. Plaintiffs argue that the new March 2025 proof

of identity and proof of income requirements are unlawful because ORR "remains bound" by the

pre-IFR regulation providing that "ORR shall not disqualify potential sponsors based solely on

their immigration status . . ." 45 C.F.R. § 410.1201(b) (2024). *See* ECF No. 58-1 at 39. Plaintiffs

maintain that the new requirements unlawfully disqualify sponsors based solely on their

immigration status, because ORR based its list of acceptable documents to establish identity on

USCIS's Form I-9 requirements for employers to verify their employees' eligibility for

employment in the United States. *Id*. But Plaintiffs omit two important deviations in the ORR List

from the Form I-9 List. ORR allows potential sponsors to establish identity by choosing one or

more of the specified types of identification documents on a list, which includes items that appear

in List B on Form I-9. *See* Form I-9, Employment Eligibility Verification ("Form I-9"), available

at https://www.uscis.gov/sites/default/files/document/forms/i-9.pdf (updated Jan. 20, 2025)

(viewed Nov. 24, 2025). Two of the specified types of documents are: (1) "Driver's license or ID

card issued by a U.S. state or outlying possession of the United States provided it contains a

photograph or information such as a name, date or birth, sex, height, eye color, and address;" and

(2) "ID card issued by U.S. federal, state or local government agencies or entities, provided it

contains a photograph or information such as name, date of birth, sex, height, eye color, and address." *Compare id.* at 2 (containing List B) *with* DSSUMF ¶ 306. Potential sponsors may establish identity with one of these types of documents. On the I-9 Form, on the other hand, USCIS requires the employee to submit one of the types of documents on List B and at least one document from a second list of documents, List C, to establish employment eligibility. *See* Form I-9 at 2 (containing Lists B and C).

Plaintiffs acknowledge, as they must, that lawful immigration status is not a prerequisite, in many states, for obtaining a driver's license or non-driver's license ID card, ECF No. 58-1 at 39, which are among the types of documents that potential sponsors may use to establish their identity.[10] Therefore, a potential sponsor's unwillingness to obtain a driver's license or non-driver identification card would not be a disqualification from sponsorship based solely on immigration status, but rather on a refusal to obtain the proper documents. If the sponsor does not live in a state that offers a non-REAL ID driver's licenses or identification, the sponsor could relocate. But this would not amount to disqualification based solely upon immigration status. In essence, ORR relied upon a list developed by an agency responsible for adjudicating eligibility for immigration benefits, which presumably possesses expertise in the assessment of identity documents and the types that serve as reliable proof of identity. Additionally, Plaintiffs overlook that sponsors can satisfy the proof of identity requirements with an employment authorization document (Form I-766 or EAD), a document that does not require lawful immigration status to obtain. *See* DSSUMF

---

[10]    Such documents are non-REAL ID compatible and cannot be used for air travel or to enter federal facilities or military installations. See How to get a REAL ID and use it for travel, available at https://www.usa.gov/real-id (updated Nov. 13, 2025) (viewed Nov. 24, 2025). Under "Can you still get a non-REAL ID-compliant license or state ID?" users may look up and visit each state's driver's licensing agency website to see how to get a non-REAL ID-compliant license or state ID. *Id.*

¶ 305; 8 C.F.R. §§ 274a.12(c)(8) (authorizing EADs for aliens who have pending asylum applications), (13) (authorizing EADS for aliens with deferred action), (18) (authorizing EADs for aliens who have final orders of removal and are released from immigration custody pursuant to an order of supervision).

The new proof of income documentation requirements in ORR Policy Guide 2.2.4 also do not disqualify based on their immigration status. One of the qualifying documents for proof of income is a potential sponsor's tax returns from the previous year. *See* PSSUMF ¶ 65. One can file a federal tax return with an Individual Taxpayer Identification Number, which does not require lawful immigration status to obtain.[11] Therefore, the Court need not reach Plaintiffs' argument that the new documentation requirements violate the pre-IFR 45 C.F.R. § 410.1201(b) (2024).

**B.    The new proof of identity and proof of income requirements, in conjunction with enhanced biometric collection and background checks, are necessary given gaps in ORR's sponsor vetting process and egregious incidents of sponsor fraud and trafficking.**

While ORR must place UACs "in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A), ORR also has a duty to protect the children from those who might seek to exploit them, 6 U.S.C. § 279(b)(1)(A) & (b)(2)(A)(ii), and to "establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity," 8 U.S.C. § 1232(c)(1). ORR identified significant deficiencies in its sponsor vetting process and documented egregious incidents of sponsor fraud and trafficking. *See* DSSUMF ¶¶ 275-80. ORR has documented multiple instances in which criminals perpetrated

---

[11]    *See* Internal Revenue Serv., Individual taxpayer identification number, https://www.irs.gov/tin/itin/individual-taxpayer-identification-number-itin (last updated Sept. 24, 2025) (stating under the tab "Who's eligible for an ITIN," "If you're a resident alien, nonresident alien or their spouse or dependent, you can apply for an ITIN regardless of immigration status").

fraud on the Agency to acquire and abuse children. *See* DSSUMF ¶¶ 270-73 (citing cases of sponsors fraudulently obtaining the release of UACs, whom they proceeded to sexually abuse and extort). The Court has recognized ORR's "compelling" interest in issuing the proof of identity requirements to "protect children from trafficking" and "to identify fraud." *See* ECF No. 35, Mem. Op. at 14.

Plaintiffs take issue with the very premise of requiring potential sponsors to produce proof of identity and proof of income from a list of documents. ECF No. 58-1 at 40. Plaintiffs contend that such a requirement does not provide an individualized assessment of sponsor suitability. *Id.* In contrast, a minimal documentation requirement for potential sponsors enables ORR and care providers to screen potential sponsors, establishing the groundwork for an individualized analysis. Here, considering that one of the types of documents on the ORR Policy Guide § 2.2.4 list conceivably is available to any adult living in the United States, it was reasonable for ORR to specify this list.

Further, if the Category 1 sponsor, defined as the parent, legal guardian, or step-parent with legal custody of the UAC, seeks to sponsor the UAC but is unable to obtain the document, the ORR Policy Guide § 2.2.4 allows ORR headquarters to grant exceptions. Plaintiffs note that seeking an exception takes several weeks, citing David D.'s wait of over five weeks, and Eduardo M.'s and his brother's wait of three weeks for their exception requests to be granted, ECF No. 58-1 at 41, but a multi-week wait for a sponsor to clear is not an unreasonable trade-off for an individualized finding of suitability and increased protection against release to a potentially harmful situation.[12]

---

[12]    Plaintiffs' reliance on *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 609 (S.D.N.Y. 2018), for the proposition that designating the ORR Director or her designee for releases was a clear violation of the TVPRA's mandate to promptly place UACs in the least restrictive setting available, is

C.    **ORR's Policy Guide Updates are not arbitrary and capricious, given that ORR considered the relevant factors and articulated a satisfactory explanation.**

The Administrative Procedure Act permits courts to set aside agency actions that are "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A). Under this narrow standard of review, the agency must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). A court is not to substitute its judgment for that of the agency," however, and should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citation omitted). The party challenging the agency action as arbitrary and capricious must show the federal agency action is not a product of reasoned decisionmaking, which is a heavy burden, since the APA requires a very deferential scope of review that forbids a reviewing court from substituting its judgment for that of the agency. *Hisp. Affs. Project v. Acosta*, 263 F. Supp. 3d 160 (D.D.C. 2017), *aff'd in part, rev'd in part*, 901 F.3d 378 (D.C. Cir. 2018). An agency action is not subject to a heightened or more searching standard of review simply because it represents a change in administrative policy. *Fox Television,* 556 U.S. at 514. This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.[13] *Id*. at 515. Nor do

---

inapposite. *L.V.M.* concerned a policy by a new ORR Director who assumed his role in June 2017 and issued a policy under which he or his designee must approve the release of any UACs who had been housed in a staff-secure or secure facility. *Id*. at 610. Under guidance at the time (pre-dating the Foundational Rule by at least six years) such children necessarily would have exhibited disruptive behaviors, escape risks, or other behaviors which raise safety concerns. *Id*. The policy led to an increase in the average time such UACs spent in custody from three months to seven or eight months. *Id*. at 610-11. This increase is different from the three- to five weeks that an individualized finding by a headquarters employee, not necessarily the Director, could take, when a Category 1 sponsor is unable or unwilling to obtain the required proof of identity.

[13]    As ORR was not writing on a blank slate, it was required to assess whether there were reliance interests. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020). This Court

courts require an agency to consider all policy alternatives in reaching a decision. *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 50-51. A rulemaking "cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man." *Id.* (citation omitted).

The primary purpose of the newly implemented documentation requirements is to protect UACs from traffickers and other individuals seeking to exploit or harm such children through criminal, harmful, or exploitative activities. *See* DSSUMF ¶ 290. In updating the ORR Policy Guide to sections 2.2.4, 2.7.4, and 5.8.2, which pertain to proof of identity, ORR observed that HHS's investigations had uncovered documented instances of criminals utilizing fraudulent documents in support of Sponsor Applications. In these cases, the former UACs became victims of crimes perpetrated by their sponsors, including incidents of trafficking and sexual assault that have resulted in criminal prosecutions. *See* DSSUMF ¶ 295. ORR observes that document fraud in the UAC program undermines the sponsor-vetting process and poses a significant safety risk to UACs. *See* DSSUMF ¶ 291. Specifically, ORR identified misrepresentations by sponsors, including falsified identity and relationship documents, and address information. *See* DSSUMF ¶ 295. ORR previously accepted foreign documents and had a policy that permitted sponsors to submit documents lacking photographs when submitted alongside other documents. *See* DSSUMF ¶ 292. However, ORR noted its difficulty authenticating foreign documents, especially in a timely manner, and was aware of widespread fraud involving such documents. omitted, leading to being *See* DSSUMF ¶ 293.

_____

observed that had the original Plaintiffs and their families been aware of ORR's new policies, they might not have decided to enter the United States. ECF No. 35 at 15. Defendants construe the Court's preliminary injunction order, ECF No. 34, and Defendants' ongoing compliance with thar order, to relieve Plaintiffs of Defendants' lapse in considering UACs' and their families' possible reliance interests when ORR issued the Policy Guide updates in March and April 2025.

Plaintiffs argue that ORR failed to consider the impact on the length of time in custody and release prospects associated with the new documentation requirements. ECF No. 58-1 at 42-43. ORR did in fact consider the possibility of longer lengths of custody before it issued the proof of identity requirements in the ORR Policy Guide. ORR recognized that certain stakeholders would express concerns that the policies hinder ORR's ability to release children without unreasonable delay. *See* DSSUMF ¶ 302. (At the time, ORR could not have known whether and to what extent the new documentation requirements would lead to an increase in average times UACs spend in ORR care and custody.) ORR also noted that the same stakeholders would be likely to claim that ORR's restrictions place barriers on sponsors, in particular parents, to the principles of family unity and that the new identity document requirements will be particularly burdensome on the ability of undocumented or out of status aliens to sponsor children. *See* DSSUMF ¶ 302. ORR also considered that it has difficulty authenticating foreign issued documents, especially in a timely manner. *See* DSSUMF ¶ 293. ORR did not articulate an explicit consideration of the 2019 HHS OIG report that Plaintiffs cite regarding the impact of prolonged custody on children, *see* ECF No. 58-1 at 43, but is well aware of its mandate to promptly place children "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). Plaintiffs' citation to the Department of Justice's lawsuit against Southwest Key, ECF No. 58-1 at 44, is irrelevant, considering that, on March 12, 2025—several months before Plaintiffs filed their Complaint in this case—the government dismissed the Southwest Key lawsuit, and ORR transferred the children from the shelters involved in that lawsuit and relocated them somewhere else. *See* Defendants' Separate Concise Statement of Genuine Issues ¶ 59.

Plaintiffs view the policy updates outside of their context. Plaintiffs omit any mention of the Foundational Rule's requirement that ORR and the care provider make and record prompt and

continuous efforts towards family unification and the release of the UAC, 45 C.F.R. § 410.1203(a), and that when a potential sponsor is identified, ORR must explain to both the UAC and the potential sponsor the requirements and procedures for release, *id*. § 410.1203(b). Presumably at that time, the potential sponsor will know what documents they must obtain. As for the length of time in ORR care and custody, ORR supervisory staff who supervise field staff must conduct automatic reviews within 90 days of an unaccompanied child entering ORR custody. These reviews aim to identify and resolve promptly the reasons for the pending sponsor application and determine potential steps to accelerate the safe release of the unaccompanied child., *id*. § 410.1207(a). Subsequently, additional reviews are conducted every 90 days until the pending sponsor application is resolved, *id*. § 410.1207(c). The case manager must update the potential sponsor and UAC on the case status, providing an explanation for the incomplete release process. *id*. § 410.1207(b). Thus, it was against this background that ORR updated three of the approximately 300 subsections of its Policy Guide.

### D.    ORR has provided a reasoned justification for its updated proof of identity requirements.

Plaintiffs argue that ORR has not reconciled its decision to specify the types of documents that it will accept from potential sponsors to establish their identity—a decision based on the difficulty and delays inherent in authenticating foreign documents—with ORR's continued allowance of foreign documents for the purposes of establishing the child's identity and proof of sponsor-child relationship. ECF No. 58-1 at 47. ORR's list of documents that it will accept to establish a child's identity and proof of sponsor-child relationship is not solely based on the ability to authenticate but also on practical considerations. *See* DSSUMF ¶ 293. A UAC is unlikely to have the means to obtain a document issued by a federal, state, or local government in the United States, and it would be difficult for someone else to obtain such a document on the child's behalf.

Thus, while it may be reasonable to have an adult undergo a more rigorous process to establish his or her identity, it may not be as reasonable to place a child in that same process. And it also should be obvious that the focus of the new proof of identity documents is on the potential sponsors, considering that a UAC is significantly less likely than an adult to engage in trafficking and sponsor fraud. Therefore, it was reasonable for ORR to require certain types of documents for one purpose but not another.

### E.    ORR provided a reasoned justification for its updated proof of income requirements.

Plaintiffs have not alleged any harm attributable to ORR's new proof of income requirements in the Policy Guide updates of April 15, 2025, as to any of the individual Plaintiffs whose claims are not moot. *See* ECF Nos. 48, 58-1. Defendants nevertheless respond to Plaintiffs' contention that that ORR did not support its choice of documents. ECF No. 58-1 at 48. ORR noted that:

> By requiring submission of proof of income information and supporting documentation, case managers and Federal Field Specialists (FFS) will be able to better assess whether there are indicators that a sponsor (or individual submitting an Affidavit of Support) is being subjected to labor trafficking or labor exploitation. The Office on Trafficking in Persons (OTIP) has found that parents and other family members have been subjected to human trafficking and/or labor exploitation and had similar debts as the children they sponsored. The information obtained during employment and income verification can inform the safety assessment, safety planning, decision to refer a case for a home study or not, and level of Post-Release Services (PRS) to recommend.

*See* DSSUMF ¶ 315. ORR produced a crosswalk that the ORR consulted, of child welfare laws in several states when it was determining the parameters of the proof of income requirements. *See* DSSUMF ¶ 313. Analogizing sponsorship of a UAC to foster care, ORR considered the state requirements. *See id.* These considerations are also consistent with ORR's statutory responsibility to ensure UAC are protected from those who may seek to victimize them, and its responsibility to

make determinations that potential sponsors for UAC are capable of providing for the child's physical and mental well-being. *See* 8 U.S.C. § 1232(c)(1); (c)(3)(A).

Plaintiffs fault ORR for not considering the possibility that an individual other than the sponsor may provide financial support to a child. *See* ECF No. 58-1 at 37. The proof of income requirement is about the *sponsor*'s financial fitness to support the child, as the child will be under sponsor's care. *See* 45 C.F.R. § 410.1202(c) ("As part of its suitability assessment, ORR may require such components as an investigation of the living conditions in which the unaccompanied child would be placed and the standard of care the unaccompanied child would receive, verification of the employment, income, or other information provided by the potential sponsor as evidence of the ability to support the child"). But ORR may consider evidence of ability to support based on other sources of income.

Plaintiffs further fault ORR for not considering alternative forms of documentation for the proof of income requirements. As Plaintiffs acknowledge, however, ORR chose to consider a limited range of documents to reduce the risk of fraud and to promote uniformity in ORR's determinations of potential sponsors' financial support capabilities. *Cf.* ECF No. 58-1 at 37 (noting the Agency's observation that potential sponsors could try to use "fraudulent documents" to circumvent the proof of income requirements). That Plaintiffs are not satisfied with ORR's rationale does not make the April proof of income requirements arbitrary and capricious.

### F.    The new proof of identity and proof of income requirements are not legislative rules.

Plaintiffs argue that the updates to the ORR Policy Guide are legislative rules that were promulgated without the required notice and comment. ECF No. 58-1 at 50-51. Legislative rules have the "force and effect of law" and may be promulgated only after public notice and comment. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (citing *INS v. Chadha*, 462 U.S.

919, 986 n. 19 (1983) (internal quotation marks omitted)). But the APA does not require notice and comment for interpretive rules, general statements of policy, and rules of organization, procedure, or practice. *Id.*; 5 U.S.C. § 553(b)(3)(A).

The "critical feature" of a procedural rule "is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *Id.* (quoting *James V. Hurson Associates, Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000) (internal quotation marks omitted). That description fits the new proof of identity and proof of income requirements in the ORR Policy Guide updates. The TVPRA requires the Secretary of HHS to make a determination that a sponsor is capable of providing for the child's physical and mental wellbeing and that, in making the determination, the Secretary must, at a minimum, include verification of the custodian's identity and relationship to the child, if any, and an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child. 8 U.S.C. § 1232(c)(3)(A). The Foundational Rule requires ORR to release UAC from its custody subject to an assessment of sponsor suitability, 45 C.F.R. § 410.1201, which includes verification of the potential sponsor's identity, 45 C.F.R. § 410.1202(b). Further, pursuant to 45 C.F.R. § 410.1202(c), ORR's sponsor suitability assessment may require, among other things, verification of the employment, income, or other information provided by the potential sponsor as evidence of the ability to support the child. The ORR Policy Guide updates, on the other hand, do not change the statutory or regulatory criteria for determining a potential sponsor's suitability to sponsor a UAC. *See National Min. Assoc.*, 758 F.3d at 249-50 (rejected the argument that an enhanced vetting procedure for mining permits was a legislative rule because procedure did not "change[] the statutory criteria" for the permits or the "substantive statutory responsibilities of the agencies"

involving in the permitting process). The ORR Policy Guide updates do alter how potential sponsors present themselves to ORR by specifying the types of documents that they may submit to establish their identities and financial capabilities to support the child they seek to sponsor. Consequently, the ORR Policy Guide updates do not require notice and comment.

*V.*    **Even if the Court finds for Plaintiffs, then the appropriate remedy would be remand rather than injunctive or declaratory relief.**

When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal. *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 94–95 (1943)). Thus, when a plaintiff brings an APA claim "to set aside an unlawful agency action . . . it is the prerogative of the agency to decide in the first instance how best to provide relief." *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013) (citing *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012)). If the Court were to find for Plaintiffs as to the IFR, the Policy Guide updates, or both, remand would be appropriate, considering that ORR, the agency Congress assigned to caring for and releasing UACs to sponsors, would be in the best position to determine how to implement the Court's findings.

Plaintiffs also have not satisfied the four-part standard, namely, to demonstrate: (1) that they have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *See Monsanto Co., v. Geerston Seed Farms*, 561 U.S. 139, 156-57 (2010) (reversing a grant of a permanent injunction).

The two individual Plaintiffs whose claims are not moot, Mateo N., and Yair G., have not demonstrated irreparable harm. Any harm caused by being in ORR care and custody could end if their sponsors submit the required documents. A remedy in equity is not warranted, and the public interest would not be served, considering ORR's responsibility to ensure that UAC are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity.

The Court should deny Plaintiffs' request for declaratory relief as a matter of discretion. Plaintiffs argue that the Court must clarify for ORR the lawful process for reviewing sponsorship applications, but Congress has clearly delegated, to ORR, through its parent agency HHS, the responsibility of interpreting, within certain parameters, *see* 8 U.S.C. § 1232(c)(2)(A), when a proposed sponsor is capable of providing for a child's physical and mental well-being. IN making these decisions, ORR must fulfil other obligations, which are not the subject of this lawsuit. Declaratory relief, therefore, could unnecessarily undermine ORR's ability to carry out its statutory responsibilities. Therefore, if the Court finds for Plaintiffs, it should decline to order injunctive or declaratory relief.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claims or, in the alternative, deny Plaintiffs' motion for summary judgment and grant summary judgment to Defendants.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

GLENN M. GIRDHARRY
Assistant Deputy Director

WILLIAM C. SILVIS
Assistant Director

MICHAEL A. CELONE
CHRISTINA PARASCANDOLA
Senior Litigation Counsel

By: */s/ Dean P. De Las Alas*
DEAN P. DE LAS ALAS
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel.: (771) 202-1393
Fax: (202) 305-7000
Dean.Delasalas@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 28, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will provide electronic notice and an electronic link to this document to all attorneys of record.

By:    */s/ Dean P. De Las Alas*
DEAN P. DE LAS ALAS
Trial Attorney
United States Department of Justice
Civil Division