**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANGELICA S., *et al.*, <br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

No. 1:25-cv-01405 (DLF)

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY**
**JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMAY**
**JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ...............................................................................................................1

ADDITIONAL BACKGROUND........................................................................................3

**I.      Children with Willing, Capable Sponsors Remain in Prolonged Detention..............3**

**II.     Plaintiffs Seek Relief for Children in ORR Custody Regardless of When They Entered Custody ...............................................................................................................3**

**III.    DHS Immigration Enforcement During and Following the ORR Sponsorship Process.................................................................................................................4**

LEGAL STANDARD ..........................................................................................................5

ARGUMENT .......................................................................................................................6

**I.      Child Plaintiffs Have Standing to Bring Each of Their Claims ..................................6**
    A.   The Released Plaintiffs Can Continue to Serve as Class Representatives....................6
    B.   Mateo N. and Yair G. Suffered Injuries Traceable to the Challenged Policies ..............7
    C.   Child Plaintiffs Have Standing to Challenge the Interim Final Rule...........................8
    D.   Plaintiffs Have Standing Under the Paperwork Reduction Act ...................................10
    E.   ImmDef Has Organizational Standing .......................................................................11

**II.     The Interim Final Rule is Unlawful and Must be Set Aside.......................................13**
    A.   The Interim Final Rule is a Final Agency Action .......................................................13
    B.   ORR Lacked Good Cause to Skip Notice and Comment ............................................15
    C.   The Interim Final Rule is Arbitrary and Capricious ...................................................18
    D.   The Interim Final Rule is Contrary to Law.................................................................19

**III.    ORR's New Sponsorship Documentation Requirements are Unlawful ..................20**
    A.   ORR's New Identity Documentation Requirements are Contrary to Law ..................20
    B.   ORR's New Documentation Policies are Arbitrary and Capricious ...........................27
    C.   ORR's New Documentation Requirements Violate the Paperwork Reduction Act......33
    D.   ORR was Required, but Failed, to Engage in Notice-and-Comment Rulemaking.......34

**IV.     Relief Requested.................................................................................................35**
    A.   The IFR and New Documentation Requirements Should be Vacated .........................35
    B.   Plaintiffs are Entitled to a Permanent Injunction .......................................................36
    C.   Plaintiffs are Entitled to Declaratory Relief...............................................................38

CONCLUSION................................................................................................................. 38

# TABLE OF AUTHORITIES

## CASES

*A.C.R. v. Noem*, No. 25-CV-3962 (EK) (TAM),
2025 WL 3228840 (E.D.N.Y. Nov. 19, 2025).......................................................................... 37

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
429 F.3d 1136 (D.C. Cir. 2005) ............................................................................................. 35

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993)................................................................................................ 35

*Allina Health Servs. v. Sebelius*,
46 F.3d 1102 (D.C. Cir. 2014)................................................................................................ 35

*Alpharma, Inc. v. Leavitt*,
460 F.3d 1 (D.C. Cir. 2006)................................................................................................... 33

*Am. Fed. of Govt. Emps., AFL-CIO v. Block*,
655 F.2d 1153 (D.C. Cir. 1981).............................................................................................. 18

*Am. Legal Found. v. FCC*,
808 F.2d 84 (D.C. Cir. 1987).................................................................................................. 12

*Am. Socy' for the Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
659 F.3d 13 (D.C. Cir. 2011).................................................................................................. 12

*Am. Wild Horse Campaign v. Bernhardt*,
442 F. Supp. 3d 127 (D.D.C. 2020) ....................................................................................... 14

*American Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001).............................................................................................. 36

*Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.*,
No. CV 25-298 (RDM), 2025 WL 1852762 (D.D.C. July 6, 2025) ........................................ 36

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020)................................................................................................................ 16

*Bennett v. Spear*,
520 U.S. 154 (1997)........................................................................................................... 13, 14

*\*Capital Area Immigrants' Rights Coalition v. Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020) ......................................................................................... 12

*Career Coll. Ass'n v. Riley*,
  74 F.3d 1265 (D.C. Cir. 1996)................................................................ 13

*Cath. Soc. Serv. v. Shalala*,
  12 F.3d 1123 (D.C. Cir. 1994).............................................................. 10

*CC Distributors, Inc. v. U.S.*,
  883 F.2d 146 (D.C. Cir. 1989).......................................................11, 36

*Cigar Ass'n of Am. v. FDA*,
  132 F. 4th 535 (D.C. Cir. 2025) .......................................................... 36

*Clean Air Council v. Pruitt*,
  862 F.3d 1 (D.C. Cir. 2017)................................................................. 17

*Collins v. Yellen*,
  594 U.S. 220 (2021)............................................................................. 9

*Consumer Energy Council of Am. v. FERC*,
  673 F.2d 425  (D.C. Cir. 1982)........................................................... 15

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024)............................................................................11

*\*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  146 F.4th 1144 (D.C. Cir. 2025)................................................ 20, 22, 31

*D.B. v. Cardall*,
  826 F.3d 721 (4th Cir. 2016)............................................................... 26

*\*DHS v. Regents of the Univ. of California*,
  591 U.S. 1 (2020)......................................................................... 19, 27

*Equal Rts. Ctr. v. Post Props., Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011)...........................................................11

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)............................................................................11

*Fla. Inst. of Tech. v. FCC*,
  952 F.2d 549 (D.C. Cir. 1992)............................................................. 21

*\*Gutierrez v. Saenz*,
  606 U.S. 305 (2025)................................................................... 8, 9, 10

*HealthAlliance Hosps., Inc. v. Azar*,
  346 F. Supp. 3d 43 (D.D.C. 2018) .......................................................................... 5

*Hisp. Affs. Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018) ............................................................................... 30

*\*J.D. v. Azar*,
  925 F.3d 1291 (D.C. Cir. 2019) ............................................................................... 6

*\*J.E.C.M. v. Lloyd*,
  352 F. Supp. 3d 559 (E.D. Va. 2018) ........................................................ 10, 19, 24

*J.E.C.M. v. Marcos*,
  689 F. Supp. 3d 180 (E.D. Va. 2023) ................................................................... 26

*\*L.V.M. v. Lloyd*,
  318 F. Supp. 3d 601 (S.D.N.Y. 2018) ................................................................... 24

*Lucas R. v. Becerra*,
  No. CV 18-5741-DMG, 2022 WL 2177454 (C.D. Cal. Mar. 11, 2022) .................. 26

*\*Mack Trucks, Inc., v. EPA*,
  682 F.3d 87 (D.C. Cir. 2012) ................................................................................. 17

*\*Moore v. City of E. Cleveland*,
  431 U.S. 494 (1977) ............................................................................................... 26

*\*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................ 27, 28, 29, 30

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
  921 F.3d 1102 (D.C. Cir. 2019) ............................................................................ 27

*Nat'l Min. Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ............................................................................... 34

*Nat'l Treasury Emps. Union v. Cornelius*,
  617 F. Supp. 365 (D.D.C. 1985) ........................................................................... 15

*NRDC v. EPA*,
  643 F.3d 311 (D.C. Cir. 2011) ............................................................................... 14

*NRDC v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020) .......................................................................... 13, 16

*Oceana, Inc. v. Pritzker*,
  24 F. Supp. 3d 49 (D.D.C. 2014) ........................................................................ 19

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ............................................................................................. 17

*PPG Indus., Inc. v. United States*,
  52 F.3d 363 (D.C. Cir. 1995)............................................................................... 36

*Ramirez v. ICE*,
  471 F. Supp. 3d 88 (D.D.C. 2020) ...................................................................... 24

*Saravia v. Sessions*,
  905 F.3d 1137 (9th Cir. 2018) ............................................................................ 24

*Sierra Club v. Mainella*,
  459 F.Supp.2d 76 (D.D.C. 2006) .......................................................................... 5

*\*Solondz v. FAA*,
  141 F.4th 268 (D.C. Cir. 2025) ...................................................................... 29, 33

*Sosna v. Iowa*,
  419 U.S. 393 (1975)............................................................................................... 6

*Standing Rock Sioux Tribe v. U.S. Army Corps of En'rs*,
  985 F.3d 1032 (D.C. Cir. 2021)........................................................................... 35

*Tri-Cnty. Tel. Ass'n. v. FCC*,
  999 F.3d 714 (D.C. Cir. 2021)............................................................................. 15

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ........................................................................................... 15

*\*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954)....................................................................................... 14, 21

*United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021)................................................................................................ 16

*United States v. Nixon*,
  418 U.S. 683 (1974)............................................................................................ 21

*United Steel v. Mine Safety & Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019)........................................................................... 35

*Util. Solid Waste Activities Grp. v. EPA*,
    236 F.3d 749 (D.C. Cir. 2001).............................................................. 17

*W. Watersheds Project v. Haaland*,
    850 F. App'x 14 (D.C. Cir. 2021)......................................................... 14

*Way of Life Television Network, Inc. v. FCC*,
    593 F.2d 1356 (D.C. Cir. 1979)............................................................ 21

## STATUTES AND RULES

44 U.S.C. § 3507................................................................................... 34

5 U.S.C. § 553............................................................................... 15, 17

5 U.S.C. § 702.................................................................................... 21

5 U.S.C. § 706.............................................................................. passim

8 U.S.C. § 1232................................................................... 1, 19, 26, 38

8 U.S.C. § 1373.......................................................................... 15, 18, 20

Fed. R. Civ. P. 56................................................................................... 5

## REGULATIONS AND FEDERAL REGISTER

*45 C.F.R. § 410.1201 ..................................................................... passim

*45 C.F.R. § 410.1205 .....................................................................25, 26

*Unaccompanied Children Foundation Rule,
    89 Fed. Reg. 34384 (Apr. 30, 2024) ................................................. 18, 26

*Unaccompanied Program Foundational Rule; Update to Accord with Statutory Requirements,
    90 Fed. Reg. 13554 (Mar. 25, 2025) ..................................................... 1, 13

## OTHER AUTHORITIES

Fact Sheets and Data, Office of Refugee Resettlement, *Average Length of Care* (current as of
    Apr. 7, 2025), https://perma.cc/SPV6-3KBD ...................................................... 3

Fact Sheets and Data, Office of Refugee Resettlement, *Average Monthly Data* (current as of Nov. 17, 2025), https://perma.cc/A4V2-E42F .................................................................................. 3

Fact Sheets and Data, Office of Refugee Resettlement, *Released to Sponsors* (current as of May 12, 2025), https://perma.cc/L938-H5YA ................................................................................ 3

Fact Sheets and Data, Office of Refugee Resettlement, *Released to Sponsors* (current as of Nov. 17, 2025), https://perma.cc/A4V2-E42F. ................................................................................ 3

Office of Planning, Research, & Evaluation, *Data Capacity*, https://acf.gov/opre/topic/data-capacity ........................................................................................................................................ 31

Priscilla Alvarez & Adam Cancryn, *Thousands of parents, guardians of migrant kids arrested in Trump Administration crackdown* (Nov. 14, 2025), https://www.cnn.com/2025/11/14/politics/parents-arrested-migrant-children-ice ................... 5

Valerie Gonzalez, *ICE is showing up to interview parents hoping to reunite with their children who entered the U.S. alone* (Sept. 2, 2025), https://apnews.com/article/immigration-children-parents-reunification-trump-81b20a1e3651337cec14b508f59cc52f .......................................... 5

## INTRODUCTION

Beginning in March 2025, Defendants Department of Health and Human Services ("HHS") and the Office of Refugee Resettlement ("ORR") began implementing drastic and unreasoned changes to ORR's sponsor vetting system that have left thousands of children detained in prolonged ORR custody rather than at home with their loving, qualified sponsors. For example, Mateo N. has been detained in ORR custody since May, for nearly seven months, rather than living with his brother, a U.S. citizen who applied to be his sponsor and complied with fingerprinting requirements, a home study, and DNA testing. ORR has refused Mateo's release simply because his brother's wife did not have immigration documentation accompanying her foreign passport.

Nothing in Defendants' cross motion for summary judgment changes what has been clear from the beginning of this litigation: HHS and ORR promulgated an unlawful Interim Final Rule ("IFR") and made concurrent arbitrary changes to ORR's sponsorship process in violation of their statutory obligations. The IFR rescinded prior regulatory prohibitions on (1) disqualifying sponsors based solely on immigration status, (2) collecting sponsor immigration status information for enforcement purposes, and (3) sharing sponsor immigration status information with enforcement agencies. *See* Unaccompanied Children Program Foundational Rule; Update to Accord with Statutory Requirements, 90 Fed. Reg. 13554 (Mar. 25, 2025). ORR made the IFR effective *immediately* without first providing notice or an opportunity to comment, without considering the impacts on the children in its care, and without any reasoned justification for permitting sponsorship denials based on immigration status.

ORR's new sponsorship documentation requirements run afoul of its obligation to "promptly place[]" each unaccompanied child "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. §§ 1232(c)(2)(A). The Trafficking Victims Protection Reauthorization Act ("TVPRA") mandates that ORR establish policies to vet potential sponsors of unaccompanied children based on the best interest of each *individual* child and an individualized determination of that sponsor's ability to care for the child's safety and well-being. 8 U.S.C. § 1232(c)(3)(A). Under the TVPRA, ORR's release policies must advance twin goals—ensuring

1

that release is safe *and* that it is free from unnecessary delay. *Id.* § 1232(c). The TVPRA and the Administrative Procedure Act ("APA") require ORR to weigh the harms and benefits of any significant new obstacle to sponsorship, consider alternative options, and conform its conduct to legally required procedures. ORR and HHS have failed to do so.

By categorically denying children's sponsors if they or their household members or alternative caregiver lack certain specific documents, regardless of other evidence of suitability, ORR has made it nearly impossible for thousands of children to be released to their family members. The newly required documents are generally available only to individuals with an immigration status that provides work authorization, which most potential sponsors do not yet have. ORR thus began disqualifying sponsors based solely on immigration status in violation of ORR's pre-IFR regulations. The administrative record includes no reasoned justification for the specific documents chosen, no consideration of alternative documents or vetting mechanisms, and no weighing of the benefits of requiring these specific documents against the harms to children from blocking release to their families. Further, it is undisputed that ORR's new documentation requirements were implemented in violation of the Paperwork Reduction Act.

The child Plaintiffs and the putative class have suffered, and will continue to suffer, unnecessarily prolonged detention and family separation because of ORR's unlawful policies. Yair G.'s older sister Milagro, for example, is eager to care for him and completed a sponsorship application, provided her passport to ORR, and completed a fingerprint-based background check. Pls.' Separate Statement of Undisputed Material Facts ("PSSUMF") ¶ 180, ECF 58-2. Because Milagro cannot obtain newly required identification, however, ORR has refused to release Yair to her and he remains in custody. PSSUMF ¶¶ 182, 184; Defs.' Separate Concise Statement of Genuine Issues ("DCSGI"), ¶¶ 182, 184, ECF 71-1.

The IFR and concurrent policy changes are procedurally defective, arbitrary and capricious, and contrary to law. These policies must be vacated and declared unlawful, and the Court should issue an injunction to ensure ORR promptly resumes adjudication of sponsorship applications based on individualized consideration of sponsor suitability.

## ADDITIONAL BACKGROUND

### I.    Children with Willing, Capable Sponsors Remain in Prolonged Detention

Since Plaintiffs filed their motion for summary judgment in September, children continue to experience unnecessarily prolonged detention in ORR custody. In fiscal years 2021 through 2024, the average length of time a child remained in ORR custody ranged from 27 to 33 days. Fact Sheets and Data, Office of Refugee Resettlement, *Average Length of Care* (current as of Apr. 7, 2025), https://perma.cc/SPV6-3KBD. In contrast, the average length of custody for children released from ORR was 173 days in October 2025. Fact Sheets and Data, Office of Refugee Resettlement, *Average Monthly Data* (current as of Nov. 17, 2025), https://perma.cc/A4V2-E42F. With an average of 2,224 children in ORR custody in October 2025, only 106 children were released to sponsors that month. Fact Sheets and Data, Office of Refugee Resettlement, *Released to Sponsors* (current as of Nov. 17, 2025), https://perma.cc/A4V2-E42F. This is compared to 1,858 releases to sponsors in February 2025, when a similar average of 2,778 children were in custody. Fact Sheets and Data, Office of Refugee Resettlement, *Released to Sponsors* (current as of May 12, 2025), https://perma.cc/L938-H5YA; *id.*, *Average Monthly Data* (current as of May 12, 2025), https://perma.cc/L7GK-H2YQ.

Children in ORR custody who remain separated from their family are struggling with the detrimental mental health impacts of prolonged detention. Their legal service providers report children are displaying symptoms of depression, fatigue, anxiety, regression, and behavioral issues. *See e.g.*, Decl. of Cynthia Felix Supp. Pls.' Mot. for Relief ("Felix Decl.") ¶ 9, ECF 65-2; Decl. of Alexa L. Sendukas Supp. Pls.' Mot. for Relief ("Sendukas Decl.") ¶ 5, ECF 65-3; PSSUMF ¶ 238; DCSGI ¶ 238.

### II.    Plaintiffs Seek Relief for Children in ORR Custody Regardless of When They Entered Custody

At the preliminary injunction stage of this case, the Court certified a provisional class of children who entered ORR custody on or before April 22, 2025. Order on Prelim. Inj., ECF 34; *see also* Mem. Op. on Prelim. Inj. ("PI Opinion"), ECF 35. After the preliminary injunction was

entered, many class members were released to approved sponsors, including Angelica S. and Liam W. However, thousands of children remain in prolonged custody, even those with willing and capable sponsors who have already undergone fingerprinting, background checks, DNA testing, and home studies. The parties also have an ongoing dispute regarding whether the provisional class definition covers (1) children who entered ORR custody for the first time on or before April 22, 2025, but who have a sponsor identified after that date; and (2) children who entered custody on or before April 22, 2025, were released to a sponsor, and then re-entered ORR custody after April 22, 2025, for reasons having nothing to do with the sponsor's suitability (like Leo B., who was highlighted in this Court's order, PI Opinion at 15-16). *See* Decl. of Mishan Wroe Supp. Pls.' Mot. for Relief, Exhs. 1, 2, ECF 65-1; *see also* Felix Decl. ¶¶ 7-8; Sendukas Decl. ¶ 7; Decl. of Carly Shortell Supp. Pls.' Mot. for Relief ("Shortell Decl.") ¶¶ 7-8, ECF 65-4. At the merits stage, Plaintiffs now seek to certify a broader class that includes all children in ORR custody who are affected by the documentation requirements regardless of whether they entered ORR custody before or after April 22, 2025. ECF 51-3. Pls.' Suppl. Mem. Supp. Mot. Class Certification, ECF 56. Hundreds of children in the putative class who entered ORR custody for the first time after April 22, 2025, remain in custody. *See* Felix Decl. ¶ 4; Sendukas Decl. ¶ 4.

### III.   <u>DHS Immigration Enforcement During and Following the ORR Sponsorship Process</u>

Since the preliminary injunction briefing in this matter, parents and other sponsors of children detained in ORR custody have experienced increased immigration enforcement as a result of their sponsorship applications. Specifically, potential sponsors have been detained by Immigration and Customs Enforcement ("ICE") during in-person ID verification appointments that are now part of ORR's sponsor vetting process. *See e.g.*, DCSGI ¶ 207 (conceding that "ICE has detained potential sponsors during the sponsorship process"); Supp. Decl. of Cynthia Isabel Felix ("Suppl. Felix Decl.") ¶¶ 6-8, ECF 58-3 (describing a mother detained by ICE at an ORR ID verification appointment); Felix Decl. ¶ 4; Priscilla Alvarez & Adam Cancryn, *Thousands of parents, guardians of migrant kids arrested in Trump Administration crackdown* (Nov. 14, 2025),

https://www.cnn.com/2025/11/14/politics/parents-arrested-migrant-children-ice.  For  example,
one father with no criminal history was arrested at his ORR ID check despite passing a background
check and being vetted by ORR to sponsor his son. *Id*. Additionally, DHS has announced and
carried out targeted enforcement actions against sponsors of youth released from ORR custody,
making clear that ORR *is* sharing sponsor information with DHS, putting sponsors at specific risk
of enforcement, unaccompanied children at risk of family separation, and directly undermining the
success of ORR's mandated reunification efforts. *See e.g.,* Valerie Gonzalez, *ICE is showing up to*
*interview parents hoping to reunite with their children who entered the U.S. alone* (Sept. 2, 2025),
https://apnews.com/article/immigration-children-parents-reunification-trump-
81b20a1e3651337cec14b508f59cc52f.

   As a result of this coordination between ORR and DHS, children in ORR custody and their
sponsors are understandably afraid that sponsors will be detained by ICE because of the ORR
sponsor vetting process. *See e.g., id.*; Suppl. Felix Decl. ¶¶ 10-13 (describing children and sponsors
withdrawing from sponsor application process because of fear ORR will share information with
ICE that will lead to sponsor detentions); Shortell Decl. ¶ 9.

## LEGAL STANDARD

   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). On cross-motions for summary judgment in an APA case such as this, "the function of the
district court is to determine whether or not as a matter of law the evidence in the administrative
record permitted the agency to make the decision it did." *HealthAlliance Hosps., Inc. v. Azar*, 346
F. Supp. 3d 43, 54 (D.D.C. 2018) (quoting *Sierra Club v. Mainella*, 459 F.Supp.2d 76, 90 (D.D.C.
2006) (internal quotation marks and citation omitted). "[A] court must limit its review to the
'administrative record' and the facts and reasons contained therein in order to determine whether
the agency's action was 'consistent with the relevant APA standard of review.'" *Id.* at 54.

## ARGUMENT

### I.    Child Plaintiffs Have Standing to Bring Each of Their Claims

#### A.  The Released Plaintiffs Can Continue to Serve as Class Representatives

Defendants assert the now-released child Plaintiffs' claims are moot because their injuries have ended and a favorable decision would not redress their past injuries. Defs.' Opp. to Pls.' Mot. for Summ. J. ("Opp.") at 20, ECF 71. But Defendants fail to acknowledge that this Court has already granted provisional class certification and ignore controlling D.C. Circuit precedent on the inherently transitory exception to mootness as applied to children in ORR custody. The Court has already certified a provisional class of children who entered ORR custody on or before April 22, 2025. PI Opinion at 9. "Once the district court deems a Rule 23 class valid, the subsequent mootness of individual claims does not terminate litigation." *J.D. v. Azar*, 925 F.3d 1291, 1310 (D.C. Cir. 2019) (citing *Sosna v. Iowa*, 419 U.S. 393, 399, 402 (1975)).

In addition, even the child Plaintiffs released prior to class certification can continue to serve as class representatives under the inherently transitory exception to mootness. *See* Pls.' Reply in Support of Class Certification at 13-15, ECF 37. The inherently transitory exception allows a class action to continue even if the class representatives have received relief prior to class certification if "the individual claim might end before the district court has a reasonable amount of time to decide class certification" and where at least "some class members will retain a live claim at every stage of litigation." *J.D.*, 925 F.3d at 1311. All named child Plaintiffs are, or were at the time of filing, in the custody of ORR. Their claims meet the first requirement because "[t]he government . . . may find a sponsor at any point . . . and obviate the claim by finding one swiftly." *Id.* The second prong is met here because there are and will continue to be children in ORR custody who experience prolonged detention as a result of the IFR and ORR's new documentation requirements throughout this litigation. Thus, whether Plaintiffs' individual claims are moot "does not affect the ability of representatives to litigate a controversy between the defendants and absent class members." *Id.* at 1308.

### B.  Mateo N. and Yair G. Suffered Injuries Traceable to the Challenged Policies

Defendants acknowledge, as they must (*see* PI Opinion at 8-9), that the child Plaintiffs' additional time in ORR custody waiting to be reunited with family is an ongoing injury. Opp. at 18. Yet Defendants contend that the prolonged custody of Plaintiffs and putative class representatives Mateo N. and Yair G. is somehow their family members' fault and not ORR's. Opp. at 19-20. Defendants' callous attempts to shift blame are factually unsupported.

Plaintiffs have demonstrated that the new proof of identity requirements directly caused sponsors to be unable to complete the reunification process, resulting in prolonged detention for the child Plaintiffs. *See* DCSGI ¶¶ 37-38, 50, 82, 84-86; PSSUMF ¶¶ 37-38, 50, 82, 84-86. Defendants' assertion that the sponsors could have obtained alternative forms of identification, or that the delay is due to a misunderstanding of the requirements, ignores the fact that the new policy narrowed the list of acceptable documents and imposed new burdens on sponsors that did not previously exist. Milagro G. and Steven N.'s wife each provided their foreign passports to ORR as permitted by prior ORR policy and the Office of Management and Budget ("OMB") approved sponsorship application. DCSGI ¶¶ 18-21, 164, 169, 172, 176, 180-181; PSSUMF ¶¶ 18-21, 164, 169, 172, 176, 180-181. Under prior policy, their release processes could have moved forward. Because ORR's new proof of identity requirements require that foreign passports be accompanied by immigration documentation demonstrating work authorization, both Milagro G. and Steven N.'s wife were told their foreign passports were not acceptable. DCSGI ¶¶ 21, 37, 169, 172, 180-182; PSSUMF ¶¶ 21, 37, 169, 172, 180-182. It is undisputed that Milagro G. was unable to obtain any newly required form of identification and that ORR has refused to release Mateo N. until Steven N.'s wife obtains new identification. DCSGI ¶¶ 175, 180-182; PSSUMF ¶¶ 175, 180-182. The new proof of identification policy has necessarily delayed both Yair G. and Mateo N.'s release processes.

Defendants' brief causes unnecessary confusion as to Mateo N.'s sponsor's ability to meet the new documentation requirements. Opp. at 19. It is undisputed that Massachusetts requires

evidence of lawful immigration status to qualify for a state identification card. DCSGI ¶ 173. It is further undisputed that Massachusetts permits individuals to obtain a driver's license without proof of lawful immigration status. *Id.* Therefore, in order for Steven N.'s wife (his household member) to meet the new documentation requirements, she must obtain a driver's license because she does not have lawful immigration status that permits her to obtain a different state ID. PSSUMF ¶ 174. In any event, even if Mateo N.'s sister-in-law was eligible for some sort of state ID card, it takes time to get an appointment at the DMV to obtain an ID card. Obtaining a driver's license takes even longer for individuals like her who have to learn to drive first. By requiring Mateo N.'s sister-in-law to jump through extra hoops before it will allow Mateo N. to be released, ORR is causing Mateo N. to spend extra time in detention that he would not have had to spend absent the documentation requirements. Decl. of Steven N. ¶ 9, ECF 56-3 ("She will keep trying to get an ID card from Massachusetts so that we can bring [Mateo] home, but it is not right that he should have to be in the custody of the government all this time while she tries to get a new form of ID.").

Defendants cannot obfuscate the real cause of Plaintiffs' injuries—ORR's new documentation requirements—by passing the blame to sponsors for failing to have the right documentation. *See* Part II.A., *infra*.

### C.  Child Plaintiffs Have Standing to Challenge the Interim Final Rule

Defendants' argument that no Plaintiff has demonstrated harm due to the IFR (Opp. at 20-21) is inaccurate. Notably, Defendants do not contest that the child Plaintiffs have standing to challenge the IFR if the IFR is a roadblock to relief on Plaintiffs' *Accardi* claim related to violations of the pre-IFR Foundational Rule. Pls.' Mem. Supp. MSJ ("MSJ") at 13, ECF 58-1 (citing *Gutierrez v. Saenz*, 606 U.S. 305 (2025)). Instead, Defendants merely assert that the child Plaintiffs lack standing to challenge the documentation requirements. Opp. at 22. As discussed above, this is incorrect.

In addition, to establish standing to challenge the IFR, child Plaintiffs and putative class representatives need only show that "concrete injury flows directly from" the challenged *conduct* and a decision in their favor could "lead to the award of at least some of the relief" that they seek.

*Collins v. Yellen*, 594 U.S. 220, 243-44 (2021) (internal citations omitted) (holding that plaintiffs needed to show only that their alleged economic harm was traceable to an amendment of an agreement where plaintiffs challenged the legal authority to adopt the amendment). Here, the alleged harm (prolonged detention and family separation) must be traceable to the challenged conduct (disqualifying sponsors based on immigration status), "not to the provision of law that is challenged" (the IFR, which permits the conduct). *Id.* at 243. Furthermore, the remedy Plaintiffs seek—vacatur of the IFR—will "redress [Plaintiffs'] injury by order[ing] a change in [the] legal status of the parties" because it will eliminate the government's unlawful new authority to disqualify sponsors based on immigration status. *Gutierrez*, 606 U.S. at 315-316 (internal citations omitted). Plaintiffs have therefore shown standing to challenge the IFR here.

Plaintiffs have shown sponsors have been disqualified by their immigration status as newly permitted by the IFR, resulting in Plaintiffs' alleged injury in this case. For example, and as Defendants acknowledge, Milagro G. was disqualified as a sponsor because her foreign passport lacked accompanying immigration documentation demonstrating work authorization, even though she completed the other requirements such as fingerprinting. DCSGI ¶¶ 21, 180-184; PSSUMF ¶¶ 21, 180-84. Milagro G.'s immigration status is what led ORR to reject her foreign passport as a form of identification, and she was unable to obtain any other newly required form of identification. DCSGI ¶¶ 21, 180, 182; PSSUMF ¶¶ 21, 180-182; *see also id.* ¶ 110 (Deisy S. could not obtain qualifying documents because of her immigration status); *id.* ¶¶ 137-38 (sponsor and her family members could not obtain acceptable identification because of their immigration status). Child Plaintiffs thus have had to spend more time in detention because the unlawfully promulgated IFR retroactively permitted and now actively permits ORR to deny sponsors based on their immigration status. *See* DCSGI ¶¶ 82, 129, 139, 175, 197; PSSUMF ¶¶ 82, 129, 139, 175, 197.

These delays and disqualifications caused by the IFR and the additional documentation requirements (which were *ultra vires* prior to issuance of the IFR), give Plaintiffs standing to challenge the IFR. That someone else might be able to be a sponsor does not change the fact that Yair G. and other child Plaintiffs have been forced to remain in detention longer and have been

prevented from reuniting with their close family members. *J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559, 579-80 (E.D. Va. 2018) (noting that a deprivation of the interest in family unity constitutes an injury). Moreover, as shown above (*supra* I.B) and contrary to Defendants' claim (Opp. at 22), that some states allow undocumented individuals to obtain driver's licenses or state IDs that would satisfy ORR's proof of identity requirements does not negate the injuries caused by the IFR. By Defendants' own admission, the new documentation requirements are "harder to meet" than those in place before March 2025. Opp. at 22.

Because Plaintiffs have standing to challenge the ORR documentation requirements, Plaintiffs have standing to challenge the IFR. The IFR rescinds a prior rule that protected children and sponsors from denials based solely on immigration status. Even though the IFR was promulgated after some Plaintiffs were injured[1], a successful challenge to the IFR would "remov[e] the allegedly [unlawful] barrier" the IFR erected to Plaintiffs' *Accardi* challenges to the document policies at issue in this case. *Gutierrez*, 606 U.S. at 319. Plaintiffs must be able to challenge the IFR to redress injuries stemming from their claim that ORR's new documentation policies violate the pre-IFR Foundational Rule. *See* Am. Compl. ¶ 162, ECF 48. That Plaintiffs may also be able to vacate the documentation policies through alternative claims does not undermine standing because standing is determined based on the allegations in the complaint, not the relief granted. *Gutierrez*, 606 U.S. at 316-17; *see also Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1125 (D.C. Cir. 1994) (standing "must be analyzed with reference to the particular claim made.").

### D. Plaintiffs Have Standing Under the Paperwork Reduction Act

Defendants' contention (Opp. at 23) that Plaintiffs do not have standing to assert a claim under the PRA because the requirements contained in the unapproved forms affect the sponsors who must submit information, and not the children in custody, is misguided. The entire purpose of

---

[1] Some Plaintiffs experienced injury after the IFR. Mateo N. and Yair G. both entered custody after the IFR was issued. Mateo and Yair are suffering harm from prolonged detention and family separation resulting from disqualification of sponsors based on immigration status of themselves or their household members, and a significantly higher risk that their loved ones will be the subject of immigration enforcement because of their attempts to bring them home. These harms are directly traceable to the IFR and establish standing to challenge it.

the sponsorship application form is to allow children to be released to sponsors. The new unapproved documentation requirements limit the list of acceptable accompanying documentation and thereby eliminate the opportunity for timely reunification with Plaintiffs' family members. *See* Pls.' Mem. Supp. Mot. Summ. J. ("MSJ") at 12, ECF 58-1; *see also CC Distributors, Inc. v. U.S.*, 883 F.2d 146, 150 (D.C. Cir. 1989) ("the loss of an opportunity to pursue a benefit" is "a constitutionally cognizable injury"). Because child Plaintiffs cannot be released until their sponsors submit the newly required information, they are directly and predictably injured by the unlawful requirements. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384-85 (2024) ("AHM") (collecting cases "where government regulation of a third-party individual or business may be likely to cause injury in fact to an unregulated plaintiff"); *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring) (characterizing this type of downstream injury to unregulated parties as "a typical APA suit").

### E.  ImmDef Has Organizational Standing

Contrary to Defendant's contention (Opp. at 23-25), ImmDef has experienced a "concrete and demonstrable injury to [its] activities" sufficient to show standing because Defendants' actions have "injured [ImmDef's] interest" and caused it to "use[] its resources to counteract that harm." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138, 1140 (D.C. Cir. 2011). Indeed, as the largest provider of legal services to unaccompanied children in California, the challenged government action has necessarily posed a direct conflict to ImmDef's mission to provide legal representation to unaccompanied immigrant children in California and ensure that no immigrant child facing removal should have to go to court alone. PSSUMF ¶¶ 198-199, 200-205. Though Defendants try to recharacterize this harm as ordinary and expected "operational costs" that are "in line with [ImmDef's] usual work" (Opp. at 24), they overlook the fact that as a result of Defendants' actions, ImmDef has had to expend a higher portion of its resources to advocate on behalf of detained unaccompanied clients and, as a result, has had to *close intake to released clients* thereby significantly impeding its mission. PSSUMF ¶¶ 206, 214-215, 218, 221-229, 239.

Defendants' attempts to distinguish *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25, 31 (D.D.C. 2020) also fail. As Defendants acknowledge, in that case, CAIR had to reduce the number of clients that it supported because of heightened asylum requirements that required CAIR to devote more resources to each client. Opp. at 25. The same is true for ImmDef: because of the new documentation requirements, ImmDef must spend more time with clients detained by ORR and has been required to increase the proportion of detained cases on its docket. PSSUMF ¶ 219. This increase in ImmDef's "detained docket" forced the organization to *close* intake to newly released children. PSSUMF ¶¶ 206, 214-215, 218, 221-229, 239-40. Defendants' suggestion that ImmDef has not been impacted by the IFR and documentation requirements because it has not experienced a reduction in its ability to provide legal services to children in ORR custody ignores that ImmDef has had to reduce services to children *released* from ORR custody. This represents a direct conflict with ImmDef's mission and is more than a mere "setback to the organization's abstract social interests" or a "change[] in litigation strategy." Opp. at 23-25.[2] It is a "discrete programmatic concern[]" that has been "directly and adversely affected by the defendants' actions" which is sufficient for organizational standing. *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987); *Am. Socy' for the Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011).

---

[2] Defendants' reliance on *AHM* is misplaced. Opp. at 25. First, ImmDef is a *non-profit* law firm representing indigent immigrant children, so Defendants' analogy to a for-profit tax law firm upset with financial consequences of changed tax policy is inapposite. *Id.* PSSUMF ¶¶ 198-199, 200-205. Second, ImmDef is not an "interloper" (Opp. at 25) simply asserting an "intense" interest or "strong opposition to the government's conduct" or an abstract expenditure of resources as did the associational plaintiffs in *AHM*. 602 U.S. at 394. Nor is ImmDef an "advocacy business" working on behalf of "members" or "the general public" like the associations in *AHM*, but rather an organization that provides direct individual services to immigrant children. *Id.* at 394-95. As such, ImmDef alleges programmatic and organizational injuries—including complete closure of a program central to its mission—directly caused by the same harm alleged by child plaintiffs: prolonged detention and separation from family. PSSUMF ¶¶ 206, 214-215, 218, 221-229, 239-40.

## II.    **The Interim Final Rule is Unlawful and Must be Set Aside**

As Plaintiffs explained in their opening brief, consistent with ORR's role as a child welfare

rather than an immigration enforcement agency, the Foundational Rule provided that:

> ORR shall not disqualify potential sponsors based solely on their immigration status and shall not collect information on immigration status of potential sponsors for law enforcement or immigration enforcement purposes. ORR shall not share any immigration status information relating to potential sponsors with any law enforcement or immigration enforcement related entity at any time.

45 C.F.R. § 410.1201(b). Plaintiffs will, as in prior briefing in this litigation, refer to the three parts

of § 410.1201(b) as the Disqualification, Information Collection, and Information Sharing

provisions, respectively.

### A.  The Interim Final Rule is a Final Agency Action

Defendants wrongly argue that their "interim ***final*** rule"—a term ORR itself chose to use,

*see* 90 Fed. Reg. at 13554 (emphasis added)—is not really "final." Opp. at 25-26. Agency action

is "final" if it "mark[s] the consummation of the agency's decisionmaking process" and it is an

action "by which rights or obligations have been determined, or from which legal consequences

will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The IFR meets the first prong because

it "was made effective immediately," Opp. at 26, and it "firmly establishes" ORR's "current

position that [the previous Foundational Rule provisions] are unenforceable, and that position will

continue to govern unless and until the agency issues a new rule. That counts as consummation of

agency decisionmaking for finality purposes." *NRDC v. Wheeler*, 955 F.3d 68, 79 (D.C. Cir. 2020).

That the IFR is an "interim" rule and that ORR may issue another final rule in the future is

immaterial. As the D.C. Circuit has explained, "*any* agency action is *always* subject to

displacement by a future rulemaking. If the mere possibility of displacement rendered a governing

agency rule non-final for purposes of judicial review, no rule would ever count as final." *NRDC*,

955 F.3d at 80 (holding an interim action to be final agency action); *see also Career Coll. Ass'n v.*

*Riley*, 74 F.3d 1265, 1268 (D.C. Cir. 1996) ("'Interim' refers only to the Rule's intended duration—

not its tentative nature.").

The IFR also meets the second *Bennett* prong because it determines ORR's obligations and sponsors' and children's rights, and legal consequences will flow from it. Defendants vaguely suggest that, despite having promulgated the IFR, there is no indication that ORR will in fact collect and share immigration status for enforcement related purposes. Opp. at 27. This is both irrelevant (the final action challenged here is not any particular act of information collection or sharing but the removal of prior protections against this use of sponsor information) and contradicted by Defendants' admission that sponsors are being detained by immigration enforcement authorities at ORR identification checks required as part of the sponsorship process. *See* DCSGI ¶¶ 207-209; PSSUMF ¶¶ 207-209; *see also supra* Additional Background. The repeal of the prohibition against disqualifying sponsors based on immigration status alone has also already had consequences, as it has removed a legal barrier to policies like ORR's new documentation requirements.

A rule that repeals a legislative rule is itself a legislative rule, as it "alter[s] the legal regime to which . . . agency action is subject." *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 149 (D.D.C. 2020) (quoting *Bennett*, 520 U.S. at 178). The Foundational Rule is a legislative rule, with the force of law, that restricted ORR's ability to collect sponsors' immigration status information for immigration-enforcement purposes or share that information with enforcement agencies. It also protected children and sponsors by prohibiting ORR from disqualifying sponsors based solely on immigration status. *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 149 ("*Bennett*'s second prong is satisfied by legal consequences that affect only the agency itself."), *aff'd sub nom,. W. Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021); *NRDC v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) ("[T]he Guidance binds EPA regional directors and thus qualifies as final agency action."). In this case, the IFR also removes legal protections that sponsors and children previously enjoyed. Under the Foundational Rule, if ORR had acted inconsistent with the regulatory prohibitions, the sponsor or unaccompanied child could challenge that ORR action as violative of the regulation under the *Accardi* doctrine, which requires agencies to follow their own regulations. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *see also U.S.*

*Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (rescission of rule providing safe harbor was final agency action). Now, because of the IFR, the sponsor and child have lost that right.

### B.  ORR Lacked Good Cause to Skip Notice and Comment

ORR lacked good cause to issue its interim final rule without first going through notice and comment and to make its rule immediately effective. *See* 5 U.S.C. § 553(b)(B), (d)(3).  As outlined in Plaintiffs' motion, exceptions to the APA's notice and comment requirements are "narrowly construed and only reluctantly countenanced." *Tri-Cnty. Tel. Ass'n. v. FCC*, 999 F.3d 714, 719 (D.C. Cir. 2021); *see* MSJ at 19.

Defendants claim that notice and comment was "unnecessary" and contrary to the public interest because the Information Collection and Information Sharing provisions of 45 C.F.R. § 410.1201(b) contravened 8 U.S.C. § 1373. Opp. at 27, 29, 31-32.[3] But these provisions do not contravene § 1373, as explained *infra* II.D. Regardless, an agency's belief that a regulation was legally defective is not a legally sufficient reason to repeal it without notice and comment because "the question of whether existing regulations are defective or inconsistent with law is itself worthy of notice and an opportunity to comment." *Nat'l Treasury Emps. Union v. Cornelius*, 617 F. Supp. 365, 371 (D.D.C. 1985). The government has made similar arguments before that were soundly rejected by the D.C. Circuit. *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 448 (D.C. Cir. 1982) ("[T]he argument that repeal was required because the regulations were defective does not explain why notice and comment could not be provided."). Defendants have not cited any authority that supports their position. *See* Opp. at 32 (no legal citations).

Defendants do not (and cannot) contend that the Disqualification provision contravenes § 1373. Rather, they claim the Disqualification provision was inseverable from the Information Collection and Information Sharing provisions. *Id.* at 30-31. But even if one or both of the other

---

[3] Defendants' new contention that the Information Collection provision runs contrary to 8 U.S.C. § 1373 departs from the rationale they offered in the IFR itself. There, they contended only that the Information Sharing provision was contrary to that statute, and that the Information Collection and Disqualification provisions were not severable from the Information Sharing provision.

two provisions were defective (they are not), that is not good cause to repeal the Disqualification provision too without notice and comment. *See NRDC*, 955 F.3d at 84-85 (court struck down only part of a rule, rejecting agency's repeal of the rest of the rule without notice and comment). Defendants again ignore that severability is a principle that *courts* apply to avoid inappropriate judicial policymaking. MSJ at 22-23. It has little applicability to an agency exercising delegated legislative authority to write rules in the first instance.

In any event, even if the severability doctrine applied here, ORR applied it incorrectly. Each provision is "capable of functioning independently" and thus is severable. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 628 (2020) (plurality opinion). Regardless of whether ORR collects or shares immigration status information for law enforcement purposes, ORR can still refrain from disqualifying sponsors based on immigration status alone. The mere fact that the three provisions are all located in paragraph (b) of § 410.1201 does not make them inseverable. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 25 (2021) (severing part of a multi-sentence paragraph in 35 U.S.C. § 6(c)); *NRDC*, 955 F.3d at 81 ("It is a routine feature of severability doctrine that a court may invalidate only some applications even of indivisible text, so long as the valid applications can be separated from invalid ones.") (citations omitted). Defendants cite no authority to support their strained approach to severability.[4]

Defendants also try to justify their failure to conduct notice and comment on the ground that, in their view, the IFR would not really have much impact. *See* Opp. at 29, 31. To the extent this argument is another attempt to cast the IFR as a general statement of policy rather than a legislative rule, that argument is unavailing. Because the Foundational Rule was a legislative rule, the agency was "itself bound by the rule until that rule is amended or revoked" and could not "alter [such a rule] without notice and comment." *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir.

---

[4] If by claiming that the agency's conclusion regarding severability was "reasonable," Opp. at 30-31, Defendants are asking the Court to defer to the agency, the D.C. Circuit has specifically held that "[d]eference to an agency's invocation of good cause . . . would conflict with this court's deliberate and careful treatment of the exception in the past." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014).

2017); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (The APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance.").

Nor does this justification constitute "good cause" to bypass notice and comment. It does not appear in the IFR itself. Allowing the government's counsel to come up with new justifications in litigation would circumvent the APA's requirement that the agency state its good cause findings and the reasons therefor "in the rule[] issued." 5 U.S.C. § 553(b)(4)(B). Further, Defendants' post hoc rationalization does not stand up to scrutiny. The changes made by the IFR were consequential, not routine, and were certainly something the public would be interested in. *Mack Trucks, Inc., v. EPA*, 682 F.3d 87, 94 (D.C. Cir. 2012); *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 755 (D.C. Cir. 2001). Under the Foundational Rule, sponsors could come forward to seek reunification with children in ORR custody with the knowledge that ORR would not share their information with DHS. That protection was stripped away by the IFR.[5] Nor may ORR minimize the effect of its regulatory change by pointing to appropriations riders that restrict the uses to which DHS may put information that ORR shared with it; ORR gave no consideration at all to the effect of these riders in the IFR itself, and ORR's bland reassurances as to its beliefs about the future course of action of DHS (which is not a party here) provide no comfort to sponsors who, under the Foundational Rule and ORR's OMB-approved sponsorship application, had been assured that information would not be used against them for immigration enforcement purposes. *See* DCSGI ¶¶ 99-100; PSSUMF ¶¶ 99-100.

Similarly, under the Foundational Rule, ORR could not disqualify sponsors solely based on immigration status by, for example, rejecting foreign passports that lack proof of lawful work authorization or other proof of lawful status. Now that regulatory protection has been taken away as well, allowing ORR to erect new barriers to sponsorship for sponsors who lack lawful

---

[5] In the cases of Angelica S. and Xavier L., for example, potential sponsors or other adults were afraid to provide required documents to ORR for fear of immigration enforcement, causing Angelica S. and Xavier L. to stay in detention longer. *See* PSSUMF ¶ 112; DCSGI ¶ 158.

immigration status. And ORR was well aware that the public cares deeply about these issues. The Foundational Rule received 73,000 comments, including "many" comments that specifically addressed 45 C.F.R. § 410.1201(b). 89 Fed. Reg. at 34,441-42 (discussing comments on § 410.1201(b)). Finally, if Defendants are suggesting that ORR did not intend for the IFR to lead to changes in its information collection, information sharing, or sponsorship eligibility practices, then there was no emergency that necessitated an immediately effective new rule. *Am. Fed. of Govt. Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ("*AFGE*") (limiting good cause exception "to emergency situations").

### C.  The Interim Final Rule is Arbitrary and Capricious

As explained in Plaintiffs' opening brief, the interim final rule fell far short of the basic requirements for reasoned decision-making under the APA. The rule—which consists of a mere two pages in the Federal Register—only recited (incorrectly) that the Information Sharing provision in the Foundational Rule violated 8 U.S.C. § 1373 and (again, incorrectly) that the remaining provisions would stand or fall with the Information Sharing provision under principles of severability. Among other defects, ORR's perfunctory rationale (1) misunderstood the law of severability; (2) failed to address important aspects of the problem, such as the significant harms that the Information Collection and Disqualification provisions would impose on children and their families; (3) failed to consider whether there were reasonable alternatives that could have minimized those harms; (4) failed to reconcile the regulatory changes with the agency's still-operative Privacy Act notice; (5) failed to consider legal authorities that undermined the agency's legal theory with regard to the Information Sharing provision; and (6) failed to acknowledge or address the reliance interests of sponsors who had shared information with ORR while the Foundational Rule had remained in effect.  *See* MSJ at 22-25.

Defendants hardly respond to any of these points. They simply contend that "ORR did provide an explanation: 45 C.F.R. § 410.1201(b) contravenes 8 U.S.C. § 1373." Opp. at 29. Defendants' brief merely repeats the errors of the interim final rule itself. Even if this conclusory statement were correct, such an observation could not excuse the agency from its obligation under

the APA to consider important aspects of the problem and to explain how it resolved those concerns. *See, e.g.*, *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 32 (2020).

Defendants also contend they should be excused from the APA's fundamental requirements of reasoned decision-making because "no credible evidence supports the notion" that the interim final rule will have any effect at all. Opp. at 30. They argue that Plaintiffs haven't shown that ORR would disqualify sponsors purely on the basis of immigration status, even if the interim final rule permits the agency to do so. *See id.* This argument, however, cannot be squared with the agency's own behavior. As Plaintiffs have explained, absent the IFR, ORR would not have a legal basis to proceed with challenged new document policies that *do* disqualify sponsors simply because they or their household members lack proof of lawful status accompanying their foreign passport. DCSGI ¶ 21. In other words, in its actual practice, ORR is treating immigration status as a dispositive factor preventing some persons from serving as sponsors; absent the rescission of the Disqualification provision, the Foundational Rule would prohibit ORR from imposing these new policies. Because ORR's defense of the rationality of its decision-making turns entirely on this incorrect description of the legal effect of its rule, the interim final rule must be set aside.

### D.  The Interim Final Rule is Contrary to Law

As explained in Plaintiffs' opening brief, the interim final rule cannot be reconciled with the requirements of the TVPRA. *See* MSJ at 26. In particular, the TVPRA directs ORR to promptly place unaccompanied children "in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A), a statutory mandate the agency cannot fulfill if potential sponsors are unable to come forward out of fear that their information would be shared with immigration authorities. *See J.E.C.M.*, 352 F. Supp. 3d at 583 (finding that this information sharing with DHS "runs counter to ORR's mission to release the children in its custody into stable, nurturing environments"). Defendants fail entirely to address the TVPRA in their brief and so have forfeited any defense of the statutory validity of the interim final rule. *See Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 72 (D.D.C. 2014).

Defendants do discuss the effect of 8 U.S.C. § 1373, but this discussion cannot rescue them from their failure to contest that the IFR violates the TVPRA. The TVPRA is the later-enacted statute, and as even Defendants concede, *see* Opp. at 28, the more recent statute controls in the event of any conflict. Regardless, there is no conflict between 8 U.S.C. § 1373 and the TVRPA; the former provision merely limits the discretion of federal agencies that they otherwise hold. It does not, however, confer new authority on federal agencies to proactively and affirmatively share immigration-related information with DHS, or override other legal restrictions against the sharing of such information (particularly restrictions found in later-enacted statutes like the TVPRA). *See* MSJ at 25-26. So, the Foundational Rule correctly described the scope of ORR's legal authority to share information on the immigration status of sponsors, and the interim final rule purported to grant the agency authority it does not legally possess.

Nor can ORR wave this problem away by vaguely hinting either that it has not or will not use the new authority that it has purported to grant to itself. *See, e.g.* Opp. at 30. That rationale is found nowhere in the interim final rule itself, and it is a black letter rule of administrative law that an agency is limited to the rationale that it offered at the time of its decision-making. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1167 (D.C. Cir. 2025). And the rationale that the agency did provide in the interim final rule cannot be squared with its counsel's new arguments during briefing. ORR rescinded the Information Sharing provision because it believed the provision imposed a restriction that violated 8 U.S.C. § 1373, a theory that could not be sustained if the agency genuinely believed that it would continue to be legally restricted from sharing information with DHS. Because the actual rationale offered by the agency in the rulemaking was legally unsupportable, the interim final rule must be set aside.

### III.    ORR's New Sponsorship Documentation Requirements are Unlawful

#### A.  ORR's New Identity Documentation Requirements are Contrary to Law

##### i.  ORR's documentation policies violate the Disqualification provision of the Foundational Rule unlawfully rescinded by the IFR

The IFR is unlawful for the reasons discussed above. Therefore, ORR remains bound by its prior regulation providing that "ORR shall not disqualify potential sponsors based solely on their immigration status . . .." 45 C.F.R. § 410.1201(b) (2024). "[I]t is a 'well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action.'" *Fla. Inst. of Tech. v. FCC*, 952 F.2d 549, 553 (D.C. Cir. 1992) (quoting *Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356, 1359 (D.C. Cir. 1979)); *see also United States v. Nixon*, 418 U.S. 683, 695 (1974); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

Defendants do not contest that ORR's change to the required documents in the Policy Guide § 2.2.4 is final agency action subject to judicial review under the APA. 5 U.S.C. §§ 702, 704. *See* Opp. at 32. Defendants instead argue that a sponsor, household member, or alternate caregiver's immigration status is not a causal factor that prevents or delays children's reunification with their loved ones. *Id.* at 32-34. The Court should reject Defendants argument because the undisputed facts lead to the opposite conclusion.

Defendants concede that "[t]he new list of permissible forms of identification eliminates all forms of identification issued by foreign governments, except for Canadian driver's licenses and foreign passports accompanied by proof of lawful U.S. immigration status." DCSGI ¶ 21. Defendants concede that without documentation of legal immigration status, sponsors "were told that their foreign passports were now insufficient under the new policy." DCSGI ¶ 37. Defendants' argument that certain sponsors who "may lack lawful immigration status" can qualify for an employment authorization document ("EAD") is irrelevant. DSSUMF ¶ 305, ECF 71-2. *Id.* ¶ 305. Defendants do not dispute that ORR's own decision memo on proof of income noted "that the majority of potential sponsors engaging with UACB do not have work authorization and may not be able to provide documentation required under this update to ORR's sub-regulatory guidance." DCSGI ¶ 68; DSSUMF ¶ 318. The pre-IFR Foundational Rule prohibits ORR from disqualifying *any* sponsor based on their immigration status, including whether they have a status that qualifies for work authorization.

This court recently recognized causation sufficient for standing between ORR's new document requirements and the delay in reunification or disqualification of sponsors suffered by the children in ORR's custody. PI Opinion at 8-9. Nothing in the administrative record and no evidence currently before the Court changes that analysis.[6] Instead, the administrative record *strengthens* the causal link between the required documents and immigration status because it shows that ORR aligned its requirements to forms designed and used by DHS and USCIS, the agencies that govern migration and immigration status. *See* DSSUMF ¶¶ 300-301; PSSUMF ¶ 23. Defendants admit that, "[i]n essence, ORR relied upon a list developed by an agency responsible for adjudicating eligibility for immigration benefits," Opp. at 34, but fail to acknowledge that sponsorship does not require eligibility for immigration benefits. Defendants further state that USCIS "presumably possesses expertise in the assessment of identity documents," without explaining why USCIS has any more expertise than other government agencies that accept foreign passports as proof of identification without proof of immigration status, or than ORR itself. DCSGI ¶ 27.

Furthermore, ORR was aware that sponsors' immigration statuses would likely prevent many sponsors from meeting the new requirements. *See* DSSUMF ¶ 302 (noting stakeholder concerns that ID requirements would be "particularly burdensome on the ability of undocumented or out of state aliens to sponsor children"), *id.* ¶ 318 (noting stakeholder concerns that "the majority of potential sponsors engaging with [ORR] do not have work authorization and may not be able to provide documentation required under this update"). Defendants' reference to alternative documents available to some subset of sponsors does not destroy the causal link between

---

[6] Defendants seem to suggest that it would be permissible for ORR to require children's sponsors to move to different states—away from established community ties and resources that would assist in supporting the child they hope to sponsor—to establish residency in that new jurisdiction, and then to apply for new identity documents in that jurisdiction, all while the child remains detained in government custody. This is self-evidently arbitrary and unlawfully prolongs children's detention. In any event, the administrative record provides no indication that the agency gave any consideration to this rationale. *See Ctr. for Biological Diversity*, 146 F.4th at 1167 (an agency is limited to the rationale that it offered at the time of its decision-making).

immigration status and qualification as a sponsor. As the Court recognized, even where sponsors live in states or localities where they or their household members may be able to obtain a government-issued photo-ID that satisfies ORR's new requirements, obtaining that identification causes lengthy delays in processing reunification applications; and for at least five class representatives, their sponsors did not live in such a jurisdiction. *See* PSSUMF ¶¶ 108-110 (Angelica S.); 120-25 (Eduardo M.); 136-37, 140 (Liam W.); 146 (Leo B.); 181-82 (Yair G.); DCSGI, ¶¶ 108-110 (Deisy lives in Texas, which does not issue state-IDs or driver's licenses to individuals who cannot show lawful immigration status.); ¶¶ 120-125 (Rosa lives in California, where proof of lawful presence is required for a state ID card but not a driver's license; Rosa cannot drive); ¶¶ 136-37, 140 (Sofia's adult household members—Liam's family members—were unable to obtain the requisite identification from Florida due to their immigration status); ¶ 146 (Living in Georgia, "Leo's sister was ineligible to sponsor Leo again because she was unable to provide" the newly required identification); ¶¶ 181-182 (conceding facts supporting that Milagro G. could not obtain a qualifying form of identification from her home state). Defendants cannot now claim immigration status is not a causal factor delaying reunification and preventing undocumented sponsors from applying to sponsor their children.[7]

The new documentation requirements indisputably disqualify many potential sponsors from completing their sponsorship applications based on their immigration status, including the sponsors of multiple child Plaintiffs. *Id.*; DSSUMF ¶¶ 302, 318. *But for* sponsors' or other adult household members' or caregivers' immigration statuses and lack of certain immigration documentation accompanying their foreign passports, the sponsors would be able to provide acceptable identification and proof of income documentation to move forward with their applications without unnecessary delay. The blanket disqualification of these sponsors from being

---

[7] Defendants claim that at least "one of the types of documents on the ORR Policy Guide § 2.2.4 list conceivably is available to any adult living in the United States." Opp. at 36. But Defendants do not provide *any* citation to the administrative record or other evidence to support this claim, and instead concede facts, described *supra*, that show such a claim is simply untrue.

able to complete family reunification applications violates the Foundational Rule's prohibition against disqualifying sponsors based solely on their immigration status.

    ii. <u>The new document policies violate the TVPRA and Foundational Rule's mandates to promptly reunify children with caregivers without unnecessary delay.</u>

The TVPRA requires ORR to engage in an individualized sponsorship assessment to ensure that *every* unaccompanied child is "promptly placed in the least restrictive setting that is in the best interest of the child," usually with "a suitable family member." 8 U.S.C. § 1232(c)(2)(A). Government custody is necessarily more restrictive than living in the community, PSSUMF ¶ 83, and unnecessary delays in release to a suitable sponsor violate the TVPRA. *See Saravia v. Sessions*, 905 F.3d 1137, 1143 (9th Cir. 2018); *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 613-14 (S.D.N.Y. 2018); *J.E.C.M.*, 352 F. Supp. 3d at 588; *cf. Ramirez v. ICE*, 471 F. Supp. 3d 88, 178 (D.D.C. 2020). The Foundational Rule further confers a legal obligation that ORR "release a child from its custody without unnecessary delay…". 45 C.F.R. § 410.1201(a).

Here, ORR has created a default rule that blocks nearly all children from being released to sponsors based on requirements unrelated to any individual sponsor's ability to verify their identity or provide for the care and wellbeing of a child financially or otherwise. *See supra* Additional Background (ORR discharged only 106 of the monthly average 2,224 children in ORR custody to sponsors in October 2025). These blanket policies apply regardless of whether there are fraud concerns for any individual document submitted, regardless of whether foreign documents have already been verified, and regardless of an individual child's best interests. DCSGI ¶¶ 19, 21, 36, 40-41(narrow exceptions for some parents require further decisions that prolong reunification process), 61-62. *See also*, DCSGI ¶¶ 135-38 (ORR refused to release Liam to his mother due to her and her adult relative household members lack of compliant documentation, despite their provision of other forms of identification, completing fingerprints, and receiving a positive home study); 168-72, 175 (ORR refuses to release Mateo to his brother because a household member (brother's wife) who provided passport identification, fingerprints, and a positive home study lacks

compliant documents); David D. Discharge Notification, ECF 63-1 (noting that as of 05/19/2025, the relevant consulate verified birth certificates for David D. and Isabel D. and verified Isabel D.'s consular ID; David D. nonetheless remained in custody until 9/16/25). Continuing to detain a child in government custody and apart from their family without individualized consideration of sponsor suitability or the child's best interests, merely because their sponsor or other adults' immigration status prevents them from providing specific newly required documents is thus contrary to law. 5 U.S.C. § 706.

The new documentation policies render meaningless the Foundational Rule requirements that completed sponsor applications be adjudicated within certain timelines (10 days for parents and legal guardians and certain close relatives, or 14 days for other close relatives). 45 C.F.R. § 410.1205(b); PSSUMF ¶ 49. Where the regulations require promptness to protect the due process rights of children and sponsors, the challenged policies have drastically expanded the timeline from sponsor application to adjudication. *See* PSSUMF ¶¶ 84-86; DCSGMI ¶¶ 84-86 (average length of custody rose from 49 days in February 2025 to 182 days in August 2025); *supra* Additional Background I (average length of custody in October 2025 was 173 days).

Nor do the narrow exceptions for parents and legal guardians bring these policies into compliance. Defendants concede that there is *no timeline or decision criteria* for approving requests for an exception from ORR's new ID requirements. DCSGI ¶ 47. Unnecessary delay to reunification also occurs when parents or other sponsors merely *live* with household members (including close family members) who lack lawful status and cannot provide newly required identity documentation, even if the sponsors themselves qualify for an exception or have status that allows them to obtain compliant documentation. PSSUMF ¶¶ 45-48; DCSGI ¶¶ 45-48 (no exception available if household members of parents or legal guardians lack compliant documentation); *see also, e.g.*, DCSGI ¶¶ 168-72, 175 (Mateo N. case). Defendants also concede there is no exception available for any sponsor, including parents and legal guardians, to the new proof of income requirements. *Id.* at ¶ 66. Furthermore, Defendants' nonchalance about children's prolonged custody lasting weeks or months longer than necessary while they wait for ORR

headquarters to grant exceptions to the policies is both jarring and unpersuasive. The argument disregards that the delays merely to adjudicate parental waivers for one aspect of the application (proof of identity) were up to *three times* the amount of time allotted in the Foundational Rule for adjudicating an *entire* completed sponsor application. Opp. at 36 (referencing delays of three and five weeks for exception requests to be adjudicated); 45 C.F.R. § 410.1205(b) (parents' sponsor applications must be adjudicated within 10 days). The argument further disregards the evidence of significant harm delays in release cause young children who are suffering from anxiety and depression while in ORR custody. *See supra*, Additional Background I; MSJ at 11, 13-14, 42-43.

Defendants point to no evidence that ORR conducts individualized determinations before applying the challenged document policies that prolong children's detention and separation from family, because there is none. *See* Opp. at 36. And there is no evidence suggesting any specific risk that either David D. or Eduardo M. would be placed in a "potentially harmful situation" if released to their mothers, but the new policies were applied equally to them and engendered lengthy *additional* delays after they requested to be excepted from the policies. *Id.* Put simply, the challenged policies must be vacated because they violate the TVPRA and the Foundational Rule by unreasonably delaying release to suitable sponsors without any individualized assessment of risk or suitability. 5 U.S.C. § 706.

### iii.   The new document policies are contrary to best interests of the child

It is widely recognized that it is generally in the best interest of the child to be in the care and custody of a family member rather than a government agency. 8 U.S.C. § 1232(c)(2)(A); 45 C.F.R. § 410.1201(a); 89 Fed. Reg. at 34440 ("generally, placement with a vetted and approved family member or other vetted and approved sponsor, as opposed to placement in an ORR care provider facility, whenever feasible, is in the best interests of unaccompanied children."); *Lucas R. v. Becerra*, No. CV 18-5741-DMG, 2022 WL 2177454, at *14, *25 (C.D. Cal. Mar. 11, 2022); *J.E.C.M. v. Marcos*, 689 F. Supp. 3d 180, 195 (E.D. Va. 2023); *Moore v. City of E. Cleveland*, 431 U.S. 494, 504-06 (1977)*, D.B. v. Cardall*, 826 F.3d 721, 740-43 (4th Cir. 2016) (discussing rights of parent sponsors).

The administrative record and Defendants' arguments reveal an agency that has reversed that statutory, regulatory, and constitutional presumption, preferring a Rapunzel approach to child welfare whereby holding children in government custody is the only way to keep them "safe" from the world. *See, e.g.*, Opp. at 36, 38 (presuming prolonged custody is preferable to release to "protect" children from a speculative risk of harm). ORR has documented harms to children caused by prolonged custody stemming from unreasonable vetting practices. *See* MSJ at 7-8. Plaintiffs have also presented copious uncontested evidence of the real harm to putative class members arising from the challenged policies here. *See* MSJ at 11, 13-14, 42-43. The challenged policies, which are applied to *every* child in ORR custody, are contrary to the best interests of the child broadly and in individual cases where there are no indications of identity fraud or inability to authenticate documentation. As such, they are unlawful and must be vacated. 5 U.S.C. § 706.

### B.  ORR's New Documentation Policies are Arbitrary and Capricious

Plaintiffs have demonstrated the agency action at issue in this case was not a product of reasoned decisionmaking. While the court's review under the APA of agency action is deferential, the court must still engage in a "searching and careful inquiry of the record." *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1111 (D.C. Cir. 2019). Defendants do not point to any evidence in the administrative record—and there is none—that ORR "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citations omitted). ORR "entirely failed to consider [] important aspect[s] of the problem" such as the impact on children's length in custody, family unity, and mental health. *Id.* Moreover, despite dramatically changing its prior policies ORR, failed to consider either "the 'alternative[s]' that are 'within the ambit of the existing [policy]'" or "whether there was 'legitimate reliance' on" prior policies. *Regents*, 591 U.S. at 30. In short, ORR has failed to meet its obligation to carefully consider a problem and explain its reasoning.

>  i. Defendants have not pointed to a legitimate and rational need nor
>  sufficiently considered explanation for the promulgated policies in the
>  Administrative Record

Defendants point to vague assertions and observations in its brief decision memos to justify its new document policies. *See* Opp. at 38. These fail to support a reasoned and legitimate justification for its policies for several reasons.

*First*, Defendants do not show the agency based its decision on a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal citations omitted). Although Defendants reference "document fraud" leading to child abuse and trafficking as the primary motivating factor for imposing the challenged policies, they do not (and cannot) point to any evidence in the record indicating widespread or prevalent fraud specific to foreign identification documentation or proof of income documentation, much less to fraud involving primary documents such as foreign passports. *See* DSSUMF ¶¶ 18, 262-89, 294; PSSUMF ¶¶ 18, 29-30; Angelica_00000268-98 (Excel sheets with data referenced by Melissa Harper collecting a total of 204 unique events of alleged fraud or misrepresentation.)[8] *None* of the instances of alleged document fraud in the administrative record related to fraudulent proof of income documents. *Id.* Additionally, after conducting a limited review of proof of income policies that led the agency to conclude that parents and legal guardians should be exempted from those new requirements, the agency inexplicably made a final decision with no such exemption nor any reason for making a decision counter to its own recommendation. PSSUMF ¶ 77, 78. *See also* MSJ at 34.

Furthermore, Defendants do not (and cannot) establish that the specific document policies challenged here would even address the few instances of document fraud or authentication

---

[8] Of the total 204 unique events identified by Defendants in the data provided in the administrative record, only 13 involved concerns with sponsors' identity documents. Angelica-00000295, Event IDs 30703626 (staff identified visible discrepancies between ID and sponsor), 31841726 (same), 41867926 (same), 33055326 (same), 31649526, 32435526 (consulate identified fraudulent ID); Angelica-00000268, Event IDs 33204126 (consulate identified forged document), 33263326 (fingerprinting uncovered identity discrepancies), 33281126 (foreign passport requested because of suspected fraudulent U.S. ID), 33299126, 33311326, 33348526, 33350226. Of these, the majority were resolved and mitigated through basic visual inspection of the documents next to the individual presenting them and/or consular authentication processes. *Id.*

challenges that they rely on in their decision memos and their briefing. In fact, the administrative record suggests that ORR itself already had effective procedures that could identify instances of attempted identity fraud and could rely on foreign consulates to also identify attempted fraud. *See supra* note 8. Furthermore, neither the administrative record nor Defendants' papers reference *any* specific instances in which a sponsor's foreign identity document could not be timely authenticated, or how long authentication typically takes. To the contrary, the record shows that authentication services were timely and effective way to identify document fraud and discrepancies. *Id.*; *see also, e.g.,* David D. Discharge Notification, ECF 63-1 (noting consulate verified birth certificates and identity documents in May 2025, almost four months before release).

Even with the limited data ORR included in the administrative record, Defendants did not conduct sufficient analysis to establish the prevalence of fraud involving foreign-issued documents or proof of income as a whole in the context of the thousands of children in its custody. While any identity fraud or misrepresentation that suggests a sponsor is attempting to traffic or harm a child is deeply concerning, the actions of a few bad actors—most of whom were thwarted by ORR's existing policies and previously strengthened vetting processes—do not explain or justify imposing drastic changes that are not tailored to the instances of fraud found and are expected to prolong custody and prevent a majority of sponsors from successfully sponsoring their children.[9] *See Solondz v. FAA*, 141 F.4th 268, 278 (D.C. Cir. 2025) (finding FAA policy to categorically deny medical certification to pilots using a specific medication was arbitrary and capricious where the agency did not consider whether existing case-by-case monitoring process was sufficient to protect safety). Therefore, the agency failed to "articulate a satisfactory explanation" that included a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal citations omitted).

---

[9] ORR did not, for example, wait to see whether its new requirements regarding fingerprinting of sponsors and all household members, DNA testing of sponsors claiming a genetic relationship to youth in custody, and increased use of home studies (none of which condition compliance on a sponsor's immigration status) would be sufficient to address the agency's concerns regarding safety. *See* PSSUMF ¶ 54.

*Second*, Defendants made no effort to examine or study the "key" issue of length of custody when considering its policies. *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018). Defendants rely on two sentences in the entire administrative record to assert that they examined and considered the impact of these policies on the length of time children would be held in custody, along with the concomitant well-documented harms to children's welfare of prolonged custody. Opp. at 39 (citing the agency's decision memo stating, in whole, "We anticipate some stakeholders, particularly *Flores* plaintiffs' counsel and other advocates (and their Congressional supporters), will express concern that the policies hinder ORR's ability to release children without unreasonable delay . . . Further, these advocates are likely to argue that ORR's identity document requirements are particularly burdensome on the ability of undocumented or out of status aliens to sponsor children."). To state the obvious, acknowledging an agency's litigation or oversight risk is not the same as examining and then considering the actual impact of the policies on the children who bear the brunt of them.[10] Moreover, there is nothing in the record explaining how ORR weighed the identified concerns against other relevant factors. ORR cannot satisfy its obligation to "examine the relevant data and articulate a satisfactory explanation for its action" with a passing mention that other "stakeholders" might "claim" that custody would be unnecessarily and unreasonably prolonged. *State Farm*, 463 U.S. at 43. *See also* PI Opinion at 16-17 ("… at a minimum, an agency ORR must address the concerns *the agency itself identified* before changing the status quo. … Once an agency identifies an element as worthy of consideration, it cannot take action without explaining how it weighed that element against other relevant factors.").

Indeed, rather than examining the years of data at hand, including length of custody data from previous policies that increased the burdens on sponsors, *see* MSJ at 7-8, Defendants assert,

---

[10] Similarly, Defendants miss the point when dismissing the relevance of the lawsuit against Southwest Key. Opp. at 39. That lawsuit, regardless of the outcome, exemplifies one of the documented risks to children of being held in "a potentially harmful situation" *in ORR custody*, which necessarily must be weighed against any risk of harm if released to family members and sponsors. *Id.* at 36, 39. Such a consideration is wholly absent from the administrative record and Defendants' papers.

without any evidence, that ORR was somehow incapable of predicting any impact of the document policies on children's detention time. Opp. at 39. This statement belies common sense. ORR itself acknowledged that the majority of sponsors would face great difficulties obtaining the newly required documents. DCSGI ¶¶ 24, 68-69. ORR has historically measured, and continues to meticulously measure, children's length of custody, and HHS's Administration for Children and Families (ACF) has a robust department dedicated to data analysis for its various programs. *See, e.g.,* Office of Planning, Research, & Evaluation, *Data Capacity*, https://acf.gov/opre/topic/data-capacity (collaborating with programs like ORR to "evaluate existing data, and design data collections and analyses that generate actionable evidence"). *See also* Angelica-00000075 (describing logistical challenges to complying with the 2018 fingerprinting requirements extending children's length of custody, and subsequent data collection and analysis of the policies and children's length of custody). ORR also analyzed impact on length of custody when considering its new fingerprinting and DNA policies. *See* PSSUMF ¶ 53. That the administrative record here lacks any analysis of likely impact on length of stay of the new identification and proof of income policies merely underscores its scant reasoning and failure to consider relevant parts of the problem it aimed to solve.[11]

  *Third*, Defendants' reliance on the provision of the Foundational Rule requiring 90-day reviews when children's custody becomes prolonged is irrelevant. Opp. at 39-40. The administrative record lacks any consideration of the interaction between the documentation policies and the regulations cited by Defendants, so Defendants cannot rely on that reasoning now. Opp. at 39-40. *See Ctr. for Biological Diversity*, 146 F.4th at 1167 (an agency is limited to the rationale that it offered at the time of its decision-making). Further, Defendants are in blatant

---

[11] Nor does ORR appear to have course-corrected following the uncontested data showing that children's time in custody has increased by up to *four times* the length of custody in February 2025 just before the policies were implemented and the IFR promulgated, from 49 days to a high of 217 days in April, and 182 days in August. DCSGI ¶ 84. These months-long delays in release and their impact on the welfare of the children in their care have engendered no response or acknowledgment from Defendants in their papers. *See generally,* Opp.

violation of the Foundational Rule's timelines for adjudicating release decisions, *supra* III.A.ii., and no matter how many times a 90-day review is conducted, the new document policies prevent ORR from "resolving" or "accelerating" most children's release to loved ones. Opp. at 40.

*Fourth*, ORR concedes that it was obligated to (but did not) consider reliance interests of children in its custody or of sponsors who had been told they could provide previously accepted forms of identification and proof of income. Opp. at n. 13. Nothing in the administrative record changes the Court's observation at the preliminary injunction phase that, the "record does not reveal whether and how ORR balanced its competing statutory duties and concluded that upsetting reliance interests was justified when weighed against the risk of exploitation… ." PI Opinion at 17. Children who entered ORR custody on or before April 22, 2025 remain in ORR custody as a result of the challenged policies. *See supra* Additional Background II (ORR does not consider children previously released from custody and re-referred to ORR after April 22, 2025, or children who entered custody prior to April 22, 2025, but are pursuing release to a sponsor identified after that date to be provisional class members). Here again, Defendants betray their near complete failure to consider the interests and wellbeing of actual children currently in their custody, including the reliance interests of any child who entered prior to April 22, 2025, whether or not the child's current sponsor was identified prior to that date.

*Finally*, Defendants' reasoning for the identity document and proof of income document policies is contradictory and unsupported and therefore arbitrary and capricious. With regard to the issue of identity document authentication, ORR claims it could not authenticate certain foreign documents "in a timely manner," but says *nothing* regarding the length of the alleged delay, whether the delay applied to all or only some documents, whether the delay applied to all or only some countries of origin, and without weighing prolonged custody for *all* children that the blanket policy would cause regardless of whether a document in any individual child's case could be timely authenticated. Opp. at 38. Given that ORR still requires foreign-issued birth certificates and requires that such birth certificates be authenticated, Defendants do not point to any evidence that authenticating additional foreign identity documents creates additional delay. DCSGI ¶¶ 32-33. In

other words, if ORR must already contact foreign consulates to verify birth certificates and wait for authentication, there is no indication in the record that requesting the consulate simultaneously verify a foreign passport or consular identification card adds significant time to the release process.[12] Nor does ORR present any evidence that it weighed the likely increase in time in custody related to its new documentation requirements with the time needed to authenticate foreign documents or considered applying the policies only to specific cases where individual foreign identity documents could not be authenticated within a certain reasonable time frame. *See Solondz*, 141 F.4th at 278. Furthermore, citing difficulty authenticating documents in a timely manner without addressing what "timely" means, or the underlying purpose of timely authentication (timely *release to a sponsor*) is neither rational, reasonable, nor sufficient to satisfy the agency's obligations under the APA.

In short, the administrative record reveals glaring "material gaps in the agency's articulated rationale" for the specific changes it promulgated through its identity document and proof of income document policy changes. *Solondz v. FAA*, 141 F.4th 268, 278 (D.C. Cir. 2025). Without more in the record—and there is nothing more—the Court cannot determine that ORR's decision is reasonable. *See Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 11 (D.C. Cir. 2006).

### C. ORR's New Documentation Requirements Violate the Paperwork Reduction Act

Defendants again offer no substantive defense of the new proof of identification and proof of income policies under the Paperwork Reduction Act ("PRA"), asserting only that Plaintiffs lack standing to bring the claim. Opp. at 22. As discussed above, Plaintiffs are directly injured by ORR's violation of the PRA because the documentation requirements contained in the unapproved forms prevent reunification with their qualified sponsors. The PRA violation here is clear.

---

[12] Defendant's attempt to explain the reason for continuing to accept and authenticate foreign birth certificates is unpersuasive. Opp. at 40-41. First, their reasoning is not in the administrative record as a consideration undertaken by the agency. *Id.* (no citations to the record). Second, Defendants do not address why ORR can continue to accept and authenticate foreign birth certificates but other foreign identity documents, such as passports, from sponsors cannot be timely authenticated.

Defendants concede they are requiring potential sponsors to provide proof of identification and proof of income documents that differ from the requirements in the OMB-approved sponsorship application. DCSGI ¶¶ 18-20 (conceding ORR changed its proof of identification requirements without OMB approval), 60-61 (conceding ORR amended proof of income requirements), 90 (conceding that ORR has not obtained OMB approval for changes to the proof of identification and proof of income collection requirements). Accordingly, Defendants admit to violating the PRA. For the reasons explained here and in Plaintiffs' Motion for Summary Judgment, the Court should issue an injunction prohibiting ORR from using the unapproved forms or applying the changed proof of identification and proof or income requirements contained therein to sponsors who were asked to provide these documents in violation of the PRA. 44 U.S.C. § 3507(a) ("[a]n agency shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information" it follows certain procedural requirements, including approval by OMB).

### D.  ORR was Required, but Failed, to Engage in Notice-and-Comment Rulemaking

The new documentation requirements are legislative rules that should have been promulgated through notice and comment rulemaking. The challenged policies impose hard requirements that disqualify huge swaths of sponsors if they are unable to obtain specific forms of newly required documentation. *See* MSJ at 39-40. They "change the regulatory criteria for determining a potential sponsor's suitability" (Opp. at 43) and are therefore more than mere "rule[s] of procedure." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014).[13]  By disqualifying close family member sponsors without offering any alternative means to prove identity or financial stability, the challenged document policies fundamentally "alter the rights" of children to family integrity and release without unnecessary delay. *Id.*; *see also* MSJ at 39-40.

---

[13] *National Mining Association* is also inapposite. In that case, the challenged agency action was a new process that allowed the U.S. Army Corps of Engineers to consult with EPA before each agency issued permits. The mining companies were not required to submit any new documents as a condition of obtaining a permit, unlike the sponsors here. 758 F.3d at 249.

## IV.    <u>Relief Requested</u>

### A.  The IFR and New Documentation Requirements Should be Vacated

Under the APA, the Court "*shall . . . hold unlawful and set aside* agency actions . . . found to be arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706 (emphasis added). Remand without vacatur is appropriate only in "rare cases." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).

Defendants argue that when an agency's action is unlawful, remand without vacatur is "ordinarily the appropriate course." Opp. at 44.  This is incorrect. In this Circuit, "unsupported agency action normally warrants vacatur." *Standing Rock Sioux Tribe v. U.S. Army Corps of En'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (quoting *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005)). Two factors govern the determination of whether to vacate: "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). The "seriousness" of a deficiency, "is determined at least in part by whether there is a significant possibility that the agency may find an adequate explanation for its actions" on remand. *Id.* Deficient notice "is a fundamental flaw that almost always requires vacatur." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).

Here, vacatur is the appropriate remedy and there is no reason to depart from the normal course. First, Defendants do not refute that the deficiencies are serious. Defendants promulgated an IFR rescinding part of the Foundational Rule and made the IFR effective immediately. 90 Fed. Reg. 13554; DSSUMF ¶ 322. They also imposed new sponsor documentation requirements without first providing notice and comment. DCSGMI ¶¶ 19, 61. That deficient notice in and of itself is a fundamental flaw requiring vacatur. *See Allina Health Servs.*, 746 F.3d at 1110. Moreover, the agency imposed new documentation requirements that are contrary to law because they unlawfully disqualify sponsors solely based on immigration status in violation of the pre-IFR

Foundational Rule and violate the TVPRA and the Paperwork Reduction Act. These legal deficiencies cannot be remedied on remand. The documentation requirements are also arbitrary and capricious beyond repair. *See supra* Argument III.B; *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1086 (D.C. Cir. 2001) (finding the agency's approval of a drug to be arbitrary and capricious and vacating the approval); *Cigar Ass'n of Am. v. FDA*, 132 F. 4th 535, 541 (D.C. Cir. 2025) (affirming that the FDA's rule was arbitrary and capricious and that the proper remedy was vacatur). *See also* MSJ at 22-25, 31, 39.

Defendants have not offered any reason to believe that returning to ORR's previous OMB-approved information-collection requirements and reinstating the Foundational Rule would be disruptive. Indeed, ORR is already applying the previous documentation requirements to a subset of the putative class under the preliminary injunction and has identified no associated disruption or other problems. *See* Order on Prelim. Inj. at 2. Accordingly, vacatur is appropriate and necessary here. *See* 5 U.S.C. § 706(2).

Defendants' citation to *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995), is inapposite because that case involved whether a district court erred in denying a motion for remand after concluding that an agency's decision in the adjudication by an administrative law judge of an administrative complaint rested on an incorrect legal standard. It says nothing about the ordinary course when an agency engages in rulemaking without observance of the procedure required by law or that is arbitrary and capricious and contrary to law and accordingly does not provide the relevant legal standard for this case.

### B.  Plaintiffs are Entitled to a Permanent Injunction

Defendants do not contest Plaintiffs' facts supporting a permanent injunction and again attempt to rehash old arguments that have already been rejected by this Court. Plaintiffs are suffering irreparable harm because they have lost the opportunity for timely release to their families or other sponsors due to the IFR's rescission of protections against sponsor disqualification based on immigration status and ORR's unlawful new documentation requirements. *See Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.*, No. CV 25-298 (RDM),

2025 WL 1852762, at *11 (D.D.C. July 6, 2025) ("[T]he loss of an opportunity to pursue a benefit . . . is sufficient to establish standing."); *CC Distributors, Inc.*, 883 F.2d at 150 ("the loss of an opportunity to pursue a benefit" is "a constitutionally cognizable injury"); *see also A.C.R. v. Noem*, No. 25-CV-3962 (EK) (TAM), 2025 WL 3228840, at *6 (E.D.N.Y. Nov. 19, 2025) (explaining that the "loss of opportunity to pursue an immigration benefit is a cognizable injury in fact, even when the government retains the ultimate discretion to deny the benefit"). Defendants argue that Mateo N. and Yair G. have not demonstrated irreparable harm because "[a]ny harm caused by being in ORR care and custody could end if their sponsors submitted the required documents." Opp. at 45. But Defendants do not contest that Mateo N. and Yair G. continue to be detained because they do not have any family members who have or were able to obtain the newly required forms of identification. PSSUMF ¶¶ 174, 184; DCSGI ¶¶ 174, 184. And this Court has already found that the family separation and prolonged ORR detention that Mateo N., Yair G., and putative class members, are suffering from constitutes irreparable harm. PI Opinion at 17. Hundreds or thousands of children who were not included in the provisionally certified class continue to suffer in prolonged ORR custody, away from their families.

The balance of equities and public interest support an injunction. Defendants argue an equitable remedy is not warranted and that the public interest would not be served "considering ORR's responsibility to ensure that UAC are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity." Opp. at 45. Defendants' "all or nothing" framing is inaccurate. ORR already has an existing robust vetting process to protect children from traffickers or other exploitation, and Plaintiffs have not challenged other increased vetting requirements such as fingerprinting of sponsors and all household members, DNA testing, and increased use of home studies. Moreover, Defendants are free to continue to improve their sponsor vetting procedures after full consideration of the relevant factors and reasonable analysis. MSJ at 44. As this Court has already explained, "the public interest is served when the government follows the APA's procedural requirements by offering a reasoned

explanation for its decisions." *Angelica S.*, 786 F. Supp. 3d at 175-76. Accordingly, this Court must enjoin Defendants' unlawful conduct.

### C.  Plaintiffs are Entitled to Declaratory Relief

Plaintiffs are entitled to declaratory relief. Defendants contend that "Congress has clearly delegated to ORR" the responsibility of interpreting, "within certain parameters," when a sponsor is capable for providing for a child's physical and mental well-being.  Opp. at 44. But Defendants have veered widely outside of those parameters by failing to consider each individual child's best interests and ORR's duty to promptly place children in the least restrictive setting. *See* 8 U.S.C. § 1232(c)(2)(A) (unaccompanied children "shall be promptly placed in the least restrictive setting that is in the best of interest of the child"). Where two guard rails exist, Defendants see only one. Worse, they view that guardrail as a near complete block of the statutory and regulatory mandate to prioritize release to family.

Finally, Defendants' vague and speculative argument that declaratory relief "could" undermine ORR's ability to carry out its statutory responsibilities is unsupported by fact or law. Opp. at 44. Here, declaratory relief would inform and clarify for Defendants the lawful process for reviewing sponsorship application of detained unaccompanied minors. Defendants' statutory responsibilities cannot possibly include bypassing notice and comment rulemaking or making policy revisions that violate the TVPRA and ORR's own regulations.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court vacate the IFR and ORR's new proof of identification and proof of income policies and issue declaratory relief and a permanent injunction requiring ORR to promptly adjudicate sponsorship applications without regard to these policies. Moreover, Plaintiffs respectfully request the Court deny Defendants' motion for summary judgment.

Date: December 12, 2025

Respectfully submitted,

/s/ *Mishan Wroe*
Mishan Wroe (admitted *pro hac vice*)
Diane de Gramont (admitted *pro hac vice*)
NATIONAL CENTER FOR YOUTH LAW
1212 Broadway, Suite 600
Oakland, California 94612
(510) 835-8098
mwroe@youthlaw.org
ddegramont@youthlaw.org

Rebecca Wolozin (D.C. Bar No. 144369)
David Hinojosa (D.C. Bar No. 1722329)
NATIONAL CENTER FOR YOUTH LAW
818 Connecticut Avenue NW, Suite 425
Washington, DC 20006
(202) 868-4792
dhinojosa@youthlaw.org
bwolozin@youthlaw.org

Cynthia Liao (admitted *pro hac vice*)
Joel McElvain (D.C. Bar No. 448431)
Skye L. Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
cliao@democracyforward.org
jmcelvain@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*