**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANGELICA S., *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>*Defendants*. | No. 25-cv-1405 (DLF) |

**MEMORANDUM OPINION***

The Immigrant Defenders Law Center, along with five minor plaintiffs proceeding pseudonymously, bring this case challenging an Interim Final Rule and changes to procedures promulgated by the Office of Refugee Resettlement within the Department of Health and Human Services. Before the Court is the plaintiffs' Motion for Class Certification, Dkt. 9, and both parties' Cross-Motions for Summary Judgment, Dkts. 58, 71. For the reasons that follow, the Court will grant in part and deny in part both Motions for Summary Judgment and defer any determination as to the class.

## I. BACKGROUND

### A. Legal Background

When unaccompanied minors arrive or are found in the United States without immigration papers, they are placed in the care of the Office of Refugee Resettlement, a component of the Department of Health and Human Services. *See* 45 C.F.R. § 410.1101(a). ORR is responsible for their care and placement. *See* 6 U.S.C. § 279(b)(1)(C). In carrying out that responsibility, ORR

* This memorandum opinion includes corrections of clerical errors.

must protect children from "smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity." *Id.* § 279(b)(2)(A)(ii). At the same time, ORR generally must place each child "in the least restrictive setting that is in the best interest of the child," which often involves placing children with adult sponsors. 8 U.S.C. § 1232(c)(2)(A).

Two statutes principally govern ORR's care and placement of unaccompanied children. The Homeland Security Act of 2002 transferred responsibility for unaccompanied children from the former Immigration and Naturalization Service to ORR. 6 U.S.C. § 279(a), (b)(1)(A), (g)(2). The Trafficking Victims Protection Reauthorization Act of 2008 further requires HHS to "establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity." 8 U.S.C. § 1232(c)(1).

Federal regulations, in turn, govern ORR's placement of children with potential sponsors. As part of the sponsor-vetting process, ORR may require documentation establishing a sponsor's identity and relationship to the child, interviews with household members, and a home visit or home study. *See* 45 C.F.R. § 410.1202(a)–(c). Potential sponsors and adult members of their households may also be required to submit fingerprints for background checks. *See id.* § 410.1292(c).

ORR also maintains a publicly available Policy Guide governing the sponsor-vetting and release process. Biswas Decl. ¶¶ 2 & n.1, 4, Dkt. 21-1; Off. of Refugee Resettlement, Unaccompanied Alien Children Bureau Policy Guide (2025) [hereinafter Guide]. The Guide divides potential sponsors into four categories. Category 1 includes parents and legal guardians; Categories 2A and 2B include immediate relatives, depending on whether the relative previously

served as the child's primary caregiver; and Category 3 includes all other potential sponsors. Guide § 2.2.1. Sponsors must submit an application identifying the members of their household and an alternative adult caregiver, documenting their identity and relationship to the child, and demonstrating their ability to support that child. *Id.* § 2.2.3–4.

In the years preceding the challenged changes, several reports raised concerns about this sponsor-vetting process. A 2022 Senate committee report found that ORR was completing fewer background checks even as the number of unaccompanied children entering the United States increased. Minority Staff of S. Comm. On Homeland Sec. & Governmental Affs., 117th Cong., Federal Care of Unaccompanied Children: Minors Remain Vulnerable to Tracking and Abuse 34 (2022). The following year, ORR established an Integrity & Accountability Team to detect fraud in sponsor applications. Biswas Decl. ¶¶ 6–7. The Team identified several instances of fraud, including ten occasions in one month in which children were released to sponsors who used falsified documents. *Id.* ¶ 6. And in 2024, the HHS Office of the Inspector General identified deficiencies in ORR's sponsor-screening practices and recommended additional safeguards. *Id.* ¶ 9; Christi A. Grimm, Dep't of Health & Hum. Servs. Off. Of Inspector Gen., OEI-07-21-00250, Gaps in Sponsor Screening and Follow-up Raise Safety Concerns for Unaccompanied Children 22 (2024), Dkt. 21-2.

Soon after taking office in January 2025, President Trump directed HHS to take "all appropriate action to stop the trafficking and smuggling of alien children into the United States." Exec. Order No. 14,159, 90 Fed. Reg. 8443, 8447 (Jan. 20, 2025). ORR responded the following month with a memorandum proposing several changes to its sponsor-vetting process. Biswas Decl. ¶ 11; *see generally* Harper Memo., Dkt. 21-3.

Two changes are relevant here. First, in March 2025, ORR removed several forms of identification—including birth certificates, foreign passports, and foreign national identification cards—from its list of documents generally acceptable to establish a sponsor's identity. Compl. ¶¶ 48, 50. ORR explained that foreign documents were difficult to authenticate quickly and had been used in fraudulent sponsor applications. *See* Biswas Decl. ¶¶ 14–15; Biswas Memo. at 3, Dkt. 21-4. Foreign and U.S. birth certificates were removed as permissible forms of identification because they lack photographs. *Id.* The revised policy permits case-by-case exceptions for Category 1 sponsors, or parents and legal guardians. Guide § 2.2.4.

Second, in April 2025, ORR imposed new proof-of-income requirements. Compl. ¶ 53. Potential sponsors previously could establish their financial ability to support a child through a narrative answer about their income without specific supporting documentation. *See* Pls.' Separate Stmt. Of Undisp. Mat'l Facts ¶ 60, Dkt. 58-1. Under the revised policy, they instead have to provide one of three forms of documentation: the previous year's tax return, paystubs from the preceding 60 days, or a letter from an employer verifying employment and salary. *Id.* (citing Guide § 2.2.4).

Usually, agencies must obtain approval from the Office of Management and Budget (OMB) before collecting new information from the public. 44 U.S.C. §§ 3502(3)(A), 3507(a). Yet ORR did not get OMB approval for its revised Sponsor Application Packet before imposing the new requirements. *See* Pls.' Suppl. Separate Stmt. of Undisp. Mat'l Facts ¶¶ 375–76. OMB approved a revised packet about a year later, in February 2026. *Id.* ¶ 376. Despite this approval, ORR continues to use the prior, unapproved version. *Id.* ¶¶ 376–78.

As it introduced the new requirements, HHS issued an immediately effective Interim Final Rule (IFR) rescinding an ORR regulation that prohibited it from disqualifying potential sponsors

based solely on their immigration status, collecting their immigration-status information for law-enforcement purposes, or sharing that information with immigration-enforcement authorities. *See* Unaccompanied Children Program Foundational Rule; Update to Accord with Statutory Requirements, 90 Fed. Reg. 13554, 13554–56 (Mar. 25, 2025) [hereinafter Unaccompanied Children Program Foundational Rule]; 45 C.F.R. § 410.1201(b) (2024). HHS explained that the information-sharing part of the regulation conflicted with 8 U.S.C. § 1373, which prohibits federal officials from restricting the exchange of information concerning an individual's citizenship or immigration status with government entities or officials. *See* Unaccompanied Children Program Foundational Rule, 90 Fed. Reg. at 13555; *see* 8 U.S.C. § 1373. Because HHS concluded that it had lacked statutory authority to promulgate the provision in the first place, it found good cause to rescind it via IFR without advance notice and comment. *See* 90 Fed. Reg. at 13555.

**B. Factual Background**

The plaintiffs include several unaccompanied alien children who were held in ORR custody after the new sponsor requirements were implemented. In May 2025, those plaintiffs filed for declaratory and injunctive relief, alleging that those changes affected the sponsor applications of the individual plaintiffs. Compl. ¶¶ 1, 54. When this action began, each was an unaccompanied minor in ORR custody with a proposed sponsor whose application had been complete or pending before the new requirements took effect. *See* Angelica S. Decl. ¶ 6, Dkt. 9-7; Eduardo M. Decl. ¶ 6, Dkt. 9-8; Liam W. Decl. ¶ 4, Dkt. 9-9; Leo B. Decl. ¶ 8, Dkt. 9-10; Xavier L. Decl. ¶ 4, Dkt. 9-11. After the requirements changed, their sponsor applications were delayed or terminated because the proposed sponsors lacked newly compliant identification or proof-of-income documentation. *See* Deisy S. Decl. ¶¶ 22–25, Dkt. 9-12; Angelica S. Decl. ¶¶ 6–7; Eduardo M. Decl. ¶ 6; Sofia W.

Decl. ¶ 7, Dkt. 9-14; Liam W. Decl. ¶ 7; Leo B. Decl. ¶¶ 8–9; Ximena L. Decl. ¶¶ 7–8, 10, Dkt. 9-15; Xavier L. Decl. ¶ 5.

The original set of plaintiffs also moved to certify a provisional class of "all unaccompanied children who are or will be in the custody of [ORR] and who (a) have or had a potential sponsor who has been identified; " and whose "sponsor's family reunification application has been denied, closed, withdrawn, delayed, or cannot be completed because the sponsor is missing" the newly-required documents. *See* Mem. Op. on Prelim. Inj. (PI Opinion) at 19, Dkt. 35. At the time, that class included all children who acted in reliance on the documentation policies that existed before March 7, 2025, when the sponsor requirements changed—in other words, those children who were in or transferred into ORR custody on or before April 22, 2025. *Id.* at 15, 22; Mem. Op. Prelim. Inj. at 1, Dkt. 34 [hereinafter PI Opinion]. The Court certified that provisional class for the purposes of the preliminary injunction, which it granted. *See generally id.*; PI Opinion at 19–22. The injunction was a narrow one: It prevented the agency "from creating a new blanket policy that departs from its previous one without explaining how it weighed the disrupted reliance interests and other valid considerations," and blocked enforcement of the new proof-of-identity and proof-of-income requirements against members of that limited, provisionally certified class. PI Opinion at 24. In other words, it extended only to those children who acted on the older sponsor-application process. It remains in effect.

Since then, the five original individual plaintiffs have been released from ORR custody. *See* First Am. Compl., ¶¶ 12–16, Dkt. 48; Pls.'s Separate Stmt. Of Undisp. Mat'l Facts ¶¶ 115 (Angelica S.), 129 (Eduardo M.), 140 (Liam W.), 150 (Leo B.), 163 (Xavier L.), Dkt. 58-2. The plaintiffs first amended their complaint to add new named plaintiffs and putative class representatives in the same factual position as the original named plaintiffs: Their reunification

cases were blocked or delayed because their sponsors or sponsors' household members could not meet the new documentation requirements because of immigration status. First Am. Compl., ¶¶ 17–19, 108–27. Later, as those plaintiffs were either released or about to age out, the plaintiffs again amended their complaint to add new named plaintiffs representing children in custody. *See* Second Am. Compl., ¶¶ 20–22, Dkt. 104; Pls.' Suppl. Separate Stmt. of Undisp. Mat'l Facts ¶¶ 382–94, 403, 406–07, 416–20, Dkt. 108-1.

Immigration Defenders of Law Center (ImmDef), the organizational plaintiff, provides legal services to unaccompanied children in California. Compl. ¶ 100. ImmDef maintains that the revised sponsor requirements have increased the number of children on its "detained docket," which handles the immigration proceedings of children in ORR custody. *Id.* ¶ 101. According to ImmDef, the uptick in detained clients has required it to devote additional resources to those clients and to revise educational materials for unrepresented children. *Id.* ¶ 102. Its injury has remained the same since the onset of this litigation.

Before the Court are the plaintiffs' Motion for Final Class Certification, Dkts. 9, 105, and the parties' Cross-Motions for Summary Judgment, Dkts. 58, 71. For the reasons that follow, the Court will grant bot Motions for Summary Judgment in part and deny both in part, and defer any determination as to the Motion for Class Certification.

## II. LEGAL STANDARDS

A court will grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one with potential to change the substantive outcome of the litigation. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). And a dispute is

"genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In cases arising under the Administrative Procedure Act, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). Accordingly, the Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E). Before reviewing an agency action, however, this Court must first determine whether the party challenging that action has Article III standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

## III. ANALYSIS

### A. Standing

Article III of the Constitution limits the "judicial Power" of federal courts to "Cases" and "Controversies," U.S. Const. art. III, § 2, cl. 1, and "there is no justiciable case or controversy unless the plaintiff has standing," *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017). To establish standing, a plaintiff must demonstrate that he has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted). A plaintiff must also establish that there is "a causal connection between the injury and the conduct complained of" and that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* Each of these elements "must be supported in the same

way as any other matter on which the plaintiff bears the burden of proof." *Id.* at 561. As such, at the summary judgment stage, "the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal citations and quotation marks omitted).

*1. ImmDef's Standing*

The Court begins with ImmDef's standing. An organization, like any other plaintiff, must establish a concrete injury to itself; it cannot "spend its way into standing" by devoting resources to opposing a government policy with which it disagrees. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394–95 (2024). Thus, an organization does not suffer an Article III injury merely because a challenged policy inspires it to devote additional resources to advocacy or litigation. *Id.* Still, an organization can establish standing if it adequately alleges that a defendant's conduct "perceptibly impaired" the organization's existing activities and thereby caused a "concrete and demonstrable injury" to those activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see All. for Hippocratic Med.*, 602 U.S. at 395–96 (describing *Havens* as an "unusual case" in which the challenged conduct "directly affected and interfered with" the organization's "core business activities").

The D.C. Circuit recently clarified the types of impairments that satisfy this standard. Where "a government action directly affects and interferes with an organization's core business activities and the organization diverted its resources to continue pursuing those activities, such concrete harm to the organization's activities supports standing to sue." *Ctr. for Taxpayer Rts. v. IRS*, No. 26-50006, slip op. at 12 (D.C. Cir. Sept 8, 2026); *accord Las Ams. Immigrant Advoc. Ctr. v. DHS*, 783 F. Supp. 3d 200, 217 (D.D.C. 2025).

The distinction, then, is between resources an organization chooses to expend in response to a challenged policy and burdens the policy imposes on activities that the organization already conducts. Expenditures on advocacy, education, or litigation undertaken in response to government action generally do not themselves establish standing. *See, e.g.*, *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 24–28 (D.C. Cir. 2011); *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018); *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1207–08 (D.C. Cir. 2020). By contrast, when government action directly impedes an organization's preexisting activities, the resulting "substantial, tangible costs" may constitute an injury to the organization itself. *See, e.g.*, *Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 46–48 (D.D.C. 2020) (internal citation omitted); *see also Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 40–41 (D.D.C. 2020).

ImmDef asserts two different but related theories of injury. First, it claims that the heightened sponsor requirements disqualify previously-eligible sponsors, thus prolonging time in ORR custody for unaccompanied children who would otherwise be released. As a result, it claims, ImmDef has to take on more detained clients for longer periods of time, which requires more time and resources. Compl. ¶ 100. Second, it claims that the IFR chills potential guardians from coming forward to sponsor children in ORR custody, which likewise contributes to longer periods in ORR custody for more detained children. Second Am. Compl. ¶ 68.

*i. Sponsor Requirements*

The uptick in children held in ORR custody for longer periods of time "directly affect[s] and interfere[s] with" ImmDef's "core business activities"—that is, providing legal representation to unaccompanied alien children. *Ctr. for Taxpayer Rts.*, slip op. at 12; *see* Compl. ¶ 100. And ImmDef "diverted its resources to continue pursuing those activities." *Id.* The policies at issue

allegedly prolong children's time in ORR custody, increasing the proportion of ImmDef's clients on the more resource-intensive detained docket from 44% to 84%. *Id.* ¶¶ 101–02; Felix Decl. ¶ 12, Dkt. 10-15; Pls.' Separate Stmt. of Undisp. Mat'l Facts ¶¶ 218–20, 239. Detained cases require additional attorney time, and the resulting reduction in available sponsors has increased the number of clients pursuing alternatives to release to sponsors that require additional resources, which in turn require additional representation. Pls.' Separate Stmt. of Undisp. Mat'l Facts ¶¶ 218–34, 239. Those burdens have ultimately forced ImmDef "to close client intake, preventing the organization from representing children it [previously] would have." *Id.* ¶ 221.

And providing legal services to unaccompanied children is not an activity ImmDef undertook to oppose the challenged policies; it predates them. Compl. ¶ 100. Those injuries thus constitute concrete burdens on the ImmDef's existing legal-services activities, not expenditures voluntarily undertaken to oppose government policy. *See Nw. Immigrant Rts. Project*, 496 F. Supp. 3d at 46–48; *Las Ams.*, 783 F. Supp. 3d at 217. Accordingly, the challenged polices have "directly affected and interfered with" the organization's core activities in a manner sufficient to establish an injury in fact to support ImmDef's standing. *All. for Hippocratic Med.*, 602 U.S. at 395.

The remaining standing requirements follow readily as to the requirements for sponsors. ImmDef attributes its increased detained caseload and attendant resource burdens to the challenged sponsor requirements and the reduced availability of sponsors they allegedly produce. Compl. ¶ 100; *see Ctr. for Taxpayer Rts.*, slip op. at 10 ("[C]ausation is shown where new activities, not previously part of the organization's normal annual expenditures, became necessary in response to the injury, causing a drain on the organization's resources.") (internal quotation marks omitted).

An order setting aside the requirements would alleviate those burdens. The organization therefore has standing to pursue its claims as to the sponsor requirements.

*ii. Interim Final Rule*

But ImmDef's challenge to the March 2025 Interim Final Rule, which rescinded 45 C.F.R. § 410.1201(b) is blocked by two related justiciability doctrines. One is standing, as ImmDef's theory runs into imminence, causation, and redressability problems. The other is ripeness, which "forbids federal courts to adjudicate disputes that are dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. California*, 609 U.S. ___, slip op. at 3 (2026) (quoting *Trump v. New York*, 592 U. S. 125, 131 (2020) (per curiam)) (internal quotation marks omitted).

ImmDef cannot fairly trace its increased caseload to the IFR on this record. The IFR lifted three related restrictions on ORR's consideration and use of a potential sponsor's immigration status, prohibiting ORR from (1) disqualifying a potential sponsor "solely based on their immigration status"; (2) collecting immigration-status information "for law enforcement or immigration enforcement related purposes"; and (3) sharing such information with "any law enforcement or immigration enforcement related entity at any time." 45 C.F.R. § 410.1201(b) (2024); 90 Fed. Reg. 13554, 13554–56 (Mar. 25, 2025). ImmDef's theory of causation appears to be that, by lifting these restrictions, ORR has chilled potential guardians from coming forward to sponsor children in its custody, out of fear that doing so could expose them to immigration enforcement. Second Am. Compl. ¶ 68. But the agency action challenged here—that is, ORR's decision to remove regulatory restrictions on its treatment of sponsor immigration-status

information—excised only statements of policy. *Cf. Chem. Mfrs. Ass'n v. E.P.A.*, 26 F. Supp. 2d 180, 186 (D.D.C. 1998) (concluding that a policy in which an agency does not bind itself or bear on the rights of private parties does not meet the second prong of *Bennett*). By rescinding policy statements that ORR shall not collect or share immigration-status information, ORR has not committed to doing so. Nor has ImmDef alleged otherwise.

Alternatively, ImmDef alleges that, combined with the new sponsor requirements, the IFR effectively disqualifies sponsors based on immigration status because the new requirements are designed to exclude the majority of sponsors, who "lack the requisite immigration status." Second Am. Compl. ¶ 68; *see* Pls.' Mem. Supp. of Pls.' Mot. Summ J. at 27–29. And they contend that this consequence is especially significant because the IFR simultaneously rescinded the regulation prohibiting ORR from disqualifying a sponsor "solely based on their immigration status." *Id.*; *see* 45 C.F.R. 410.1201(b)(2024).

But the identification policy does not make lawful immigration status a condition of sponsorship. It identifies documents ORR will accept as proof of identity. Some people without lawful status may nevertheless possess qualifying documents, including an employment-authorization document or, in some states, a driver's license.[1] *See* Pls.' Mem. Supp. of Pls.' Mot. Summ J. at 39; *see, e.g.*, Pls.' Stmt. of Undisp. Mat'l Facts ¶¶ 124 (California), 173 (Massachusetts); 8 C.F.R. § 274a.12 (identifying classes of noncitizens who can receive employment authorization without possessing lawful immigration status). And Category 1 sponsors (parents or legal guardians) are eligible for individualized exceptions. *See* Guide § 2.2.4.

---

[1] The plaintiff argues that, although some states allow individuals to obtain a driver's license without proof of lawful status, "they still require lawful presence to obtain a regular state identification card," *see* Dkt. 58-1, at 28 n.7, which disqualifies sponsors who cannot drive. But that refrain underscores the point: Those sponsors are not excluded because of their immigration status, but because of their status as non-drivers.

That the documentation requirements may make sponsorship more difficult for those without lawful status does not transform the identity-verification requirement into an immigration-status prerequisite.

Nor does the rescission of § 410.1201(b) change that conclusion. The Interim Final Rule removed a regulatory prohibition on certain uses of immigration-status information; it did not *require* ORR to disqualify sponsors based on their status. *See* Unaccompanied Children Program Foundational Rule, 90 Fed. Reg. at 13554–56; Defs.' Mem. Opp'n to Pls.' Mot. Summ. J. at 30. ImmDef thus asks the Court to infer from the combined effect of two policies an immigration-status criterion that neither policy expressly imposes while alleging no actual instances of a sponsor being declined based on his immigration status.

Absent allegations of actual enforcement or disqualification based on status—or even an imminent threat of either—ImmDef's theory of causation is difficult to credit. The Court would have to "speculate about how the agency would weigh" the nearly 400 comments the IFR received. *California*, 609 U.S. ___, slip op. at 7. The Court would also have to speculate about whether ORR would issue a final rule, *id.*, what that final rule would say, *id.* at 8, whether ORR might use that final rule to share immigration information with DHS or to disqualify potential sponsors, and finally, whether the shared information would in fact lead DHS to enforce immigration laws against those sponsors. That speculation necessarily rests on an "attenuated chain of inferences." *Clapper*, 568 U. S., at 414–415, n. 5. And such "speculative threat[s]" cannot support standing. *California*, 609 U.S. ___, slip op. at 9.

For many of the same reasons, ImmDef's theory poses a redressability problem. It is unclear whether ORR's consideration and use of a potential sponsor's immigration status has changed since the IFR and, indeed, existing laws and regulations suggest otherwise. "Immigration

status is not one of the many enumerated factors that ORR must consider when determining sponsor suitability, either by statute, *see* 8 U.S.C. § 1232(c)(3)(A), . . . or regulation," *see* 45 C.F.R. § 410.1202, and "no provision within the Policy Guide explicitly permits ORR to disqualify potential sponsors solely based on their immigration status." Defs.' Mem. Opp'n to Pls.' Mot. Summ. J. at 30, Dkt. 72. Even if HHS wants to share immigration status information to advance immigration enforcement, it cannot: In the same month the IFR was promulgated, Congress conditioned DHS's appropriations such that none of its funding may be used "to place in detention, remove, refer for a decision whether to initiate removal proceedings, or initiate removal proceedings against a sponsor, potential sponsor, or member of a household of a sponsor or potential sponsor of [UAC] based on information shared by the Secretary of [HHS]." Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, div. D, title II, § 216(a), 133 Stat. 2317, 2513 (Dec. 20, 2019); *see* Full Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, title I, § 1101(a)(6), 139 Stat. 9, 10-11 (Mar. 15, 2025) (adopting rider in 2020 Consolidated Appropriations Act); Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, div. A, § 101(a) (Nov. 12, 2025) (adopting rider in 2020 Consolidated Appropriations Act by adopting that same rider in the Continuing Appropriations and Extensions Act, 2025). Accordingly, even assuming that the IFR has the effect that ImmDef claims, it is unclear that setting it aside would change the state of affairs at all.

Relatedly, ImmDef's claim is not ripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur." *Texas v. United States*, 523 U.S. 296, 300 (1998). The "ripeness doctrine" thus prevents courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements … until … its effects are felt in a concrete way

by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967). Courts accordingly consider both the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149.

For many of the same reasons already described, ImmDef's challenge is not yet fit for judicial resolution. The present record does not establish whether ORR will start sharing sponsors' immigration information with DHS, whether it will share information about ImmDef or its clients, or whether any such sharing will result in heightened immigration enforcement against sponsors. Nor does it allege any instances of a sponsor being disqualified because of his immigration status. Each link in that chain thus depends on future events that might not occur. And, because the legality of ORR's rescission likely turns on those facts, that uncertainty militates against finding the dispute ripe for judicial review.

As for hardship, the relevant inquiry focuses on the hardship to the party seeking judicial review. *See Abbot Laby's v. Gardner*, 387 U.S. at 149. The unaccompanied children in ORR custody may of course experience hardship from remaining in custody while their sponsors satisfy the heightened sponsorship requirements. And, as discussed, those children's extended periods in custody might continue to sap ImmDef's resources. But "a discretionary agency position is often best postponed to a specific application of the position." *See Office of Communication of United Church of Christ v. FCC*, 826 F.2d 101, 104 (D.C. Cir. 1987). Especially where, as here, the organizational plaintiff has not established a cognizable injury sufficient for Article III standing, withholding review pending a more concrete application of the challenged requirements imposes comparatively limited hardship on that plaintiff, since it can still seek review should its concerns come to fruition. *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427–28 (D.C. Cir. 1996).

Adjudicating ImmDef's challenge now would require the Court to fill in the blanks and evaluate the consequences of an agency action before those consequences have taken concrete form. The challenge to the IFR is thus not ripe.

2. *Individual Plaintiffs*

The individual plaintiffs run into the same barriers. They too claim that the IFR chills available sponsors, thus contributing to prolonged periods in ORR custody. *See* Second Am. Compl. ¶ 68. Although being held in ORR custody for a prolonged period qualifies as an injury in fact, *see* PI Opinion, on this record, that injury is neither fairly traceable to the IFR, nor is it likely to be redressed by setting the rule aside. Thus, for these same reasons, the individual plaintiffs' claims also are not ripe.

3. *Class Certification*

If no named plaintiff can establish standing to challenge the IFR, the class cannot either. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). Alternatively, if no member of the class has a ripe claim, class certification cannot cure that defect. *See id.* Any class would thus lack standing to challenge the IFR.

Because the Court concludes that the organizational plaintiff has standing to challenge the sponsor requirements—and thus provides the Court jurisdiction to reach the merits of that challenge—the Court need not address whether the individual plaintiffs, or the putative class, have standing to challenge those requirements. *See Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*, No. 26-5123, slip op. at 30–31 (D.C. Cir. Aug. 7, 2026); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[O]ne party with standing is sufficient to satisfy Article III's case-or-controversy requirement."). It also need not make a final determination as to whether it should certify an equitable class in order to evaluate the merits. *See* Cert. Mot. at

25, Dkt. 9-1 (motion for provisional certification); Mem. Op. 19 ("Conscious of its authority to "alter[] or amend[]" the certification before adjudication on the merits, *see R.I.L-R.*, 80 F. Supp. 3d at 179–80, the Court will certify a class."). "The question of whether to allow a suit to proceed as a class action is one primarily for the determination of the trial judge," *Bermudez v. U.S. Dep't of Agr.*, 490 F.2d 718, 725 (D.C. Cir. 1973), who has "broad discretion in deciding whether to permit a case to proceed as a class action," *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994). "It is not uncommon for courts to deny class certification on the basis that certification is not needed when the particular facts and circumstances of the case warrant doing so." *Gomez v. Trump*, 485 F. Supp. 3d 145, 204 (D.D.C.) (internal quotation marks omitted). A common reason for declining to certify a class is where, as here, there is "nothing left to achieve by certifying the class and doing so would only needlessly burden [the] litigation." *Id.*

Finally, the relief the Court will grant to ImmDef, *see infra*, necessarily produces the same result that any putative class could achieve. The Court thus denies without prejudice the plaintiffs' requests for class certification.

**B. Merits Claims**

ImmDef also challenges the sponsor requirements in their own right as an agency action subject to APA review. Only final agency actions can be challenged under APA. Although finality is not jurisdictional, "there is no doubt that [plaintiffs] would lack a cause of action under the APA" without it. *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003). For an action to be "final" and subject to review under the APA, the action must mark consummation of agency's decision-making process, rather than merely be tentative or interlocutory in nature, and the action must be one by which rights or obligations have been

determined or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

A court must set aside any final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under that standard is deferential, but an agency must still "examine the relevant data and articulate a satisfactory explanation for its action," including "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or supplied an explanation "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

This standard of review does not permit a court to substitute its judgment for the agency's. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Nor must an agency "consider all policy alternatives in reaching [its] decision," *State Farm*, 463 U.S. at 51, or explore "every alternative device and thought conceivable by the mind of man," *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,, 435 U.S. 519, 551 (1978). But the agency must reasonably consider the relevant issues and explain the path it took. *See Prometheus Radio*, 592 U.S. at 423.

ORR operates under statutory directives that pull in more than one direction. It generally must place an unaccompanied child "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). At the same time, Congress has directed HHS to "establish policies and programs to ensure that unaccompanied alien children in the United States are

protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity." *Id.* § 1232(c)(1); 6 U.S.C. § 279(b)(2)(A)(ii).

The challenged policies reflect ORR's effort to balance those obligations. The Court's task is not to decide how it would have struck that balance. It asks only whether ORR considered the relevant factors and reasonably explained the choices it made. *See Prometheus Radio*, 592 U.S. at 423. With those considerations in mind, the Court turns toward ORR's identification and proof-of-income requirements.

*1. Identification and Income Requirements*

Plaintiffs argue that the identification and income-verification requirements implemented as part of ORR's Policy Guide violate ORR's rescinded regulatory obligations and the TVPRA, conflict with ORR's statutory obligation to place children with sponsors without "unnecessary delay," and are arbitrary and capricious under the APA. *See* Pls.' Mem. Supp. of Pls.' Mot. Summ. J. at 27, Dkt. 58-1. The Court disagrees.

*i. Final Agency Action*

To start, the identification and income requirements are final agency actions. ORR is presently applying the requirements, and in doing so adopts a settled position regarding what documentation sponsors and household members must provide. It also asks potential sponsors to provide that information, creating an obligation. And the requirements impose legal consequences: Sponsors must satisfy the requirements to proceed through the reunification process, and their failure to provide required documentation can prevent or delay a child's release from custody. Because the requirements reflect the consummation of the agency's decisionmaking process, determine "rights or obligations," and create "legal consequences," they constitute final agency action. *See Bennett*, 520 U.S. at 177–78.

*ii. The Sponsor Requirements Do Not Violate Governing Law*

ORR adequately explained its decision to strengthen the identification requirements for potential sponsors. The new requirements primarily serve to protect unaccompanied children from traffickers or other individuals seeking to exploit or harm such children through criminal, harmful, or exploitative activities. Defs.' Separate Stmt. of Undisp. Mat'l Facts ¶ 290; *see* § 1232(c)(1). In line with that goal, the revised identity requirements narrowed the forms of documentation that potential sponsors could use to establish their identities, including by eliminating foreign passports unless accompanied by an immigrant visa or employment authorization. Pls.' Ex. 1-C, at 6, Dkt. 10-7. ORR explained that it had encountered difficulty authenticating foreign documents within the time available for sponsor review and had identified widespread use of fraudulent documents in sponsor applications. Defs.' Stmt. of Undisp. Mat'l Facts ¶ 292–93; Biswas Memo. at 3, Dkt. 21-4; Biswas Decl. ¶¶ 14–15. It therefore selected a narrower set of documents that it considered more readily verifiable, and which included photographs, drawing in part on the documents accepted by United States Citizenship and Immigration Services in the Form I-9 context, which identifies what documents are necessary to determine one's employment eligibility. Defs.' Stmt. of Undisp. Mat'l Facts ¶ 292; U.S. Citizenship and Immigr. Servs., *Form I-9 Acceptable Documents*, https://www.uscis.gov/i-9-central/form-i-9-acceptable-documents (last updated Nov. 19, 2025). Using an existing federal framework for documents commonly accepted to reliably verify identity provided ORR with an administrable means of addressing the authentication problems it had identified.

The administrative record provides a substantial basis for ORR's decision to impose stricter requirements. The Integrity and Accountability Team identified serious instances of fraud in the sponsor-application process. Defs.' Stmt. of Undisp. Mat'l Facts ¶ 295. Potential sponsors had

submitted altered photographs and documents to establish their identities or relationships to children, sometimes in applications to sponsor multiple children. *Id.*; Harper Memo. at 3–4. In one instance, a woman and her partner submitted false documents in attempts to sponsor fifteen children over five years, and at least seven of those attempts succeeded. Harper Memo. at 6. ORR field staff likewise reported increasing instances of sponsor and age fraud and recommended stricter document-verification procedures. *Id.* at 5. And the Team concluded that ORR's emphasis on reducing the average length of care had permitted "only a cursory review of sponsor applications," with "very few enhanced safety measures like fingerprinting, home studies, and DNA testing." *Id.* at 8–9. Those findings directly implicated ORR's statutory responsibility to protect children from trafficking and exploitation. *See* 6 U.S.C. § 279(b)(2)(A)(ii); 8 U.S.C. § 1232(c)(1). ORR thus had ample reason to conclude that its existing verification procedures were inadequate.

ImmDef raises several objections to ORR's new policy despite the administrative record. *First*, it argues that the new documentation requirements unnecessarily delay children's release to sponsors, in violation of the TVPRA and ORR's statutory obligation to "promptly place[]" unaccompanied children "in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A); *see* Pls.' Mem. Supp. of Pls.' Mot. Summ. J. at 27–28, "without unnecessary delay," 45 C.F.R. § 410.1201(a). ORR's Foundational Rule also requires the agency to prioritize close relatives over more distant relatives or nonrelatives. Pls.' Mem. Supp. of Pls.' Mot. Summ. J. at 29; 45 C.F.R. § 410.1201(a).

But the new identification requirements do not invert that priority, as ImmDef claims. Pls.' Mem. Supp. of Pls.' Mot. Summ. J. at 30. ImmDef does not identify any instance in which ORR selected an otherwise-eligible non-parent over an otherwise-eligible parent because of the new

requirements. Even where the documentation requirements might burden a parent seeking sponsorship, ORR provides an alternative means of establishing identity that mitigates that burden. *See* Guide § 2.2.4.

To be sure, the new requirements have created delays in the release of unaccompanied children from ORR custody. But delay is not necessarily unnecessary delay. ORR must retain custody of unaccompanied children until it can adequately vet and approve their sponsors. *See* 8 U.S.C. § 1232(c)(3)(A) ("[A]n unaccompanied alien child may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being."). And determining what information is necessary to accomplish that task requires the agency to balance the interest in prompt reunification against its obligation to ensure safe placement. So long as the challenged requirements reasonably further that statutory responsibility, the additional time required to satisfy them does not, without more, establish that ORR has violated its obligation to avoid unnecessary delay. *See Diego N. v. U.S. Dep't of Health & Hum. Servs.*, No. 1:26-cv-00577, slip op. at 19–20 (D.D.C. Apr. 30, 2026) (concluding that, although certain restrictions on re-referred unaccompanied children may favor ORR's child-protection obligation at the expense of prompt placement, balancing those competing statutory obligations is within the agency's authority).

*Second*, ImmDef argues that the identification requirement is arbitrary and capricious because ORR "entirely failed to consider . . . important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, including the impact on children's mental health and length in custody and sponsors' "legitimate reliance on" prior policies, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks omitted); *see* Pls.' Mem. Supp. of Pls.' Mot. Summ. J. at 31, 42–43; Pls.'

Separate Stmt. of Undisp. Undisputed Mat'l Facts ¶¶ 36, 37, 105, 108. It emphasizes that ORR applied the new requirements to sponsorship applications already underway, including applications involving sponsors who could have qualified under the prior requirements. *See* First Am. Complaint ¶ 83; Defs.' Answer to First Am. Compl. ¶ 83, Dkt. 53; Rosa M. Decl. ¶ 8, Dkt. 9-13; Ximena L. Decl. ¶ 10; Pls.' Separate Stmt. of Undisp. Mat'l Facts ¶ 184.

Those circumstances demonstrate that the policy change had real consequences. And at the preliminary injunction stage, this Court remedied that issue as to a subset of minors who entered custody without notice that the sponsor-documentation requirements would change—all of whom have since been released. *See* First Am. Compl., ¶¶ 17–19; Order Granting Prelim. Inj. and Class Cert.; PI Opinion at 19–22. Even so, ImmDef does not establish that, as to the remaining minors, ORR entirely ignored the possibility of reliance on its existing procedures. ORR's memoranda expressly recognized that the change would affect potential sponsors and children who had proceeded under the existing system. Harper Memo. at 11; Biswas Memo. at 5. It nonetheless determined that the safety concerns identified through its investigation warranted changing the requirements without a transition period.

Nor does ImmDef successfully argue that ORR failed to consider the impact of the new requirements on detention time. ORR recognized that some stakeholders would express concern over possible delays. Defs.' Stmt. of Undisp. Mat'l Facts ¶ 302. And it noted that those stakeholders would worry about family unity. *Id.* It made those observations against the backdrop of its foundational requirements: ORR is still required to make and record prompt and continuous efforts toward family unification and children's release, 45 C.F.R. § 410.1203(a); and when a potential sponsor is identified, ORR must explain to both the child and the potential sponsor the requirements and procedures for release, *id.* § 410.1203(b). ORR thus considered concerns about

prolonged detention in light of its obligation to quickly release detained children and settled on the new requirements despite these concerns.

To be sure, an agency must identify significant reliance interests and weigh them against its competing policy concerns. *See Regents*, 591 U.S. at 33. But ORR identified the relevant disruption and chose to prioritize more reliable sponsor verification. Plus, unlike the plaintiffs before the Court at the time of the preliminary injunction motion, the newly named plaintiffs entered (or re-entered) custody well after the new requirements took effect. They, and by consequence ImmDef, therefore benefitted from notice that the earlier plaintiffs lacked at the preliminary stage. On this record, the Court cannot substitute a different balance for the one the agency struck.

*Finally*, ImmDef argues that ORR was required to promulgate the new proof-of-identity and proof-of-income requirements through notice-and-comment rulemaking. *See* Pls.' Mot. for Summ. J. 39–40; Pls.' Reply 34. The Court disagrees. The APA exempts from notice and comment "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). A rule is procedural where it does not itself "alter the rights or interests of parties," even if it changes "the manner in which the parties present themselves or their viewpoints to the agency." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quoting *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000)). That is the case here. The TVPRA and ORR's regulations already require the agency to assess sponsor suitability, including by verifying a sponsor's identity and, where appropriate, employment, income, or other information bearing on the sponsor's ability to support the child. *See* 8 U.S.C. § 1232(c)(3)(A); 45 C.F.R. § 410.1202(b)–(c). The Policy Guide updates do not alter those substantive criteria; they specify the forms of documentation through which sponsors may establish them. Although those requirements may

make it more difficult for some sponsors to complete the process, that practical consequence does not transform an otherwise procedural rule into a legislative one. *See Nat'l Mining Ass'n*, 758 F.3d at 250. ORR therefore was not required to use notice-and-comment rulemaking before issuing the challenged Guide updates.

More fundamentally, ImmDef's arguments do not undermine ORR's stated justification for the income and identification requirements. ORR was required to consider the burdens associated with stricter verification, and the record shows that it did. ORR recognized that enhanced vetting could delay release and that restricting acceptable identification could disadvantage some potential sponsors. Harper Memo. at 9; Biswas Memo. at 5. It nevertheless concluded that more reliable identity and income verification was warranted given the documented instances of fraud and the resulting risks to children. Even if the Court might reach a different conclusion than the agency in the first instance, the APA does not authorize the Court to reweigh those competing considerations. *See Prometheus Radio*, 592 U.S. at 423. The identity- and income-verification requirements thus survive arbitrary-and-capricious review.

### C. Paperwork Reduction Act

Separately, ImmDef brings a claim under the Paperwork Reduction Act (PRA). They contend that, between March 2025 and February 2026, ORR imposed its new identification and proof-of-income requirements without obtaining the required approval from the Office of Management and Budget (OMB). Pls.' Suppl. Separate Stmt. of Undisp. Mat'l Facts ¶ 375. And although OMB approved a revised Sponsor Application Packet in February 2026, ImmDef asserts that ORR continues to use the prior, unapproved version. *Id.* ¶¶ 376–78.

The difference between the two versions bears directly on the challenged proof-of-income requirements. The OMB-approved form permits sponsors to establish income through, among

other things, a recent bank statement, an Affidavit of Financial Support, or documentation of income from assets or public assistance. *Id.* The form ORR allegedly continues to use does not permit sponsors to rely on those forms of documentation. *Id.* ImmDef therefore contends that ORR continues to impose information-collection requirements that OMB has not approved. Unlike their arbitrary-and-capricious claims, this claim does not turn on whether ORR reasonably concluded that stricter sponsor vetting would protect children. It turns instead on whether ORR adhered to separate procedures that Congress prescribed before an agency may collect information from the public.

The PRA provides that an agency shall not "conduct or sponsor the collection of information" unless, before adopting or revising the collection, it satisfies specified procedural requirements. 44 U.S.C. § 3507(a). Among other things, the agency must publish notice of the proposed collection, provide an opportunity for public comment, obtain approval from the Office of Management and Budget (OMB), and secure an OMB control number. *See id.* §§ 3506(c), 3507(a). A "collection of information" includes identical questions or reporting requirements imposed on ten or more persons. *Id.* § 3502(3)(A)(i).

The challenged information requirements fall within that definition, and the difference between the approved and unapproved forms is material. The OMB-approved form permits sponsors to establish income through, among other things, a recent bank statement, an affidavit of financial support, or documentation of income from assets or public assistance. *See* Defs. Ex. A at 8–9, Dkt. 91-1. The prior, unapproved form that ORR continues to use does not permit sponsors to rely on those forms of documentation. Pls.' Suppl. Separate Stmt. of Undisp. Mat'l Facts ¶¶ 376–78. ORR therefore not only began collecting information before obtaining OMB approval; it

continues to impose a collection materially different from the collection OMB ultimately approved.

The defendants do not dispute that ORR was required to comply with the PRA. They instead argue that ImmDef cannot enforce those requirements in this action because the PRA does not create a private cause of action, or because the ImmDef lacks standing to sue under it. *See* Defs.' Mem. Supp. of Defs'. Cross-Mot. Summ. J. at 23, Dkt. 71. But ImmDef does not invoke a cause of action under the PRA. They invoke the APA. *Id.*

The PRA does not itself create a general private cause of action. It instead includes a "public protection" provision under which "no person shall be subject to any penalty" for failing to comply with an information collection that lacks a valid OMB control number or otherwise fails to provide the required notice. 44 U.S.C. § 3512(a). That protection may be raised "in the form of a complete defense, bar, or otherwise" in an agency or judicial proceeding. *Id.* § 3512(b).

The APA, however, generally authorizes a person adversely affected by final agency action to obtain judicial review and directs courts to set aside agency action that is "not in accordance with law" or adopted "without observance of procedure required by law." 5 U.S.C. §§ 702, 704, 706(2)(A), (D). The absence of a cause of action in the statute allegedly violated does not by itself foreclose APA review. *See Trudeau v. FTC*, 456 F.3d 178, 188 (D.C. Cir. 2006) (explaining that the APA "supplies a generic cause of action in favor of persons aggrieved by agency action"). Instead, the APA's cause of action remains available unless another statute precludes judicial review. 5 U.S.C. §701(a)(1). There is a "strong presumption that Congress intends judicial review of administrative action," which may be overcome only by clear evidence of contrary congressional intent. *Steele v. United States*, 144 F.4th 316, 322 (D.C. Cir. 2025) (quoting *Amador Cnty. v. Salazar*, 640 F.3d 373, 379–80 (D.C. Cir. 2011)). Nothing in the PRA demonstrates that

Congress displaced that ordinary avenue of review here. To the contrary, the PRA expressly precludes judicial review in a particular circumstance: a "decision by the Director [of OMB] to approve or not act upon a collection of information contained in an agency rule shall not be subject to judicial review." 44 U.S.C. § 3507(d)(6). The D.C. Circuit recently construed that provision narrowly in *Steele v. United States*. As *Steele* explained, § 3507(d)(6) protects the OMB Director's decision whether to approve a collection; it does not broadly insulate agency conduct involving information collections from judicial review. 144 F.4th at 322–24.

In *Steele*, the court cautioned against allowing parties to evade the PRA's limits by recasting PRA objections as challenges under another statute. *Id.* at 323–24. But ImmDef does not challenge an OMB approval that § 3507(d)(6) places beyond judicial review. Before February 2026, there was no OMB approval to review. And after February 2026, ImmDef does not ask the Court to second-guess the collection OMB approved; it alleges that ORR continues to impose a materially different collection that OMB did not approve. Section 3507(d)(6) does not by its terms preclude either challenge.

Nor does § 3512, which allows a person to invoke an agency's PRA noncompliance defensively, establish that its protection against penalties is the exclusive remedy for such noncompliance. Congress expressly barred judicial review of specified OMB decisions in § 3507(d)(6), yet imposed no comparable limitation on review of an agency's antecedent obligation to obtain approval before conducting a collection. Against the background presumption favoring judicial review, the Court will not infer a restriction on its review merely because Congress also provided an additional defense to persons asked to comply with an unlawful collection. *See Steele*, 144 F.4th at 322–24; *Amador Cnty. v.* , *Salazar*, 640 F.3d 373, 379–80 (D.C. Cir. 2011); *Lawfare Inst. v. U.S. Dep't of State*, No. 26-cv-798, 2026 WL 2568788, at *12 (D.D.C. Aug. 31, 2026)

(recognizing that the APA "supplies a generic cause of action in favor of persons aggrieved by agency action" like failure to adhere to the PRA). ImmDef may thus pursue its PRA claims through the APA.

And ImmDef has standing to bring the claim for the same reason it has standing to challenge the requirements in the first instance. The form used by ORR imposes more stringent requirements than the unapproved one currently in use. *See* Pls.' Suppl. Separate Stmt. of Undisp. Mat'l Facts ¶¶ 375–78. Those heightened requirements, as explained, can contribute to longer periods in ORR custody for unaccompanied children and a heavier burden for ImmDef while it represents them. ImmDef therefore has standing.

On the present record, ImmDef's APA claim succeeds. Section 3507(a) provides that an agency "shall not conduct or sponsor the collection of information" unless it has satisfied the PRA's requirements "in advance of the adoption or revision of the collection of information." 44 U.S.C. § 3507(a). ORR revised its sponsor information requirements in March and April 2025 but did not obtain OMB approval for the revised Sponsor Application Packet until February 2026. Pls.' Suppl. Separate Stmt. of Undisp. Mat'l Facts ¶¶ 375–76.

Nor does the February 2026 approval resolve ImmDef's challenge to ORR's current conduct. OMB approved a form that permits sponsors to submit categories of financial documentation that the form ORR allegedly continues to use does not accept. *Id.* ¶¶ 376–78. An agency cannot satisfy § 3507(a) by obtaining approval for one collection while continuing to impose a materially different one. *See* 44 U.S.C. § 3507(a). Thus, to the extent ORR continues to require information under the superseded Sponsor Application Packet rather than the collection approved by OMB, that collection likewise has not received the approval the PRA requires.

The defect here is procedural. As explained above, ORR reasonably concluded that stricter identity and income verification would further its statutory responsibility to protect children from fraud, trafficking, and exploitation. But Congress required ORR to obtain OMB approval before adopting or revising the information collection through which it implemented those policies. Because ORR did not do so, its use of the unapproved information collection was "not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). More troubling still, the agency continues to use this unapproved collection even though an approved form exists and is available for precisely this purpose.

**D. Remedies**

The Court concludes that remand without vacatur is the proper avenue for addressing this PRA violation. That is, it remands ORR's information-collection practices without vacating them. Although vacatur is the ordinary remedy for unlawful agency action, *see Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014), the D.C. Circuit permits remand without vacatur when the circumstances warrant it, *see, e.g.*, *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). Whether to vacate depends principally on "the seriousness of the order's deficiencies" and "the disruptive consequences of an interim change that may itself be changed." *Id.* (internal quotation marks omitted); *see Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013).

Both considerations favor remand without vacatur here. First, the PRA defect does not cast substantial doubt on the substantive policies ORR adopted. The Court has concluded that ORR reasonably explained both its decision to require more reliable identification and its decision to verify potential sponsors' financial capacity. The PRA violation, for its part, concerns only the manner by which ORR implemented those policies through collections of information.

The nature of the asserted deficiency does not warrant vacatur because it can be remedied without requiring the agency to abandon the challenged requirements if it begins to use the approved form. *See Black Oak Energy, LLC v. FERC*, 725 F.3d at 244. OMB has already approved a revised Sponsor Application Packet addressing the same subjects. Pls.' Suppl. Separate Stmt. of Undisp. Mat'l Facts ¶ 376. The agency therefore need not reconsider from scratch whether identity and income verification are appropriate components of sponsor vetting. But it must bring the information collection into compliance with the PRA, either by using the collection OMB has approved or by obtaining approval for any materially different collection it wishes to use. That is a readily identifiable defect that ORR can cure on remand. *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) (explaining that remand without vacatur may be appropriate when an agency can readily cure the identified defect).

Second, vacatur would risk significant disruption to ORR's administration of the sponsor-placement process. The identification and proof-of-income requirements form part of ORR's system for determining whether potential sponsors can safely receive children in federal custody. Vacating those requirements while ORR completes the required PRA process could require the agency either to revert to superseded vetting procedures or to conduct sponsor review without information that ORR reasonably determined bears on identity, financial capacity, and the risk of trafficking or exploitation. Given ORR's statutory responsibility to protect children from those risks, *see* 6 U.S.C. § 279(b)(2)(A)(ii); 8 U.S.C. § 1232(c)(1), that interim disruption weighs heavily against vacatur, *see, e.g.*, *Healthy Gulf v. FERC*, 107 F.4th 1033, 1047 (D.C. Cir. 2024) (remanding without vacatur where vacatur would "needlessly disrupt" ongoing activity); *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1332 (D.C. Cir. 2021) (same); *Black*

*Oak Energy*, 725 F.3d at 244 (preserving the status quo where vacatur would impose significant disruption).

Remand without vacatur is especially appropriate because the Court does not hold that ORR may continue indefinitely to impose a collection that the PRA forbids. "[R]emand without vacatur" is not "an invitation to do nothing." *Black Oak Energy*, 725 F.3d at 244. On remand, ORR must conform its information collection to the one OMB has approved or promptly obtain the approval required by the PRA for any materially different collection it wishes to use. The Court simply declines, while ORR takes one of these steps, to vacate substantively reasonable sponsor-vetting requirements and thereby disrupt the system Congress charged ORR with administering.

The Court therefore remands the identification and proof-of-income information collections to ORR without vacatur to take prompt action consistent with this opinion.

**CONCLUSION**

For the above reasons, the plaintiffs' Motion for Summary Judgment, Dkt. 58, is granted in part and denied in part. And the defendants' Cross-Motion for Summary Judgment, Dkt. 71, is granted in part and denied in part. A separate order consistent with this decision accompanies this memorandum opinion.

Dabney L. Friedrich

DABNEY L. FRIEDRICH
United States District Judge

October 30, 2026